UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                               )
KATHLEEN A. BREEN et al.,      )
                               )
     Plaintiffs,               )
                               )
          v.                   )    Civil Action No. 05-654 (RWR)
                               )
NORMAN Y. MINETA et al.        )
                               )
     Defendants.               )
                               )
```

### MEMORANDUM OPINION AND ORDER

Unless enjoined, the Federal Aviation Administration ("FAA")
will outsource its flight service ("FS") effective October 4,
2005.  The FS is currently staffed by approximately 1,935
specially trained – – and by all accounts, very dedicated and
skilled – – air traffic control specialists in approximately 60
FS stations.  Approximately 92 percent, or about 1,770, of the
1,935 FS specialists are at least 40 years of age, and a little
more than half of those are plaintiffs here.[1]  Plaintiffs allege
age discrimination by the FAA and its parent agency, the
Department of Transportation ("DOT"), and seek to enjoin them
from proceeding with the outsourcing plan.  Defendants oppose the
motion for injunction, arguing that plaintiffs cannot show
irreparable harm and are not likely to succeed on the merits of
the age discrimination claim.  Because plaintiffs are not likely

---

[1]  The 834 original plaintiffs have filed a motion, still
pending, to add some 80 more plaintiffs.

-2-

to succeed on the merits of their age discrimination claim and have not identified legally cognizable harm that is irreparable, plaintiffs' motion for preliminary injunction will be denied.

BACKGROUND

The primary function of the FS specialists is to provide weather and flight information to general aviation pilots, i.e., non-commercial, non-charter pilots.  They also coordinate flight plans, provide assistance to pilots who are lost or disoriented and initiate search and rescue activities as needed.  Since at least 1996, the DOT's Inspector General and others have concluded on the basis of audits and studies that the FAA could realize substantial savings without compromising services by using advanced technology to reduce the number of FS stations and specialists.

The Federal Activities Inventory Reform Act of 1998, Pub. L. No. 105-270, § 2, 112 Stat. 2382 (reprinted at 31 U.S.C. § 501 note) ("FAIR Act"), requires federal agencies to categorize activities performed by its personnel as either commercial or inherently governmental.  The latter is restricted to those activities that are "so intimately related to the public interest as to require performance by Federal Government employees," which are further defined as those "activities that require either the exercise of discretion in applying Federal Government authority or the making of value judgments in making decisions for the

-3-

Federal Government, including judgments relating to monetary transactions and entitlements." FAIR Act § 5(2). In early 2002, the FAA determined that the FS services are commercial in nature, not inherently governmental. A subsequent feasibility study conducted by Grant Thorton, LLP concluded that the services could be competitively outsourced without compromising safety. Consequently, the FAA selected the FS function for competitive outsourcing. The National Association of Air Traffic Specialists, an organization currently headed by Kathleen Breen, lead plaintiff in this action, challenged the categorization of their function as commercial, but the FAA denied the challenge and the DOT affirmed the FAA's decision.

In December 2003, the FAA received five proposals in response to its solicitation, one of which was an in-house proposal from FAA employees. Working in teams, ten evaluators with cost expertise and 50 evaluators with technical expertise contributed to evaluating the proposals and submitted recommendations to the FAA's Source Selection Authority. The Source Selection Authority selected one proposal, Lockheed Martin's, on the basis of a blind review of all the proposals and the teams' evaluation reports. The proposals from both Lockheed and the FAA employees envisioned a major consolidation of FS stations and concomitant reduction in the number of stations and

-4-

specialist positions.[2]   After the award was made to Lockheed in
early 2005, the sponsors of the in-house proposal filed a contest
in which Breen intervened as agent for a majority of the directly
affected FAA employees.  Breen also filed a separate contest.  A
special master[3] appointed to consider and determine the contests
issued a lengthy decision on June 28, 2005 recommending that the
claims be rejected in their entirety.  On July 20, 2005, the FAA
Administrator adopted in full the special master's findings of
fact and recommendations.  In March 2005, while that contest was
pending, plaintiffs filed this class action complaint alleging
age discrimination.  On July 26, 2005, a few days after the FAA
Administrator, a defendant in this action, adopted the special
master's ruling, plaintiffs filed this motion for preliminary
injunction.

DISCUSSION

To justify a preliminary injunction, the movant must
demonstrate that (i) the movant is likely to succeed on the
merits of the underlying dispute, (ii) irreparable harm will

---

[2]  Both the in-house sponsors and Lockheed Martin proposed
"nearly identical transition timetables and similar
consolidations in the workforce": the Lockheed proposals would
reduce the FS to 1000 employees in 18 months, while the in-house
proposal would reduce the FS to 966 employees in 18 months.
(Mem. in Supp. of Pl.'s Application for Prelim. Inj. ("Pl.'s
Mem.") at 28.)

[3]  Edwin B. Neill, Board Judge for the General Services
Board of Contract Appeals, was appointed special master.

result absent immediate intervention of the court, (iii) any harm
to other parties that would be caused by granting the injunction
does not outweigh the equities in favor of granting the
preliminary injunction, and (iv) granting the injunction serves
the public interest.  <u>Wisc. Gas Co. v. FERC</u>, 758 F.2d 669, 673-74
(D.C. Cir. 1985); <u>Serono Labs., Inc. v. Shalala</u>, 158 F.3d 1313,
1317-18 (D.C. Cir. 1998); <u>Miami Bldg. & Constr. Trades Council v.
Sec'y of Def.</u>, 143 F. Supp. 2d 19, 23 (D.D.C 2001) (citing
cases).  These factors interrelate on a sliding scale, so that
particularly strong equities on one or some factors may balance
weak equities on another.  <u>Serono Labs.</u>, 158 F.3d at 1317-18.

     The threshold requirement among the four, however, is a
showing of some irreparable harm flowing from the injury claimed.
"'[T]he basis for injunctive relief in the federal courts has
always been irreparable harm and inadequacy of legal remedies.'"
<u>Sampson v. Murray</u>, 415 U.S. 61, 88 & n.59 (1974) (quoting <u>Beacon
Theatres, Inc. v. Westover</u>, 359 U.S. 500, 506-07 (1959)); <u>accord
Dorfmann v. Boozer</u>, 414 F.2d 1168, 1174 (D.C. Cir. 1969) (holding
that preliminary injunction is available only when there is no
adequate remedy at law); <u>Miami Bldg. & Constr. Trades</u>, 143 F.
Supp. 2d at 27 ("For the Court to grant a preliminary injunction,
plaintiffs must make some showing that irreparable harm will
result absent immediate intervention by the Court.").
Irreparable harm requires something more than having to comply

-6-

with or abide by an illegal agency decision pending the outcome

of litigation over that decision.  <u>Miami Bldg. & Constr. Trades</u>,

143 F. Supp. 2d at 27.

> The key word in this consideration is irreparable.
> Mere injuries, however substantial, in terms of money,
> time and energy necessarily expended in the absence of
> a stay, are not enough.  The possibility that adequate
> compensatory or other corrective relief will be
> available at a later date, in the ordinary course of
> litigation, weighs heavily against a claim of
> irreparable harm.

<u>Virginia Petrol. Jobbers Ass'n v. Fed. Power Comm'n</u>, 259 F.2d

921, 925 (D.C. Cir. 1958).

I.   LIKELIHOOD OF SUCCESS ON THE MERITS

Nondiscrimination on account of age in federal government

employment is governed exclusively by a specific section of the

Age Discrimination in Employment Act ("ADEA"), 28 U.S.C. § 633a

(2000).  That section requires the FAA, as a federal government

employer, to make all its personnel actions "free from any

discrimination based on age."  29 U.S.C. § 633a(a).  Plaintiffs

have advanced two ADEA claims, one premised on disparate

treatment and the second on disparate impact.

A.   <u>Disparate treatment</u>

In a disparate treatment case, a plaintiff suing under the

ADEA is required ultimately to prove that he suffered an adverse

employment decision because his employer acted with

discriminatory intent with respect to the plaintiff's age.

<u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1151, 1154-55

(D.C. Cir. 2004); Dunaway v. Int'l Bhd. of Teamsters, 310

F.3d 758, 763 (D.C. Cir. 2002).  "Clarifying the standards for

liability" in a disparate treatment case under the ADEA, Hazen

Paper Co. v. Biggins, 507 U.S. 604, 606 (1993), the Supreme Court

concluded that "there is no disparate treatment under the ADEA

when the factor motivating the employer is some feature other

than the employee's age."  Id. at 609.

> It is the very essence of age discrimination for an
> older employee to be fired because the employer
> believes that productivity and competence decline with
> old age.  . . .  Congress' promulgation of the ADEA was
> prompted by its concern that older workers were being
> deprived of employment on the basis of inaccurate and
> stigmatizing stereotypes.  . . .  Thus, the ADEA
> commands that employers are to evaluate older workers
> on their merits and not their age.  The employer cannot
> rely on age as a proxy for an employee's
> characteristics, such as productivity, but must instead
> focus on those factors directly.

Id. at 610.  When an employer's decision is wholly motivated by

factors other than age, the ADEA is not violated even if the

motivating factor is correlated with age.  Id. at 611-12.  "The

law requires the employer to ignore an employee's age . . .; it

does not specify further characteristics that an employer must

also ignore."  Id. at 612 (emphasis in the original).

A plaintiff may offer proof of his employer's discriminatory

intent either by direct or circumstantial evidence.  See Dunaway,

310 F.3d at 763.  In the absence of direct evidence, a plaintiff

may advance a disparate treatment claim using the burden shifting

framework adopted in McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973), the first step of which is presenting a prima
facie case.  See Teneyck, 365 F.3d at 1155.  If a plaintiff makes
a prima facie showing that age was an improper motivating factor
in the adverse employment decision, then the burden shifts to the
defendant to identify legitimate reasons for its action.  The
plaintiff can rebut the proffered legitimate reasons by
demonstrating that they are mere pretext.  Id. at 1151.

    To make a prima facie showing of age-based discrimination in
this case, plaintiffs must show that they are members of a
protected class (i.e., at least 40 years of age), that they are
qualified for the positions they hold, that they will be or were
disadvantaged by an employment decision, and that they are
disadvantaged in favor of substantially younger people.  See
Teneyck, 365 at 1155; see also O'Connor v. Consol. Coin Caterers
Corp., 517 U.S. 308, 313 (1996) ("In the age discrimination
context, [an inference of age discrimination] cannot be drawn
from the replacement of one worker with another worker
insignificantly younger."); Radue v. Kimberly-Clark Corp., 219
F.3d 612, 617 (7th Cir. 2000) (in an ADEA action involving a
reduction in force, plaintiff must show, among other things, that
other similarly situated employees substantially younger than
plaintiff were treated more favorably).  If plaintiffs fail to
establish that they are disadvantaged in favor of substantially
younger people who are in other meaningful respects comparable to

plaintiffs, they fail to establish a prima facie case of
discrimination.  See Dunaway, 310 F.3d at 767 (finding that in
the absence of other evidence of age discrimination, plaintiff
who had been replaced by a worker seven years younger had not
made a prima facie showing of age discrimination); Teneyck, 365
F.3d at 1155 (holding that plaintiff failed to establish a prima
facie case because she did not offer evidence to support an
inference that she was disadvantaged in favor of a younger
person); Radue, 219 F.3d at 617-619 (concluding that plaintiff
failed to show that other similarly situated employees who were
substantially younger than he were treated more favorably).

Plaintiffs do not appear likely to be able to show that the
FAA acted with discriminatory intent.  First, they have not
identified any other comparable group that was substantially
younger and was treated more favorably.  Plaintiffs assert that
the appropriate comparison group is the "2125 Air Traffic Control
series," whose average age is "approximately 45 years old."
(Hr'g Tr. at 11, 39, Sept. 1, 2005.)[4]  They make the point that
of all the 2125 positions, it is those who are older that service
general aviation pilots, and that the service to general aviation
pilots is being outsourced.  (Id. at 39.)  However, an age
difference of less than ten years is not sufficient to support a

_____

[4]  Plaintiffs' witness testified that the average age of FAA
employees as a whole is "about 47."  (Hr'g Tr. at 11.)

-10-

prima facie inference of age discrimination.  See Grosjean v.
First Energy Corp., 349 F.3d 332, 338 (6th Cir. 2003) ("The
overwhelming body of cases in most circuits has held that age
differences of less than ten years are not significant enough to
make out the fourth part of the age discrimination prima facie
case.") (collecting cases); Dunaway, 310 F.3d at 767 (seven years
not sufficient to support inference).

Second, plaintiffs have not offered any evidence that
supports a reasonable inference that the FAA made its decision
based on inaccurate stereotypical presumptions of reduced
productivity and competence of an older workforce.  In an effort
to bolster their argument that age animus played at least some
part in the FAA's decision, plaintiffs state that FAA
Administrator Marion Blakely "equated the so-called 'retirement
eligible workforce' with one that is in need of an 'upgrade.'"
(Pl.'s Mem. at 94 (quoting Ex. 51).)  In fact, Blakely's
statement does not yield the age-discriminatory interpretation
urged by plaintiffs.  What the FAA Administrator said is that

> [e]ach time one of our specialists picks up the phone,
> it costs the taxpayer an average of $25.  Nationwide
> the bill comes to over a half billion dollars a year, a
> number which includes salaries for about 2,700
> employees.  We also know that most of our automated
> flight service stations are in major need of repair.
> Almost 40 percent of flight service specialists [are]
> eligible to retire.
>
> So here's the dilemma:  how can we save money and upgrade
> our equipment and our service to you at the same time?

-11-

(Pl.'s Mem., Ex. 51 at 2.)  On its face, the Administrator's statement identifies (i) excessive costs, (ii) a need for funds to upgrade equipment, and (iii) the probability of attrition of large numbers of experienced personnel in the foreseeable future. Nothing in this statement reveals inaccurate and denigrating generalizations about age.  Plaintiffs' attempts to interpret "upgrades" and "flexibility" as references reflecting age discrimination are unreasonably strained and not capable of establishing a prima facie case of discriminatory intent.

Third, plaintiffs themselves argue and offer evidence that the FAA was motivated by a desire to save costs, and in particular, the costs of salaries and pension benefits related to its FS specialists.  Higher salaries and pension benefits are often correlated with age, but the Supreme Court has determined that an employer motivated by a factor that correlates with age does not, without more, violate the ADEA.  Hazen Paper, 507 U.S. at 612-13.

Plaintiffs called two witnesses at the hearing on their motion for preliminary injunction.  When asked why they believe the FAA acted with age bias, both responded by identifying costs correlated with age, not age-based animus, as the FAA's motivator.

> Q:  Ms. Breen, I have a final question for you and that
> is:  Are you convinced that age bias was the reason for
> this reduction in force and if so, why?

-12-

A.  Yes, I do, because they can get rid of these higher
paid controllers and go out on the street and try to
hire people in at $30- or $40,000 less a year.  What
they don't realize is the caliber of people that
they're losing.

(Hr'g Tr. at 20.)  Plaintiffs' second witness, Michael John

Sheldon, also identified cost in response to a similar question.

Q:  Do you believe that age bias was the motivating
decision behind — or the motivating reason behind the
decision to RIF [reduction in force] the Flight Service
Station Controllers?

. . .

A:  I do.

Q:  Okay.  Tell us why you believe that.

A:  The statement I heard from the Administrator, at
meetings I've attended, she's indicated that the work
force is aging . . . I'm talking about the people that
aren't retirement age at this point, 70 percent of them
are within five years of reaching an annuity.  And I
believe that the FAA's attempting to try not to have to
pay that annuity.

(Hr'g Tr. at 31-32.)  Plaintiffs' filings also reflect this

interpretation of the FAA's motivation.  Plaintiffs assert that

"by denying their pensions the opportunity to vest . . . the FAA

is able to reap a massive windfall . . . ."  (Pl.'s Mem. at 44.)

They also state that

[i]f the FAA were a private employer, its actions would
be suitable for a challenge under the ERISA, see Hazen
Paper, 507 U.S. at 604 [sic], and it is against public
policy to allow Defendants to claim the FAA's
indefensible actions are legitimate for purposes of the
ADEA.

-13-

(Pl.'s Mem. at 81.)  The unavailability of an ERISA action does
not give rise to an ADEA action, and despite plaintiffs' efforts,
they have not presented facts sufficient to warrant a conclusion
that they will be likely to show that the FAA acted with age
animus in its decision to outsource the FS.

The Supreme Court's decision in Hazen Paper controls this
case.  There, the evidence suggested that the employer had acted
to prevent an employee's pension from vesting.  507 U.S. at 607.
Here, plaintiffs have testified that they suspect the FAA of
trying to welch on its pension deal with plaintiffs.  There, the
employer had offered to retain the employee in a consulting
capacity, which would have allowed him to work but prevented his
pension from vesting.  Hazen Paper, 507 U.S. at 607.  Here,
Lockheed is required by contract to offer a position to any full-
time regular FS specialist who is affected by the outsourcing and
who applies for one of the positions outsourced to Lockheed;
furthermore, Lockheed must retain that person for a minimum of
three years.  (Def.'s Mem. at 21.)  In both cases, the evidence
supports the conclusion that cost-savings motivated the employer;
in both cases, the employers were willing to retain the services
of the plaintiffs, a fact that runs counter to a conclusion that
the employer acted on the basis of a stereotypical inaccurate
assumption of incompetence or lack of productivity.  The Court in
Hazen Paper pointedly concluded that "[o]ur holding is simply

-14-

that an employer does not violate the ADEA just by interfering

with an older employee's pension benefits that would have vested

by virtue of the employee's years of service," even though

pension benefits and years of service often correlate with age.

507 U.S. at 613.  Age animus mixed with other motives could

trigger ADEA liability, but where the motivating factors merely

correlate with age, a plaintiff cannot state a disparate

treatment claim.  Id. at 612-13.  Here, plaintiffs have offered

insufficient evidence that age animus was either the sole or one

of multiple reasons for the FAA's decision.  "[T]o the extent

that [plaintiffs] link [their] age discrimination claim to the

fact [they were nearing pension vesting] and claim[] that [the

FAA was] trying to avoid paying [their] retirement benefits,

Hazen Paper . . . is dispositive."  Dunaway, 310 F.3d at 767.

     In short, the evidence plaintiffs offer indicate that they

are not likely to succeed on the merits of their underlying

disparate treatment claim.[5]  Rather, the evidence plaintiffs

---

     [5]  Even if plaintiffs were able to make a prima facie case
of disparate treatment, it is unlikely that they could show that
the defendants' rebuttal is merely camouflage for discrimination.
The special master has already examined the challenges to the
technical and cost estimates and assumptions underlying the FAA's
decision to award the competitive sourcing contract to Lockheed
Martin.  Following his exhaustive and detailed discussion of the
dispute, he recommended that the "contests be denied in their
entirety."  Without deciding whether the special master's
determinations of factual issues would have collateral estoppel
effect in this court, a conclusion defendants urge (Def.'s Mem.
at 63-70), it is hard to imagine what defendants would offer as a
legitimate reason for the FAA's action that was not one of the

-15-

offer makes a prima facie case that cost was paramount in the
agency's decision-making.  Without more, actions designed to save
costs do not equate with age discrimination, even when those
costs are correlated with age.  See Hazen Paper, 507 U.S. at 612-
13.

    B.   Disparate impact

"Disparate impact claims arise from 'employment practices
that are facially neutral in their treatment of different groups,
but that in fact fall more harshly on one group than another and
cannot be justified by business necessity.'"  Smith v. City of
Jackson, 351 F.3d 183, 186 (5th Cir. 2003) (citation omitted).
To date, the portion of the ADEA enacted specifically to apply to
federal employers, 28 U.S.C. § 633a(a), has been interpreted to
provide a cause of action for disparate treatment only, and not
for disparate impact.  See Hazen Paper, 507 U.S. at 610 ("[W]e
have never decided whether a disparate impact theory of liability
is available under the ADEA[.]"); cf. Smith v. City of Jackson,
125 S. Ct. 1536, 1540 (2005) (plurality) (holding for the first
time that the section of the ADEA that applies only to private,
not federal, employers authorizes recovery in disparate impact
cases).

Plaintiffs advance their disparate impact claim in reliance
on Smith.  125 S. Ct. at 1540.  The decision in Smith, however,

---

issues already disputed before the special master and sustained.

-16-

derived from an interpretation of 29 U.S.C. § 623, id. at 1541

(citing 28 U.S.C. § 623(f)(1)), a section of the ADEA that

expressly does not apply to federal employers.  As defendants

point out, there is no basis on which to conclude that the

federal sovereign has waived its immunity from such suits, which

must be express, not implied and inferred through interpretation.

(See Def.'s Mem. at 77 (citing Irwin v. Dep't of Veterans

Affairs, 498 U.S. 89, 95 (1990), among others).)  There is good

reason to doubt that plaintiffs have a cognizable ADEA disparate

impact claim against the FAA and DOT.

Even if a disparate impact claim is available to these

plaintiffs, they have not established that they are likely to

succeed on the merits, which would require showing (1) that a

specific employment practice is responsible for imposing greater

injury on the older FS specialists compared to the younger FS

specialists who are subject to the same employment practice and

(2) that the specific employment practice is not based on a

reasonable factor other than age.  See Smith, 125 S. Ct. at

1545.[6]

---

[6]  Plaintiffs erroneously state that "[i]n order to prevail
on their disparate impact claim," they must only show outwardly
neutral employment practices and a disproportionate impact.
(Pl.'s Mem. at 98.)  This formula may establish a rebuttable
prima facie case, but it is not a sufficient showing with which
"to prevail."  Smith, 125 S. Ct. at 1545.

-17-

With one exception, the anticipated harms plaintiffs identify can be expected to impose equal hardship on those affected, regardless of age.  For example, loss of a job, loss of federal employment, loss of civil service protection, unwelcome relocation in order to take a job with Lockheed, loss of any of the current health and life insurance benefits, loss of a bargaining unit, and loss of the benefits negotiated pursuant to the collective bargaining agreement are harms that would fall on all the displaced FS specialists, regardless of age.  Plaintiffs have identified only one harm from which older workers will likely suffer disproportionately, namely, lost contributions to their enhanced retirement annuity benefit.  The FS specialists are among those few categories of federal employees subject to mandatory early retirement and, concomitantly, eligible for an enhanced retirement annuity.  See generally Johnson v. Mayor and City Council of Baltimore, 472 U.S. 353, 363-68 (1985) (discussing the history of the civil service mandatory retirement provisions and the related enhanced retirement annuity in light of the enactment of the ADEA).  In order to realize an enhanced retirement annuity, compared to most federal employees, the FS specialists contribute more on a yearly basis to their pension. (See Hr'g Tr. at 7, 16.)[7]  Plaintiffs assert that if they are

---

[7]  As the witnesses explained, FS specialists contribute 1.3 percent of their annual salary to their enhanced retirement annuity account, compared to the .8 percent most federal

unable to continue under the current system, those not already eligible to retire on October 4, 2005 will lose "all the extra money we put in, that .5 percent we've put in over the years . . . . There's no refunds." (Hr'g Tr. at 7.)  While the loss of this enhanced retirement annuity plan affects the displaced FS specialists regardless of age, the magnitude of the alleged injury can be expected to be greater for those who have made larger contributions, i.e., for those who have made contributions over a longer period of time or with respect to higher salaries. Plaintiffs, however, like the plaintiffs in <u>Smith</u>, 125 S. Ct. at 1545-46, have not provided any specifics, let alone detail, with respect to the magnitude of the differential impact or the mechanism that produces the differential impact.  Plaintiffs have neither described the harm in terms of net loss, taking into account what defendants assert is Lockheed's "generous 401K retirement plan" and other benefits, including social security benefits (<u>see</u> Def.'s Mem. at 23; Hr'g Tr. at 35), nor established that the net loss constitutes a disparate impact on the older workers.  In short, plaintiffs have not provided information of sufficient specificity and detail to support a conclusion that

---

employees contribute.  FS specialists who realize their enhanced retirement annuity receive annuities of 1.7 percent of the sum of their three highest annual salaries, compared to most federal workers who receive annuities of only 1 percent of their "high threes."

-19-

they are likely to succeed on the merits of a disparate impact claim, even if one is available to them.[8]

C.  Subject matter jurisdiction over a collateral attack

Defendants characterize plaintiffs' suit as nothing more than a collateral attack on the FAA's decision to outsource plaintiffs' services and to award the contract to Lockheed. Relying on Carey v. O'Donnell, 506 F.2d 107, 110 (D.C. Cir. 1974), they argue that because 49 U.S.C. § 46110 commits review of the FAA's action exclusively to the jurisdiction of the courts of appeals, the district court has no subject matter jurisdiction over this case.  (See Def.'s Mem. at 61-63.)  To the extent this ADEA action may be fairly characterized as a collateral attack on a final agency decision clothed as an age discrimination action, this court lacks jurisdiction over it.

> Appellants in the cases at bar have all had their day
> in court as contemplated by the statute.  Viewed
> objectively, the actions below, although couched in
> terms of violations of the RLA [Railway Labor Act] and
> the ADEA, are essentially collateral attacks on the
> integrated seniority list as incorporated in the . . .
> agreement . . ., approved by the CAB, and reviewed by
> this court . . . .  We perceive no necessity for
> additional review, not contemplated by the Federal
> Aviation Act, in the District Court or any other forum.

---

[8]  Even if they were able to establish a prima facie case, which they have not done here, plaintiffs would likely be unable to show that the FAA's action was not based on a reasonable factor other than age, for the same reasons mentioned in note 5, above.

-20-

Carey, 506 F.2d at 110.  On the other hand, to the extent this

action represents a genuine and legitimate age discrimination

action, subject matter jurisdiction is not in doubt.  See Cook v.

Pan Am. World Airways, Inc., 771 F.2d 635 (2d Cir. 1985)

(departing from Carey and holding that the district court was not

deprived of its statutory jurisdiction over an ADEA challenge to

a seniority system just because it happened to be adopted as part

of a merger approved by the Civil Aeronautics Board ("CAB"), an

agency action that was reviewable only by the courts of appeals);

Clayton v. Republic Airlines, 716 F.2d 729 (9th Cir. 1983)

(departing from Carey and holding that plaintiff could be heard

on his duty of fair representation claim in district court even

though review of the merger in which the representation occurred

was approved by the CAB and review of the CAB's action was

committed exclusively to the courts of appeals).  This initial

review of the plaintiffs' likelihood of success on the merits

leads to a fairer characterization of this action as a collateral

attack on an agency decision rather than a genuine age

discrimination case.  On this ground, as well, plaintiffs do not

appear likely to succeed on the merits of the underlying action.

II.  IRREPARABLE HARM

     Plaintiffs, alleging they will suffer irreparable harm if

the FAA is not enjoined from outsourcing the FS on October 4,

2005, anticipate "severe economic harm" stemming from a loss of

jobs, federal employment, civil service protection, retirement
contributions, opportunity to continue to contribute to an
enhanced retirement annuity, a bargaining unit, and benefits
arising from their collective bargaining agreement, including a
negotiated grievance procedure, as well as harm from forced
relocation in order to take a Lockheed position, and increased
costs of life and medical insurance.  (Pl.'s Mem. at 107-11.)
They further assert that the remedies available under the ADEA
are insufficient to compensate plaintiffs for the damages they
anticipate as a result of the outsourcing because the ADEA does
not permit plaintiffs to recover for future monetary damages (as
distinct from "front pay"), or personal injuries such as
emotional pain, suffering, inconvenience, anguish, and loss of
enjoyment of life.  (Pl.'s Mem. at 103-07, 112-13 (noting that
plaintiffs' "connection to their positions is not entirely
measurable in monetary terms") (quotations omitted).)

Much of what plaintiffs identify as irreparable harm,
namely, lost jobs, lost retirement contributions or increased
costs of health and life insurance, is exactly the sort of harm
that the law treats as compensable by monetary damages, and thus
it is not irreparable.  Plaintiffs' witness even testified as
much.

Q:  Is there anyway that money can make that up
somehow?

> A:   I mean, I'm standing to lose about a million
> dollars over the course of a lifetime if I don't get to
> my [eligible date for the enhanced] retirement
> [annuity], so if someone wanted to give me a million
> dollars, perhaps.

(Hr'g Tr. at 27.)  And, while the loss of grievance procedures or
employee rights negotiated as part of the collective bargaining
agreement or the loss of federal civil service protection may
well be harms that are not compensable by money damages, they are
not incapable of being remedied through "other corrective
relief," Virginia Jobbers, 259 F.2d at 925, by order of a court,
if it is later determined that the FAA has violated the law.

Finally, an injury is not rendered "irreparable" for the
purposes of injunctive relief merely because the injuries claimed
are not cognizable under the cause of action pursued by the
plaintiff.  Thus, the fact that the ADEA does not authorize
compensation for psychological suffering associated with a job
loss, personal emotional upheaval, or distress does not mean that
there is no adequate remedy at law and that injunctive relief is
an appropriate substitute.  It means that such injuries are not,
in fact, injuries for the purposes of the law.  Plaintiffs cannot
argue that they are irreparably harmed simply because the
governing statute does not recognize such injuries.  Granting an
injunction will not alter the fact that under the ADEA such
experiences, however real they may be, are not compensable,

either by money damages or through "other corrective relief."
Virginia Jobbers, 259 F.2d at 925.

III. BALANCE OF HARMS TO THE PARTIES

Plaintiffs argue that unless this court enjoins the planned
outsourcing, most plaintiffs will lose their federal employment
and others will be faced with hard choices.  Defendants point to
the expense that will be incurred by the contractor and the
agency if the planned change is interrupted by the court's
intervention since change has already been committed to or
undertaken.  On balance, the harm to the individual plaintiffs
appears to represent the slightly greater harm.  However, in
light of the fact that the harm does not appear to be the result
of any illegal agency action, the perceived greater harm to the
plaintiffs should not weigh heavily in the sliding scale of the
four factors.

IV. PUBLIC INTEREST

The public interest weighs in favor of denying the requested
injunction.  The public has a strong interest in federal agencies
realizing cost savings through competitive outsourcing mandated
by Congress.  In this case, the justifications and presumptions
behind the decisions have been challenged at every turn,
sometimes repetitively.  In each instance, the agency actions
have been affirmed.  The public's interest in cost-savings,

-24-

coupled with the public's interest in finality, weigh against granting the injunction.

SUMMARY AND CONCLUSION

The human toll that FS outsourcing will take on a valued segment of the federal workforce is tangible.  The outsourcing stems from Congressional directives for the entire government to streamline, though, and plaintiffs have not shown that they are likely to succeed on the merits of their underlying age discrimination claims.  Nor have they shown that any anticipated injury proximately caused by the alleged ADEA violation is not remediable by money damages, or that the public interest will be served by the injunction.  Accordingly, it is hereby

ORDERED that plaintiffs' motion for a preliminary injunction be, and hereby is, DENIED.

SIGNED this 30th day of September, 2005.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge