IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
KATHLEEN A. BREEN, et al.,                 )
)
     Plaintiffs,                              )
)
             v.                      )    Case No. 1:05CV00654-RWR
)
MARY E. PETERS, et al.,                     )
)
     Defendants                               )
_____)

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
1) IN OPPOSITION TO GEBHARDT AND ASSOCIATES' MOTION
TO WITHDRAW AS COUNSEL FOR 714 PLAINTIFFS AND
2) IN SUPPORT OF DEFENDANTS' MOTION TO BIFURCATE
DISCOVERY AND TRIAL ON LIABILITY AND DAMAGES

Introduction

      "As a fundamental premise, counsel is under an obligation to see the work

through to completion when he agrees to undertake the representation of his

client." *Byrd v. District of Columbia*, 271 F. Supp. 2d 174, 176 (D.D.C. 2003). "The

court may deny an attorney's motion for leave to withdraw if the withdrawal would

unduly delay trial of the case, or be unfairly prejudicial to any party, or otherwise

not be in the interests of justice." Local Rule 83.6(d); *Byrd*, 271 F. Supp. 2d at 176.

The proposal of Gebhardt and Associates ("Gebhardt") that 714 plaintiffs, scattered

over every part of the country except Alaska, will henceforth proceed in this case

*pro se* is manifestly unworkable, will severely prejudice defendants, and will delay

resolution of the case.  Even if Gebhardt had shown cause for withdrawal, the

prejudice to defendants and the delay in proceedings would therefore require denial of Gebhardt's motion.

In any event, the few selectively chosen facts Gebhardt's motion sets forth do not demonstrate what would be good cause for withdrawal even in a case where the prejudice to defendants was not so manifest. Gebhardt argues (Gebhardt Mem. at 5) that it should be permitted to withdraw because the 714 plaintiffs have not paid fees Gebhardt has asked for. Attorneys may indeed withdraw (at least absent the kind of prejudice withdrawal would cause here) where a "client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services." Rule 1.16(b)(3), District of Columbia Rules of Professional Conduct; *accord, Fidelity Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, 310 F.3d 537, 540 (7th Cir. 2002) (Easterbrook, J.) . But whether any of the 714 plaintiffs have "fail[ed] substantially" to fulfill their obligations toward the lawyers depends on what obligations they agreed to when they and Gebhardt agreed to enter into an attorney-client relationship in 2005. *Compare Byrd*, 271 F. Supp. 2d at 178 (denying withdrawal motion where, "because of the contingency-fee arrangement, the record does not demonstrate that the plaintiff has substantially failed to fulfill financial obligations to her counsel regarding his legal services") *with Fidelity*, 310 F.3d at 540 (failure to pay $470,000 in fees to four-attorney firm ground for withdrawal where client had "undertak[en] via contract" to pay). Gebhardt's motion does not disclose what its underlying fee arrangement with plaintiffs was, and the motion therefore does not

support any conclusion that the 714 plaintiffs have failed, let alone failed substantially, to meet their obligations under the undisclosed fee agreement.

The Gebhardt motion to withdraw does, however, highlight problems with manageability of this 900-plaintiff case.  In light of the experience to date with this case and after reflection on the issues raised by the Gebhardt motion, defendants move that the case be bifurcated between liability and damages, with discovery and any trial on liability to proceed prior to any further discovery and trial on damages.

<u>Argument</u>

A.    The Presence Of 714 Separate *Pro Se* Plaintiffs Will Unduly Prejudice
<u>Defendants And Will Likely Delay Trial And Other Proceedings</u>

Under Local Rule 83.6(d), the Court "may deny an attorney's motion for leave to withdraw if the withdrawal would unduly delay trial of the case, or be unfairly prejudicial to any party, or otherwise not be in the interest of justice."  Gebhardt's withdrawal would substantially and unfairly prejudice defendants and is likely substantially to delay trial and other proceedings in the case.

1.    Motions Practice, Discovery, Scheduling, Other Pre-Trial
Matters, And Trial Will Be Enormously Complicated
<u>By The Presence Of More Than 700 Pro Se Plaintiffs</u>

Gebhardt's motion suggests that the "logistics" of dealing with 714 *pro se* plaintiffs are not all that daunting.  Gebhardt Mem. at 6-7.  But that suggestion relates only to service, which is by no means the only problem.  Consider, for example, what, in an ordinary case of this size is likely to be a routine occurrence, the filing of non-dispositive motions.  Under the local rules, before filing any such

motion, a "required discussion" to narrow the issues must take place among counsel and "non-incarcerated parties appearing pro se." Local Rule 7(m). It would be essentially impossible to comply with the local rule if the filer must wait until the required discussions could be held with all 714 *pro se* plaintiffs. Even instantaneous e-mail communication – assuming it were available – does not solve the problem. The discussion, virtual or real, must still be had, and that discussion will often be two-way (times 714) proposal-and-counterproposal. Of course, the local rule could be waived, and if Gebhardt's motion is granted, we would propose doing so. But that would come at a cost to the goals served by the local rule, as neither the Court nor the parties would know, without waiting at least two weeks for oppositions to be filed, whether any given motion would be opposed (or partly opposed, sometimes on grounds the movant might have acceded to or partly acceded to), which means, among other things, delay in relying on any proposed order and the expenditure of what might be unnecessary effort briefing and considering motions that might (but might not) end up unopposed.

Or consider the matter of scheduling depositions. Even assuming that many of the *pro se* plaintiffs would not end up attending, all would have the right to attend at whatever gymnasium-sized room is available, and the scheduling would have to be done sufficiently in advance to assure that any schedule conflicts could be worked out. If they could be worked out. As anyone who has tried to schedule a large meeting knows, if even 5% of 714 people from across the country want to attend, finding a common date will be close to impossible. Nor is it an acceptable

answer – at least not as far as hardship to the defendants is concerned – to say that the scheduling problem can be "solved" by letting busy federal officials each be deposed multiple times by different plaintiffs.

Yet scheduling a deposition will be child's play compared to re<u>scheduling</u> one. In almost any major case, at least one deposition will be rescheduled, often for very compelling reasons (*e.g.*, witness's illness, death in counsel's family) or good, if slightly less compelling, reasons (*e.g.*, emergency motion in another case). Among counsel, accommodations are usually reached, sometimes with only a day's or a few hours' notice. With an unknown number of *pro se* plaintiffs planning to fly to a deposition on a given date, the flexibility to make such otherwise sensible and often necessary scheduling changes will largely disappear.[1]

Similar problems would be encountered in the Court's scheduling or rescheduling of hearings, status conferences, and pre-trial conferences, particularly since out-of-town *pro se* plaintiffs do not have the option most attorneys would have of picking co-counsel or colleagues who could "cover" hearings or conferences scheduled for days they were unable to travel to Washington.

These are, in a sense, mundane logistical issues. But lawsuits involve more than just deciding momentous legal questions. In nearly every case, the mundane

---

[1] A *pro se* party would ordinarily be under no obligation to tell counsel in advance whether he or she would be coming to any given deposition, so if even only five *pro se* plaintiffs were likely to show up at a deposition, counsel could not be sure either that the number would only be five or, in any event, <u>which</u> five would need to be consulted about rescheduling.

logistical issues must also be solved.  Among counsel representing two, three, four, or even five or six sides in a case, they are usually worked out.  With 714, or even just 70 or 20, *pro se* plaintiffs, the case will drag to a standstill.

> 2.  The Court May Lack The Authority To Require
> <u>Pro Se Plaintiffs To Accept Electronic Service</u>

Even on the one logistical point for which Gebhardt does make a proposal, service of papers, it is far from clear that the proposal could be adopted.  "Plaintiffs propose that the Court issue a notice to all <u>pro se</u> Plaintiffs requiring them to provide the Court and the parties with an e-mail address at which they may be served upon pain of dismissal from the case."  Gebhardt Mem. at 7.

 If Gebhardt's motion were to be granted, defendants' counsel would certainly prefer if service could be made electronically.  And, as defendants' counsel, we would ordinarily be delighted to see a sentence that begins "Plaintiffs propose" and ends "upon pain of dismissal from the case."  But this isn't what "[p]laintiffs propose."  It's merely the proposal of counsel about to abandon them.  And, unfortunately, it is unclear whether the Court has authority to order *pro se* plaintiffs to accept electronic service without <u>their</u> consent, as opposed to the mere consent of their once-upon-a-time counsel.

Under Federal Rule of Civil Procedure 5(b)(D), service may be made, *inter alia*, by "[d]elivering a copy by electronic means, consented to in writing <u>by the person served</u>."  (Emphasis supplied); *see Tubar v. Clift*, 2007 WL 214260 at *6 (W.D. Wash.) (electronic service not allowed unless consented to in writing).  Unless

the rule could be read to allow the Court to require such "consent[ ]" by threat of dismissal, it would not provide a basis for Gebhardt's proposal.  Gebhardt does not cite, and we likewise have not found, any case interpreting this relatively recent rule as authorizing a court to require a *pro se* plaintiff to consent to electronic service.  *Cf. Willis v. Mullins,* 2006 WL 2792857 at *3 (E.D. Calif.) ("under certain circumstances, compelling an attorney to accept electronic receipt of documents may be a well-tailored sanction").

Rule 5(b)(D) of the Federal Rules also allows electronic service through the Court's transmission facilities "[i]f authorized by local rule."  In turn, Local Rule 5.4(b)(6) provides that "a pro se party who obtains a CM/ECF password consents to electronic service of all documents."  *See Phifer v. Sacramento City and County Housing Authority,* 2007 WL 1655847 (E.D. Calif.) (explaining similar local rule). But that local rule does not appear to authorize service on *pro se* plaintiffs who do not obtain a CM/ECF password, and there is no assurance that a substantial number of the 714 plaintiffs will ever do so.

        3.      Even If The Pro Se Plaintiffs Were Eventually To
                Be Dismissed Without Fully Participating In The
                <u>Case Defendants Will Be Substantially Prejudiced</u>

Perhaps it might be thought that the logistical concerns expressed above are overdrawn.  The likelihood that there will be 714 active *pro se* plaintiffs each actively involved in the case may well be low.[2]  As a practical matter, the motion to

---

[2] However, Gebhardt's Exhibit 2 shows that 20 plaintiffs have already
                                        (continued...)

withdraw may not be so much a motion to let 714 plaintiffs proceed *pro se*, as the first frame of a slow-motion dismissal of those plaintiffs for failure to prosecute. Obviously, to the extent that this motion is merely part one of a mass dismissal, the concerns that the Court will need to consider are partly those of the *pro se* plaintiffs rather than of defendants, who can be expected to favor dismissals.

But a path of eventual mass dismissals could be unwieldy and time con-suming even for defendants.  For example, if a *pro se* plaintiff declines to answer interrogatories, defendants' counsel would need to consult first with that plaintiff before seeking a sanction, Rule 37(d), F.R. Civ. Proc., which might be a sanction less than dismissal in the first instance.  *See, e.g., Young v. Office of United States Senate Sergeant at Arms*, 217 F.R.D. 61 (D.D.C. 2003) (dismissing for "repeated" failure to answer discovery after two court orders compelling discovery).  Indeed, if a first failure to respond to discovery were enough to routinely provoke a dismissal, the current motions could be about dismissal, rather than withdrawal.  Almost all of the 714 plaintiffs have <u>already</u> failed to answer discovery defendants served on them through their counsel <u>three</u> months ago <u>while</u> they are <u>still</u> represented.  If

---

[2](...continued)
expressly indicated – at least to Gebhardt – that they intend to proceed *pro se* rather than dismiss their claims.  For the plaintiffs who did respond that they choose to dismiss, the parties have been agreeing to voluntary dismissals.  As to the majority of plaintiffs who apparently made no response to Gebhardt, it is <u>perhaps</u> likely that <u>most</u> of them will never enter a *pro se* appearance and will have their claims accordingly dismissed.  But that can hardly be presumed from any <u>individual</u> instance of non-response, since the form Gebhardt sent indicated that those who did not respond would be considered *pro se*.  Gebhardt Ex. 2.

dismissal for failure to prosecute is a quick option, it is available <u>now</u>, without the necessity of first considering a motion to withdraw.

In all likelihood, of course, the Court will be understandably reluctant to dismiss a *pro se* plaintiff for failure to prosecute without first giving him or her ample opportunity to correct any shortcomings.  While defendants' counsel would obviously have every incentive to try to package together as many failure-to-prosecute motions as possible, with 714 plaintiffs the facts that constitute such failures and the times at which they occur are likely to vary.  In at least some cases, the motions, any predecessor motions to compel, and the 714 prior consultations on those motions, will require considerable effort, and some may well not be appropriate for decision for quite some time.

Finally, even if 90% of 714 *pro se* plaintiffs end up having their cases dis-missed for failure to prosecute, the logistical problems discussed above with respect to the remaining *pro se* plaintiffs would still be nearly as daunting and the unfairness and prejudice to defendants nearly as great.

4.  Discovery Is Already Behind Schedule And Is Certain
    <u>To Be Further Delayed If Withdrawal Is Allowed</u>

Gebhardt's guess that withdrawal will not delay the action, Gebhardt Mem. at 6, is overly optimistic.  It is true, as Gebhardt notes, that discovery is in a "very early stage," *id*., but that is more a cause for alarm than for complacency.

The case would be a massive undertaking even with only the 200 or so plaintiffs who would remain if all 714 soon-to-be-*pro-se* plaintiffs could be made

conveniently to disappear from the case (conveniently for the rest of the parties,

that is).  Discovery is now set to close in February 2008.  Even without the com-

plications caused by the withdrawal motion, the parties have not made as much

progress in discovery as one would have hoped in order to meet that schedule.

Defendants served their first set of discovery requests on March 16, 2007.  No

answers were received until June 13, 2007, and even then answers were provided to

only some of the interrogatories and from fewer than half of the plaintiffs Gebhardt

is still willing to represent.

      For their part, plaintiffs' counsel have so far served only six interrogatories,

and two of those asked only for their own clients' addresses and phone numbers.

Obviously, as defendants' counsel, we are not inclined to complain that plaintiffs

have not served massive discovery, especially since defendants' comprehensive

initial disclosures should obviate the need for much non-deposition discovery by

plaintiffs.  But plaintiffs requested permission to ask 200 interrogatories, and

received permission to ask 100.  They have 94 left and presumably intend to serve

much more extensive written discovery requests than they have to date.

      As for depositions, plaintiffs have indicated that they intend to depose high-

level officials, including the Administrator herself.  Assuming such depositions are

appropriate at all – a potential dispute we leave to another day – it would prejudice

defendants if each deposition had to be held twice or more.  If the withdrawal

motion were granted, it would likely be months before all plaintiffs who will have

newly become *pro se* will be up-to-speed and ready to participate in depositions, so

the only way to avoid such repetitive depositions would be to postpone any deposi-
tions by even the represented plaintiffs until the fall at the earliest.

Some, perhaps most, of the delay so far in discovery may well be due to the
original decision of Gebhardt to represent 900 individual plaintiffs.  Perhaps (we
guess, though it is a guess that makes sense) the considerable and evident work the
Gebhardt firm has put into attempting to communicate with over 900 clients has
made it difficult simultaneously to answer and propound discovery.  That problem
of trying to coordinate with over 700 different parties will not go away by casting
loose 714 to be *pro se*.  It will merely become defendants' problem also.

B.      Gebhardt Has Not Shown That 714 Plaintiffs Have
        Violated Any Obligation To Pay Gebhardt Fees

As we have explained above, the prejudice to defendants is so great, and the
likelihood that trial and other proceedings will be delayed is so certain, that
Gebhardt's motion to withdraw as counsel to 714 plaintiffs should be denied even if
Gebhardt had shown that those plaintiffs had breached their obligations under
their representation agreement to pay Gebhardt's fees.  But, in any event, Gebhardt
has failed to show what its representation agreement with those plaintiffs even
was, let alone that the 714 plaintiffs have breached it.

As a general matter, attorneys may withdraw (absent the kind of prejudice
withdrawal would cause here) where a "client fails substantially to fulfill an
obligation to the lawyer regarding the lawyer's services."  Rule 1.16(b)(3), District of

Columbia Rules of Professional Conduct (emphasis supplied).[3]   Although a "client's refusal to pay attorney's fees may constitute 'good cause' to withdraw[, . . . .i]n most cases . . .  courts have permitted counsel to withdraw for lack of payment only where the client either 'deliberately disregarded' financial obligations or failed to cooperate with counsel." *United States v. Parker*, 439 F.3d 81, 104 (2d Cir.) (citations omitted), *cert. denied*, 127 S. Ct. 456 (2006).

Where an attorney seeks to withdraw from representation because of non-payment of his fees, it is incumbent on him to show the facts with "particularity." *Whiting v. Lacara*, 187 F.3d 317, 322 (2d Cir. 1999) (dictum); *see Rophaiel v. Alken Murray Corp.,* 1996 WL 306457 (S.D.N.Y.)  Here, key facts are not asserted even in generalities.

Most importantly, the motion never says what the original representation agreement with the 714 plaintiffs provided for by way of fees.[4]   For all defendants

---

[3] Attorneys may also seek to withdraw where "[t]he representation will result in an unreasonable financial burden on the lawyer."  Rule 1.16(b)(4), District of Columbia Rules of Professional Conduct.  Gebhardt's motion does not rely on that ground.

[4] The only hint in the motion of what that agreement might have been is at page 3 of 21 of Gebhardt's Exhibit 2, in which plaintiff Angela Bowman asks for a refund of a $2,500 retainer.  But that letter postdated Gebhardt's later efforts to obtain additional fees from its clients, and it is not stated whether that $2,500 was paid as a retainer under the initial representation agreement, as a result of those later efforts, or both.

The motion also says, Gebhardt Mem. at 2, that the majority of the plaintiffs "were originally recruited by a union" that no longer represents them.   In the course of defendants' counsel's consultation with Gebhardt over the cross-motion to

(continued...)

and the Court know from what is in the motion, the original agreement between Gebhardt and the plaintiffs (or between Gebhardt and the plaintiffs' former union) may have been for Gebhardt to handle the case on a contingency basis, in which case the plaintiffs would not have breached any obligation to Gebhardt at all, let alone "fail[ed] substantially" to meet their contractual obligations. *Compare Byrd v. District of Columbia*, 271 F. Supp. 2d 174, 178 (D.D.C. 2003) (denying withdrawal motion where, "because of the contingency-fee arrangement, the record does not demonstrate that the plaintiff has substantially failed to fulfill financial obligations to her counsel regarding his legal services") *with Lieberman v. Polytop Corp.*, 2 Fed. Appx. 37 (1st Cir. 2001) (allowing attorney to withdraw where client failed to pay "over $80,000 in fees "in derogation of their written fee agreement") *and Fidelity Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, 310 F.3d 537, 540 (7th Cir. 2002) (failure to pay $470,000 in fees to four-attorney firm ground for withdrawal where client had "undertak[en] via contract" to pay).  If Gebhardt wants to withdraw because 714 plaintiffs have violated their fee agreement, Gebhardt, like withdrawing counsel in *Lieberman* and *Fidelity*, must at least disclose what that agreement was and how, if at all, plaintiffs have "substantially failed" to live up to their end of the agreement.

---

[4](...continued)
bifurcate, Gebhardt advised that its representation agreement was with the union, rather than with the plaintiffs Gebhardt represents in this case.  That agreement has not been disclosed, and there is no record evidence to show that the union substantially failed to meet its obligations under any representation contract.

The two letters Gebhardt sent earlier this year to the plaintiffs are of little help.  Gebhardt refuses to make the full text of those letters available and chooses instead to rely on short excerpts that it unilaterally chooses to disclose.[5]  Even the two excerpts Gebhardt selects seem to contradict each other.  The February 16 letter excerpt told the plaintiffs that their decision involved making a choice whether to "[c]ontinue as an active Plaintiff with our law firm's representation."  Gebhardt Mem. at 2.  The April 17 letter, on the other hand, referred to the plaintiffs as persons "who have not yet signed up for legal representation."  *Id.* at 3.  The wording of the first letter's snippet seems to suggest – though not conclusively – that Gebhardt and the plaintiffs had a prior agreement on representation and the question was its "continu[ation]."  The wording of the second letter seems to suggest – again not conclusively – that Gebhardt and the plaintiffs never had a representation agreement when the case was filed in 2005, and it was only in 2007 that clients would be "sign[ing] up for legal representation."[6]  This second possibility is reinforced by Gebhardt's oral representation to us on June 21 that its original representation agreement was with a non-party, the plaintiffs' former union.

_____

[5] In response to our inquiry whether the letters were exhibits to the memorandum quoting and relying upon the letters, the Gebhardt firm responded by e-mail of June 12, 2007, that the letters were privileged attorney-client communications.  Exhibit 1 hereto.

[6] The June 12, 2007, e-mail claiming that these letters are privileged is similarly ambiguous, asserting both that the addressees included persons who would "remain clients," and that the letters were seeking to "arrange[ ] legal representation."  Exhibit 1 hereto.

Defendants and the Court do not know which of those possibilities is correct –
because Gebhardt's motion does not tell us – but neither possibility would be help-
ful to Gebhardt's motion.  If there was a representation agreement in 2005 between
Gebhardt and the plaintiffs, then the 2007 letters (from what little Gebhardt has
shared about their contents) would seem to be a unilateral demand by Gebhardt
that representation be continued only if plaintiffs paid fees in addition to those that
had previously been agreed upon.  Even if it now appears that more work will be
required of Gebhardt than when the original agreement on representation was
reached, that is not an adequate reason for withdrawal from representation of
clients Gebhardt once agreed to represent and whom it would now abandon to
become *pro se*.[7]

If, on the other hand, Gebhardt did not have any fee agreement until 2007
with plaintiffs it had already agreed to represent in 2005, then Gebhardt has only
itself to blame.[8]  When a lawyer-client relationship is initiated, "an understanding

---

[7] *See In re Cuddy*, 322 B.R. 12, 17-18 (Bkrptcy. D. Mass. 2005) ("The image
that has come to my mind most insistently while working on this opinion is this: A
professional swim instructor takes on a new student with this understanding: You
have paid me my initial fee. For that money I will lead you to the swimming pool,
show you how to enter the water, and explain the basic elements of swimming. If,
however, you should begin to drown, of if some other serious problem arises, I will
leave you to your own resources unless you pay me more money.").

[8] Even if, as Gebhardt states to us outside the motion, its original agreement
was with the non-party union that formerly represented the plaintiffs rather than
with the plaintiffs, that union had not represented the plaintiffs since Lockheed
began operating the flight service stations in early October 2005.  If the union,
rather than the plaintiffs Gebhardt represents in court, was Gebhardt's original

(continued...)

as to the fee should be promptly established," District of Columbia Rules of Professional Conduct, Rule 1.5, comment 1.[9]  Nearly two years after filing an amended complaint is not "promptly."  When the amended complaint was <u>filed</u> naming 900 plaintiffs, that launched obligations of defendants and the Court to deal with 900 claims – even if ultimately only to process motions to dismiss for failure to prosecute – obligations that should never have been imposed if there was no meeting of the minds in the first place between plaintiffs and their counsel concerning representation.

We stress that defendants <u>do not know</u> what agreements exist between Gebhardt and its clients regarding payment of fees.  Perhaps there is an explanation more favorable to Gebhardt's position than what can be surmised from what little information Gebhardt will share.  Our point is precisely that the motion does not tell either defendants or the Court enough to make any judgment whether plaintiffs have substantially failed to fulfill any agreed-upon obligation to pay fees.  Consequently, any alleged failure to pay fees is not sufficiently supported to justify withdrawal.

---

[8](...continued)
client, Gebhardt does not explain why it was apparently not until February 2007 that it sought to enter into representation agreements with the people it was already representing.

[9] *See In re Holocaust Victim Assets Litigation*, 2007 WL 805768 *10 n.11 (E.D.N.Y.) (Orenstein, M.J.) (although similar provision was not mandatory in New York prior to 2002, counsel "should for any number of reasons have long ago made explicit . . . his proposed compensation").

C.     The Alleged Lack Of Communication Between Gebhardt And
Some Plaintiffs Does Not Justify Withdrawal At This Time

In addition to seeking to withdraw for lack of payment of fees, Gebhardt's

motion indicates that 694 plaintiffs have "remained uncommunicative." Gebhardt

Mem. at 3.

Lack of communication is potentially a problem, particularly because it may

well presage similar problems if those 694 plaintiffs become *pro se*. It may well be

that <u>many</u> of these plaintiffs have little or no interest in pursuing this lawsuit. If,

despite ample opportunity and clear requests to do so, the 694 plaintiffs do not

communicate with Gebhardt or the Court, it may become be appropriate to allow

Gebhardt to withdraw <u>and</u> to dismiss those plaintiffs' claims for lack of prosecution.

*See AdvantEdge Business Group v. Meridian Ben, Inc.*, 2007 WL 1061512 (D. Colo.)

(simultaneously granting counsel's motion to withdraw and dismissing for failure to

prosecute in light of plaintiff's failure to communicate with counsel). But there is at

present no reason why Gebhardt should <u>first</u> be permitted to withdraw, because the

evidence provided by Gebhardt does not warrant a conclusion that <u>each</u> of these

plaintiffs has <u>already</u> definitively refused to communicate and will continue to

refuse to communicate.

The evidence for lack of communication to date seems to be that these

plaintiffs did not return a form that gave them only three choices. Gebhardt Mem.

at 2-3. This leaves open a possibility that some plaintiffs' alleged lack of communi-

cation consists only in not agreeing with any of the three choices Gebhardt gave

them.[10]  Those three choices (which can be seen from the completed forms in

Gebhardt's Exhibit 2) were 1) to become a client (or continue as a client?) of

Gebhardt and pay an amount Gebhardt does not disclose that may or may not have

been over and above any amounts that were already paid in any original represen-

tation agreement; 2) to dismiss; or 3) to proceed *pro se*.  There is no provision made

for an "other" response, including no provision for communicating that the client

sought to retain Gebhardt's services either under the original representation

agreement (if there was one) or at a price different than the one suggested in

Gebhardt's offer.  In short, from what little Gebhardt has disclosed about the letters

and responses, one cannot tell in any given case whether a non-response reflects an

unwillingness to communicate or merely a disagreement with all of a limited set of

options.

Gebhardt's motion also includes a notice to the plaintiffs that, quoting Local

Rule 83.6, advises plaintiffs that "if" they intend "to conduct the case pro se they

should notify the Clerk in writing within five days of service of the motion," which

Gebhardt advised them meant "no later than **June 25, 2007**."  Notice Appended to

Gebhardt Motion (emphasis original).  As of this writing, that deadline has not

passed.  In the event that the Court grants Gebhardt's motion, the Court should

---

[10] In addition, the form does not seem to literally require any response in the
first place, since it contemplates the possibility of non-response and states how non-
response will be construed (as intent to proceed *pro se* rather than to dismiss).  A
client who intended to convey that message might have construed Gebhardt's
letters as not requiring any response.

dismiss the claims of any plaintiffs who do not communicate to the Court either an intent to proceed *pro se* or an intent to proceed with new counsel.  *See, e.g., O-J-R v. Ashcroft*, 216 F.R.D. 150 (D.D.C. 2003).  However, because Gebhardt has not yet shown good cause for withdrawal, the Court need not consider at this time when to enter such dismissals nor such subsidiary issues as whether a show-cause order or other communication directly from the <u>Court</u> should be sent to unrepresented plaintiffs before dismissing their claims.

> D.    Discovery And Trial On Damages, If Necessary, Should Be
>       <u>Bifurcated Until After Discovery And Trial On Liability</u>

As we explained above, this case will be unmanageable with 714 *pro se* plaintiffs.  But we are under no illusion that continued representation of those plaintiffs by a reluctant Gebhardt firm is an ideal solution.  The now inescapable reality is that, once the amended complaint named more than 900 individuals as plaintiffs, there were no good case management options, only some that are less bad than others.

Reflection on those options and the withdrawal motion and experience with limited discovery to date now leads defendants to cross-move that, whether or not the motion to withdraw is granted, discovery (and any trial) be bifurcated, with discovery and trial on liability preceding any discovery and trial on damages.

Under Rule 42(b), Fed. R. Civ. Proc., a court may bifurcate claims or issues for separate trial "to advance judicial economy, to avoid the possibilities of confusion, to further convenience, to avoid delay and prejudice, and to serve the

ends of justice." *Webb v. Hyman*, 861 F. Supp. 1094, 1119 (D.D.C. 1994).  A court

has broad discretion to choose whether to bifurcate claims in a case for separate

trial, and a court may order a case bifurcated even if only one criterion from Rule

42(b) is satisfied.  *See Ricciuti v. New York Transit Authority*, 796 F. Supp. 84, 86

(S.D.N.Y.1992).  "Class action lawsuits brought under Title VII are typically bifur-

cated into two phases, a liability phase and a damages phase." *Berger v.

Ironworkers Reinforced Rodmen, Local 201*, 170 F.3d 1111, 1124 (D.C. Cir. 1999).

"The first phase establishes whether the employer is liable to the class because of a

pattern or practice of discrimination. . . . The second phase addresses questions of

class membership and the degree of damage suffered by individual class members."

*Id.* at 1124 (citation omitted).

        This case is not a class action, but that makes bifurcation even <u>more</u>

appropriate.  After all, the point of certifying a 900-member class would have been

to make the case more manageable than what Gebhardt's choices have created here,

a case in which 900 different plaintiffs must each be treated as full parties rather

than class members.  *See* Rule 23(a), Fed. R. Civ. Proc. (class actions to be used in

cases where joinder of numerous persons as parties "is impracticable").  With the

class action device unavailable here to make the case more manageable, the use of

other means of case management, such as bifurcation, becomes essential. [11]

_____

        [11] Although the Amended Complaint indicates that the case is brought as a
class action, plaintiffs withdrew the motion to certify the class.  In any event, class
certification would not help make this case more manageable, since the class

                                                                (continued...)

It is now apparent that even the represented parties will need until the current February 2008 discovery deadline to complete discovery on the liability issues alone.  Discovery on damages incurred by 900, or even 200, individual plaintiffs will be far too time- and resource-consuming to be undertaken during the same period.  The added benefit of bifurcation is that if defendants prevail at the liability stage (which this Court's decision denying plaintiffs' motion for preliminary injunction recognized is the likely outcome), discovery on damages will be unnecessary and the parties will not have wasted resources on it.

<u>Conclusion</u>

For the reasons stated above, the motion of Gebhardt and Associates to withdraw as counsel for 714 plaintiffs should be denied.  For the reasons stated above, defendants' motion that discovery and trial on liability and damages be bifurcated and that the existing scheduling order be modified so that discovery will proceed only with respect to liability at this time should be granted.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

---

[11](...continued)
definition coincides with the list of named plaintiffs.  Amended Complaint ¶ 1.  If the proposed class were certified, it would not transform the 900 plaintiffs who are not class representatives into mere class members without named-party status.  It would only (and pointlessly) make them class members <u>and</u> named plaintiffs.  All the problems of managing a 900-plaintiff case would remain.

STUART A. LICHT
Assistant Branch Director
Civil Division

_____/s/ Brian G. Kennedy_____
BRIAN G. KENNEDY (D.C. Bar # 228726)
MARCIA BERMAN (PA Bar # 66168)
WILLIAM B. JAFFE (NY Bar)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 6104
Washington, D.C.  20530
Tel.: (202) 514-3357  Fax: (202) 616-8470
Email: brian.kennedy@usdoj.gov

Attorneys for Defendants