**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KATHLEEN A. BREEN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | C.A. No. 05-00654 (RWR) |
| ) | |
| MARY E. PETERS ) | |
| SECRETARY OF TRANSPORTATION ) | |
| DEPARTMENT OF TRANSPORTATION, et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**REPLY TO DEFENDANTS' OPPOSITION TO MOTION OF
GEBHARDT & ASSOCIATES TO WITHDRAW AS COUNSEL FOR
714 PLAINTIFFS AND PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO BIFURCATE DISCOVERY AND TRIAL**

Defendants' Opposition to Gebhardt & Associates' Motion to Withdraw as Counsel for 714 Plaintiffs and their Motion to Bifurcate Discovery and Trial on Liability and Damages border on bad faith and are unworthy of the government.

By Minute Order of February 7, 2007, this Court denied the Plaintiffs' Motion for Class Certification.[1]  With that decision, the Court made this a case of 912 individual Plaintiffs.  At the time of the decision on February 7, the Court and the Defendants were fully aware that certain Plaintiffs would be proceeding *pro se*. See Joint Meet and Confer Statement, filed January 31, 2007, ¶ (2)(a), at 5-6.  Defendants made no objection to Plaintiffs'

---

[1] The Court's denial was without prejudice.

statements in the Joint Meet and Confer Statement about certain Plaintiffs proceeding *pro se*.  See id.[2]

Similarly, at counsel's Meet and Confer meeting, the issue of bifurcation was discussed.  That discussion is reflected in the following statement contained in the Joint Meet and Confer Statement: "Neither party believes that either the trial or discovery should be bifurcated."  Id. at 11.

Now, nearly six months after the Meet and Confer and the Court's Initial Scheduling Conference, Defendants have filed an Opposition to withdrawal and a Motion to Bifurcate stating that having *pro se* Plaintiffs in this case "will severely prejudice defendants" and "will delay resolution of the case."  Defendants' Memorandum of Points and Authorities 1) in Opposition to Gebhardt and Associates' Motion to Withdraw as Counsel for 714 Plaintiffs and 2) in Support of Defendants' Motion to Bifurcate Discovery and Trial on Liability and Damages (hereinafter "Defendants' Opposition") at 1.

---

[2] "Within 60 days of the Court's Scheduling Order, Plaintiffs' counsel will file a Praecipe with the Court indicating which Plaintiffs they continue to represent, which Plaintiffs are stating they will proceed pro se, and which Plaintiffs seek voluntary dismissal of their claims. For each of the pro se individuals, Plaintiffs' counsel will provide the Court with their last known mailing addresses, phone numbers, and email addresses."

According to Defendants, the burden of these *pro se* Plaintiffs requires Gebhardt & Associates (hereinafter sometimes "the firm") to remain responsible for all 911[3] of them despite being unpaid by most of them,[4] against the tacit consent of most of them and the explicitly stated desire of some of them.  Further, Defendants assert, this burden requires that discovery and trial be bifurcated, creating one case to deal with liability and another, to be begun from scratch, to deal with damages.  Given the inflated nature of the difficulties they imagine, and the absence of solutions more or less obvious upon unbiased examination of the case, it is difficult to avoid the suspicion that Defendants' real concern is a desire to handicap the Plaintiffs who wish to continue vigorous representation through Gebhardt & Associates rather than a genuine fear that the case in its current posture cannot be litigated.

---

[3] One of the original number, Larry W. Reid, is deceased.  A suggestion of death upon the record was filed on May 8, 2007.

[4] One hundred seventy-seven (177) Plaintiffs have indicated a continuing desire to be represented by the firm and have made arrangements to pay them.  This figure includes the 20 applicants for joinder and former Plaintiff Steven Szymanski, who seeks to be reinstated as a Plaintiff.

**I.   No Good Reason Exists to Refuse Permission to Gebhardt & Associates to Withdraw from Representing Plaintiffs Who Do Not Object to Counsel's Withdrawal <u>And Who Will Not Pay for Representation.</u>**

Defendants assert that Gebhardt & Associates has not shown good cause to withdraw, in that it is not clear why the prospective *pro se* Plaintiffs are not paying the firm for continued representation, and speculate that their failure to communicate with counsel is due to dissatisfaction with the choices being offered by counsel rather than a willingness not to be further represented. Defendants' Opposition at 2, 11-18. The attached Declaration of Kathleen A. Breen (Exhibit 1 hereto), former President of the National Association of Air Traffic Specialists, Plaintiffs' erstwhile Union, clarifies the situation. As recited in the Declaration, the Union retained Gebhardt & Associates, on an hourly fee basis, to oppose the decision to outsource the Flight Service on the ground that it violated the ADEA, on behalf of every member over the age of 40 who expressed a wish to participate. Each individual union member who wished to challenge the decision signed an individual letter of request to the firm to file a complaint on his or her behalf. The Union continued to pay the firm's fees and expenses for this suit through February 3, 2006, 11 months before the Court allowed this case to go forward. Exhibit 1, ¶¶ 6, 9.

However, as explained in the Declaration, following this Court's refusal to enjoin the reduction-in-force ("RIF") that resulted from the award of the contract to Lockheed Martin, and Lockheed's refusal to recognize the Union as representative of the Flight Service Controllers to whom it offered employment, NAATS has continued to represent only the Flight Service Controllers in Alaska. The Alaska controllers, still employed by the FAA, have no cognizable interest in this lawsuit, and their union no longer receives dues payments from the Plaintiffs. The Union cannot therefore reasonably continue to pay the fees and expenses of the suit. Id. ¶¶ 7, 10-11.

On the other hand, it is unreasonable to expect counsel to continue to litigate this action, which will certainly continue for more than another year, without payment.[5] It appears that all of the Plaintiffs recognize this. One hundred seventy-seven (177) Plaintiffs have agreed to pay the firm to continue its representation of them, some have withdrawn, and some have

---

[5] Defendants purport to find it surprising that, as the RIF occurred in October 2005, the firm began only in February 2007 to work out new payment arrangements with the Plaintiffs. Opposition at 15-16 n.8. However, as Defendants are aware, their motion to dismiss this action, or in the alternative, for summary judgment, filed July 24, 2005 (prior to the RIF), was not denied until January 8, 2007. It would hardly have been possible, or even very sensible, to ask Plaintiffs to begin paying for a suit that might not continue (as the government had urged).

explicitly requested to become *pro se*. Significantly, although all 714 Plaintiffs from whose representation the firm's withdrawal is contemplated were invited in the Notice of Withdrawal served upon them to inform the Court by June 25, 2007, if they objected, not a single person appears to have done so.[6] (Presumably, the Clerk of the Court would have electronically filed any such objections on PACER. None have been filed.) While it is impossible to know the thoughts of someone who has not communicated, it is a reasonable inference that the Plaintiffs recognize that, while it is not their fault that the Union is no longer able to pay for their representation, they do not expect counsel to continue on unpaid in the circumstance.[7]

Defendants also describe a "parade of horribles," devastating inconveniences that will supposedly be created by hundreds of *pro se* Plaintiffs all requesting to attend each deposition and participate in each motion, creating nightmarish difficulties with scheduling and motions and potentially requiring repeated depositions of the

---

[6] The fact that not a single Plaintiff has written to object to counsel's withdrawal disproves Defendants' speculation, at page 18 of their Opposition, that the failure of most of the Plaintiffs to communicate with counsel is due to a willingness neither to pay nor to proceed *pro se*.

[7] It is also somewhat unfair to those Plaintiffs who are paying Gebhardt & Associates to insist that many hundreds of others should be represented at their expense.

same witnesses. Opposition at 3-6. This supposition is unrealistic in the extreme. It is highly unlikely that those who could not be bothered even to communicate with Gebhardt & Associates will suddenly decide to take an active part in the litigation. The majority will probably fail to answer even the existing discovery[8] and be dismissed in the near future for failure to prosecute. Moreover, there is no reason to suppose that even those who have indicated an affirmative desire to proceed *pro se* have been vested with delusions that they are Clarence Darrow reincarnated. These individuals are present or former Air Traffic Controllers, not lawyers. Although the majority no longer work as Flight Service Controllers, a great many are employed or seeking employment or occupied with other concerns. It is far more likely that they intend to pursue a more rational course of conduct, *i.e.*, to respond to discovery directed to them and "free ride" on the professional discovery and motions being conducted on behalf of their represented co-Plaintiffs. There is no reason to imagine that discovery scheduling or motions will be affected by the *pro se* Plaintiffs.

---

[8] As Defendants' counsel are aware, Gebhardt & Associates has forwarded Defendants' discovery requests to date to all 911 surviving Plaintiffs. Those who have not indicated that they wish to be represented by the firm were given the address for Brian G. Kennedy, Defendants' counsel, and instructed to mail their responses to him by May 21, 2007.

Nor does communication with the *pro se* Plaintiffs present an insurmountable problem. Even assuming Defendants are correct that Fed. R. Civ. P. 5(b)(2)(D) bars the Court from requiring parties to accept electronic service without their consent (Opposition at 6-7), there is no reason to suppose that any Plaintiffs who wish to continue in the case *pro se* would not consent to such service if requested to do so. The Notes of the Advisory Committee on the 2001 amendments to the Rule state that "[c]onsent is required . . . because it is not yet possible to assume universal entry into the world of electronic communication." However, as Air Traffic Controllers are perforce experienced in the use of state-of-the-art computers, it is virtually certain that these Plaintiffs have entered the world of electronic communication and understand the benefits thereof.[9]

In summary, Defendants have pointed to no convincing reason that justifies requiring Gebhardt & Associates to continue as unpaid counsel to 714 Plaintiffs who are not paying or communicating with them and who consent to their withdrawal.

---

[9] Other alternatives to mailing notices to all *pro se* Plaintiffs may also exist. For example, it is possible that groups of Plaintiffs might, on request, designate a "discovery representative" to receive communications concerning depositions and designate representative attendees.

## -II. Bifurcation of Discovery and Trial Will Not Further Convenience Nor Be Conducive to Expedition or Economy.

The sole basis presented by Defendants to justify bifurcation in this case is the large number of Plaintiffs in this case. Defendants concede that whether or not they are represented by counsel is irrelevant, because in their view the existence of more than 900 individuals as Plaintiffs ended the possibility of good case management options. Opposition at 19. However, as already discussed, the overwhelming management problems foreseen by Defendants are simply nonexistent.

Defendants also rely on what they allege to be "experience with [their] limited discovery to date." Opposition at 19; see id. at 9-10. Actually, however, while collecting responses from 177 individuals (those Plaintiffs who are represented by Gebhardt & Associates) living in almost every part of the United States is certainly more time-consuming than collecting responses from one or two people, responses to Defendants' discovery are well underway. Responses relating to 76 Plaintiffs were served on Defendants on June 13, 2007; an additional 61 responses have been served today. The remaining 40 are expected to be provided within the next month.

Moreover, if it is difficult to contact a large number of Plaintiffs once, it follows that it will be twice as difficult to do so twice, which would be the necessary result of bifurcation. There

9

is no reason why information as to each individual's economic harm cannot be gathered at the same time as any other information sought from them.

In point of fact, Defendants have already begun discovery concerning damages, and have received a substantial amount of evidence on the subject from Plaintiffs. Defendants' First Set of Interrogatories and Requests for Production of Documents is attached as Exhibit 2. With the exception of Interrogatory No. 1, which is directed to the identities of the Plaintiffs, each of the Interrogatories and related Requests for Production of Documents is directed toward damages incurred by Plaintiffs: mental or emotional distress (Interrogatory No. 2), relevant employment and salary history (Interrogatory No. 3), and basis of relief sought (Interrogatory No. 4). As noted above, the responses from the 177 represented Plaintiffs to these questions are nearly complete. The *pro se* Plaintiffs have been mailed Defendants' discovery requests by Plaintiffs' counsel, as previously indicated. Thus, Defendants have already conducted much of their discovery concerning liability!

Generally speaking, cases are bifurcated when very different, and sometimes confusing issues, would otherwise have to be tried simultaneously. For example, in Ricciuti v. New York City Transit Authority, 796 F. Supp. 84 (S.D.N.Y. 1992), cited by Defendants, a

major reason for the bifurcation was to separate completely different issues: The issue for the first trial was the liability of individual defendants for assault and other outrageous torts, while the issue for the second trial (assuming the complained-of acts were found to have occurred) was the alleged negligent hiring and training of New York City transit police and others. Bifurcation was appropriate not merely because the outcome of the first trial might obviate the need for the second, but also because the issues to be tried were factually unrelated. A second and more important reason was that evidence about the departmental issues, which was predicted to include evidence of assaults by non-defendant officers on non-plaintiff individuals, had a substantial propensity to prejudicially taint the trial of individual defendants. 796 F. Supp. at 86.

Berger v. Iron Workers Reinforced Rodmen, Local 201, 170 F.3d 1111 (D.C. Cir. 1999), provides another example of when bifurcation is appropriate. The Berger decision states that a "typical" Title VII case is bifurcated between liability and damages. 170 F.3d at 1124. However, as the court went on to describe, even after liability is proved in a typical class action, at the damages phase,

> it remains for [each] particular individual to prove the defendant's liability to him.... Each claimant is relieved of the burden of proving that defendants discriminated against the class, not that he is part of the class.

170 F.3d at 1125 (<u>quoting</u> from Def. Br. at 33). In short, in the typical class action for discrimination, the damages phase includes evidence not merely concerning the damage suffered by each individual, but whether the facts show that he or she was in reality a member of the discriminated-against class. It is evident that trying the facts of each individual's experience simultaneously with the question of whether discrimination occurred has the potential to prejudice the evaluation of each putative class member's circumstances.

The consideration of a typical class action is not relevant here. If Plaintiffs prove that the outsourcing and the RIF were a violation of the ADEA, then it is undisputed that each Plaintiff is a victim of the unlawful action, as it is undisputed that every single one of them was over 40 years of age and was separated from government service as a result of the action. There can be no confusion about the status of individual Plaintiffs due to the proof adduced relating to the discriminatory act. The damages portion of this lawsuit for each Plaintiff will relate solely to the harm suffered, not to whether each was in fact a victim of the discrimination proved to have occurred. As noted above, Defendants have already gathered substantial data on that via discovery.

In this case, bifurcation has the potential to substantially delay and prolong the case if Plaintiffs prove liability, and no tendency to shorten or simplify the case significantly. In short, bifurcation of this case would be inappropriate.

### Conclusion

Defendants' arguments are imaginary and speculative and, given the prior proceedings in this case the the six months still remaining for discovery, definitely border on bad faith. Wherefore, for the reasons stated above and in counsel's Motion to Withdraw as Counsel for 714 Plaintiffs, this Court should permit the withdrawal of Gebhardt & Associates from representation of 714 Plaintiffs and should decline to bifurcate this action.

Respectfully submitted,

_____/s/_____
JOSEPH D. GEBHARDT
    (D.C. Bar No. 113894)
LENORE C. GARON
    (D.C. BAR No. 172205)
CHARLES W. DAY, JR.
    (D.C. Bar No. 459820)
MARK A. DANN
    (D.C. BAR No. 484523)
GEBHARDT & ASSOCIATES, LLP
1101 17th Street, N.W.
Suite 807
Washington, DC 20036-4716
(202)496-0400

June 13, 2007         Counsel for Plaintiffs