IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                             )
KATHLEEN A. BREEN, et al.,                   )
                                             )
        Plaintiffs,                          )
                                             )
                    v.                       )       Case No. 1:05CV00654-RWR
                                             )
RAY H. LAHOOD, et al.,                       )
                                             )
        Defendants                           )
_____ )


<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Defendants, by their undersigned attorneys, hereby move, pursuant to Rule 56, Federal

Rules of Civil Procedure, for summary judgment.

The grounds for this motion are that defendants are entitled to judgment as a matter of

law and that there are no genuine issues with respect to any facts material to defendants'

entitlement to judgment as a matter of law.

In support of this motion, defendants rely on, and respectfully refer the Court to:

– The memorandum of points and authorities, filed herewith;

– Defendants' statement of material facts as to which there are no genuine issues, filed

herewith;

– The depositions taken in this action.  The portions of the depositions cited and

discussed in the accompanying memorandum are excepted and filed herewith;

– The declarations of Norman Y. Mineta, Maureen A. Vorce, and Aaron McDaniel, all

filed herewith;

– The declarations previously filed in support of defendants' August 24, 2005 motion to

dismiss or, in the alternative, for summary judgment (Docket # 23), of which the

following are cited in the accompanying memorandum and refiled herewith: Declarations

of Marion C. Blakey, Daniel J. Courain, Dennis DeGaetano, John Hennigan, Joann

Kansier, Wanda Reyna, Paul J. Sheridan, James H. Washington, and George W.

Williams, Jr.

– The reports of defendants' experts William J. Carrington, Bernard R. Siskin, and

William D. Turner; and

– The exhibits filed herewith and individually listed in the index of exhibits also filed

herewith (the exhibit styled "NAATS proposal," though filed herewith as an exhibit for

the convenience of the Court, is not relied upon but is discussed in the accompanying

memorandum for the limited purpose of demonstrating that, even assuming its

genuineness and admissibility, no genuine issue with respect to defendants' entitlement

to summary judgment is raised).

In addition, defendants cite and file for the convenience of the Court the report of

plaintiffs' liability-issues expert, Dale Belman.  Although defendants do not rely on Belman's

report, that report is discussed in the accompanying memorandum for the limited purpose of

demonstrating that, even assuming its admissibility, no genuine issue with respect to defendants'

entitlement to summary judgment is raised.

A proposed order is submitted herewith.

Respectfully submitted,

TONY WEST
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

STUART A. LICHT
Assistant Branch Director
Civil Division

Of Counsel:                              /s/ Brian G. Kennedy
                                          BRIAN G. KENNEDY (DC Bar No. 228726)
Eden Brown Gaines, Esq.                   ADAM D. KIRSCHNER (IL Bar No. 6386601)
Michael Doherty, Esq.
Julia A. Rhodes, Esq.                     United States Department of Justice
Personnel & Labor Law Staff               Civil Division, Federal Programs Branch
Office of Chief Counsel                    20 Massachusetts Avenue N.W.  Room 7126
Federal Aviation Administration           Washington, D.C.  20530
600 Independence Ave., S.W.               Telephone:  (202) 514-3357
Room 1E100                                Fax:  (202) 616-8470
Washington, D.C. 20591                    Email: brian.kennedy@usdoj.gov
Phone: (202) 385-8254
Fax: (202) 493-5085                       Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                             )
KATHLEEN A. BREEN, et al.,                    )
                                             )
        Plaintiffs,                           )
                                             )
              v.                              )        Case No. 1:05CV00654-RWR
                                             )
RAY H. LAHOOD, et al.,                        )
                                             )
        Defendants                            )
_____)

DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE ARE NO GENUINE ISSUES

        Pursuant to Local Rule 7.1(h), defendants hereby submit the following statement of

material facts as to which there are no genuine issues with regard to their motion for summary

judgment:

    1.      At the time of the Reduction in Force (RIF) of Flight Service Specialists (October

            3, 2005), the Air Traffic Organization ("ATO") in the FAA administered the air

            traffic control functions within the FAA, including en route, terminal, and flight

            service functions.  See FAA Organizational Chart, June 18, 2004, Ex. 31.

    2.      Terminal (including tower and terminal radar approach and non-radar approach)

            and en route controllers are air traffic controllers who are actively engaged in the

            separation and control of air traffic.  Sheridan Decl. (Docket # 23-6) ¶ 7; Reyna

            Decl. (Docket # 23-10) ¶ 4; Report of Defs.' Expert William D. Turner ("Turner

            Rep't") at 3-4.

    3.      Flight service specialists are controllers actively engaged in providing preflight,

            inflight, and airport advisory service to aircraft operators.  See Elias Dep. 29-31;

*Currier* Dep. 15; *Jensen* Dep. 25; *Mitchell* Dep. 15; Turner Rep't at 5-6.[1]

4.    The primary function of flight service specialists is to provide meteorological and aeronautical information to assist pilots in planning a safe flight.  *See* Sheridan Decl. ¶ 4; Pls.' Response to Dfs.' Stm't of Material Facts as to Which There are No Genuine Issues, September 16, 2005 (Docket #31-2) ("Pls.' Resp.") ¶ 43.

5.    Unlike aircraft separating controllers, flight service specialists are not authorized to direct pilots with air traffic control instructions used to separate planes.  *See Brydon Dep*. 30; Turner Rep't at 3-5; Jackson-Brame Dep. 26-27; Sheridan Decl. ¶¶ 7-8; Reyna Decl. ¶ 6; *Mitchell* Dep. 20; Sturgell Dep. 52.

6.    Flight service specialists cannot immediately move into non-developmental positions as terminal or en route controllers without training and certification. Reyna Decl. ¶ 6.

7.    Flight service specialists do not have policy-level decision-making authority or the ability to bind the Government to one course of action over another, in the performance of their duties.  Sheridan Decl. ¶¶ 4, 6, 8; Pls. Resp. ¶ 46.

8.    FAA flight service had never been the sole source for all pilots to obtain weather briefings and file flight plans.  *See Elias Dep.* 95; Sturgell Dep. 52.

9.    Commercial airlines have relied on their own or a contractor's employees to per-form such functions.  *See Elias Dep.* 95; Sturgell Dep. 52; *Brydon* Dep. 44;

---

[1]  In citing depositions, names of deponents who are plaintiffs (including dismissed plaintiff Dodson) are in italics.  Names of other deponents are in plain type.  The table of persons includes a brief identification of deponents' roles in the case.  The deposition excerpts are not cited by exhibit numbers in the brief, but are given exhibit numbers and listed in the index to exhibits in alphabetical order.

Brown Dep. 52; Sheridan Decl. ¶ 12.

10.    Some general aviation pilots have used private companies instead of FAA flight

services for weather briefings and flight planning.  Brown Dep. 52.

11.    There were 35% more licensed pilots in the United States in 1980 than there were

in 2005.  *See FAA Certificate Pilots 1929-2007,*

http://www.aopa.org/whatsnew/stats/pilots.html (last visited April 22, 2009).

12.    The number of general aviation hours flown declined during the quarter century

preceding the 2005 RIF of flight service specialists. *U.S. General Aviation*

*Accidents, Fatalities, and Rates – 1938 -2005,*

http://www.aopa.org/special/newsroom/stats/safety.html (last visited April 22,

2009).

13.    The number of general aviation hours flown in 2005 were less than 70% of the

hours flown in 1980.  *Id.*

14.    During the years preceding the RIF, there was an increasing ability and demand

for some services previously provided by Automated Flight Service Station

("AFSS") to be provided on-line.  Sheridan Decl. ¶ 6; Pike Dep. 33-34; Shew

Dep. 50; Pls.' Resp. ¶ 47.

15.    During a single ten-year span, fiscal 1994 through fiscal 2003, the number of pilot

briefings conducted by specialists declined by 26%, the number of flight plans

filed through specialists declined by more than 12%, and the number of aircraft

contacted by specialists fell nearly 40%.  *See* FAA Air Traffic Activity Statistics,

Exs. 2-3.

- 3 -

16.     The FAA initiated a modernization plan in 1978, relying on consolidation and

        automation.  The FAA consolidated from 318 Flight Service Station into 61

        automated Flight Service Stations.  The FAA retained 14 non-automated stations

        in Alaska as part of the consolidation plan.  *Flight Service Modernization Plan*,

        45 FED. REG. 26202 (April 1, 1980); 1996 Office of the Inspector General Report

        1996 ("1996 IG Report")*,* Ex. 5, at 2-3, 5; Flight Service Architecture Core Group

        Report, April 30, 1998, Ex. 6, at 4-1, P00768.

17.     This consolidation process had not been completed by 1996, when the FAA still

        had 16 non-automated stations to close in the contiguous United States.  The

        closing of these 16 stations were included in the FAA's FY 1997 budget

        submission.  1996 IG Report at 2.

18.     In the years preceding the RIF, the number of Flight Service Specialists being

        hired by the FAA was declining.  *Department of Transportation and Related*

        *Agencies Appropriations for 1998: Hearing Before the Subcomm. on Trans-*

        *portation and Related Agencies of the H. Comm. on Appropriations*, 105th Cong.

        48 (1997) (statement of Michael F. McAnaw); *Breen* Dep. 142.

19.     In the years preceding the RIF, the number of Flight Service Specialists being

        employed by the FAA was declining.  *Department of Transportation and Related*

        *Agencies Appropriations for 1998: Hearing Before the Subcomm. on Trans-*

        *portation and Related Agencies of the H. Comm. on Appropriations*, 105th Cong.

        48 (1997) (statement of Michael F. McAnaw); *Breen* Dep. 142.

20.     A potential source for substantial savings for the FAA in the years preceding the

RIF was to further consolidate the number of offices that the FAA used to provide

flight services.  1st Hennigan Dep. 129; Pls.' Resp. ¶ 47.

21.   Several internal and external studies, conducted from 1996 through 2001, found

that the FAA could provide AFSS services differently and in a more cost effective

manner.  *See* Hennigan Decl. (Docket # 23-19) ¶ 10; Pls.' Resp. ¶ 7.

22.   Several internal and external reports to the FAA that were issued between 1996

and 2001 recommended further consolidation of flight service stations.  These

reports include 1996 and 2001 Office of Inspector General reports, 1997 National

Civil Aviation Review Commission ("NCARC") Report, and 1998 FAA Flight

Service Architecture Core Group Report.  *See* Exs. 5-7; NCARC Final Report,

http://www.library.unt.edu/gpo/NCARC/reports/pepele.htm, Part II, § V.C. (last

visited April 22, 2009) ("NCARC Report").

23.   The 1996 and 2001 Inspector General reports concluded that efficiencies and cost

savings could be realized from restructuring and consolidating the services

performed at automated flight service stations.  Henningan Decl. ¶¶ 11,13; Pls.'

Resp. ¶ 8; 1996 IG Report; 2001 Office of the Inspector General Report ("2001

IG Report"), Ex. 7.

24.   In its 1996 report, the Inspector General recommended that the FAA should

"consider having the private sector provide the full range of flight services."

1996 IG Report at 8.

25.   In its 2001 report, the Inspector General estimated that the FAA could realize cost

savings of nearly $500 million over seven years by consolidating the FAA's

existing 61 automated flight service stations. *See* 2001 IG Report at 1; Pls.' Resp. ¶ 9.

26.     In addition, the Inspector General determined that consolidation of the existing automated flight service stations could be accomplished "without degradation to safety or service." 2001 IG Report at 1; Pls.' Resp. ¶ 10.

27.     The 1997 NCARC Report concluded that the FAA could save over $1 billion through consolidating flight service stations and by expanding the use of Direct User Access Terminal Service to provide pre-flight briefings, weather briefings, and flight plan filings.  NCARC Report, Part II, § V.C.

28.     The NCARC also concluded that the FAA could accomplish these savings "while maintaining or improving safety and existing services to the general aviation community."  *Id*.

29.     The April 1998 Flight Service Architecture Core Group Report recommended consolidation of AFSS facilities after assessing operational demand.  Henningan Decl. ¶¶ 12; Pls.' Resp. ¶ 8; Flight Service Architecture Core Group Report, April, 1998, Executive Summary, Ex.6, at P00760.

30.     The 1997 FAA Financial Assessment by Coopers and Lybrand, LLP noted that the "consolidation of flight services will ultimately produce savings for the FAA." Coopers & Lybrand Study, §VI(C), Ex. 4 at D004850.

31.     Pursuant to Office of Management and Budget (OMB) Circular No. A-76 and the Federal Activities Inventory Reform (FAIR) Act of 1998, agencies are directed to classify, on an annual basis, all activities performed by government personnel as

either commercial or inherently governmental.  *See* Hennigan Decl. ¶¶ 2, 8; Pls.'
Resp. ¶ 1.

32.  In 2001, President Bush placed the Competitive Sourcing Initiative on his
management agenda in an effort to expand competitions under OMB Circular A-
76.  *See* Mineta Decl. ¶¶ 6-9; Hennigan Decl. ¶ 9; Pls.' Resp. ¶ 3.

33.  Secretary of Transportation Norman Mineta took the President's Management
Agenda very seriously.  *See* Mineta Decl. ¶ 6.

34.  President Bush's management agenda for fiscal 2002 required federal agencies to
do a cost comparison (to determine if the function could be performed more
efficiently by a private company) or directly convert 15% of its commercial
activity inventory (using the calendar year 2000 FAIR Act Inventory as a
baseline), and that this be accomplished by the end of fiscal year (FY) 2003.  *See*
President's Management Agenda, Fiscal Year 2002, Ex. 8, at 18; Hennigan Decl.
¶ 9; Pls.' Resp. ¶ 4.

35.  In fiscal 2002, while preparing its budget request for fiscal 2003, the FAA had
asked the President to ask Congress for budget authority to buy modern software
for its AFSSs.  Bertram Dep. 21-24.

36.  The Office of Management and Budget informed the FAA that it would not
budget money for all of the modern software that the FAA requested for AFSSs,
but rather noted that the FAA should consider consolidating AFSSs.  *Id*. at 23.

37.  Chris Bertram, the FAA's Chief Financial Officer, suggested that, rather than
simply consolidating the flight service stations, the agency should use the A-76

process to consider how to more efficiently provide flight services. *Id*. at 28.

38.    The FAA had been under pressure during fiscal 2002 to save money. *Id*. at 28-29.

39.    The FAA was also under pressure to consider functions for possible competitive sourcing. *Id*. at 28-29; 1st Hennigan Dep. 51, 58; Hennigan Decl. ¶¶ 9, 16.

40.    On June 19, 2002, Bertram issued a memorandum to the Administrator of the FAA Jane Garvey, informing her that the Office of Financial Services for the FAA had determined that the FSS function, except in Alaska, should be used to meet the current OMB requirements for competitive sourcing. *See* Bertram Memorandum to Administrator, June 19, 2002, Ex. 10.

41.    Betram informed the Administrator Garvey in that June 19, 2002, memorandum that according to instructions from OMB, federal agencies must complete public-private or direct conversion competition on not less than 15 percent of the full time equivalent positions, approximately 1,100 positions for the FAA, listed on their FY 2000 commercial activity inventory by the end of FY 2003. *Id*.

42.    In that same memorandum, Bertram informed the Administrator Garvey that the FAA had engaged an outside contractor to perform a feasibility study to clarify the scope of the review. *Id*.

43.    The feasibility study performed by Grant Thornton, completed in July 2002, determined that the AFSS function was a strong candidate for competitive sourcing because (i) private companies could accomplish the work; (ii) private companies were interested in bidding for and performing the work; and (iii) outsourcing would not compromise safety or homeland security. Hennigan Decl.

¶¶ 14-15; Pls.' Resp. ¶ 14.

44. On August 21, 2002, Bertram wrote to the Acting Administrator of the FAA
    Monte Belger that Bertram had accepted the results of the feasibility study and
    decided to proceed with a study of the FSS function for competitive sourcing
    excluding the FSS function in Alaska.  Memorandum from Bertram to Acting
    Administrator, August 21, 2002, Ex 11.

45. Bertram informed Acting Administrator Belger in that memorandum that
    competitive sourcing is one of the five initiatives in the President's Management
    Agenda and that the study of flight services is a central part in the FAA's efforts
    to meet the requirements of the initiative.  *Id*.

46. In this August 21, 2002, memorandum, Bertram stated that Alaska would be
    excluded from the study because of the unique nature and requirements of
    aviation in Alaska.  *Id*.

47. The flying conditions in Alaska are unique compared to the rest of the United
    States.  *See* Sturgell Dep. 79-80; *Alaska Aviation*, *Field Hearing Before the S.
    Comm. on Commerce, Science & Transportation* 109th Cong. 49 (2005)
    (Statement of Phil Brown, Director, NAATS Alaska Region).

48. Bertram did not consider the age of the flight service specialists in reaching the
    decision to study the flight service function pursuant to Circular A-76.  Bertram
    Dep. 111.

49. Bertram's decision to subject flight service stations to the A-76 process was based
    on budgetary and financial concerns.  Bertram Dep. 107.

50.    Bertram did not know the age of the flight service workforce.  Bertram Dep. 111.

51.    Bertram's deputy, John Hennigan, did not consider the age of the flight service

specialists in any of the decisions he made in considering the flight service

function for competitive sourcing.  Hennigan Decl. ¶ 23; 1st Hennigan Dep.

164-65.

52.    Even if Hennigan had considered the age of the flight service specialists, he

would have taken the same actions to comply with the President's Management

Agenda.  Hennigan Decl. ¶ 23.

53.    In September 2002, the FAA transmitted to the Department of Transportation

(DOT) a list of functions to be included on the 2002 FAIR Act Commercial

Activities Inventory. This list included functions performed by Flight Service

Specialists.  *Id*. Hennigan Decl. ¶ 6; Pls.' Resp. ¶ 16.

54.    Hennigan's office was in charge of putting together the FAIR Act Inventory for

the FAA.  1st Hennigan Dep. 27.

55.    Hennigan did not consider the age of the employees in making a determination or

recommendation concerning what should be listed in the FAIR Act Inventory as

inherently governmental or a core function of the FAA.  Hennigan Decl. ¶ 23**;**

1st Hennigan Dep. 164-65.

56.    In March 2003, the National Association of Air Traffic Specialists ("NAATS")

challenged the FAA's inclusion of Flight Service Specialist functions on the

Commercial Activities Inventory.  Hennigan Decl. ¶ 17; Pls.' Resp. ¶ 17.

57.    In April 2003, the FAA denied NAATS' challenge and NAATS appealed to the

DOT.  Hennigan Decl. ¶¶ 18-19; Pls.' Resp. ¶ 18.

58.   On May 9, 2003, DOT upheld the FAA's decision.  Hennigan Decl. ¶ 20; Pls.'
      Resp. ¶ 19.

59.   There were six workgroup job functions delineated in the 2002 FAIR Act
      inventory that had more than 1,101 full time equivalent positions.  Report of
      Defs' Expert Bernard R. Siskin ("Siskin Rep't") ¶ 10.

60.   The selection of the flight service function to be competitively sourced is not
      statistically significantly different from what one would expect from an age-
      neutral process in which the FAA selected amongst job functions delineated on
      the 2002 FAIR Act Inventory that each had more than 1,101 full time equivalent
      positions.  *Id*.

61.   The selection of the flight service function to be competitively sourced is not
      statistically significantly different from what one would expect from an age-
      neutral process in which the FAA selected amongst multiple job functions
      delineated on the 2002 FAIR Act Inventory that in the aggregate had more than
      1,101 full time equivalent positions.  *Id*. at ¶ 11.

62.   Amongst the employees in the six job functions delineated on the 2002 FAIR Act
      Inventory that had more than 1,101 full time equivalent positions, the decision of
      which functions were identified as commercial and which functions were
      identified as inherently governmental on the 2002 FAIR Act Inventory had no
      adverse impact on older workers.  *Id*. at ¶ 33.

63.   Amongst the employees in job functions delineated on the 2002 FAIR Act

Inventory that had more than 1,101 full time equivalent positions that were considered performing commercial and non-core functions of the FAA, the decision to select flight service for a public-private competition had no adverse impact on older workers.  *Id*. at ¶¶ 23, 33.

64.   Amongst the employees in the job functions delineated on the 2002 FAIR Act Inventory with more than 1,101 full time equivalent positions, any statistically significant adverse impact on older workers was due to the decision that functions concerned with the separation and control of aircraft were core FAA functions. *Id*. at ¶¶ 31, 33, 34.

65.   As stated in a December 18, 2002, memorandum, Secretary Mineta determined that air traffic control services provided at FAA's en route and larger terminal facilities are core functions of the FAA.  Mineta Determination, December 18, 2002, Ex. 27.

66.   In making that determination, Secretary Mineta considered how significant tower and en route controllers are in maintaining the safety and security of the national airspace.  Declaration of Norman Mineta ¶ 14; Mineta Determination, December 18, 2002 at P01271.

67.   The ages of flight service specialists did not factor into Secretary Mineta's decision not to subject air traffic control services at en route and larger terminal facilities to competitive sourcing.  Mineta Decl. ¶ 16.

68.   In early 2003, Joann Kansier became head the Office of Competitive Sourcing ("ACA").  Kansier Decl. (Docket # 23-4) ¶ 1; Kansier Dep. 29-37; DeGaetano

Dep. 50-51.

69.  Marilyn Jackson-Brame became the deputy director of ACA.  Jackson-Brame

Dep. 40-42, 210-11.

70.  Kansier had not been involved in the prior decision of Bertram's Office of

Financial Services that flight service would be the subject of an A-76 study.

Kansier Dep. 30, 33-34; Kansier Decl. ¶ 3.

71.  Jackson-Brame had been involved in the prior discussions of whether to have an

A-76 study for flight services.  Jackson-Brame Dep. 93-97.

72.  Jackson-Brame had been against having the study.  *Id*. at 111-12.

73.  One of the first steps performed by ACA was to put together a Performance Work

Statement ("PWS"), setting forth for all potential bidders on a uniform basis the

requirements for which they were required to propose solutions.  Kansier Decl.

¶ 5.

74.  A team formed to develop the PWS met in Washington from March 25-27, 2003,

to receive initial training.  Jackson-Brame Dep. 103-105; The Briefer, An Update

on the AFSS A-76 Study, April, 2003, Ex. 15, at P01274.

75.  The PWS team was comprised of FAA management from flight services, NAATS

union members, and contract support from Grant Thornton.  Hopkins Dep. 80-85;

The Briefer, An Update on the AFSS A-76 Study, April, 2003, at P01274.

76.  In early June, the ACA's Acquisition Team published a Request for Information

to solicit input from all interested parties.  The Briefer, An Update on the AFSS

A-76 Study, June, 2003, Ex. 16, at P01278.

77.    By August, ACA had received 18 responses, including from the working group
       that was the precursor to the in-house government bidder, and had followed-up
       with one-on-one sessions with the respondents.  The Briefer, An Update on the
       AFSS A-76 Study, August, 2003, Ex. 17, at P01283.

78.    On December 19, 2003, the FAA announced that the functions performed at the
       automated flight service stations (excluding those in Alaska) would be bid for
       competition pursuant to OMB Circular No. A-76.  *See* DeGaetano Decl. ¶ 3;
       Hennigan Decl. ¶ 21; FAA Notice of Intent to Conduct Competition, Ex. 32; Pls.'
       Resp. ¶ 22.

79.    As part of that announcement and a draft solicitation, the FAA released the draft
       PWS.  FAA Notice of Intent to Conduct Competition; Kansier Decl.  ¶ 7.

80.    A formal Request for Offers was released in May 2004 to the five private sector
       Potential Service Providers who had been selected to compete in the competition
       and to the Most Efficient Organization, the FAA's in-house bidder.  Kansier Decl.
       ¶¶ 2,8, 9.

81.    Both the in-house government bidder, the Most Efficient Organization ("MEO"),
       and outside vendors presented their technical proposals in August 2004 and their
       cost proposals in September 2004.  *Id*. at ¶ 11.

82.    A technical evaluation team ("TET") evaluated the technical aspects of the
       proposals and a cost evaluation team ("CET") evaluated the cost aspects of the
       proposals.  *Id*. at ¶ 12.

83.    The TET included at least twenty-six core members of the team and a total of

- 14 -

approximately sixty individuals who served as either advisors or evaluators.  Neill

Opinion, Public Version ("Neill Opinion"), Ex. 18, at 20; Defs' Responses To

Pls' 3d Set of Interrogatories, Ex. 19, at 18-19.

84.     Judge Edwin B. Neill of the General Services Administration Board of Contract

Appeals, sitting as a special master in the appeal of the award to Lockheed Martin

before the FAA's Office of Dispute Resolutions, described the experience and

background of the TET team as highly impressive.  Neill Opinion at 20.

85.     The "core" of the separate cost evaluation team included at least thirteen

members.  Defs' Responses To Pls' 3d Set of Interrogatories at 19.

86.     After evaluating the proposals, the technical team rated the proposal submitted by

Lockheed Martin as "excellent" on each of four factors (each of which was itself

an amalgam of identified strengths and weaknesses) while the technical team

rated the MEO proposal as "good" on one factor and satisfactory on the other

three.  Neill Opinion at 54-55.

87.     The cost team concluded that Lockheed's bid was more than 5% less costly than

the MEO's proposal.  *Id*. at 52.

88.     The Technical Evaluation Team and the Cost Evaluation Team each submitted a

report to the Source Selection Evaluation Board ("SSEB").  Kansier Decl. ¶ 16.

89.     Jackson-Brame, who was a member of the technical team, concluded that

Lockheed had the best bid.  Jackson-Brame Dep. 208–09.

90.     The SSEB, co-chaired by Kansier and contracting officer Donald King, also

included both technical and cost experts.  Kansier Decl. ¶ 16.

91.     The SSEB rejected the findings of "one influential weakness and one lesser
        weakness" thought by the technical team to have beset the MEO's proposal, and
        likewise rejected the finding of one of the cost risks "said to be present in the
        MEO proposal."  Neill Opinion at 55-57, 99.

92.     The SSEB concluded that Lockheed had the "'best technical solution'" and
        "'clearly provided the greatest benefit to the Government.'"  Neill Opinion at 100.

93.     The age of the employees was not a factor in the SSEB's deliberations.
        Declaration of Maureen A. Vorce ¶4; Kansier Decl. ¶ 26.

94.     On January 31, 2005, concurring with the recommendation of the SSEB, the
        Source Selection Authority, Dennis DeGaetano, decided that what he knew as
        "PSP2, which turned out to be Lockheed Martin," had the best bid.  DeGaetano
        Decl. (Docket # 23-29) ¶ 7.

95.     DaGaetano made his decision on a "'best value basis,'" considering "the
        combination of the impact of the overall benefits, risk, and cost for delivery of
        services to support safe and efficient flight." *Id.* at ¶ 7.

96.     DaGaetano concluded that "[e]ven though the PSP2 proposal cost more than the
        PSP1 [another private company] proposal, the technical superiority of the PSP 2
        proposal [was] worth the price difference." *Id*.

97.     In February 2005, the FAA announced its decision to select Lockheed Martin as
        the vendor to perform the functions of automated flight service stations
        (excluding those in Alaska). *Id*. at ¶ 4; Pls.' Resp. ¶ 28.

98.     DeGaetano did not consider the age of the workforce in making his decision.

- 16 -

DeGaetano Dep. 98; DeGaetano Decl. (Docket # 23-29) ¶ 8.

99.     Even if DeGaetano considered the age of the workforce, he would still have

        selected Lockheed Martin because he considered its proposal to represent the best

        value based on non-age reasons.  DeGaetano Decl. (Docket # 23-29) ¶ 8.

100.    Compared to the *status quo ante*, the FAA has estimated that the contract will

        save taxpayers more than $2 billion.  Original Estimate of AFSS Income and Cost

        Summary, Ex. 21; Reforecast Estimate of AFSS Income and Cost Summary, Ex.

        22; March 31, 2008, Automated Flight Service Station Program: 90-Day Progress

        Report to the House Aviation Subcommittee (Madera Dep. Ex. 2), Ex. 20, at 3-4;

        September 30, 2007, Automated Flight Service Station Program: 90-Day Progress

        Report to the House Aviation Subcommittee (Madera Dep. Ex. 1), Ex. 33, at 3.

101.    Following the February 1, 2005 award of the AFSS contract to Lockheed Martin,

        Agency Tender Official (ATO), James H. Washington, filed a contest on behalf of

        the Most Efficient Organization to challenge the contract decision.  Washington

        Decl. (Docket # 23-35) ¶ 5; Pls.' Resp. ¶ 34.

102.    In March 2005, the principal named plaintiff in this suit, Kathleen A. Breen, filed

        a separate contest and also intervened in the ATO contest.  Neill Opinion at 3;

        Pls.' Resp. ¶ 36.

103.    Plaintiff Kathleen A. Breen filed the contest as the agent for the majority of the

        affected FAA employees.  Neill Opinion at 3; Pls.' Resp. ¶ 37.

104.    Breen was the President of NAATS at the time of the contest.  Neill Opinion at 3

105.    The FAA appointed Judge Edwin B. Neill of the General Services Board of

Contract Appeals to serve as the Special Master to make findings and recommendations on the resolution of the contest.  Neill Opinion at 3-4; Pls.' Resp. ¶ 38.

106.    Judge Neill issued a decision, totaling approximately one hundred pages, that rejected in their entirety the claims of the ATO and Breen.  Neill Opinion; Pls.' Resp. ¶ 39.

107.    On July 20, 2005, the FAA Administrator, Marion Blakey, issued an Order adopting Judge Neill's findings of fact and recommendations in full.  FAA Order 05-348, Ex. 25; Pls.' Resp. ¶ 40.

108.    While the procurement had been proceeding before the Office of Competitive Sourcing, Blakey, knowing that she would later decide any bid contest, had been "in the bubble, which meant" that she "was not involved with the procurement." Blakey Dep. 85.

109.    The age of the employees did not play a role in Blakey's decision to accept Neill's recommendations.  Blakey Decl. (Docket # 23-36) ¶ 5; Blakey Dep. 228.

110.    The extent to which the employees were retirement eligible was not a factor in Blakey's decision to accept Neill's recommendations.  Blakey Decl. (Docket # 23-36) ¶ 5

111.    The FAA issued RIF Notices on or about July 22, 2005, to all AFSS employees covered by the Lockheed Martin contract who would be separated from employment with the FAA after October 3, 2005.  1st Williams Decl. (Docket # 23-34) ¶ 6; Pls.' Resp. ¶ 48.

112.   James Washington, the Vice President of Flight Services at the time of the RIF,

requested the administration of the RIF of all AFSS employees excluding those in

Alaska because their positions were being eliminated by the conversion of their

responsibilities from the FAA to Lockheed Martin.  Washington Decl. ¶ 4.

113.   The ages of the employees did not factor into Washington's request for the

administration of the RIF of all AFSS employees excluding those in Alaska.  *Id*.

at ¶ 6.

114.   The RIF occurred on October 3, 2005.  William Dep. 45.


Respectfully submitted,

TONY WEST
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

STUART A. LICHT
Assistant Branch Director
Civil Division


Of Counsel:                              /s/ Brian G. Kennedy
                                         BRIAN G. KENNEDY (DC Bar No. 228726)
Eden Brown Gaines, Esq.                  ADAM D. KIRSCHNER (IL Bar No. 6386601)
Michael Doherty, Esq.
Julia A. Rhodes, Esq.                    United States Department of Justice
Personnel & Labor Law Staff             Civil Division, Federal Programs Branch
Office of Chief Counsel                   20 Massachusetts Avenue N.W.  Room 7126
Federal Aviation Administration          Washington, D.C.  20530
600 Independence Ave., S.W.              Telephone:  (202) 514-3357
Room 1E100                               Fax:  (202) 616-8470
Washington, D.C. 20591                   Email: brian.kennedy@usdoj.gov
Phone: (202) 385-8254
Fax: (202) 493-5085                      Attorneys for Defendants

- 19 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KATHLEEN A. BREEN, <u>et al.</u>, | ) | Case No. 1:05CV00654-RWR |
|  | ) |  |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
|  | ) | AUTHORITIES IN SUPPORT OF |
| v. | ) | DEFENDANTS' MOTION FOR |
|  | ) | SUMMARY JUDGMENT |
| MARY E. PETERS, <u>et al.</u>, | ) |  |
|  | ) |  |
| Defendants | ) |  |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................................iv

TABLE OF ABBREVIATIONS................................................................................xiii

TABLE OF CITED INDIVIDUALS..........................................................................xvi

EXHIBITS...............................................................................................................xviii

EXPERT REPORTS................................................................................................xxiii

INTRODUCTION..........................................................................................................1

STATEMENT OF THE CASE.......................................................................................3

    1.     FUNCTIONS OF FLIGHT SERVICE SPECIALISTS.............................................3

    2.     JOB PRE-REQUISITES, TRAINING, AND COMPENSATION.........................5

    3.     THE LONG DECLINE IN THE DEMAND FOR FLIGHT SERVICE
         SPECIALISTS' WORK......................................................................................8

         a.    *Decline In Flights In Portion Of Aviation Community Served By FAA
              Flight Service*.......................................................................................8

              i.    *Aviation Community Served By FAA Flight Service*......................8

              ii.    *The Long-Term Decline In General Aviation Flying*.....................10

         b.    *The Rise Of Automated Alternatives To Flight Services*............................11

         c.    *Decline In Measures Of Flight Service Activity*.........................................14

    4.     THE 1978-1997 CONSOLIDATION OF FLIGHT SERVICE.............................14

    5.     SLOWDOWN IN NEW HIRES AND THE RESULTANT AGING OF THE
         WORKFORCE...................................................................................................15

    6.     CALLS FOR FURTHER CONSOLIDATION OF FLIGHT SERVICES...........16

    7.     GOVERNMENT-WIDE POLICIES TO CONSIDER COMPETITION FOR
         COMMERCIAL ACTIVITIES.........................................................................17

    8.     THE DECISION TO CONSIDER FLIGHT SERVICE FOR A PUBLIC-

PRIVATE COMPETITION....................................................................................19

9.      THE PUBLIC-PRIVATE COMPETITION.........................................................23

10.     ESTIMATED SAVINGS TO TAXPAYERS........................................................28

11.     LOCKHEED'S PROMISES TO RETAIN INCUMBENT EMPLOYEES FOR
        LIMITED TIME.............................................................................................29

12.     REDUCTION IN FORCE AND LEGAL CHALLENGES TO LOCKHEED
        CONTRACT....................................................................................................29

ARGUMENT.......................................................................................................................32

I.      THE ONLY PERSONNEL ACTION AT ISSUE IN THIS CASE, THE RIF,
        WAS FREE OF ANY AGE DISCRIMINATION................................................32

        A.      *The Indiscriminate RIF Of Old And Young Flight Service Specialists Was
                Not Discriminatory*....................................................................................32

        B.      *Older Workers Were Not Disproportionately Harmed By The Reduction In
                Force*.............................................................................................................35

        C.      *The Plaintiffs Have Not Properly Raised Any Claim With Regard To Post-
                RIF Hiring, And In Any Event Have Not Shown Any Discrimination With
                Respect To Such Hiring*..............................................................................38

                1.      *Because Plaintiffs' Notice Of Intent To File Civil Action Did Not
                        Raise Any Claim Of Discrimination In Later Hiring Of Specialists
                        For Other FAA Positions, The Court Lacks Jurisdiction Over Such
                        Claims*.............................................................................................38

                2.      *Plaintiffs Have Not Shown That, In Selecting Among Former
                        Flight Service Specialists For Different Positions, Defendants
                        Discriminated On The Basis Of Age*...............................................41

        D.      *Plaintiffs Did Not Raise Any Claims With Respect To The FAA's
                Continued Direct Performance Of Flight Service In Alaska, Which In Any
                Event Was Justified Under The Unique Conditions Present In Alaska*.....44

II.      PLAINTIFFS' ATTEMPTS TO CHALLENGE UNDERLYING STRUCTURAL DECISIONS THAT WERE NOT PERSONNEL ACTIONS WOULD RESULT IN AN UNWARRANTED EXPANSION OF THE SCOPE OF THE ADEA.....49

III.     THE DECISIONS THAT LED TO THE RIF WERE NOT DISCRIMINATORY.........................................................................54

      A.     *The Court Should Not Substitute Its Judgment For An Employer's Judgment To Have A RIF*.........................................................55

      B.     *There Was Not A Discriminatory Decision To Have A RIF*.....................57

      C.     *Plaintiffs' Statistical Evidence Does Not Support A Conclusion That The RIF Was Discriminatory*.........................................................59

          1.     *Plaintiffs' Statistical Evidence Does Not Support A Conclusion That There Was Disparate Treatment*.............................59

          2.     *Plaintiffs' Statistical Evidence Does Not Support A Conclusion That There Was A Disparate Impact on Older Workers*..............63

      D.     *Defendants' Designation Of Flight Service Specialist Positions As Commercial Was Correct Rather Than Discriminatory*..........................64

      E.     *Plaintiffs' Assertion That The FAA Should Have Outsourced Aircraft Separating Controllers Rather Than Flight Service Specialists Does Not Establish Any Age Discrimination*.............................................68

      F.     *The Determination By FAA's Office of Financial Services That Flight Services Was A Suitable Subject For A Competitive Sourcing Study Was Not Based On Age*.....................................................................72

      G.     *The Agency's Decision That Lockheed's Bid Offered Taxpayers The Best Value Was Not Based On Age*.................................................78

          1.     *The Alleged "NAATS Proposal"*...................................78

          2.     *The Decision That Lockheed's Bid Was Best*...............................83

      H.     *Even If Plaintiffs Had Demonstrated That Consideration of Age Played Role In The Decisions They Challenge, Defendants Would Have Made The Same Decisions*...............................................................90

CONCLUSION.....................................................................................92

## TABLE OF AUTHORITIES

**<u>CASES</u>**                                                        **<u>PAGE(S)</u>**

Abbate v.  Cendant Mobility Services Corp.,
    2007 WL 2021868 (D. Conn. July 13, 2007)  .................................................................. 40

Adeyemi v. District of Columbia,
    525 F.3d 1222 (D.C. Cir. 2008) ...................................................................................... 55

Alaska Professional Hunters Ass'n v. FAA,
    177 F.3d 1030 (D.C. Cir. 1999) ..................................................................................... 47

Albemarle Paper Co. v. Moody,
    422 U.S. 405 (1975) ...................................................................................................... 44

Alexander v. Denver-Gardner Co.,
    415 U.S. 36 (1974) ........................................................................................................ 89

\*   Aliotta v. Bair, 576 F. Supp. 2d 113 (D.D.C. 2008) ............................................................ passim

Baqir v. Principi,
    434 F.3d 733 (4th Cir. 2006)  ....................................................................................... 90

Barnette v. Chertoff,
    453 F.3d 513 (D.C. Cir. 2006), ...................................................................................... 65

\*   Brady v. Office of Sergeant at Arms,
    520 F.3d 490 (D.C. Cir. 2008) ................................................................................. passim

Breen v. Mineta,
    2005 WL 3276163 (D.D.C. Sept. 30, 2005) .................................................................. 35

Breen v. Peters,
    474 F. Supp. 2d 1 (D.D.C. 2007) ............................................................................. 63, 87

Brown v. Marsh,
    777 F.2d 8 (D.C. Cir. 1985) .......................................................................................... 39

Burger v. New York Inst. of Technology,
    94 F.3d 830 (2d Cir. 1996) ............................................................................................ 33

Campbell v. PMI Food Equip. Group,
 509 F.3d 776 (6th Cir. 2007) ........................................ 34

Chemung County v. Dole,
 804 F.2d 216 (2d Cir. 1986) ..................................... 14-15

City of Pierre v. FAA,
 150 F.3d 837 (8th Cir. 1997) ............................... 13, 14, 15

Cochrane v. Norton,
 2003 WL 21768006 (N.D. Cal. July 28, 2003) ...................... 77

Coghlan v. Peters,
 555 F. Supp. 2d 187 (D.D.C. 2008) .............................. 7

Cox v. Infomax Office Sys., Inc.,
 2009 WL 124700 (S.D. Iowa. Jan. 16, 2009) ..................... 78

Davis v. United States,
 849 F.2d 549 (7th Cir. 1987) .................................. 3

Desert Palace, Inc. v. Costa,
 539 U.S. 90 (2003) ........................................... 90

Doan v. Seagate Technology, Inc.,
 82 F.3d 974 (10th Cir. 1996) ................................. 43

Douglas v. Donovan,
 559 F.3d 549 (D.C. Cir. 2009) ................................ 51

Douthard v. Rawlinson,
 433 U.S. 321 (1977) .......................................... 44

Duffy v. Barnhart,
 2002 WL 1933236 (E.D. Pa. Aug. 21, 2002) ..................... 77

Evers v. Alliant Techsystems, Inc.,
 241 F.3d 948 (8th Cir. 2001) ................................. 56

Fischback v. District of Columbia Dep't of Corrections,
 86 F.3d 1180 (D.C. Cir. 1996) ...................... 65, 71,74, 86

Furr v. Seagate Technology, Inc.,
 82 F.3d 980 (10th Cir. 1996) ............................. 33, 56

Gaffney v. Dep't of Info. Tech. & Telecomm.,
    536 F. Supp. 2d 445 (S.D.N.Y. 2008) ............................................................. 34

Gray v. York Newspapers, Inc., 957 F.3d 1070 (3d Cir. 1992) ...................................... 55

Grimm v. Alro Steel Corp.,
    410 F.3d 383 (7th Cir. 2005) ....................................................................... 33

Hall v. Giant Food, Inc.,
    175 F.3d 1074 (D.C. Cir. 1999) ..................................................................... 75

Hanan v. Corso,
    1999 WL 320858 (D.D.C. May 18, 1999) ....................................................... 78

Hazen Paper Co. v. Biggins,
    507 U.S. 604 (1993) ................................................................................... 77

Hinds v. Sprint/United Management Group,
    523 F.3d 1187 (10th Cir. 2008) .................................................................... 33

Isbell v. Allstate Ins. Co.,
    418 F.3d 788 (7th Cir. 2005) ....................................................................... 34

Jackson v. United States,
    156 F.3d 230 (1st Cir. 1998) ......................................................................... 3

Jones v. Bernanke,
    557 F.3d 670 (D.C. Cir. 2009) ........................................................... 33, 40, 45

Kelly v. Drexel University,
    94 F.3d 102 (3d Cir. 1996) ..................................................................... 55-56

Kentucky Retirement Systems v. EEOC,
    128 S. Ct. 2361 (2008), *quoting* Hazen Paper Co. v. Biggins, 507 U.S. 604
    (1993) ................................................................................................. 65

Loeb v. Best Buy Co.,
    537 F.3d 867 (8th Cir. 2008) ....................................................................... 75

Lumpkin v. Brown,
    898 F. Supp. 1263 (N.D. Ill. 1995) ............................................................... 67

Maxwell v. Cuyahoga Metropolitan Housing Auth.,
    2008 WL 746818 (N.D. Ohio March 18, 2008) ........................................... 39-40

\*   May v. Shuttle, Inc.,
        129 F.3d 165 (D.C. Cir. 1997), *cert. denied*, 524 U.S. 927 (1998) ........................ passim

\*   Meacham v. Knolls Atomic Power Laboratory,
        128 S. Ct. 2395 (2008) ............................................................ passim

    Mereish v. Walker,
        359 F.3d 330 (4th Cir. 2004) ........................................................... 77

    Miller v. ITT,
        755 F.2d 20 (2d Cir. 1985) ............................................................ 39

    Miller v. Rosenker,
        578 F. Supp. 2d 107 (D.D.C. 2008) .................................................. 39

    Murphy v. Pricewaterhouse Coopers LLP,
        580 F. Supp. 2d 16 (D.D.C. 2008) ................................................... 44

\*   National Federation of Federal Employees v. Cheney,
        883 F.2d 1038 (D.C. Cir. 1989) ................................................... passim

    Parisi v. Boeing Co.,
        400 F.3d 583 (8th Cir. 2005) ......................................................... 39

    Park v. Howard Univ.,
        71 F.3d 904 (D.C. Cir. 1995) ......................................................... 39

    Peterson v. Archstone,
        2009 WL 511145 (D.D.C. Feb. 27, 2009) ...................................... 39, 45

    Pignato v. American Trans Air, Inc,
        14 F.3d 342 (7th Cir. 1994) ........................................................... 74

    Pippin v. Burlington Northern Resources Oil & Gas Co.,
        440 F.3d 1186 (10th Cir. 2006) ...................................................... 33

    Price Waterhouse v. Hopkins,
        490 U.S. 228 (1989) .................................................................. 90

    Redd v. Summers,
        232 F.3d 933 (D.C. Cir. 2000) ....................................................... 54

    Reshard v. Peters,
        579 F. Supp. 2d 57 (D.D.C. 2008) .................................................. 64

Rowan v. Lockheed Martin Energy Systems, Inc.,
    360 F.3d 544 (6th Cir. 2004) ........................................ 77

Safe Extensions, Inc. v. FAA, 509 F.3d 593 (D.C. Cir. 2007) ................................. ........ 89

Schmid v. Frosh, 680 F.2d 248 (D.C. Cir. 1982) .................................................. 33, 67

Silver v. Leavitt,
    2006 WL 626928 (D.D.C. Mar. 13, 2006) .................................... 67

Simms v. District of Columbia,
    587 F. Supp. 2d 269 (D.D.C. 2008) ................................. 54

Smith v. City of Jackson,
    544 U.S. 228 (2005) ........................................ 67

Srock ex rel. Estate of Srock v. United States,
    462 F. Supp. 2d 812 (E.D. Mich. 2006) ......................... 3, 5

Stewart v. Smith,
    673 F.2d 485 (D.C. Cir. 1982) ........................... 43

Summers v. Winter,
    303 Fed. Appx. 716, 719 (11th Cir. 2008) .................... 67

Sundaram v. Brookhaven Nat'l Laboratories,
    424 F. Supp. 2d 545 (E.D.N.Y. 2006) ........................ 40

Texas Department of Community Affairs v. Burdine,
    450 U.S. 248 (1981) ...................................... 50

Tice v. Bristol-Myers Squibb Co., 2009 WL 943838 (3d Cir. Apr. 8, 2009) ................... 88-89

* Tice v. Bristol-Myers Squibb Co.,
    515 F. Supp. 2d 580 (W.D. Pa. 2007), aff'd, 2009 WL 943838 (3d
    Cir. Apr. 8, 2009) ..................................... 88-89

Watkins v. Sverdrup Technology, Inc,
    153 F.3d 1308 (11th Cir. 1998) ........................... 3

Whitacre v. Davey,
    890 F.2d 1168 (D. C. Cir. 1989) .......................... 44

## STATUTES

5 U.S.C. §702 ............................................................................................................ 88-89

5 U.S.C. §§ 2109(1) .................................................................................................... 4, 5

5 U.S.C. § 3307(b) .................................................................................................... 6, 43

5 U.S.C. § 8335 ............................................................................................................. 8

5 U.S.C. § 8336 ........................................................................................................ 7, 76

5 U.S.C. § 8412 ........................................................................................................... 76

5 U.S.C. § 8414 ............................................................................................................. 7

5 U.S.C. § 8422 ............................................................................................................. 8

5 U.S.C. § 8425 ............................................................................................................. 8

29 U.S.C. § 623(f)(1) ................................................................................................... 67

*  29 U.S.C. § 633a ................................................................................................... passim

29 U.S.C. § 633a(a) .......................................................................................... 32, 49, 67

29 U.S.C. § 2101-09 ................................................................................................... 52

*  31 U.S.C. § 501 note ............................................................................................ passim

49 U.S.C. § 106 .......................................................................................................... 20

49 U.S.C. §§ 40109(f)(3) ........................................................................................... 47

49 U.S.C. § 40113(f) .................................................................................................. 48

49 U.S.C. § 44718 ...................................................................................................... 47

49 U.S.C § 44727 ....................................................................................................... 47

49 U.S.C. § 44915 ................................................................................................... 47-48

49 U.S.C. § 46110 ...................................................................................................... 89

Pub. L. No. 103-122 § 340, 107 Stat. 1198, 1224 (1993) ......................................... 48

## LEGISLATIVE MATERIALS

H.R. Rep. No. 90-805, *reprinted in* 1967 U.S. Code Cong. & Ad. News 2213, 2219-20 .......... 77

S. Rep. No. 105-269 .............................................................................................. 18

144 Cong. Rec. H9448 (daily ed. Oct. 5, 1998) ........................................................ 18

149 Cong. Rec. S15386 (daily ed. Nov. 21, 2003) .................................................... 71

149 Cong. Rec. S15387 (daily ed. Nov. 21, 2003) .................................................... 71

149 Cong. Rec. S15389 (daily ed. Nov. 21, 2003) .................................................... 71

*Civil Service Retirement System Amendments, Hearing on H.R. 1131, 989, and 1518 Before the Subcomm. on Compensation and Employee Benefits of the House Comm. on Post Office and Civil Service*, 99th Cong. (June 27, 1985) ................................................................. 8

*Alaska Aviation*, Field Hearing Before the S. Comm. on Commerce, Science & Transportation, 109th Cong. (2005) ........................................................................................ 45-47

*Department of Transportation and Related Agencies Appropriations for 1998: Hearing Before the Subcomm. on Transportation and Related Agencies of the H. Comm. on Appropriations*, 105th Cong. 48 (1997) ................................................................................ 15, 17, 53

*Department of Transportation and Related Agencies Appropriations for 2002: Hearing Before the Subcomm. on Transportation and Related Agencies of the H. Comm. on Appropriations*, 107th Cong. 471 (2001) ........................................................................... 15-16, 78

*Executive and Judicial Compensation in the Federal Government (Quadrennial Commission): Hearing Before the Subcomm. on the Federal Workforce and Agency Organization of the H. Comm. on Gov't Reform*, 109th Cong. (2006) ........................................................ 77

## EXECUTIVE MATERIALS

Exec. Order 13264, 67 Fed. Reg. 39243 (June 7, 2002) ............................................. 69

Exec. Order 13180, 65 Fed. Reg. 77493, 77493 (Dec. 11, 2000) ............................... 69

14 C.F.R. § 91.103 ................................................................................................ 12

Office of Management and Budget, Circular A-76 .............................................. passim

*Flight Service Modernization Plan*, 45 FED. REG. 26202 (April 1, 1980)  .................................. 14

Department of Defense, *Compare*, http://www.comparea76.com/ (last visited April 22, 2009)  84
Federal Aviation Administration, GENERAL AVIATION PILOT'S GUIDE TO PREFLIGHT WEATHER
PLANNING, WEATHER SELF-BRIEFINGS, AND WEATHER DECISION MAKING  (2007) .................. 12

FAA, AERONAUTICAL INFORMATION MANUAL § 4-1-15(b)(2) (Feb. 14, 2008 web version) ..... 81

*General Aviation and Part 135 Activity Surveys – CY 2007*, Table 1.7,
http://www.faa.gov/data_statistics
/aviation_data_statistics/general_aviation/CY2007/ (last visited April 22, 2009). .................... 11

*FAA Historical Chronology, 1926 - 1996*, http://www.faa.gov/about/media/b-chron.pdf (last
visited April 22, 2009) .............................................................................................. 11

Bureau of Labor Statistics, *Employed Persons by Detailed Occupation, Sex, Race, and Hispanic
or Latino ethnicity*, ftp://ftp.bls.gov/pub/special.requests/lf/aat11.txt
(last visited April 22, 2009). ............................................................................... 49-50

Bureau of Labor Statistics, *Employed persons in Nonagricultural Industries by Age, Sex, Race,
and Hispanic or Latino Ethnicity*, at ftp://ftp.bls.gov/pub/special.requests/lf/aat14.txt (last visited
April 22, 2009) .............................................................................................. 50

Remarks of Jim Hall, Chairman, National Transportation Safety Board, Before the National
Weather Service Workshop on Weather Services for Aviation Operations,
http://www.ntsb.gov/speeches/former/hall/jh980409.htm (April 9, 1998) (last visited April 22,
2009) ..................................................................................................... 46-47

## OTHER

National Civil Aviation Review Commission, Final Report,
http://www.library.unt.edu/gpo/NCARC/reports/pepele.htm, Part II, § V.C. (last visited April 22,
2009) ................................................................................................. 16, 20, 73

David T. Norton, *A Lawyer-Flight Instructor's Prognostications on the Implementation of Free
Flight: How Will the Large-Scale Introduction of GPS Into General Aviation Cockpits Affect the
Liabilities That Face Pilots and the Flight Instructors Who Train Them*, 62 J. AIR L. & COM.
725, 737 n.33 (1997). ...................................................................................... 11-12

*FAA Certificate Pilots 1929-2007*, http://www.aopa.org/whatsnew/stats/pilots.html (last visited
April 22, 2009). ......................................................................................... 10

*U.S. General Aviation Accidents, Fatalities, and Rates – 1938 -2005*,
http://www.aopa.org/special/newsroom/stats/safety.html (last visited April 22, 2009) .............. 10

AOPA PILOT, Nov. 1996 ........................................................................................... 11

Alfonso Castillo, *Schumer Urges FAA To Reconsider Moving Jobs*, NEWSDAY, Apr. 15, 2009, at A22 ........................................................................................................................ 81

David Field, *New FAA Computer May End Old Gripes*, WASH. TIMES, Feb. 16, 1990, at C3 ... 11

Neil Irwin & David Cho, *Markets in Disarray as Lending Locks Up*, WASH. POST, Sept. 18, 2008, at A1. ....................................................................................................................... 57

Michael Sangiacomo, *Weather Outlook Cloudy for FAA Plan: Industry Workers Object to Relocating*, CLEVELAND PLAIN DEALER, Dec. 25, 2008, at A1. .................................................. 81

Jim Tharpe, *Controllers Blast FAA Plan To Shift Meteorologists*, ATLANTA JOURNAL-CONSTITUTION, Feb. 24, 2009, at B1 ........................................................................................ 81

Carl Marbach, *Where's My Real-Time Cockpit Weather?*, http://www.avweb.com/news/osh2002/184007-1.html (July 2000) ........................................... 13

David Jensen, *Weather in the Cockpit*, AVIONICS MAGAZINE, http://www.aviationtoday.com/av/categories/military/12704.html (June 2000) ......................... 13

Randy Kenagy, AOPA Chief of Staff for Government Affairs, Letter to the FAA, http://download.aopa.org/epilot/2008/080828vor.pdf (May 23, 2008) (last visited April 22, 2009). ...................................................................................................................................... 13

*New AOPA Online Flight Planning Service Offers Easy Web-Based Access to Weather, Route Planning, and AOPA's Airport Directory*, http://www.aopa.org/whatsnew/newsitems/1999/99-3-002.html (last visited April 22, 2009). . 12

*President Hockfield Speaks out on the Issue of Women in Science and Engineering*, http://web.mit.edu/newsoffice/2005/gender-equity.html (last visited April 22, 2009) .............. 51

*Speed Your Flight Planning With AOPA's Real-Time Flight Planner*, http://www.aopa.org/whatsnew/newsitems/2005/050325rtfp.html (last visited April 22, 2009). 12

*Weather in Cockpit Gets FAA OK*, FLYING MAGAZINE, http://www.flyingmag.com/avionics/140/weather-in-the-cockpit-gets-faa-ok.html (2002) (last visited April 22, 2009) ............................................................................................................ 13

*WSI InFlight' Cockpit Weather System Certified by FAA*, http://www.aero-news.net/SpecialContent.cfm?ContentBlockID=53b8f6ed-b47f-4ae5-b813-c8df2c00a196&cat=7 (2003) ....................................................................................................... 13

Wikipedia, http://en.wikipedia.org/wiki/Sky_King (last visited April 22, 2009) ...................... 11

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ACA | Office of Competitive Sourcing |
| ADEA | Age Discrimination in Employment Act |
| AFSSs | Automated Flight Service Stations |
| AOPA | Aircraft Owners and Pilots Association |
| ATO | Agency Tender Official |
| Centers | Route Centers |
| CET | Cost Evaluation Team |
| DUATS or DUAT Service | Direct User Access Terminal Service |
| EEOC | Equal Employment Opportunity Commission |
| FAA | Federal Aviation Administration |
| FAIR Act | Federal Activities Inventory Reform Act of 1998 |
| FDIC | Federal Deposit Insurance Corporation |
| FSSs | Flight Service Stations |
| GPS | Global Positioning System |
| IG | Inspector General |
| Lockheed | Lockheed Martin Corporation |
| MEO | Most Efficient Organization |
| NAATS | National Association of Air Traffic Specialists |
| NCARC | National Civil Aviation Review Commission |
| NOTAMs | Notices to Airmen |

ODRA                        FAA's Office of Dispute Resolution for Acquisition

OMB                         Office of Management and Budget

PWS                         Performance Work Statement

RFOA                        Reasonable Factor Other Than Age

RIF                         Reduction In Force

SSEB                        Source Selection Evaluation Board

Specialists                 Flight Service Specialists

TET                         Technical Evaluation Team

TER                         Technical Evaluation Report

Towers                      Airport Control Towers

TRACONs                     Radar Approach Facilities

## TABLE OF CITED INDIVIDUALS

| | |
|---|---|
| Belger, Monte | FAA Acting Administrator (July-August 2002) |
| Belman, Dale | Represented plaintiffs designated as a liability expert witness |
| Bertram, Christopher | FAA Assistant Administrator for Financial Services, Chief Financial Officer (mid-2001 until early 2003) |
| Blakey, Marion | FAA Administrator (September 2002- September 2007) |
| Breen, Kathleen | Plaintiff; President of NAATS starting in the Fall of 2004 |
| Brown, Steven | Senior Vice President of the National Business Aviation Association; former FAA Associate Administrator for Air Traffic |
| Brydon, Malcolm | Plaintiff |
| Campbell, Cathy | Plaintiff |
| Cantu, Ernesto | Plaintiff |
| Carrington, William | Defendants designated as both a damages expert and liability expert witness |
| Challan, Peter | Former FAA Deputy Associate Administrator for Air Traffic |
| Consalvo, Ronald | Plaintiff |
| Courain, Daniel | Lockheed Martin's Program Manager for the AFSS program during the transition of AFSS to Lockheed Martin |
| Crigler, Donna | Plaintiff |
| Currier, Kenneth | Plaintiff |
| DeGaetano, Dennis | Served as Source Selection Authority for the AFSS A-76 competition |
| Dodson, Donna | Dismissed Plaintiff; served on the MEO team |
| Eastman, Franklin | Plaintiff |
| Elias, Denise | Plaintiff |

| | |
|---|---|
| Freed, Richard | Plaintiff |
| Garvey, Jane | FAA Administrator (August 1997- August 2002) |
| Gibson, Ventris | FAA Assistant Administrator for Human Resource Management |
| Grace, Lauren | FAA Manager, Flight Services Safety Evaluation Group; served on MEO team |
| Hennigan, John | FAA Deputy Assistant Administrator for Financial Services |
| Hopkins, Stephen | Served as FAA Performance Work Statement Lead, Office of Competitive Sourcing |
| Jackson-Brame, Marilyn | Served as FAA Deputy Director, Office of Competitive Sourcing; previously, director of Flight Services |
| Jaffe, Mark | Plaintiff |
| Jensen, Peter | Plaintiff |
| Jones, Denise | Deceased plaintiff |
| Kansier, Joann | FAA Director, Office of Competitive Sourcing; Co-chair of Source Selection Evaluation Board |
| King, Donald | Co-chair of Source Selection Evaluation Board |
| Kilpatrick, Philip | Plaintiff |
| Konschake, Karen | Plaintiff |
| Madera, Pilar | FAA Manager, Flight Services Program Operations Office |
| Malon, Scott | FAA Labor and Employee Relations Specialist; served as chief NAATS negotiator regarding Reduction-In-Force |
| McDaniel, Aaron | FAA Human Resources Official |
| Mineta, Norman | Secretary of Transportation (2001-2006) |
| Mitchell, Gregory | Plaintiff |
| Neill, Edwin | Special Master for AFSS A-76 bid protest |

| | |
|---|---|
| Nimmo, Jack | Served as member of FAA AFSS Feasibility Study Workgroup |
| Olson, Darlene | FAA Manager, Human Capital Management Staff |
| Pike, Walter | President, NAATS (1998-2004) |
| Reimann, Richard | Plaintiff |
| Reyna, Wanda | Former FAA Official; served as FAA Management and Program Development Manager in ATO during Lockheed transition |
| Rufo, Paul | Plaintiff |
| Sheldon, Michael | Plaintiff |
| Sheridan, Paul | FAA Official; served as FAA Acting Director, Safety and Operations Support, Flight Services during Lockheed transition |
| Shew, Michael | Plaintiff |
| Sims, Steven | Plaintiff |
| Siskin, Bernard | Defendants designated as a liability expert witness |
| Sturgell, Robert | FAA Deputy Administrator (2002-2007); FAA Acting Administrator (2007-2009) |
| Sturm, James | Lockheed Martin, Director of Human Resources |
| Torres, Milton | Plaintiff |
| Tryon, Joseph | Represented plaintiffs designated as a damages expert witness |
| Turner, William | Defendants' designated as a liability expert witness |
| Vorce, Maureen | SSEB member |
| Washington, James | Served as the Agency Tender Official, overseeing the MEO, and FAA Vice President of Flight Services during the A-76 process |
| Williams, George | FAA Human Resources Official |
| Yoo, Jeannine | FAA Human Resources Official |

**INDEX OF EXHIBITS (INCLUDING DECLARATIONS AND EXCERPTS OF DEPOSITIONS) TO MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

<u>TAB NO.</u>                               <u>DESCRIPTION OF DOCUMENTARY EXHIBITS</u>

1                               January 1982, Ohio University Athens, Evaluation of the FAA/MITRE Weather Data Device (Ohio University Study)

2                               Federal Aviation Administration Air Traffic Activity Statistics, FAA Aerospace Forecasts 1999-2010

3                               Federal Aviation Administration Air Traffic Activity Statistics, FAA Aerospace Forecasts 2005-2016

4                               1997 FAA Financial Assessment of Federal Aviation Administration by Coopers & Lybrand, LLP,  (Coopers and Lybrand Study)

5                               December 16, 1996, Office of the Inspector General Audit Report, Management Advisory Memorandum on Acquisitions for Automated Flight Services (1996 Inspector General Report)

6                               April 30, 1998, Flight Service Architecture Core Group Report

7                               2001 Office of the Inspector General Report (2001 IG Report)

8                               Executive Office of the President, Office of Management and Budget, *The President's Management Agenda for Fiscal Year 2002*

9                               July 2003, Office of Management and Budget, Competitive Sourcing: *Conducting Public-Private Competition in a Reasoned and Responsible Manner*

10                              June 19, 2002, Memorandum from Christopher Bertram to Administrator Jane Garvey

11                              August 21, 2002, Assistant Administrator for Financial Services Christopher Bertram Memorandum to Acting Administrator Monte Belger

12                              May 9, 2003, Department of Transportation Determination of Classification Appeal

| 13 | January 8, 2003, Memorandum from Christopher Bertram to Marion Blakey |
| 14 | June 25, 2003, AFSS Competitive Source Program Briefing to ATCA |
| 15 | April 2003, The Briefer |
| 16 | June 2003, The Briefer |
| 17 | August 2003, The Briefer |
| 18 | Opinion by Judge Edwin B. Neill of the General Administration Board of Contract Appeals |
| 19 | Defendants' Responses to Plaintiffs' Third Set of Interrogatories (Defs' Responses To Pls' 3d Set of Interrogatories) |
| 20 | March 31, 2008, Automated Flight Service Station Program: 90-Day Progress Report to the House Aviation Subcommittee |
| 21 | Original Estimate of AFSS Income and Cost Summary |
| 22 | Reforecast Estimate of AFSS Income and Cost Summary |
| 23 | February 8, 2005, Notice of Intent to File a Civil Action Under the ADEA |
| 24 | March 30, 2005, Office of Dispute Resolution for Acquisition Intervention Decision |
| 25 | July 20, 2005, FAA Order No. ODRA-05-348 |
| 26 | Policy Bulletin 30 |
| 27 | December 18, 2002, Determination as to the Inherently Governmental Nature of Air Traffic Control Services by Secretary Norman Y. Mineta (Mineta Determination) |
| 28 | June 12, 2002, Statement of Department of Transportation on Amendment of Executive Order on Air Traffic Organization |
| 29 | National Association of Air Traffic Specialists Proposal (NAATS Proposal) |

| 30 | MEO Proposal, Volume VII |
| 31 | June 18, 2004, FAA Organizational Chart |
| 32 | FAA Notice of Intent to Conduct Competition |
| 33 | September 30, 2007, Automated Flight Service Station Program: 90-Day Progress Report to the House Aviation Subcommittee |

**TAB NO.**        **DECLARATIONS**

| 34 | Declaration of Marion Blakey, Docket # 23-36 |
| 35 | Declaration of Daniel Courain, Docket # 23-5 |
| 36 | Declaration of Dennis DeGaetano, Docket # 23-29 |
| 37 | Declaration of John Hennigan, Docket # 23-19 |
| 38 | Declaration of Joann Kansier, Docket # 23-4 |
| 39 | Declaration of Aaron McDaniel |
| 40 | Declaration of Norman Mineta |
| 41 | Declaration of Wanda Reyna, Docket # 23-10 |
| 42 | Declaration of Paul Sheridan, Docket # 23-6 |
| 43 | Declaration of Maureen Vorce |
| 44 | Declaration of James Washington, Docket # 23-35 |
| 45 | Declaration of George Williams, Docket # 23-34 |

**TAB NO.**        **CITED EXCERPTS OF DEPOSITIONS**

| 46 | Deposition of Dale Belman |
| 47 | Deposition of Christopher Bertram |
| 48 | Deposition of Marion Blakey |
| 49 | Deposition of Kathleen Breen |

| 50 | Deposition of Steven Brown |
|----|----------------------------|
| 51 | Deposition of Malcolm Brydon |
| 52 | Deposition of Cathy Campbell |
| 53 | Deposition of Ernesto Cantu |
| 54 | Deposition of Peter Challan |
| 55 | Deposition of Ronald Consalvo |
| 56 | Deposition of Donna Crigler |
| 57 | Deposition of Kenneth Currier |
| 58 | Deposition of Dennis DeGaetano |
| 59 | Deposition of Donna Dodson |
| 60 | Deposition of Franklin Eastman |
| 61 | Deposition of Denise Elias |
| 62 | Deposition of Richard Freed |
| 63 | Deposition of Ventris Gibson |
| 64 | Deposition of Lauren Grace |
| 65 | First Deposition of John Hennigan (1st Hennigan Dep.) |
| 66 | Second Deposition of John Hennigan (2nd Hennigan Dep.) |
| 67 | Deposition of Stephen Hopkins |
| 68 | Deposition of Marilyn Jackson-Brame |
| 69 | Deposition of Mark Jaffe |
| 70 | Deposition of Peter Jensen |
| 71 | Deposition of Denise Jones |

72                              Deposition of Joann Kansier

73                              Deposition of Philip Kilpatrick

74                              Deposition of Karen Konschake

75                              Deposition of Pilar Madera

76                              Deposition of Scott Malon

77                              Deposition of Gregory Mitchell

78                              Deposition of Jack Nimmo

79                              Deposition of Darlene Olson

80                              Deposition of Walter Pike

81                              Deposition of Richard Reimann

82                              Deposition of Paul Rufo

83                              Deposition of Michael Sheldon

84                              Deposition of Michael Shew

85                              Deposition of Steven Sims

86                              Deposition of Robert Sturgell

87                              Deposition of James Sturm

88                              Deposition of Milton Torres

89                              Deposition of George Williams

90                              Deposition of Jeannine Yoo

**TABLE OF EXPERT REPORTS**

TAB NO.                EXPERT REPORTS

91                     Report of Defendants' Expert William Turner (Turner Rep't)

92                     Report of Plaintiffs' Expert Dale Belman (Belman Rep't)

93                     Report of Defendants' Expert William Carrington on Monopsony

94                     Report of Defendants' Expert William Carrington Supplemental
                       Report A

95                     Report of Defendants' Expert William Carrington Supplemental
                       Report B

96                     Report of Defendants' Expert Bernard Siskin (Siskin Rep't)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                               )
KATHLEEN A. BREEN, et al.,                     )
                                               )
    Plaintiffs,                               )
                                               )
           v.                          )     Case No. 1:05CV00654-RWR
                                               )
MARY E. PETERS, et al.,                        )
                                               )
    Defendants                                )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

     As flight service specialists employed by the Federal Aviation Administration ("FAA"), plaintiffs provided weather information to pilots. As the 21st century began, their continued federal employment ran into a metaphorical perfect storm.

     First, the amount of work required was in long-term decline. Year after year, fewer of the pilots served by the flight service specialists were flying. Meanwhile, the internet and other modern technologies increasingly enabled the remaining pilots to formulate and file flight plans and receive weather briefings without needing to speak to a specialist. Second, the FAA was saddled with facilities that would require repair or replacement (at one office, a non-metaphorical roof fell in) and an obsolete computer system that would require major investment just to continue providing service. Third, the FAA, like other federal agencies, had been directed to consider whether the government should continue to perform services that could instead be performed commercially, and providing flight service had long been done commercially as well as by the government.

In fiscal year 2002, the agency's budget officers were faced with resistance to FAA plans to spend tax dollars to modernize the computer system.  They realized that a "public-private" competition to consider whether FAA flight services outside Alaska should be delivered by government employees or through a contract could simultaneously satisfy two goals: the presidential mandate that agencies consider such competitions, and the need to modernize and reorganize the work at a substantial savings to the taxpayer.

So a competition was held.  In 2005, agency contracting officials concluded that a bid by Lockheed Martin Corporation ("Lockheed") to provide flight services clearly offered the best combination of quality and value to the taxpayer.  The agency estimated that the Lockheed bid would save the government about two billion dollars compared to the *status quo*.  The contract was awarded to Lockheed.  As a result, all the flight service specialists outside Alaska were sent notices that their federal positions were being terminated in a reduction in force ("RIF").  Many of the specialists thereafter became Lockheed employees.

Plaintiffs argue that the RIF violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a.  But the RIF was utterly indiscriminate: all the non-Alaska flight service specialists received the RIF notices, men and women alike, whites and blacks alike, old and young alike.  Because the employees were all subject to the RIF whether they were 39 or 59, there was no discrimination on the basis of age.  *May v. Shuttle, Inc*., 129 F.3d 165 (D.C. Cir. 1997), *cert. denied*, 524 U.S. 927 (1998).

Plaintiffs argue that the RIF occurred because flight service specialists were an "aging workforce."  That argument mistakes for cause and effect what are in fact both effects of underlying causes.  With occupations that are shrinking because of declining demand or

increased automation, the first resort of an employer will usually be, as here with the FAA, to slow or stop hiring, which will almost inevitably leave it with an "aging workforce" by the time it takes the more painful step of a RIF.  That is not age discrimination.

STATEMENT OF THE CASE

1.  Functions Of Flight Service Specialists

Flight service specialists ("specialists") serve the general aviation population and perform a variety of functions.

The function most typically associated with the job is providing pre-flight weather briefings over the phone to general aviation pilots.  *See Srock ex rel. Estate of Srock v. United States*, 462 F. Supp. 2d 812 (E.D. Mich. 2006) (quoting and analyzing two such briefings); *Elias* Dep. 29-31; *Currier* Dep. 15; *Jensen* Dep. 25; *Mitchell* Dep. 15.[1]  Specialists take information provided to them by the National Weather Service and other sources (such as pilot reports made to flight service over the radio, *Currier* Dep. 20-21) and interpret and analyze it for general aviation pilots.  *Rufo* Dep. 39; *Brydon* Dep. 44; Report of Defs' Expert William Turner ("Turner Rep't") at 5; *Jackson v. United States*, 156 F.3d 230, 234 (1st Cir. 1998) ("weather briefer to interpret, translate, and convey in summarized form relevant weather information").  In providing these briefings, specialists "do not have any power to prohibit a pilot from flying his craft," though they may make recommendations.  *Davis v. United States*, 849 F.2d 549, 552 (7th Cir. 1987).

---

[1]  In citing depositions, names of deponents who are plaintiffs (including dismissed plaintiff Dodson) are in italics.  Names of other deponents are in plain type.  The table of persons includes a brief identification of deponents' roles in the case.  The deposition excerpts are not cited by exhibit numbers in the brief, but are given exhibit numbers and listed in the index to exhibits in alphabetical order.

In addition to providing pre-flight briefings, specialists communicate by radio with pilots in flight to provide and receive weather information and to provide other assistance to pilots, such as helping lost pilots find their bearings and an airport at which to land. *E.g.*, *Elias* Dep. 33-34; Pike Dep. 37-38.

Specialists also help pilots prepare, file, amend, cancel, or close "flight plans," which indicate when and where a flight is planned. *E.g.*, *Currier* Dep. 21; *Freed* Dep. 68-69; *Crigler* Dep. 40. If a flight plan is not cancelled or closed, a specialist will follow up to determine whether the flight arrived safely and, if unable to confirm safe arrival or cancellation, will contact law enforcement or other authorities to begin search and rescue operations. *Jensen* Dep. 27-28; *Elias* Dep. 46-48, 51; *Freed* Dep. 69-70; Pike Dep. 31-32.

Specialists disseminate Notices to Airmen ("NOTAMs"). For example, an airport worker might call a specialist to say that a runway was closed by snow, and the specialist would then format and enter that information into the FAA's database. *Campbell* Dep. 33-34 (that example); *Currier* Dep. 15-16 (tower-light-outage example); *Elias* Dep. 44-46; *Freed* Dep. 70; *Rufo* Dep. 42-43; Jackson-Brame Dep. 49-51.

Specialists also perform other functions, including recording weather information for broadcast (*Freed* Dep. 71-72, *Elias* Dep. 27, *Mitchell* Dep. 15-16, Pike Dep. 39, *Rufo* Dep. 44), relaying clearances between pilots and the air traffic controllers who separate air traffic (*Rufo* Dep. at 43; Turner Rep't at 5), and exchanging information on flights with the Customs Service (*Cantu* Dep. 21-22, 25-26).

For purposes of allowing and requiring early retirement, the civil service law defines two types of "air traffic controllers." 5 U.S.C. §§ 2109(1)(A), 8331(30). Air traffic controllers at en

-4-

route centers ("centers"), radar approach facilities ("TRACONs"), and airport control towers

("towers") (collectively "aircraft separating controllers") are designated as air traffic controllers

because they are "actively engaged" in the "separation and control of air traffic."  5 U.S.C. §

2109(1)(A)(i).[2]  Flight service specialists are designated as "air traffic controllers" under a

separate clause, 5 U.S.C. § 2109(1)(A)(ii), because they "provid[e] preflight, inflight, or airport

advisory service to aircraft operators."  Unlike aircraft separating controllers, flight service

specialists are not authorized to direct pilots with air traffic control instructions used to separate

planes.  *E.g.*, *Srock*, 462 F. Supp. 2d at 817-18; *Brydon Dep*. 30; Turner Rep't at 4-5; Jackson-

Brame Dep. 26-27; Sheridan Decl. (Docket # 23-6) ¶¶ 7-8; Reyna Decl. (Docket # 23-10) ¶ 6;

*see Mitchell* Dep. 20 (flight services specialists do not have radar showing aircraft positions).

The two types of air traffic controller jobs are not interchangeable; in particular, flight service

specialists could not immediately move into non-developmental positions as aircraft separating

controllers without extensive training and certification.  Reyna Decl. ¶ 6.[3]

    2.  <u>Job Pre-Requisites, Training, And Compensation</u>

    The specialists and former specialists deposed in this case reached flight service jobs

through several paths.  Many came to the FAA after having had aviation-related responsibilities

---

[2] Tower and TRACON controllers are also sometimes referred to collectively as "terminal" controllers.  Reyna Decl. ¶ 4.

[3] The point here is that the two kinds of air traffic controller jobs are different, not whether one or the other is more or less important.  As Bobby Sturgell, Deputy Administrator at the time of the RIF and Acting Administrator at the time of his deposition, explained in response to questions from plaintiffs' counsel: "[S]pecialists are not involved in actually controlling and separating air traffic via radio communications.  It is a different function.  Q.  Is it less important?  A.  I think everything in aviation is important.  It is important that people know the weather and they flight plan properly.  Flight Service Specialists assist pilots in completing those tasks."  Sturgell Dep. 52.

in the military,[4] but others either had no military experience[5] or non-aviation military exper-

ience.[6]  Some specialists had wanted to become aircraft separating controllers ("I've wanted to be

a tower controller since I was little boy," *Brydon* Dep. 36), but landed in flight service jobs after

they "washed out" (*Jaffe* Dep. 18) of the training to be an aircraft separating controller (Nimmo

Dep. 16; *Jaffe* Dep. 18; *Campbell* Dep. 25, 29, 35-36; *Elias* Dep. 14-15), were medically

disqualified for a separating controller position (*Reimann* Dep. 42; *Sims* Dep. 41-42), were over

the maximum age limit to apply for a separating position (*Brydon* Dep. 35-36),[7] decided that

separating aircraft was not what they wanted to do after all (Pike Dep. 20), or left training for

reasons they no longer remember (*Kilpatrick* Dep. 24-25).  For others, flight service itself

appears to have been a first-choice FAA job.  *Jones* Dep. 11-12 ("dream come true"); *Eastman*

Dep. 27; *Konschake* Dep. 16; *Dodson* Dep. 14; Jackson-Brame Dep. 13-14.

      Though more than half the plaintiffs deposed in this case have Associates or higher-level

degrees in a wide variety of fields, a college degree was not required to become a flight service

specialist.  *See* Jackson-Brame Dep. 12-13 (testimony of former head of flight service: "I am a

high school grad. I received all my air traffic and managerial training through the FAA and I

---

     [4] *Brydon* Dep. 24; *Dodson* Dep. 12-13; *Freed* Dep. 28-29; *Jensen* Dep. 19-20, *Reimann* Dep. 12-13; *Sheldon* Dep. 24-26; *Sims* Dep. 22-23.

     [5] *Breen* Dep. 15-25; *Campbell* Dep. 18-24; *Eastman* Dep. 27; *Konschake* Dep. 13-16; *Mitchell* Dep. 9-11; *Rufo* Dep. 14.

     [6] Pike Dep. 17 (served as infantryman in Vietnam); *Cantu* Dep. 34 (same).

     [7] The Secretary is authorized to fix a "maximum limit of age within which an original appointment to a position as an air traffic controller may be made," 5 U.S.C. § 3307(b).  *See also* 42-43 & n.38, *infra*.

have some college" work done while at the FAA).  Instead, in addition to later on-the-job train-

ing, the FAA provided training to new specialists before they assumed their duties.[8]

At the journeyman level, the flight service position was compensated at the GS-12 level

(*Consalvo* Dep. 46-48; *Dodson* Dep. 63; Kansier Dep. 153; *Rufo* Dep. 53).[9]  Night, weekend, and

holiday work was required; since shift differentials were paid, some specialists preferred those

hours.  *Jones* Dep. 27-31; *Elias* Dep. 52-57.

Retirement provisions for federally employed flight service specialists differ from those

applicable to most federal employees in both allowing and requiring earlier retirement.  Most

federal employees may retire with either 30 years of service at age 55 to 57 (depending on year

of birth and retirement system) or with 20 years of service at age 60.  5 U.S.C. §§ 8336, 8412.

Flight service specialists may retire at age 50 with only 20 years of service in a specialist or

other air traffic controller position or at any age with 25 years of such service.  5 U.S.C. §§ 8336,

8412.  Either group may also retire at age 62 with 5 years of federal service.  5 U.S.C. §§ 8336,

8412.  In addition, federal employees subject to a reduction in force may receive a discontinued

service retirement at age 50 with 20 years of federal service or at any age with 25 years of

service.  5 U.S.C. §§ 8336, 8414.  Flight service specialists under the newer federal employee

retirement system (though not under the older civil service retirement system) are required to

---

[8] *E.g.*, *Breen* Dep. 28, *Campbell* Dep. 32-33, *Consalvo* Dep. 41.  Plaintiffs did not all have training at the same time, and their recollections of its length vary.  *Currier* Dep. 13-14 (four months); *Cantu* Dep. 12 (two months); *Dodson* Dep. 14 (four months); *Elias* Dep. 19 (four to five months); *Freed* Dep. 55 (six months); *Jaffe* Dep. 18 (three months); *Kilpatrick* Dep. 26 (three to four months).

[9] In 2004, flight service was converted to the "pay band" system described by this Court in *Coghlan v. Peters*, 555 F. Supp. 2d 187, 192-93 (D.D.C. 2008).

make contributions to the retirement system at a higher rate than other employees under the new

system.  5 U.S.C. § 8422.  Flight service specialists hired after 1986 are required to retire when

they reach the later of age 56 or qualification for voluntary retirement.  5 U.S.C. §§ 8335, 8425.

That statutory restriction on continued FAA employment of older flight service specialists was

enacted over the objection of the FAA, which had argued that it had "no evidence which

suggests to us that it is either necessary or advisable in the interest of flight safety to strive for a

younger work force in the flight service stations."[10]

>   3.   The Long Decline In The Demand For Flight Service Specialists' Work

Beginning long before the 2005 RIF, the demand for much of the work done by flight

service specialists was declining.  Reasons for this decline in demand include a decline in the

number of flights by the subset of the aviation community that relies on flight service specialists

and the spread of internet and other technologies that increasingly gave pilots ready access to

alternatives for weather briefing, flight planning, and navigational assistance.

>   >   a.   Decline In Flights In Portion Of Aviation
>   >        Community Served By FAA Flight Service

>   >   >   i.   Aviation Community Served By FAA Flight Service

The FAA's flight service offerings had never been the sole source for all pilots to obtain

weather briefings and file flight plans.  Commercial airlines use their own or a contractor's

employees to perform such functions.  *E.g.*, *Elias Dep.* 95 (flight dispatchers for cargo airline

"keep[ ] flight plans and enter[ ] flight plans into the system for their aircraft going overseas

---

[10] *Civil Service Retirement System Amendments, Hearing on H.R. 1131, 989, and 1518 Before the Subcomm. on Compensation and Employee Benefits of the House Comm. on Post Office and Civil Service*, 99th Cong. 120-21 (June 27, 1985) (statement of  FAA Associate Administrator Charles E. Weithoner).

from this airport area and give[ ] them weather information similar to what we did"); Sturgell

Dep. 52 ("As a pilot for a major airline, we had our own meteorologists, our own dispatchers

who performed flight planning and weather and provided other information for the flight");

*Brydon* Dep. 44; Brown Dep. 52; Sheridan Decl. ¶ 12.

     Not even all general aviation pilots chose to use FAA flight services for weather briefing

and flight planning, as some turned instead to the FAA's private competitors.  Plaintiffs' counsel

discussed this point with Steven Brown, a senior vice president of the National Business

Aviation Association:

> 6   Q.  But there is a lot of commercial traffic.  I
> 7  mean, you talked a little while ago when you talked
> 8  about the National Business Aviation Association, you
> 9  said it involves companies that own and use aircraft
> 10  in their business --
> 11    A.  Correct.
> 12    Q.  -- and that there are a lot of them,
> 13  including some very big ones.  So these companies do
> 14  utilize flight services, don't they?
> 15    A.  Typically, they do not.
> 16    Q.  They do not?
> 17    A.  No.

Brown Dep. 51.  Instead, such companies "typically go to other companies that provide these

flight planning and weather and other services to their companies, companies like Air Routing

and Universal Weather."  *Id.* at 52.

> 15    Q.  So you're saying that the only people who
> 16  use flight services are essentially private pilots
> 17  with small planes?
> 18    A.  It's not the only group, but it's the vast
> 19  majority of the customers that flight service
> 20  provides their service to.

*Id.* (Brown himself is one of those small-plane pilots and has often used FAA flight services. *Id.* at 56, 92-93.)

ii. <u>The Long-Term Decline In General Aviation Flying</u>

The number of pilots in the subset of the general aviation community that typically uses flight service specialists' weather briefings, flight planning, and in-flight assistance has long been declining.  In 2005, there were 609,737 licensed pilots in the country.  *FAA Certificate Pilots 1929-2007*, http://www.aopa.org/whatsnew/stats/pilots.html (last visited April 22, 2009). However, a quarter of a century previously that number had been more than 35% higher.  *Id.* The decline in the number of general aviation pilots may be understated by the overall pilot license figures, since the overall figures include air transport pilot licenses (the kind needed by airline pilots), which more than doubled between 1980 and 2005, while private licenses were declining from 357,479 to only 228,619.  *Id.*[11]

The number of general aviation hours flown also declined during the quarter century preceding the RIF.  By 1992, hours flown were already only about two-thirds of the hours flown only twelve years previously, and they have remained at similarly low levels.  *U.S. General Aviation Accidents, Fatalities, and Rates – 1938 -2005*,

http://www.aopa.org/special/newsroom/stats/safety.html (last visited April 22, 2009).  Those figures for general aviation as a whole understate the relevant decline: General aviation flying by turbojets – the kind of plane often used by companies that do not typically patronize FAA flight services' weather briefings and flight planning – has been increasing substantially, while flight

---

[11] As a pilot may hold a commercial or air transport license and nevertheless fly only or also as a private pilot, *see id.*, both the overall pilot license and private pilot license statistics shed light on the number of users of flight service.

hours of small one-engine piston airplanes have continued to decline.  *General Aviation and Part 135 Activity Surveys – CY 2007*, Table 1.7, http://www.faa.gov/data_statistics /aviation_data_statistics/general_aviation/CY2007/ (last visited April 22, 2009).[12]

b.  The Rise Of Automated Alternatives To Flight Services

The computer and internet revolutions have enabled general aviation pilots to obtain weather briefings and make and file flight plans directly from their own computers, allowing them to bypass flight service specialists.  On February 13, 1990, the FAA introduced the Direct User Access Terminal Service (DUATS or DUAT Service).  *See* David Field, *New FAA Computer May End Old Gripes*, WASH. TIMES, Feb. 16, 1990, at C3; *FAA Historical Chronology, 1926 - 1996*, http://www.faa.gov/about/media/b-chron.pdf (last visited April 22, 2009).  DUATS allowed pilots to obtain official weather briefings and to formulate, file, and close flight plans by computer rather than by talking to a flight service specialist.

After the FAA allowed use of the computer for flight plan filing, flight planning, and weather briefings, software vendors began offering enhanced or simplified interfaces to accomplish these tasks.  By 1996 at least one vendor was touting "[e]ase of use, intuitive interface, and precision graphics" in a program that could "get your weather briefing, display free weather graphics and file your FAA flight plan with DUATS."[13]  In 1999, the Aircraft

---

[12] Changes in popular culture seem to mirror the retreat of small-plane general aviation into a smaller niche of American life.  When Americans in or now reaching retirement were growing up, the radio and television series *Sky King* showcased general aviation pilots in a very favorable light.  *See* http://en.wikipedia.org/wiki/Sky_King (last visited April 22, 2009).  General aviation has not thereafter had a comparable ambassador to the broader culture.

[13] Advertisement, AOPA PILOT, Nov. 1996, at 109, *quoted in* David T. Norton, *A Lawyer-Flight Instructor's Prognostications on the Implementation of Free Flight: How Will the*
(continued...)

Owners and Pilots Association (AOPA), the leading organization of general aviation pilots,

"launched the AOPA Online Flight Planning Service, an easy-to-use Web-based interface that

integrates online route planning, *AOPA's Airport Directory,* GTE DUATS, graphic weather

charts, and flight plan filing."[14]  By early 2005, 120,000 AOPA members had used AOPA flight

planning software.[15]  Internet weather briefings not only offer convenience but also convey

information that "can be difficult to absorb . . . in a telephone briefing" since "[p]ictures are

priceless when it comes to displaying complex, dynamic information like cloud cover and

precipitation."[16]

      The in-flight weather functions of flight service specialists also face competition from

new technologies.  As early as 1982, an Ohio University study had noted that transmission of

graphical real-time weather information to pilots in flight would "aid the pilot[s] in [their]

decision-making process," and "eliminate errors due to verbal communication of the weather

picture."  Ex. 1 at 1.  By the turn of the millennium, it was becoming obvious that satellite

---

[13](...continued)
*Large-Scale Introduction of GPS Into General Aviation Cockpits Affect the Liabilities That Face Pilots and the Flight Instructors Who Train Them,* 62 J. AIR L. & COM. 725, 737 n.33 (1997).

[14] *New AOPA Online Flight Planning Service Offers Easy Web-Based Access to Weather, Route Planning, and AOPA's Airport Directory*,
http://www.aopa.org/whatsnew/newsitems/1999/99-3-002.html (last visited April 22, 2009).

[15] *Speed Your Flight Planning With AOPA's Real-Time Flight Planner*,
http://www.aopa.org/whatsnew/newsitems/2005/050325rtfp.html (last visited April 22, 2009).

[16] Federal Aviation Administration, GENERAL AVIATION PILOT'S GUIDE TO PREFLIGHT WEATHER PLANNING, WEATHER SELF-BRIEFINGS, AND WEATHER DECISION MAKING 3 (2007). Even so, "a Flight Service weather briefing is still the single most comprehensive source of weather data" for general aviation flying. *Id.*  However, the FAA's rules permit self-briefing given the plethora of weather information now available to pilots, *see* 14 C.F.R. § 91.103, and many pilots do choose that option, *e.g.*, *Shew* Dep. 50; Challan Dep. 75.

transmission of real- or near-real-time cockpit weather would become increasingly available to general aviation pilots, although the choices at that time were limited.[17]  Over the next few years, however, the FAA approved additional systems for transmitting weather information directly to the pilot's cockpit.[18]

Another recent technological development provides general aviation pilots with an alternative to asking a specialist for in-flight navigational assistance: AOPA estimates that three-quarters of general aviation pilots now use the Global Positioning System (GPS) as their preferred navigation tool.[19]

Another task once performed by flight service specialists, going outside at an airport and observing weather conditions with their own senses, was also being displaced by automation as "now most of the airports have gone to . . . an automated observation system . . . a machine that does all of the readings and everything."  *Freed* Dep. 73; *see Cantu* Dep. 59; *Elias* Dep. 23, 26; Pike Dep. 30; *City of Pierre v. FAA*, 150 F.3d 837, 841 (8th Cir. 1997) (Pierre airport weather observations to be automated after 1997 closure of flight service station).

---

[17] *See*, *e.g*., David Jensen, *Weather in the Cockpit*, AVIONICS MAGAZINE, http://www.aviationtoday.com/av/categories/military/12704.html (June 2000) (last visited April 22, 2009); Carl Marbach, *Where's My Real-Time Cockpit Weather?*, http://www.avweb.com/news/osh2002/184007-1.html (July 2000) (last visited April 22, 2009).

[18] *Weather in Cockpit Gets FAA OK*, FLYING MAGAZINE, http://www.flyingmag.com/avionics/140/weather-in-the-cockpit-gets-faa-ok.html (2002) (last visited April 22, 2009); *'WSI InFlight' Cockpit Weather System Certified by FAA,* http://www.aero-news.net/SpecialContent.cfm?ContentBlockID=53b8f6ed-b47f-4ae5-b813-c8df2c00a196&cat=7 (2003) (last visited April 22, 2009).

[19] Randy Kenagy, AOPA Chief of Staff for Government Affairs, Letter to the FAA, http://download.aopa.org/epilot/2008/080828vor.pdf (May 23, 2008) (last visited April 22, 2009).

      c.  <u>Decline In Measures Of Flight Service Activity</u>

Measured flight service activity was falling at the turn of the millennium, as small-plane general aviation flying continued to decline and do-it-yourself alternatives to FAA flight service began to proliferate.  FAA Air Traffic Activity Statistics (set forth in exhibits 2-3) show that during just one ten-year span, fiscal 1994 through fiscal 2003, the number of pilot briefings conducted by specialists declined by 26%, the number of flight plans filed through specialists declined by more than 12%, and the number of aircraft contacted by specialists fell nearly 40%.

      4.  <u>The 1978-1997 Consolidation Of Flight Service</u>

Many years ago, when general aviation was more widespread and when people still knew and cared whether a phone call was "long distance," the FAA had more than 300 flight service stations ("FSSs").  *See* Ex. 4. Coopers & Lybrand Financial Assessment of FAA (Coopers & Lybrand study), at D04846.  By 1960, some of the original flight service station functions had already been displaced, *City of Pierre v. FAA*, 150 F.3d 837, 839 (8th Cir. 1997), and by early 1978 the FAA had created a plan for a process that ultimately consolidated FSSs outside Alaska into 58 larger "automated flight service stations" ("AFSSs"), with the FAA retaining 14 FSSs and 3 AFSSs in Alaska.  *See Flight Service Modernization Plan*, 45 FED. REG. 26202 (April 1, 1980) (addendum to and modification of original 1978 plan); Ex. 5 at 2-3, 5 (1996 Inspector General Report describing process); Coopers & Lybrand Study at D04846; *City of Pierre*, *supra*.

The "process did not proceed smoothly."  1996 Inspector General Report at 3.  And "it took far longer to complete that consolidation process . . . than anyone ever anticipated" in part "because of political interests."  Jackson-Brame Dep. 89; *see, e.g., Chemung County v. Dole*, 804 F.2d 216 (2d Cir. 1986) (addressing contention that congressmen had pressured FAA to locate an

-14-

AFSS in Buffalo rather than Elmira); DeGaetano Dep. 7-8 (was deposed in *Chemung County*);

*Consalvo* Dep. 45 ("political pressure from some elected representatives . . . to keep certain

stations open"); *City of Pierre*, 150 F.3d at 840 (noting appropriations bill language addressing

closure of three specific stations). The FAA was not able to complete the process until 1997.

*City of Pierre*, 150 F.3d at 839.

    5.   Slowdown In New Hires And The Resultant Aging Of The Workforce

    The 1978-1997 consolidation process was conducted without RIFs, as employees were

given the option of retiring, moving to the nearest new AFSS, or relocating to another part of the

country. Nimmo Dep. 20-35; *Elias* Dep. 23; *Dodson* Dep. 32. However, the number of flight

service specialists was decreasing, as retiring specialists were not always replaced by new hires.

As the process was winding down in 1997, the president of the same plaintiffs' union (the

National Association of Air Traffic Specialists ("NAATS")) later headed by plaintiff Breen told

a congressional committee that flight service would not "hire another new employee from

outside the Air Traffic Division of the FAA for at least three years" and that "[t]here have been

virtually no new hires into Flight Service for more than 10 years." *Department of Transporta-*

*tion and Related Agencies Appropriations for 1998: Hearing Before the Subcomm. on Trans-*

*portation and Related Agencies of the H. Comm. on Appropriations*, 105th Cong. 48 (1997)

(statement of Michael F. McAnaw) ("Union 1997 Congressional testimony"). Plaintiffs' union

told Congress that, as a result, the workforce was "rapidly aging." *Id.* In early 2001, the plain-

tiffs' union again told Congress that the FAA was hiring very few specialists, that staffing was

down through attrition, and that the remaining workforce was "rapidly aging." *Department of*

*Transportation and Related Agencies Appropriations for 2002: Hearing Before the Subcomm. on*

*Transportation and Related Agencies of the H. Comm. on Appropriations*, 107th Cong. 471 (2001) (statement of Wally Pike) ("Union 2001 Congressional testimony").  To illustrate this point, union president Wally Pike said that even with "over 30 years' experience, within Flight Service I am still a relative newcomer."  *Id.*

> 6.  <u>Calls For Further Consolidation Of Flight Services</u>

The planning for the consolidation that began in 1978 pre-dated much of the decline in general aviation and the rise in automation that would further erode demand for flight services.

Even before the FAA finished that consolidation process, the Department of Transportation's Inspector General was pointing out in 1996 that the FAA "could realize substantial resource savings through further consolidation of AFSSs . . . without compromising safety."  Ex. 5 at 4.  The Inspector General specifically suggested that the FAA "should . . . also consider having the private sector provide the full range of flight services."  *Id.* at 8.

In 1997, the National Civil Aviation Review Commission ("NCARC") pointed out that "[c]onsolidation of Flight Service Stations and relying on expanded" use of DUATS "to provide pre-flight briefings, weather briefings, and flight plan filings could save the FAA over $1 billion over the next five years while maintaining or improving safety and existing services to the general aviation community."  NCARC Final Report, http://www.library.unt.edu/gpo/NCARC/reports/pepele.htm, Part II, § V.C. (last visited April 22, 2009) ("NCARC Report").  Also in 1997, the Coopers & Lybrand report, while not reaching an "unequivocal recommend[ation]" among privatization and other options, did note that "it is clear that an acceleration of the consolidation of flight service stations presents opportunities for near-term cost savings."  Coopers & Lybrand Report, Ex. 4 at D004850-51.  In 1998, an internal FAA

-16-

study recommended that the AFSSs in the United States outside Alaska, Hawaii, and Puerto Rico be reduced to 23 to 27.  Defs' Ex. 6 at P00760.

The Office of Inspector General returned to the theme of further consolidation in late 2001.  Pls' PI Ex. 11, *refiled* as Ex. 7 hereto.  The 2001 IG report noted that the FAA was saddled with "1970's technology that is increasingly difficult and costly to support," and was planning to replace it with newer technology in all 61 AFSSs.  *Id*. at 2.  Four years earlier, the plaintiffs' union was already calling that 1970s technology "antiquated and outdated."  Union 1997 Congressional testimony at 46.  Even getting replacement parts to patch the old system was difficult (Jackson-Brame Dep. 83; *Brydon* Dep. 123), which meant that work stations had to be taken out of service (*Brydon* Dep. 123).  The Inspector General's Office noted that, instead of buying or leasing new technology in all 61 AFSSs, the FAA had "an opportunity to significantly reduce costs," including labor costs, "by incorporating a strategy for consolidating its 61 automated flight service stations in conjunction with" deployment of new technology.  2001 IG Report, Ex. 7 at 3 (quotation), 5 (discussion of personnel savings).

Buildings occupied by flight service were also in need of expensive attention.  Kansier Dep. 23-25.  At one office, the roof fell in.  *Consalvo* Dep. 68-70; *Freed* Dep. 21; Nimmo Dep. 122-23.

7. Government-Wide Policies To Consider
   Competition For Commercial Activities

The decline in the demand for FAA flight services would eventually intersect with the government-wide policy to rely on the private sector for needed commercial services to ensure that the American people receive maximum value for their tax dollars.  The policy is not new.  Quoting a 1979 Senate Report, the Court of Appeals explained in *National Federation of*

-17-

*Federal Employees v. Cheney*, 883 F.2d 1038 (D.C. Cir. 1989), that the policy is based on three

principles:

> "1.  Rely on the private sector.  The Government's business is not to be in business.  If private sources are available, they should be looked to first to provide the commercial or industrial services needed by the Government.

> "2.  Retain certain governmental functions in-house.  Certain functions are inherently governmental in nature being so closely related to the public interest as to demand performance by Federal employees.

> "3.  Aim for economy.  Use cost comparison.  When private performance is feasible and no overriding factors require in-house performance, the taxpayer deserves and expects the most economical performance and therefore rigorous comparison of contract cost versus in-house cost should be used when appropriate to decide how the work will be done."

883 F.2d at 1049, *quoting* S. REP. No. 96-144, at 4 (1979).

Congress reinforced this policy with the Federal Activities Inventory Reform Act of

1998, 31 U.S.C. § 501 note ("FAIR Act").  The Senate report explained that the FAIR Act

reflects a "belie[f] that there are many opportunities for competition" and an "expect[ation]" that

agencies would "prioritize functions that are most likely to have a high payback from such

competition."  S. REP. No. 105-269, at 8.  A House proponent of the FAIR Act explained that it

is intended to give the "private sector" the opportunity to show whether "it can provide a good or

service more cost effectively and efficiently" in order "to ensure that the taxpayers receive the

very best service from the government at the lowest possible cost."  144 CONG. REC. H9448

(daily ed. Oct. 5, 1998) (statement of Rep. Duncan).

The FAIR Act requires that each agency publish an annual list of "activities performed

by Federal Government sources for the executive agency that, in the judgment of the head of the

executive agency, are not inherently governmental functions."  FAIR Act § 2(a).  The "Competi-

tion Required" subsection of the Act mandates that agency heads "review the activities on the

list" and that, "[e]ach time that the head of the executive agency considers contracting with a private source for the performance of such an activity, the head of the executive agency shall" (except to the extent otherwise provided by law) "use a competitive process to select the source." FAIR Act § 2(d).

President Bush's management agenda for fiscal 2002 underscored these points, setting a goal for each agency to complete public-private or direct conversion competitions on not less than five percent of the full-time equivalent positions listed in each agency FAIR Act inventory of commercial positions and noting that the goal would increase by 10 percent in 2003.  Ex. 8 at 18.[20]

The competition called for under the FAIR Act is often referred to as a public-private competition, or as an A-76 study or A-76 competition, because the rules for the competition are set forth in Office of Management and Budget Circular A-76.

   8.  <u>The Decision To Consider Flight Service for a Public-Private Competition</u>

In fiscal 2002, the decline in the demand for flight service, the projected expense of replacing or repairing antiquated physical plant and obsolescing computer systems, and the mandate that agencies offer private entities a chance to demonstrate that they could deliver better value for the taxpayer all contributed to a decision of the FAA's Office of Financial Services that

---

[20] By July, 2003, after flight service had already been selected for a competitive sourcing study, OMB modified its criteria for evaluating each agency's commitment to competitive sourcing by no longer relying on these numeric benchmarks.  See Ex. 9.

the FAA would hold a public-private competition for flight service.  The principal decision-makers were Chris Bertram and John Hennigan.[21]

Bertram had been recruited as the agency's Chief Financial Officer in mid-2001 by Jane Garvey, who had been appointed FAA Administrator by President Clinton in 1997.[22]  Bertram Dep. 13-14.  Bertram left the FAA in early 2003 to work for a Senate Committee.  *Id.* at 60.

Hennigan has worked for the federal government since 1976 and for the FAA since 1991. 1st Hennigan Dep. 11-16.  He became the FAA's Deputy Director of Aviation Policy in 1991 and its Deputy Chief Financial Officer in 1999.  *Id*. at 16-18.

Throughout Hennigan's "career at the FAA . . . there was a constant focus, emphasis, and interest in efficiency at the FAA."  *Id*. at 26.  Hennigan had long been comfortable with an underlying insight of the FAIR Act that allowing the private sector to compete for commercial activities being conducted by the government can sometimes generate greater efficiency.  In his doctoral dissertation, he had studied the relative efficiency of public and private water utilities and concluded that private utilities were more efficient than government-owned utilities.  *Id*. at 20-21.  He had been involved throughout the 1990s in studies to reform the FAA, including Vice President Gore's National Performance Review and the National Civil Aviation Review Commission.  *Id*. at 30; NCARC Report attachment 4.

---

[21] *See* Ex. 10 (Bertram memorandum to Administrator Garvey); Ex. 11 (Bertram memorandum to Acting Administrator Belger); Bertram Dep. 29-30, 37-40, 71; 1st Hennigan Dep. 22-23.

[22] Since FAA administrators serve five-year terms, 49 U.S.C. § 106, their tenures can overlap presidential administrations.

Hennigan had also taken early note of the declining demand for FAA's flight service offerings:

> [At the policy office], one of the things that I was involved in was forecasting FAA activity. . . .   During that period of time, the number of activities provided to the public were decreasing for Flight Service Stations . . . . So very early in my career at the FAA, I was aware that there was -- this was an interesting – interesting part of the FAA that required analysis.[23]

Hennigan and the Office of Financial Services were also involved in the FAA's attempts to compile annual FAIR Act inventories. 1st Hennigan Dep. 58-61.  The initial inputs for the inventories were prepared in the field and reviewed by Hennigan's office, *id*. at 60-61, and the first inventories had regional or local differences in whether the same jobs were listed as commercial, *id*. at 72-73.  However, as the FAA and Hennigan's office got more experience with the inventories, the accuracy and consistency of the inventories improved (*id*. at 64, 66-67, 75-76; Bertram Dep. 95), and for the 2002 inventory the FAA decided on a nationwide basis that flight service positions were commercial, 1st Hennigan Dep. 81-84.[24]

In fiscal 2002, while preparing its budget request for fiscal 2003, the FAA was seeking budget authority to buy modern software for its AFSSs.  Bertram Dep. 21-24.  The Office of Management and Budget, however, pointed to the Inspector General's recommendation that the FAA should consolidate its offices rather than buy expensive new computer systems for all of them.  *Id*. at 23.  Bertram in turn suggested that, rather than simply consolidating the flight sta-tions, the agency should use the A-76 process to consider how to provide flight services more

---

[23] 1st Hennigan Dep. 25-26 (transcriber's paragraph breaks omitted).

[24] Plaintiffs' union, NAATS, later appealed this determination, and the Department of Transportation sustained the FAA's decision.  Ex. 12.

efficiently.  *Id*. at 28.  Given the proposed "invest[ment]" of "hundreds of millions of dollars in new equipment at 61 facilities," it was an appropriate "time to take a hard look at" flight service. 1st Hennigan Dep. 129-30.

Making use of the A-76 process had the advantages of a mere consolidation and several more as well.  For one thing, though Bertram had not been with the FAA during the 1978-1997 round of consolidation, others in the agency made him aware of how difficult that process had been.  Bertram Dep. 28.  The agency was also under "a lot of pressure to save money."  *Id*.  The FAA was also under pressure to use the A-76 process that Congress had underscored that agencies were indeed expected to use, and studying flight service would meet the goals of the President's Management agenda.  *Id*. at 29; 1st Hennigan Dep. 51, 58; Hennigan Decl. (Docket # 23-19) ¶¶ 9, 16.  President Bush personally expressed to Secretary Mineta and other Cabinet officers the importance of meeting the agenda goals, which included consideration of public-private competitions.  Declaration of Norman Mineta ¶¶ 6-7.  Another advantage of using the A-76 process is one that informed passage of the FAIR Act: The A-76 process is "an established way of actually analyzing a function and trying to see how you could make it more efficient." Bertram Dep. 32.

An early step in deciding whether an A-76 process would prove worthwhile initiated by the finance office was to determine whether a competition would be feasible (*e.g*., whether the FAA could expect private companies even to bid on the work), which was informed by a study conducted for the FAA by the accounting firm Grant Thornton.  1st Hennigan Dep. 104; Bertram Dep. 49.

In a June 19, 2002, Memorandum to Administrator Garvey, Bertram informed her that his office had determined that the FAA would examine flight services (except in Alaska) for an A-76 competition.  Ex. 10 at 1.  He noted that the A-76 process was designed "to enable organizations to achieve their missions in the most efficient, effective, and affordable manner possible."  *Id*.  Referring to the Grant Thornton study then being finalized (Bertram Dep. 67), Bertram also noted that "a contractor was performing a feasibility study to clarify the scope of the review."  Ex. 10 at 1.  On August 21, 2002, Bertram informed Acting Administrator Monte Belger[25] that Bertram "had accepted the results" of the Grant Thornton study "and decided to proceed with a study of the FSS function excluding the FSS function in Alaska."  Ex. 11.[26]

Neither Bertram nor Hennigan considered the age of the flight service specialists in reaching the decision to study the flight service function pursuant to Circular A-76.  Bertram Dep. 111-12; 1st Hennigan Dep. 164-65.

9.  The Public-Private Competition

A decision to study a commercial activity performed by the federal government does not mean that the function will inevitably be contracted out to the private sector.  Sometimes, when tested in the crucible of a competition, an agency can show, through a "most efficient organiza-

---

[25] Garvey's five-year term as Administrator had ended on August 2, 2002, and her successor, Marion Blakey, was not sworn in until September.

[26] Obviously, that decision could have been subject to being revisited when, for example, questions of continuing funding arose.  *See*, *e.g.*, Ex. 13 (Jan. 8, 2003, memorandum from Bertram to Blakey regarding commitment to complete study).  Equally obviously, once the decision was made and as more time passed and resources were expended, it would become more unlikely that the agency would reverse that decision.  *See* Pike Dep. 128-29 (even Administrator Blakey felt that, as a practical matter, her options were constrained by the momentum of decisions made before her "watch").

tion" ("MEO") bid put together by agency management and employees, that the function can be done as efficiently in-house as by the private sector.  Nimmo Dep. 84-85.  That outcome is not a failure of the bidding process since the hard-look process of redesigning agency structures into a most efficient organization may itself result in substantial efficiencies over the *status quo*.  1st Hennigan Dep. 129.

Bertram and Hennigan realized that their budget office was not experienced in running as major an acquisition as the A-76 study.  Bertram Dep. 86; 2d Hennigan Dep. 46; 1st Hennigan Dep. 123-24.  Responsibility to conduct the A-76 competition was placed in a newly created Office of Competitive Sourcing, also known as "ACA."  Kansier Dep. 32-33; Bertram Dep. 86; DeGaetano Dep. 16-17, 48-50.

In early 2003, Joann Kansier was chosen to head ACA.  Kansier Decl. (Docket # 23-4) ¶ 1; Kansier Dep. 29-37; DeGaetano Dep. 50-51.  Kansier began her federal career in 1974.  Kansier Dep. 9-11.  She became a contracting specialist in 1980, moved to the FAA in 1985, and had earned warranted contracting officer status by 1987.  *Id*. at 10-13.  Her acquisitions experience included buying equipment for flight service.  *Id*. at 15, 18-19.  Kansier had not been involved in the prior decision of Bertram's Office of Financial Services that flight service would be the subject of an A-76 study.  *Id*. at 30, 33-34.

Marilyn Jackson-Brame became the deputy director of ACA.  Jackson-Brame Dep. 40-42, 210-11.  After stints in the Navy and the private sector, Jackson-Brame had begun working for the FAA in 1974 as a flight service specialist.  *Id*. at 13-14.  By 1999, she had become the manager of the FAA's flight service division.  *Id*. at 32-34.  Unlike Kansier, she had been involved in the prior debate whether to have an A-76 study.  *Id*. at 93-97.  She had "not [been] in

favor" of the decision to conduct an A-76 study for flight services, and had "fought very hard to

find reasons not to conduct the study." *Id*. at 111-12.  Once the decision to have an A-76 study

was made, Jackson-Brame had not wanted to be part of the Office of Competitive Sourcing that

would conduct that acquisition.  *Id*. at 210.  She was, however, persuaded to become deputy

director by Kansier, "a dynamic woman" who "makes a compelling case," that flight service

would, "regardless of why," finally be "getting the attention that" Jackson-Brame thought it

needed; "that the bidders, all of them, including the MEO, would be coming with their best"; and

that Jackson-Brame's flight service experience would contribute to that process.  *Id*. at 210-11.

Plaintiffs have relied on various briefings made by Kansier and others that list "aging

workforce" as part of the "business case" for conducting an A-76 study.  For example, a briefing

by Kansier on June 25, 2003, listed four "outside influences" (the IG recommendation, "FAA

studies," "Congressional Appropriations Language," and the "President's Management

Agenda") and five items under "State of AFSS" ("Aging facilities and equipment," "aging work-

force," "imbalanced workload," "inadequate funding for AFSS related programs," and "potential

for efficiencies") coming together to create an "opportunity."  Ex. 14 at P01179.

The "main premise" of the A-76 process was to have a "level playing field and a fair

acquisition."  Kansier Dep. 32.  "One of the first steps in putting together a public-private

competition (or any large-scale acquisition) is the development of" a "Performance Work State-

ment" ("PWS"), which sets forth for all potential bidders on a uniform basis the requirements to

which they will propose solutions.  Kansier Decl. ¶ 5.  In March, 2003, ACA formed a "PWS

team," including both management and union members, to evaluate what flight service did, and

what bidders would be asked to do in any contract.  Ex. 15; Jackson-Brame Dep. 103-05;

Hopkins Dep. 80-85.  ACA also formed a multidisciplinary "Studies team" to look at technologi-

cal and asset issues.  Ex. 16.  In early June 2003, the ACA's "Acquisition team," published a

Request for Information to solicit input about the acquisition from all interested parties.  *Id*.  By

August, ACA had received 18 responses and had followed-up with one-on-one meetings with

those respondents.  Ex. 17 at P01283.  After the PWS team had done its work, which included

site visits across the country, Ex. 16, the FAA posted the PWS on the internet on December 19,

2003, Kansier Decl. ¶ 7.  A formal Request for Offers was released in May 2004, *id*. ¶ 9, and

both the MEO and outside vendors presented their technical proposals in August 2004 and their

cost proposals in September, *id*. ¶ 11.

ACA put together a technical evaluation team and a cost evaluation team to evaluate the

proposals.  The technical evaluation team was later described as follows by Judge Edwin B.

Neill of the General Services Administration Board of Contract Appeals, sitting as a special

master in an FAA administrative appeal:

> Sixty individuals are identified in this listing [of members of the technical evalua-
> tion team].  Slightly over half of these individuals are listed as advisors – as
> opposed to being evaluators.  The experience and background of each individual
> is briefly summarized . . . . "[T]he years of professional experience and the key
> knowledge, skills, and abilities of these [technical team] members are highly
> impressive.

Neill Opinion, Public Version (Docket # 23-30[27]) ("Neill Opinion"), Ex. 18, at 20; *see also* Defs'

Responses To Pls' 3d Set of Interrogatories, Ex. 19, at 18-19 (listing 26 "core" members of

technical team).  The "core" of the cost evaluation team included at least thirteen members.  *Id*.

---

[27] When filed with our 2005 motion, the Neill Opinion was divided into three exhibits for
electronic filing, Docket ##s 23-30 (pages 1-32), 23-31 (pages 33-65), and 23-32 (pages 66-102).

After detailed evaluation of the proposals, the technical team rated the Lockheed proposal "excellent" on each of four factors (each of which was itself an amalgam of identified strengths and weaknesses) while the MEO proposal was rated "good" on one factor and satisfactory on the other three.  Neill Opinion at 54-55.  The cost team concluded that Lockheed's bid was about 5% less costly than the MEO's proposal, *id*. at 52.

The technical and cost team reports were provided to a Source Selection Evaluation Board (SSEB), which would issue a recommendation to the ultimate selection official.  The SSEB was co-chaired by Kansier and contracting officer Donald King, and also included both technical and cost experts.  Kansier Decl. (Docket # 23-4) ¶ 16.  As Judge Neill later found, the SSEB's "review was obviously more than a 'rubber stamp' exercise," as the SSEB rejected "one influential weakness and one lesser weakness" thought by the technical team to have beset the MEO's proposal, and likewise rejected one of the cost risks "said to be present in the MEO proposal."  Neill Opinion at 99.  Even so, the SSEB's overall analysis concluded that Lockheed had the "'best technical solution'" and "'clearly provided the greatest benefit to the Government.'"  *Id*. at 100, *quoting* SSEB Report.  The age of the employees was not a factor in the SSEB's recommendations.  Kansier Decl. ¶ 26; Declaration of Maureen A. Vorce ¶ 4.

The SSEB's recommendation was presented to the "source selection official" for the acquisition, Dennis DeGaetano, the FAA's Air Traffic Organization's Vice President of Acquisition and Business Services.  DeGaetano had begun his career with the FAA as an engineer in 1972, and his work had included acquisitions of weather and communications equipment related to flight service.  DeGaetano Dep. 11-17.  DeGaetano reviewed the SSEB's report, the technical team's report, and the cost team's report.  DeGaetano Decl. (Docket # 23-29) ¶ 5.

On January 31, 2005, concurring with the recommendation of the SSEB, he decided that what he knew as "PSP2, which turned out to be Lockheed Martin," had the best bid.  *Id.* ¶ 7.  He made his decision on a "'best value basis,'" considering "'the combination of the impact of the overall benefits, risk, and cost for delivery of services to support safe and efficient flight.'" DeGaetano Decl. ¶ 7, *quoting* Screening Information Request.  He concluded that "[e]ven though the PSP2 proposal cost more than the PSP1 [another private company] proposal, the technical superiority of the PSP 2 proposal [was] worth the price difference."  DeGaetano Decl. ¶ 7.

DeGaetano did not consider the age of the workforce in making his decision.  DeGaetano Dep. 98; DeGaetano Decl. ¶ 8.

10.  <u>Estimated Savings to Taxpayers</u>

Compared to the *status quo ante*, the FAA has estimated that the contract will save taxpayers about $2.1 billion.[28]  March 31, 2008, Automated Flight Service Station Program: 90-Day Progress Report to the House Aviation Subcommittee (Madera Dep. Ex. 2), Ex.20, at 3-4; DeGaetano Dep. 85-87; Blakey Dep. 156-59; Sturgell Dep. 23-25; Kansier Dep. 170; Original Estimate of AFSS A-76 Income and Cost Summary, Ex. 21, Reforecast Estimate of AFSS A-76 Income and Cost Summary, Ex. 22 .[29]  This includes about $1.6 billion in savings over the ten-year (including option years) life of the contract plus about $500 million in "cost avoidances"

---

[28] The FAA had originally estimated this figure as $2.2 billion.  The slightly lower current savings estimate results from both settlement of post-contract disputes with Lockheed as well as higher wage rate determinations by the Department of Labor.  March 31, 2008, Automated Flight Service Station Program: 90-Day Progress Report to the House Aviation Subcommittee (Madera Dep. Ex. 2), Ex.20, at 3.

[29] The AFSS A-76 Income and Cost Summary, filed in partially redacted form to protect proprietary data shown on the figures for some line items, shows the line items considered in making these overall calculations.

(expenditures foregone in anticipation of a new contract) during the prior three years.  Madera

Dep. 98; Ex. 20 (Madera Dep. Ex. 2) at 3-4; Sturgell Dep. 24-25; Exs. 21-22.

      11.  <u>Lockheed's Promises To Retain Incumbent Employees for Limited Time</u>

      As part of its bid, Lockheed promised to make job offers to all incumbent employees at

their FAA salary level.  Courain Decl. (Docket # 23-5) ¶ 25; Sturm Dep. 36-37, 53-54.  For em-

ployees at the facilities that remained open, the employment guarantee was to last for three

years.  Courain Decl. ¶ 25; Sturm Dep. 53-54.  Incumbent employees at offices slated to close

were to be offered bonuses for staying through the closures and the first opportunity to relocate

to the three hub facilities Lockheed would open.  Courain Decl. ¶¶ 25-26; Sturm Dep. 75-76, 89-

92.

      12.  <u>Reduction in Force and Legal Challenges to the Lockheed Contract</u>

      On February 1, 2005, DeGaetano's decision that Lockheed had won the competition for

the flight services contract was announced.  Amended Complaint ¶ 19.

      On February 8, 2005, some named plaintiffs (later joined by other named plaintiffs)

provided the EEOC with a notice of intent to file a civil action under the ADEA.  The notice

described the action being challenged as "[t]he discriminatory decision to contract out the Flight

Services component of Air Traffic Control."  Ex. 23 at ¶ 12.[30]

      On March 11, 2005, the agency "tender official" for the MEO bid filed a contest

challenging the decision to the award the contract to Lockheed with the FAA's Office of Dispute

Resolution for Acquisition ("ODRA").  Ex. 24 ("ODRA Intervention Decision") at 1-2.

---

      [30] Because of the size of the document, we have deleted a listing of plaintiffs at P04462-
4518, P04521-4523, P04528-4531, P04534-35.

On March 14, 2005, the president of plaintiffs' union, Kate Breen, intervened in the contest filed by the MEO, and, on March 16, she filed a separate contest. *Id*. at 1;  Neill Opinion at 3.  Over Lockheed's objection, ODRA sustained Breen's claim that she could represent the other bargaining unit employees in the ODRA proceedings.  ODRA Intervention Decision.  The MEO contest and the Breen contest were consolidated by ODRA.  Neill Opinion at 3.

On March 31, 2005, plaintiffs filed this civil action.

Judge Edwin B. Neill of the General Services Administration Board of Contract Appeals was designated as a special master in the consolidated ODRA challenges to the decision award-ing the contract to Lockheed.  Neill's recommended decision in the ODRA contest applied a standard that tested whether the agency decision had a "rational basis," whether it was "arbitrary, capricious" or "an abuse of discretion," and whether it was supported by substantial evidence. Neill Opinion at 61.

On June 28, 2005, Neill issued a 102-page single-spaced opinion addressing the many issues raised by the MEO and Breen and recommending that the contests of the award to Lockheed be denied.  Neill Opinion at 102.

On July 20, 2005, then-Administrator Marion Blakey adopted special master Neill's recommendations and made the final agency decision that the contests to the Lockheed award be denied.  Ex. 25.   Neither the age of the employees nor the extent to which they were retirement eligible played a role in Blakey's decision to accept Neill's recommendations.  Blakey Decl. (Docket # 23-36) ¶ 5; Blakey Dep. 228.  While the procurement had been proceeding before the ACA, Blakey, knowing that she would later decide any bid contest, had been "in the bubble, which meant" that she "was not involved with the procurement."  Blakey Dep. 85.

Breen did not appeal the final agency decision denying the bid contests.

On July 22, 2005, the FAA issued notices to employees then occupying AFSS positions that they would be separated from the FAA via a RIF on October 3, 2005.  Williams Decl. (Docket # 23-34) ¶ 6.

On September 30, 2005, this Court denied plaintiffs' motion for a preliminary injunction against the reduction in force, in part based on its conclusion that plaintiffs had not shown that they were likely to succeed on the merits of their age discrimination claims.

On October 3, 2005, the RIF occurred.  Since the RIF was effective at the end of that day, October 4, 2005, is also sometimes identified as the date of the RIF.

On December 28, 2005, the Court of Appeals affirmed the denial of preliminary relief.

While opposing the preliminary injunction, defendants had also moved to dismiss or, in the alternative, for summary judgment.  On January 8, 2007, the Court addressed that motion. The Court noted that discovery had not yet taken place, and held that "because plaintiffs have not had an opportunity to develop the facts, no determination can be made as to whether a genuine issue of material fact exists."  January 8, 2007, Order at 15.  Accordingly, the Court denied defendants' motion for summary judgment "without prejudice to its renewal after discovery has been completed."  *Id*.

After multiple rounds of interrogatories, thousands of pages of document production, and more than fifty depositions, non-damages discovery has been completed.  Defendants renew their motion for summary judgment.

-31-

<u>ARGUMENT</u>

The only adverse personnel action at issue in this case, the reduction in force, involved no discrimination on the basis of age. The reduction in force applied equally to all flight service specialists outside Alaska, young and old alike. We address this point (including the "outside Alaska" qualifier) in Part I of the argument. This fully addresses any issue of discrimination in what the ADEA does apply to, "[a]ll personnel actions," 29 U.S.C. § 633a(a).

Plaintiffs, however, ask the Court to expand the reach of the ADEA to cover not only personnel actions but also the underlying structural decisions of what kind of business or endeavor to be in. We explain in Part II of the argument why the Court should not accept plaintiffs' invitation.

In Part III of the argument we assume *arguendo* that plaintiffs can expand the reach of the ADEA to encompass their attack on the FAA's decisions about what lines of business to be in. We explain why those decisions were free of age discrimination.

I.      The Only Personnel Action At Issue In This Case,
        <u>The RIF, Was Free Of Any Age Discrimination</u>

        A.      The Indiscriminate RIF Of Old And Young Flight
                <u>Service Specialists Was Not Discriminatory</u>

The ADEA requires that "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). The "personnel action[ ]" that was challenged in the notice of intent to sue and in the amended complaint, the then looming and later actual reduction in force, was free of any age discrimination, or indeed, any discrimination of any kind. All the flight service specialists outside Alaska, whether black or white, male or female, young or old, were equally subject to that RIF. "In other words, the young workers were

treated exactly like the old workers – all were let go." *Grimm v. Alro Steel Corp*., 410 F.3d 383, 386 (7th Cir. 2005).

*May v. Shuttle, Inc.*, 129 F.3d 165 (D.C. Cir. 1997), *cert. denied*, 524 U.S. 927 (1998),[31] makes it clear that under the relatively rare facts of both this case and *May* – an across-the-board RIF of an entire work function – not even a *prima facie* case of discrimination is present.[32]   The employer in *May* decided that it would replace an entire work function, its "fleet service group," by outsourcing the work to an outside contractor.  129 F.3d at 169.  The employer's decision-maker had characterized the employees as an "'old and aging workforce,'" *id.* at 173, and the employer contended that it conducted the RIF in order to cut costs, *id*. at 170.  The Court of Appeals explained that, in order to "'make out a *prima facie* case of age discrimination,'" the plaintiffs had to show that they were in some respect "'disadvantaged in favor of' a younger person.'" *Id.* at 172*, quoting Cuddy v. Carmen*, 694 F.2d 853, 856-57 (D.C. Cir. 1982).  With all the workers in the group having been subject to the contracting out, the Court of Appeals held

---

[31] In *May*, the Court of Appeals published a district court opinion "as if it were an opinion of our court."  129 F.3d at 165.  The Court of Appeals added a point that it "noted, however," with respect to a non-ADEA issue.  *Id.*

[32] Both *May* and this case are unlike more frequently encountered discrimination cases involving RIFs in which some, but not all, of the employees in a particular group are subject to a RIF, such as *Meacham v. Knolls Atomic Power Laboratory*, 128 S. Ct. 2395 (2008); *Pippin v. Burlington Northern Resources Oil & Gas Co.*, 440 F.3d 1186 (10th Cir. 2006); *Watkins v. Sverdrup Technology, Inc*, 153 F.3d 1308 (11th Cir. 1998); *Furr v. Seagate Technology, Inc*., 82 F.3d 980 (10th Cir. 1996); *Schmid v. Frosh*, 680 F.2d 248 (D.C. Cir. 1982); and *Aliotta v. Bair*, 576 F. Supp. 2d 113 (D.D.C. 2008).  The choices employers have in those cases, to decide which employees in the group to RIF, must be made without discrimination and thus can give rise to a *prima facie* case if younger employees within the group are favored when those choices are made.  Similar observations about the distinction between these two kinds of cases are made by both *Hinds v. Sprint/United Management Group*, 523 F.3d 1187, 1196 (10th Cir. 2008), and *Burger v. New York Inst. of Technology*, 94 F.3d 830, 833-34 (2d Cir. 1996).

that plaintiffs had not met that element of their *prima facie* case since they "failed to show that

defendants treated younger persons more favorably than plaintiffs."  129 F.3d at 173.[33]

Here, as in *May*, defendants decided to outsource an entire work function, flight service,

to an outside contractor.  As in *May*, given that all workers in the group were subject to the RIF,

including the young ones, plaintiffs have not sustained their burden of showing that they were

treated worse than comparable younger employees.[34]

---

[33] The same reasoning was used in *Campbell v. PMI Food Equip. Group*, 509 F.3d 776 (6th Cir. 2007), and *Gaffney v. Dep't of Info. Tech. & Telecomm.*, 536 F. Supp. 2d 445 (S.D.N.Y. 2008).  In *Campbell*, the court affirmed dismissal of an ADEA claim where defendant fired all its hourly workers, whether over or under 40, and the work was thereafter done by a contractor who allegedly used workers 18 years younger on average.  509 F.3d at 785-86.  In *Gaffney*, the court held that "Foundation Line" employees did not establish a *prima facie* case of race or age discrimination where "all Foundation Line Employees were terminated, regardless of age or race," 536 F. Supp. 2d at 461, even though the employer was still hiring in different departments, *id*. at 462.  Similarly, in *Isbell v. Allstate Ins. Co.*, 418 F.3d 788 (7th Cir. 2005), the court found an age discrimination claim to "have no merit" where all of more than 6,000 employees, "*regardless of age*," lost their positions as employees and became eligible to work in the same positions as contractors.  418 F.3d at 795 (emphasis original).

[34] The relatively rare facts of both *May* and this case differ from the more usual case in which an employer asserts a non-discriminatory reason for a challenged personnel decision after which inquiry into whether plaintiff has made a *prima facie* case becomes an unnecessary "sideshow," and the only question is that of discrimination *vel non*, *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).  Our point here is not that the FAA had a non-discriminatory reason for deciding that it would apply the RIF equally to all the old, all the young, all the male, all the female, all the white, and all the black specialists.  Our point, and a holding of *May*, is that such an across-the-board decision that all the employees would be equally subject to the RIF is not discriminatory in the first place.  Defendants do not need to assert a non-discriminatory reason for not discriminating. We do explain below that the FAA had legitimate non-discriminatory reasons for decisions leading to the RIF that plaintiffs seek to challenge (Part III, *infra*), but, as we first explain (Part II, *infra*), those decisions were not personnel actions within the domain of the ADEA to begin with, and they are not the personnel action discussed here that actually is at issue, the non-discriminatory RIF.

In any event, the central point of *May* is still good law even if, in light of cases like

(continued...)

-34-

When an employer fires everyone in a given area, it is likely to be unfortunate for the workers involved, it will sometimes be unwise, and in some cases it may even be unfair. But such literally indiscriminate personnel actions, whatever else they might be, are not discriminatory. Defendants are therefore entitled to summary judgment.

B.    Older Workers Were Not Disproportionately
         Harmed By The Reduction In Force

When it denied the preliminary injunction motion, this Court observed that, though plaintiffs had argued that the RIF had a "differential impact" on older workers, they had "not provided any specifics, let alone detail, with respect to the magnitude of the differential impact." *Breen v. Mineta*, 2005 WL 3276163 at *7 (D.D.C. Sept. 30, 2005).

Discovery and the calculations of plaintiffs' expert Joseph Tryon have disclosed, if not the magnitude of the impact, at least its direction. As it turns out, the "differential impact" was that <u>younger</u> workers subject to the RIF sustained <u>greater losses</u> than older workers.[35]   Although damages discovery in this case is not completed, the Court's minute order of January 29, 2008, directed the parties to do a "sampling of damages discovery." Tryon calculated damages for a sampling of plaintiffs that he and plaintiffs' counsel chose. Although defendants disagree with

_____

[34](...continued)
*Brady*, an across-the-board RIF should now be seen as non-discriminatory, not because it fails to present a *prima facie* case, but because it is non-discriminatory considered *vel non*: Either way, it is not discrimination. The weakness of plaintiffs' *prima facie* case does not somehow disappear once a non-discriminatory reason has been asserted. *See Brady*, 520 F.3d at 494 n.2 ("lack of . . . evidence" to support *prima facie* case relevant to summary-judgment-stage consideration of discrimination *vel non*).

[35] In citing plaintiffs' expert reports, defendants do not concede that they will be admissible at trial or waive any objections to their admissibility. Even <u>assuming</u> the admissibility of all plaintiffs expert reports, defendants are entitled to summary judgment.

the absolute amounts of damages calculated by Tryon, the <u>relative</u> levels of damages calculated by plaintiffs' own expert show that, within the sample chosen by plaintiffs, the older the plaintiff, the <u>less</u> the damages.  *See* Supplemental Report B of Defs' Expert William J. Carrington.

Plaintiffs' other expert argues that, even though both young and old workers were subject to the RIF, older workers were nevertheless disproportionately disadvantaged "in this instance" because Lockheed could "potentially" exercise more monopsony power over older workers. Report of Pls' Expert Dale Belman ("Belman Rep't") at 6-7.  That argument fails for at least three reasons.

First, an observation that Lockheed could "potentially" exercise monopsony power does not convict even Lockheed of age discrimination.  That an employer has monopsony power does not imply that it is using that power to discriminate.

Second, even if Belman's report did show that Lockheed is now discriminating against older workers, it would do nothing to prove that <u>defendants</u> discriminated.  *May* forecloses any such argument, holding that evidence of possible age discrimination by the non-defendant contractor was "irrelevant to [the] case" against the outsourcing original employer, since that employer "had no control over the selection of the" contractor's employees.  129 F.3d at 173.[36]

_____

[36] Here, the FAA contract with Lockheed affected who Lockheed hired, but that distinction cuts against plaintiffs: As part of the contract, the FAA insisted that Lockheed offer rights of first refusal to the incumbent workforce and, for at least three years, retain such employees at facilities that remained open.  Courain Decl. ¶ 25; Sturm Dep. 36-37, 53-54.  Beyond that, however, the FAA does not control whom Lockheed employs.  *See* Grace Dep. 129-30. Lockheed and the FAA are instead competitors in the labor market.  Sturm Dep. 110.

Third, as defendants' expert William Carrington pointed out (and as plaintiffs' expert Dale Belman conceded, Belman Dep. 37-38), to the extent Lockheed has greater monopsony power over older employees, it is because older employees were damaged <u>less</u> by the RIF than younger employees.  Report of Defs' Expert William J. Carrington on Monopsony ¶¶ 30-31.

Moreover, if plaintiffs had been correct in their supposition that older specialists were damaged more by the RIF than younger specialists, one would have expected to find that older specialists were more likely than younger ones to have made the choice to hire counsel and sue. The data do not support any such supposition, however.  Instead, of the twenty oldest non-supervisory flight service specialists as of January 2005, only one is now a plaintiff.  Declaration of Aaron McDaniel ¶ 9.  And even that plaintiff was not injured, at least not monetarily.  As defendants' expert William Carrington explained, under any reasonable scenario, the oldest plaintiff, like the other oldest specialists who were already eligible for federal retirement, was better off  "double dipping" by accepting both federal retirement and a paycheck from Lockheed. Supplemental Report A of Defs' Expert William J. Carrington ¶¶ 33-40.  Not surprisingly given the opportunity of the oldest employees to "double dip," of the one hundred oldest non-supervisory flight service specialists as of January 2005, only two are among the non-dismissed plaintiffs.  McDaniel Decl. ¶ 9.  And, on average, the non-dismissed plaintiffs are more than two and a half years younger than the entire group of non-supervisory flight service specialists eligible to bring an age discrimination claim.  *Id.* ¶¶ 6-8.

As we explain above in Part I.A of the argument, all that really need be said to rebut plaintiffs' claim of age discrimination is that the young and old workers were both subject to the RIF.  But if one did accept plaintiffs' invitation to examine whether older workers were hurt

more by the RIF than younger ones, plaintiffs' claim that the older employees were dispropor-

tionately harmed by the RIF is not supported by the facts.  The oldest employees did not

disproportionately choose to become plaintiffs and, in plaintiffs' sample of the employees who

did choose to become plaintiffs, the older the employee, the <u>less</u> the damages.

C.     The Plaintiffs Have Not Properly Raised Any<br>
Claim With Regard To Post-RIF Hiring,<br>
And In Any Event Have Not Shown Any<br>
<u>Discrimination With Respect To Such Hiring</u>

In an attempt to evade the inescapable fact that there was no discrimination because all

the specialists, young and old alike, were subject to the RIF, plaintiffs appear to argue that in fact

not all the specialists were ultimately let go because some of them were hired by the FAA for

other positions after the RIF, and those who were hired for other positions, plaintiffs contend,

were disproportionately young.  Belman Rep't 5-6.  But, while decisions regarding whom to hire

for non-flight specialist positions are indeed personnel actions, they are not the personnel action

challenged in the Notice of Claim to the EEOC.  Questions of discrimination in later hiring

decisions are thus not properly before the Court in this RIF case.  And plaintiffs have shown no

evidence of age discrimination in those decisions in any event.

1.     Because Plaintiffs' Notice Of Intent To File Civil<br>
Action Did Not Raise Any Claim Of Discrimination In<br>
Later Hiring Of Specialists For Other FAA Positions,<br>
<u>The Court Lacks Jurisdiction Over Such Claims</u>

Plaintiffs' notice of intent to sue was filed in <u>February</u> 2005.  Ex. 23.  Plaintiffs gave

notice that they challenged the then-recent decision of the agency to award the contract to

Lockheed.  However, it did not set forth or give even oblique notice of the claim that plaintiffs

are trying now to introduce through their expert, a claim that specialists who were hired by the

-38-

FAA for other positions "since the reduction of force of October 3, 2005" were younger on average than the entire pool of specialists subject to the RIF.  Belman Rep't at 5-6.  Any such claims of age discrimination with respect to subsequent hiring by the FAA for other positions are not properly before the Court because there was no notice to defendants that plaintiffs had or would raise such claims of discrimination in post-September 2005 hiring in their February 2005 Notice of Intent to sue about a RIF.

A civil action in ADEA and other discrimination cases is "'limited to the matters addressed at the administrative level.'" *Peterson v. Archstone*, 2009 WL 511145 at *2 (D.D.C. Feb. 27, 2009).  "Among other benefits, exhaustion gives the employer 'fair notice of the claims against it,'" and "allows an employer 'an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary.'" *Id*., *quoting Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995), *and Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985).  Even when, as in *Peterson*, an employee has raised <u>a</u> claim of discrimination, that is not a lifetime pass into the federal courts to argue any and all <u>other</u> claims of discrimination that might ever arise against the same employer.  *E.g.*, *Peterson*; *Miller v. Rosenker*, 578 F. Supp. 2d 107 (D.D.C. 2008).

Rather, if a claim is to be litigated in court, it must be "like or reasonably related to the allegations of the [administrative] charge and growing out of such allegations."  *Park*, 71 F.3d at 907.  A claim that an employee was not hired for one job is not "reasonably related" to a claim that he was previously fired from a different job, even if the employer is the same; therefore separate exhaustion of that later non-selection claim is required.  *Parisi v. Boeing Co*., 400 F.3d 583, 586 (8th Cir. 2005); *Miller v. ITT*, 755 F.2d 20, 25-26 (2d Cir. 1985); *Maxwell v. Cuyahoga*

*Metropolitan Housing Auth.*, 2008 WL 746818 at *9-10 (N.D. Ohio March 18, 2008); *Abbate v. Cendant Mobility Services Corp.*, 2007 WL 2021868 at *13 (D. Conn. July 13, 2007); *Sundaram v. Brookhaven Nat'l Laboratories*, 424 F. Supp. 2d 545, 568 (E.D.N.Y. 2006).

Even if plaintiffs had challenged post-September 2005 hiring decisions in the notice of intent to sue, those claims are barred for the independent reason that they were not asserted in the March 2005 complaint. *See Jones v. Bernanke*, 557 F.3d 670, 674-75 (D.C. Cir. 2009).

Defendants' post-RIF hiring of Scott Malon, one of the younger flight service specialists whose post-RIF hiring was cited by plaintiffs' expert, is an example of how factually dissimilar a claim related to even one such hiring decision would be to plaintiffs' RIF claim. At the time of the RIF, Malon was only 38 years old. Malon Dep. 6. He, along with other older and younger flight service specialists, was let go in the RIF, and, like many of his colleagues, he went to work for Lockheed. *Id.* at 14-15. He was later hired by the FAA as a human resources specialist. *Id.* at 15-16. If the FAA's decision to hire Malon rather than some other former flight specialist were at issue, one would need to look at whether any older flight service specialists applied for that human resources specialist position; if so, at how comparable their qualifications were (the agency might argue that Malon had experience, *see id.* at 11-15, related to the duties of the new position, *see id.* at 19-22); and at whether agency decisionmaker Tom Boro, *see id.* at 16, had done anything to suggest age bias. What little information the record contains about Malon's hiring was generated only because Malon was deposed for an unrelated reason (he was chief negotiator for the union on issues related to the RIF). For other post-RIF hirings, even less is known. What is clear, however, is that these many rehiring decisions involved different

decisionmakers, different positions, different times, and different considerations than the RIF claim raised in plaintiffs' notice to the EEOC and in the amended complaint.

Another reason why plaintiffs' challenge in February 2005 to the RIF could not plausibly be construed as also challenging post-October 3, 2005, non-selections is that doing so would convene plaintiffs into a circular firing squad. Many of the plaintiffs are among the specialists who <u>were</u> hired in other positions by the FAA after the RIF. Kate Breen was hired by the agency after the RIF.[37] So was Michael Sheldon. *Sheldon* Dep. 41. Likewise, for example, Ronald Consalvo, Denise Elias, Peter Jensen, and William Corbo. *Consalvo* Dep. 14-15; *Elias* Dep. 77-78; *Jensen* Dep. 68-69; *Sheldon* Dep. 31. A challenge by plaintiffs to the selections by the FAA for post-RIF jobs would therefore be arguing that the FAA discriminated by hiring some of the plaintiffs themselves. That is neither a sensible nor permissible construction of their actual administrative claims.

Accordingly, plaintiffs' having exhausted administrative remedies with respect to the flight service RIF does not justify their challenges to later decisions on hiring for different positions, and the Court lacks jurisdiction to consider any challenges to those decisions.

> 2.    Plaintiffs Have Not Shown That, In Selecting Among
> Former Flight Service Specialists For Different Positions,
> <u>Defendants Discriminated On The Basis Of Age</u>

Even if the claims that the agency discriminated among former flight service specialists in making hiring decisions for a potpourri of post-RIF jobs were properly before the Court, plaintiffs have not made even a *prima facie* showing of discrimination. Using again the example of the human resources specialist job Scott Malon got, plaintiffs have not shown how the FAA

---

[37] For plaintiffs who, like Breen, are currently employed by the FAA, their positions can be found at https://employees.faa.gov/employee_directory/ (last visited April 22, 2009).

treated an older plaintiff applicant for the job any differently or shown that there even was an older applicant among the plaintiffs who was equally qualified for that job.

To be sure an original appointment to one important category of FAA jobs, aircraft separating controllers, must generally be made before an applicant reaches his or her 31st birthday.  But that age-based initial hiring criterion does plaintiffs no good for at least two reasons.  First, this criterion could have made an age-based difference among flight service specialists only with respect to a comparison between those over 31 and those under 31, and there were very few (only fifteen) of the latter.  McDaniel Decl. ¶ 10.  Among the more than 99% of the specialists who were already over 30, the initial-hire-before-age-31 requirement obviously made a difference to those who wanted aircraft separating controller jobs, but this was not an age-based difference: a 50-year old who had previously worked in an air traffic control tower could be eligible to apply for another tower position, while a 41-year old or 32-year old who had never worked in a tower would not have been eligible for an original appointment to a tower position.  For example, (then) 50-year old plaintiff Malcolm Brydon was hired by the FAA as a controller at the Nantucket tower.  *Brydon* Dep. 20, 74.[38]  Prior tower experience, not age,

---

[38] Brydon was hired after the RIF was announced, but before October 4, 2005, so his hiring is not included in plaintiffs' expert's statistics on post-RIF hiring.  *Compare* Belman Rep't at 5 *with Brydon* Dep. 52, 74.  As noted above, Brydon had "wanted to be a tower controller since [he] was little boy," *Brydon* Dep. 36, but had been too old to apply for an FAA tower position, *id.* at 35-36.  However, Brydon had been a tower controller in the Air Force, *id.* at 24, and, as a one-time accommodation to the RIF'd flight service specialists, the FAA waived the age 31 requirement for former military controllers.  Ex. 26.  There is a hint of the circular firing squad with respect to that waiver.  Brydon thought the special waiver for military experience should have been broader (he was not allowed to use the waiver a second time to apply for another tower job).  *Brydon* Dep. 81-82.  On the other hand, two other plaintiffs thought the FAA was unfairly allowing specialists with military controller experience to "leapfrog[ ]" plaintiffs who had longer FAA experience, *Torres* Dep. 65; *Elias* Dep. 97-99.  Plaintiffs as a whole have not raised either of these opposing arguments.  In any event, questions of how much weight the FAA
(continued...)

was the controlling factor.  Second, even if the maximum-age-for-first-hire policy had made an age-based difference within the RIF group, it would not have violated the ADEA.  Congress authorized the Secretary to fix a "maximum limit of age within which an original appointment to a position as an air traffic controller may be made."  5 U.S.C. § 3307(b).  That statute operates as an exception to the ADEA.  *Stewart v. Smith*, 673 F.2d 485, 490-94 (D.C. Cir. 1982).

Plaintiffs attempt to bolster their post-RIF hiring argument with statistics, but those statistics are fatally flawed.

First, Belman is comparing apples with tomatoes, oranges, and lettuce, a RIF of flight service specialist jobs with hiring for a variety of different jobs.[39]  Such a comparison does nothing to establish that the RIF was discriminatory.  *See Doan v. Seagate Technology, Inc*., 82 F.3d 974, 979 (10th Cir. 1996) (reversing jury verdict for ADEA plaintiff despite statistics showing that "a greater percentage of older workers were selected for the RIF while a greater percentage of younger people were hired afterwards" where RIF and after-hire jobs were not "comparable"); *Aliotta v. Bair*, 576 F. Supp. 2d 113, 128 (D.D.C. 2008) (granting employer's summary judgment motion and rejecting comparison of older RIF workforce with younger new hires where RIF positions were not similarly situated to new hire positions).

Second, as defendants' statistical expert, Bernard Siskin, explained, Belman compared the ages of those hired for non-specialist jobs to the ages of all the specialists subject to the RIF

_____

[38](...continued)
should give to military experience in hiring decisions involve distinctions based on prior military experience, not distinctions based on age.

[39] Among the different jobs for which FAA hired former flight service specialists are the human resources job Malon got, the tower job Brydon got, the air traffic security job Sheldon got, *Sheldon* Dep. 41, the flight data communications job Jensen got, *Jensen* Dep. 68-69, 83, 101, and the staff specialist job Dodson got, *Dodson* Dep. 164-65.

-43-

rather than (as required[40]) to the ages of those who <u>applied</u> for the jobs in question.  Report of

Defs' Expert Bernard R. Siskin ("Siskin Rep't") at 2 n.4.  Belman asserted that he did not look at

the age of the applicants because "if there's a perception that certain groups are unlikely to be

rehired," then "using the pool of applicants may simply reproduce the pattern of . . . perceived

bias."  Belman Dep. 92.  Yet Belman had no evidence of such perceived bias to begin with.  *Id.*

at 93.[41]  In short, Belman purported to prove age bias by first assuming age bias as his excuse not

to use the relevant statistics as the base for comparison.  Such bootstrapping proves nothing.[42]

        D.        **Plaintiffs Did Not Raise Any Claims With Respect To**
                        **The FAA's Continued Direct Performance Of Flight**
                        **Service In Alaska, Which In Any Event Was Justified**
                        <u>**Under The Unique Conditions Present In Alaska**</u>

FAA flight services in Alaska were not bid as part of the contract ultimately awarded to

Lockheed and are still conducted directly by the FAA.

Plaintiffs have not raised a timely challenge to that exclusion of Alaska in either their

notice of intent to file a civil action or their complaint.  The notice of intent to file civil action

did cite the FAA's decision not to outsource its Alaska operations, but <u>with approval</u>.  Notice of

Intent, Ex. 23, ¶ 28.  Since any challenge to the FAA not including Alaska in the outsourcing

---

[40] *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975); *Whitacre v. Davey*, 890 F.2d 1168, 1172 (D. C. Cir. 1989).

[41] By contrast, in *Douthard v. Rawlinson*, 433 U.S. 321, 330 (1977), it was appropriate to use a non-applicant baseline where the announced job criteria were met more often by men than women, and would-be female applicants could determine that they did not meet criteria.

[42] *See Murphy v. Pricewaterhouse Coopers LLP*, 580 F. Supp. 2d 16, 29-30 (D.D.C. 2008) (in ADEA promotion case, granting employer's summary judgment motion where plaintiff's statistical expert made "*no* effort" to assure that those in baseline comparison group included only employees "eligible, qualified, and interested" in promotion, and instead "simply *assum*[ed]" that they were all qualified and interested) (emphasis original).

was not raised administratively, it is too late now for plaintiffs to claim that decision was discriminatory.  *Peterson*, *supra*.  The Complaint likewise cited the FAA's decision not to out-source its Alaska operations with approval.  Complaint ¶ 45; Amended Complaint ¶ 46.  Accordingly, any challenge to the Alaska exclusion is not properly before the Court for the inde-pendent reason that it was not raised in the complaint.  *Jones v. Bernanke*, 557 F.3d 670, 674-75 (D.C. Cir. 2009).[43]

Indeed, plaintiffs not only were not challenging the decision not to contract out Alaska operations, they were supporting that decision.  For example, in July 2005 – i.e., after the announcement of the RIF – plaintiffs' union, NAATS, in addition to opposing the contracting out in the other States, specifically opposed contracting out of flight services in Alaska and warned that "Alaska aviation" should "not suffer under a one-size fits all policy."  *Alaska Aviation*, *Field Hearing Before the S. Comm. on Commerce, Science & Transportation*, 109th Cong. 49 (2005) ("2005 Alaska Aviation Hearing") (statement of Phil Brown, Director, NAATS Alaska Region).  Plaintiff Breen, president of NAATS during the RIF period, when asked whether Alaska flight services should have been outsourced, said: "absolutely not."  *Breen* Dep. 44-45.

If anything, the FAA's decision not to outsource its Alaska operations, rather than discriminating against plaintiffs, helped them, since some of them, such as plaintiffs Wilkerson

---

[43] Plaintiffs' preliminary injunction brief was more equivocal.  After praising the FAA (p. 19) for "recogniz[ing] that Alaska was not suitable for contracting out because of unusual environmental factors," the brief later (p. 85) made passing reference to the FAA "inexplicably exempting Alaska."  The Court need not psychoanalyze the preliminary injunction brief to discern how the same decision so quickly went from "recognized" to "inexplicable," because that brief does not matter:  It is whether the complaint raises the issue that governs whether the issue (if previously raised administratively) may be asserted, *see Jones*, 557 F.3d at 674-75.

and McKean, were able to obtain jobs in the FAA's Alaska flight service operations. Wilkerson

Response to Show Cause Order (Docket #220); *Cantu* Dep. 78.

In any event, with respect to aviation, Alaska is unique.

First, Alaska is uniquely dependent on aviation.  In a majority of Alaska communities,

there is no road, let alone a bridge, to anywhere.  About 70% of Alaska's "communities are not

connected to the outside world, or even each other."  2005 Alaska Aviation Hearing at 41

(statement of Karen E. Casanovas).[44]  Thus, as plaintiffs' union acknowledged, "aviation is often

the only lifeline for [Alaska] communities."  2005 Alaska Aviation Hearing at 49 (emphasis

supplied).

Second, the terrain and weather are more challenging in Alaska than elsewhere:

> Alaska experiences all the aviation weather hazards found in the lower 48
> with a greater risk of volcanic eruptions than almost anyplace else in the
> world.  Flight operations and weather forecasting are challenged by the
> state's geography – rough terrain, vast land area, exposure to ocean –
> extremely variable weather, and limited weather radar and satellite
> coverage as compared to that enjoyed by the rest of the country. . . .
>
> . . . . [T]he Aleutian Islands are recognized as having some of the worst
> flying conditions in the world. . . .
>
> Alaska's geography creates a myriad of flying problems. Innumer-
> able small-scale climates exist near mountainous terrain, mountain passes
> and glaciers.  Widely separated weather reporting stations and limited
> satellite imagery allow these localized conditions to go unreported.  Also,
> mountain tops are frequently obscured by clouds, and the freezing level is
> rarely above 7,000 feet.  These factors often cause significant problems for
> the VFR pilot.

---

[44] *See also* 2005 Alaska Aviation Hearing at 21-22 (statement of Mike Barton,
Commissioner, Alaska Dep't of Transp. and Pub. Facilities) ("Alaska comprises more than 20
percent of the land mass of the United States, but has less road mileage than Fairfax County");
29 (statement of Richard Harding) ("more than 200 communities . . . not on any road system").

> Unlike in the lower 48, Alaska does not have an adequate system for flight under IFR at the low altitudes used by general aviation and the bulk of the commercial air carriers in the state.  As a result, aviation in Alaska is more highly dependent on the weather facilities and products needed to make VFR flying safe in this difficult environment.

Remarks of Jim Hall, (then) Chairman, National Transportation Safety Board, Before the

National Weather Service Workshop on Weather Services for Aviation Operations,

http://www.ntsb.gov/speeches/former/hall/jh980409.htm (April 9, 1998) (last visited April 22,

2009).

Bobby Sturgell, the Acting Administrator at the time of his deposition and Deputy

Administrator at the time of the RIF, saw the capriciousness and extremity of Alaska weather in

the Navy.  A flight of planes from his carrier ran into "zero zero" conditions that prevented them

from landing until the weather changed.  The Navy had to rely on Air Force assistance to save

pilots and planes from disaster.  Sturgell Dep. 79-80.  Asked by plaintiffs' counsel to compare

flying in Alaska with his experience flying in Hawaii, Sturgell explained (*id*. at 83-84):

> [B]y and large the weather in Hawaii is visual meteorological conditions, it is nice weather.  You have convective activity that flows through on what I would consider to be a fairly predictable basis.  That is completely unlike the weather and geography in Alaska.  Granted Hawaii has some peaks, but Alaska has a huge number of mountain ranges and a huge number of islands, and the weather is much more instrument condition type weather than Hawaii.  It is winter there 10 months out of the year.

As plaintiffs' union recognized, "[n]owhere else in the nation are these potential weather

dangers more prevalent than in Alaska."  2005 Alaska Aviation Hearing at 49.

Because both the importance of, and challenges for, aviation in Alaska are so different

from aviation elsewhere in the country, many aviation rules, practices, or policies apply

differently in, only in, or everywhere except in, Alaska.  *See, e.g.*, *Alaska Professional Hunters*

*Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999); 49 U.S.C. §§ 40109(f)(3), 44718(d)(2), 44727,

44915.  Indeed, as a general matter, Congress has told the FAA that whenever it amends its regulations in a manner that will affect intrastate Alaska aviation it must specifically "consider the extent to which Alaska is not served by transportation modes other than aviation, and shall establish such regulatory distinctions as the Administrator considers appropriate."  49 U.S.C. § 40113(f).  When it comes to aviation, Alaska is different.

With respect to flight service in particular, the pre-automated flight service stations in Alaska had been left open even after the 1978-1997 round of consolidation had closed such stations elsewhere.  *See*, *e.g.*, Coopers & Lybrand Study at D04846; Pub. L. No. 103-122 § 340, 107 Stat. 1198, 1224 (1993) ("None of the funds appropriated by this Act shall be available for use for closing or otherwise reducing the services of any flight service station in the State of Alaska . . . .").   Alaska thus was at a different starting point in terms of function and structure for possible future consolidation than the rest of the country.  When deciding that the A-76 competition would not cover Alaska, Bertram was in part reflecting these pre-existing differences between flight services in Alaska and in the rest of the country.  Bertram Dep. 72.  Moreover, because of those differences, Bertram was concerned about whether private vendors would be more reluctant to bid, or would bid at all, if they had to put together a plan to take over two different types of operations, the flight service operations outside Alaska and the differently structured operations in Alaska.  *Id*.  These were valid concerns that have nothing to do with age, and everything to do with the agency's continued sensitivity to the special role of, and challenges facing, aviation in Alaska.

II.    Plaintiffs' Attempts To Challenge Underlying Structural
       Decisions That Were Not Personnel Actions Would Result
       In An Unwarranted Expansion Of The Scope Of The ADEA

The ADEA requires that "[a]ll personnel actions . . . shall be made free from any dis-crimination based on age."  29 U.S.C. § 633a(a).  There was a personnel action at the center of this case, the RIF.  Plaintiffs challenged that action.  As we explained above, since the RIF applied equally to old and young alike, it was non-discriminatory.  Part I.A., *supra*.  Subsequent FAA decisions about who to hire for other positions were also personnel actions, albeit (as we also explained above) personnel actions that plaintiffs neither challenged nor showed were discriminatory.  Part I.C., *supra*.

Since they cannot show that any personnel action was discriminatory, plaintiffs ask this Court to expand the reach of the ADEA in a novel manner.  They ask, in effect, that courts begin using the ADEA, not merely to assure that employers' personnel actions are free of discrimina-tion, but also to begin policing employers' antecedent decisions about who the employer even is or will be, about, in other words, what lines of business an employer decides to undertake.  *See*, *e.g.*, Pls' PI Mem. at 100-01; Pls' Opp. to Mot. to Dismiss at 16-18.  The "discrimination," under this theory, would become, not discrimination in choosing who would get flight service jobs (for there were none), but in the employer's decision not to have any such jobs to offer.  That would be a bridge too far for the ADEA.

We acknowledge that it is not just "personnel actions" that determine who an employer employs in a way that might affect protected classes quite differently.  Since many occupations are disproportionately male or female, black or white, young or old,[45] what business an employer

---

[45] Bureau of Labor Statistics data showing "Employed persons by detailed occupation,
(continued...)

-49-

is in, and what occupations it will consequently employ, may also profoundly affect the demographics of its likely and actual workforce,

But neither the ADEA nor, for that matter, Title VII, commands that an employer must engage in some lines of business rather than others.  Indeed, those statutes do not even "require the employer to restructure his employment practices to maximize the number of minorities and women hired."  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981).  *A fortiori* they do not require an employer to change what businesses the employer is in.  An employer is therefore not guilty of discrimination in taking a "personnel action" merely because it has chosen to engage in some lines of business rather than others with a more even or off-setting demographic balance.  A local government, for example, does not violate Title VII merely because it decides not to operate a public pre-school system, even if it has chosen to be an employer of firefighters, and even if, when it makes those decisions, it knows (what the Bureau of Labor statistics show) that fewer than 5% of firefighters, but more than 95% of pre-school and kindergarten teachers, are women.

Lest there be any misunderstanding: It is not our point that local governments should discriminate against female firefighters.  It is our point that an employer's decision to provide fire protection despite knowing that relatively fewer females are firefighters than pre-school teachers would not violate Title VII on some theory that the employer had not chosen instead or also to engage in different or additional lines of business that would result in a more

---

[45](...continued)
sex, race, and Hispanic or Latino ethnicity" can be found at ftp://ftp.bls.gov/pub/special.requests/lf/aat11.txt (last visited April 22, 2009).  Data showing age are at ftp://ftp.bls.gov/pub/special.requests/lf/aat14.txt (last visited April 22, 2009), but with less occupational detail.

demographically balanced employment roster.  MIT does not violate Title VII merely because it

has not chosen to be an Institute of Technology and Social Work.[46]

To be sure, it might be possible that somewhere some employer decided, for example, to

provide fire protection rather than pre-school instruction because the county commissioners did

not want to deal with female employees rather than because fire protection was thought to be

important.  Holding such decisions categorically not subject to Title VII or ADEA scrutiny

means that, if they were in fact biased, they will go unpunished under those employment

discrimination laws.[47]  But such a "secret memo scenario . . . could be offered in *any* case where

the requirement of an adverse employment action has not been satisfied."  *Douglas v. Donovan*,

559 F.3d 549, 555 (D.C. Cir. 2009) (emphasis original).  The costs of using the employment dis-

crimination laws to police such decisions on the off-chance that such bias might one day be

found through expensive discovery and trial would be unduly high.  This Court ought not accept

plaintiffs' invitation to expand Title VII and the ADEA to allow such expensive second guessing

of, for example, a private entrepreneur's decision to operate a fishing fleet rather than an

automobile dealership, or a local governmental employer's decision to operate fire stations but

not pre-schools, or a federal governmental employer's decision to operate a merchant marine

academy but not a liberal arts college.

--------

[46] According to MIT president Susan Hockfield, in 2004 only 18% of MIT's faculty were women.  *President Hockfield Speaks out on the Issue of Women in Science and Engineering*, http://web.mit.edu/newsoffice/2005/gender-equity.html (last visited April 22, 2009).  This brief expresses no views on whether MIT is or is not complying with Title VII other than a view that its being MIT is not a violation.

[47] The Constitution is not limited in application to "personnel actions" and may in some instances reach bias by public actors in making decisions that are not "personnel actions."  No constitutional claims are raised in this case, however.

To this point, we have been supposing cases with an almost tenseless abstraction in which an employer at some unstated time decides what business it "is in." The actual case before the Court is not tenseless. For many years, the FAA <u>was</u> in the flight service business and then it decided that it <u>no longer</u> would be. Posing the question as firing, rather than hiring, does seem a tougher case, if only because being fired often exacts a heavier toll, particularly on long-time employees like most of the plaintiffs here, than not being hired. And, indeed, some statutes not involved in this case do in some circumstances extend protections to already-employed workers that do not apply to the never-hired. *E.g.*, Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101- 2109. But the statute that is at issue here, the ADEA, covers hiring and firing alike. The threshold question whether what one is looking at is a "personnel action" or an antecedent decision of what business the employer is in (whatever the tense) is the same in both cases. Whether the hypothetical local government never decided to open pre-schools as well as fire stations or whether in tough budgetary times it closed down its pre-schools but not its fire stations, in either case those decisions would not be personnel actions.[48]

Cases involving termination rather than hiring may also seem to be of particular salience under the ADEA because an employer decision of what business <u>no longer to be in</u> is susceptible to being mistaken for age discrimination. Often, an employer's decision to exit a line of business is based at least in part on changing circumstances. The demand for the employer's product (flight service in this instance) may have declined. Or technological change may have overtaken

---

[48] In the case of a closing, the <u>resulting</u> RIF of pre-school teachers <u>would</u> be a personnel action for the same reason that the RIF of the flight service specialists here was a personnel action. We address the RIF that resulted in this case in Part I, *supra*. In the case of a pre-school never having been opened, the fire department's hiring decisions <u>would</u> be personnel actions, and we address that issue below.

the business and profession.  Such circumstances do not always arise overnight.  The facts here show that the decline in the need for a federally operated flight service was longstanding rather than instantaneous.  In such circumstances, an employer is <u>likely</u> to have an "aging workforce" by the time it ultimately exits the business.  Before resorting to a RIF or leaving the business altogether, an employer in a declining industry may first reduce new hiring.  With few young employees being hired and entering the workforce and the remaining workers getting older, the workforce as a whole will generally become older.[49]  As plaintiffs' union told Congress, that was happening with flight service for nearly two decades before the RIF.  Union 1997 Congressional testimony at 48; *Breen* Dep. 142 ("staffing kept going down and the FAA refused to hire anybody new").  Thus, an employer decision of what line of business <u>no longer to be in</u> is very likely to involve firing an aging workforce, even if the employer has no animus or bias whatsoever against older workers.  In such circumstances the workforce aging that occurs first and the eventual exit from the enterprise may be mistaken for cause and effect when they are actually both effects of the same underlying, non-discriminatory causes.

In any event, whether it is a decision of an employer not to undertake a new endeavor or a decision to exit from an existing endeavor, such a decision is not a personnel action.  A job applicant who is qualified as a pre-school teacher can sue a fire department for not hiring her, and she may succeed if she is also qualified to be a firefighter.  But she could not prevail by instead arguing that, though she was qualified only to be a teacher, the fire department decision not also or instead to <u>be</u> a pre-school was a discriminatory "personnel action."  So too here, if

---

[49] To be sure, hiring could be of older employees as well as younger ones.  However, young workers entering the workforce are, virtually by definition, over-represented in the pool of workers looking for jobs like flight service that require neither a college degree nor prior specialized experience.

defendants had made older but not younger flight service specialists subject to the RIF, plaintiffs might have a case.  As we explain in Part I, that did not happen.  But plaintiffs' novel arguments that the agency discriminated against them because it decided no longer to <u>be</u> a flight service operator are beyond the scope of the ADEA, because, instead of challenging any employer's "personnel actions," those arguments challenge only an antecedent decision of what the employer is.[50]

III.     <u>The Decisions That Led To The RIF Were Not Discriminatory</u>

We explained in Part I that the personnel action challenged in this case, the RIF, affected all flight service specialists equally and therefore was not discriminatory.  Plaintiffs' principal response appears to be that, even if there had been equality <u>among</u> the older and younger <u>flight service specialists</u>, there is no reason to so limit the inquiry to flight service specialists, and that the Court ought to look at whether some different occupation or combination of occupations that might have been younger might have been RIFfed instead:  Perhaps the agency might have RIF'd aircraft separating controllers instead of specialists?  Or how about payroll clerks?  Or maybe specialists could have been given the jobs of National Weather Service meteorologists,

_____

[50] There is, of course, <u>a</u> sense in which the FAA <u>still is</u> in the flight service business, since, though it no longer performs that service directly, it pays for Lockheed to offer such a service.  But what counts is that, except in Alaska, the FAA is no longer in that business <u>as an employer</u>.  So too, a local government that does not choose to employ firefighters or pre-kindergarten teachers may nevertheless arrange to have such services provided to residents by entering into agreements with volunteer fire companies or with private schools willing to accept vouchers, subsidies, or targeted tax breaks.  The fact that the FAA or the hypothetical local government has entered a contract for another entity to provide services means that it is not or is no longer an employer of the work force at issue, and that its relations with the contractors' workers are not or are no longer relations of an employer to employees that are governed by the employment discrimination statutes.  <i>See, e.g.</i>, <i>Redd v. Summers</i>, 232 F.3d 933 (D.C. Cir. 2000); <i>Simms v. District of Columbia</i>, 587 F. Supp. 2d 269 (D.D.C. 2008) (former agency employee whose status changed to working at agency but for agency contractor could not bring sexual harassment claim against agency under Title VII).

and the meteorologists could have been RIF'd?  Or perhaps just RIF some percentage of every

occupation throughout all the FAA rather than any one occupation?  For the reasons we

explained in Parts I and II, those arguments and suggested alternatives need not and ought not be

reached because they would all require the Court to review, not a personnel action, the RIF, but

the FAA's anterior decision that it will no longer be directly performing flight service even

though it still will be trying to keep airplanes from flying into each other, getting its payroll

processed, and asking the National Weather Service about the weather.  Nevertheless, on the

*arguendo* assumption that these issues are properly before the Court, we address plaintiffs'

arguments below.

> A.   The Court Should Not Substitute Its Judgment
>        For An Employer's Judgment To Have A RIF

Even in an ordinary discrimination case, the court does not function as a "super-

personnel department that re-examines an entity's business decisions," such as who to hire.  *E.g.*,

*Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (internal quotation marks

omitted).

There is even less warrant to second-guess an employer's decision to conduct a RIF.  As

the Third Circuit explained in a case affirming summary judgment for an ADEA defendant:

> [W]hile Kelly questions the economic necessity for Drexel having reduced its
> employee force, it would hardly be appropriate for us to second guess that
> management decision.  We are dealing, after all, with discrimination statutes
> which are not intended to "handcuff the managers and owners of businesses to the
> *status quo*."  *Gray v. York Newspapers, Inc.*, 957 F.3d 1070, 1083 (3d Cir. 1992).
> <u>Thus, there is a qualitative distinction between a court reviewing a business
> determination that there should be a reduction in force and a court considering an
> employee's claim that an employer discriminated against him in reducing its
> force</u>.  The first determination is a management decision with which a court
> should be reluctant to interfere.  The second determination requires a
> conventional analysis under the relevant anti-discrimination statute.

*Kelly v. Drexel University*, 94 F.3d 102, 109 (3d Cir. 1996) (emphasis added).  Thus, because "a company's exercise of business judgment is not a proper subject for judicial oversight," when "a company exercises its business judgment in deciding to reduce its work force, it need not provide evidence of financial distress to make it a 'legitimate' RIF.'"  *Evers v. Alliant Techsystems, Inc*., 241 F.3d 948, 956 (8th Cir. 2001) (internal quotations omitted).

In *Furr v. Seagate Technology, Inc*., 82 F.3d 980, 986 (10th Cir. 1996), "[p]laintiffs attempted to attack the RIF as pretextual by challenging its necessity . . . . present[ing] much evidence tending to show Seagate's financial health and profitability."  Plaintiffs here have taken discovery obviously aimed at disputing defendants' projection that the taxpayers would save about $2 billion as a result of the competition.  However, as *Furr* explained, "[f]inancial evidence suggesting that a decision, in hindsight, may not have been prudent is not evidence of improper motive," since "the wisdom of a RIF is not for a court or jury to decide.  A RIF is a business decision, and the ADEA is not a vehicle for reviewing the propriety of business decisions."  *Id.*  (internal quotations omitted).

Similar constraints against reviewing the wisdom or prudence of an employer's business judgments in hindsight apply in an agency-defendant context, as *Aliotta v. Bair*, 576 F. Supp. 2d 113 (D.D.C. 2008), illustrates.  The defendant in that case, the FDIC, contended that a partial RIF was based on its judgment in 2005 that it was facing a reduced workload resulting from "a robust banking industry's decline in receiverships."  *Id*. at 127.  This Court accepted the FDIC's assertion as "show[ing]" that "even if" the office selected for a RIF "was the oldest division in the FDIC . . . the division was not targeted because of age, but because of a drastic reduction in workload."  *Id*. at 127-28.  Notably, in accepting the FDIC's assertion of its view that it could

shed receivers because the banking industry was "robust," this Court properly resisted any temp-

tation to second guess that judgment, even though in hindsight the banking industry might have

looked somewhat less robust.[51]

Accordingly, the Court should not allow plaintiffs to put it in the position of second

guessing the RIF decision, whether the invitation be to green-eyeshade whether the agency is

saving about $2 billion or only some lesser amount, or to decide how the agency could have

achieved comparable savings by firing some other group of workers.  As the cases make clear,

that is not a court's role.  Defendants are accordingly entitled to summary judgment.

B.     <u>There Was Not A Discriminatory Decision To Have A RIF</u>

Even if the Court were to accept plaintiffs' invitation second guess the decision to have a

RIF, it would find that there was not a discriminatory decision to have a RIF.  One reason that

assertion is accurate is that (as we explain below) there was no discrimination in deciding upon a

RIF.  It is also true for a second, threshold reason, namely, that there was not **a** decision to have a

RIF, discriminatory or otherwise.  Instead, there was a series of decisions, <u>no one</u> of which by

itself was sufficient to be "a decision to have a RIF," that resulted in a RIF as part of a

contingent chain.

Bertram's decision in 2002 that the FAA would conduct an A-76 study was not a

decision to RIF all flight service specialists, because for all he knew in 2002 (or when he left the

FAA in 2003), the in-house MEO bid would end up winning the competition, as MEO bids in

other agencies often had, *see*, *e.g.*, Ex. 9, Office of Management and Budget, *Competitive*

---

[51] On the very day of the decision in *Aliotta*, a front-page article in the *Post* began: "The
flow of money through critical parts of the financial system all but stopped yesterday, prompting
the stock market to plunge again as banks lost faith in one another . . . ."  Neil Irwin & David
Cho, *Markets in Disarray as Lending Locks Up*, WASH. POST, Sept. 18, 2008, at A1.

*Sourcing* at 2 (July 2003) ("On average, the [MEO] wins just over 50% of public-private competitions").  Bertram's decision was part of the chain of decisions that led to the RIF, but only in conjunction with later decisions that he had no role in and could not with any certainty predict.

Those later decisions led more proximately to the RIF, but the options available to those decisionmakers were in turn partially locked in by the earlier decision that there would be an A-76 study.  Whether or not those evaluating Lockheed's bid agreed with the earlier decision to have an A-76 study (Kansier seems to have agreed after the fact, but Jackson-Brame opposed the decision to have a study at the time it was made, *see* Jackson-Brame Dep. at 111-12), their role was only to recommend or (in DeGaetano's case) decide which bid was the best value for the taxpayers, not to make the entirety of a RIF/no RIF decision or to revisit the decision to have an A-76 competition in the first place.  After all, if an agency has asked companies to go to the trouble and expense of preparing bids, it is not fair to use their bids as mere foils to be discarded once they serve the purpose of stimulating an MEO to re-invent the way the agency does business.  Principles of fair competition require that if a private vendor clearly has the best overall bid, it should actually get the contract.  Thus, the decisionmakers evaluating the bids were tasked with recommending and deciding which bid was best, not deciding whether, once they realized that the MEO did not have the best bid, having an A-76 study still (or ever) seemed like a good idea.  Their recommendations and decision led to a RIF, but only in conjunction with other decisions they did not make.  *See also* Pike Dep. 128-29 (even Administrator Blakey felt that, as a practical matter, her options were constrained by decisions made before her "watch").

We do not make these points in order to make any decision to RIF magically disappear as some back-door way of arguing that the decisions that led to the RIF cannot be reviewed.  The Court indeed ought not review the soundness of the decisions that led to the RIF, but for reasons we have already gone through the front door to argue openly.  Parts I, II, and III.A, *supra*.  We make this point instead because, if the Court were to accept plaintiffs' invitation to probe the decisions that led to the RIF, it would be important to look at the actual decisions in the chain that led to the RIF, not some hypothetical single "decision to have a RIF" that simply never occurred.

We therefore look below at the decisions that were made and show that age discrimination played no role.  However, we begin by looking at the non-existent, overall decision to have a RIF because plaintiffs' expert, Dale Belman, makes the mistake of treating the RIF as if it did result from a single decision rather than, as was actually the case, from a chain of decisions.

     C.     Plaintiffs' Statistical Evidence Does Not Support
             A Conclusion That The RIF Was Discriminatory

          1.     Plaintiffs' Statistical Evidence Does Not Support
                  A Conclusion That There Was Disparate Treatment

When they began this case, plaintiffs argued that the FAA "target[ed]" its flight service function for contracting out because flight service specialists were on average the oldest occupational group of employees within the FAA.  Amended Complaint ¶ 40, 48.  Discovery has shown that assertion to be wrong.  The oldest workers in an FAA occupational group are the nearly 4,000 safety inspectors, whose average age in mid-2002 (when the decision to have an A-76 study was made) was 52.74 compared to 48.85 for the flight service specialists.  Siskin Rep't ¶

12 & table 3.  If the FAA actually had intended to "target" its oldest workforce for a RIF, the broad sides of our nation's barns have nothing to fear from any FAA fusillades.

Unable to prove the amended complaint's allegation that the oldest occupational group was targeted for a RIF, plaintiffs' statistical expert writes about something else.  He compared the average age of the flight service specialists on October 3, 2005, which by then had become 51.09, with the average age of all FAA employees and of other groups he chose to look at.   He did not choose to look at the older safety inspectors.  He then used the "Kolmogorov-Smirnov test" with better than 99.999% certainty to "reject[ ]" the "hypothesis" that on average those 2,408 flight service specialists "were no older than" the groups he did look at, for example, the aircraft separating controllers, whose average age was 44.82.  Belman Rep't at 3.  That is an argument with a strawman.  The experts on both sides were given the data that let them start knowing the age of every employee in each group.  That means that they, and anyone else who had the same data and could do long division, already knew which group was on average older with 100% certainty, without any need to drag Kolmogorov or Smirnov into the fray.  The "hypothesis" that Belman "rejects," that a group whose average age is over 51 is "no older than" a group whose average age is under 45, is something no one is hypothesizing in the first place.[52]

Something like Belman's statistics might be relevant if the FAA had chosen 2,000 or so employees one at a time from among all its employees, or from among all its specialists and

---

[52] Belman's alternative phraseology for a "hypothesis" his test rejected at an .001 confidence level is less trivial, but just as irrelevant.  He rejected the possibility that the employees in the two groups "were drawn from the same underlying population."  Belman Rep't at 3 (emphasis added).  If this were a hiring case, and if the claim were brought by a class of persons born after 1974 who never even had the chance for an FAA flight service career because the FAA hired very few people that young for flight service jobs, and if the FAA had still been hiring older workers, and if reverse age discrimination were actionable, that hypothesis might be relevant.  In this actual case, however, Belman's observation is irrelevant.

aircraft separating controllers.  But the FAA was not choosing employees in ones and twos from throughout its workforce to be outsourced.  No private sector vendor would bid on – and no one would expect any efficiency gains from asking for such bids – taking over the "function" that was merely a mash-up composite of, say, the controller who works the mid-shift on the third workstation in the Atlanta tower, plus one of the safety inspectors in China, plus one of the night maintenance workers in the Seattle center, plus one of the secretaries in the headquarters HR staff, plus a day-shift flight service specialist at the second workstation from the left in Miami, plus a test pilot, plus a scientist in Atlantic City, and so on until one gets to a couple of thousand jobs scattered throughout the FAA.  Yet, as defendants' statistical expert explained, Siskin Rep't ¶ 5-7, that is the only kind of process that Belman's statistics might have any bearing on.

The actual decisionmaking process chose a <u>group</u> function to consider for an A-76 process, rather than plucking different employees from all over the agency.  The appropriate statistical analysis of those processes is very different.  Siskin Rep't ¶ 7.  For example, if one randomly chose 25 players from among all major league baseball players, there is a vanishingly close to zero chance that all 25 players would be on the same team.  Nevertheless, each year, all the players who get a World Series ring are on the same team.  Is that defiance of the odds that shows that baseball is rigged?  No, it means that the process for defining who gets a World Series ring is not a process for choosing one player at a time randomly from among every player in major league baseball until one gets to 25, but a process for choosing among pre-defined workgroups.

Here too, the A-76 process was not a process to throw a couple of thousand darts at the FAA phonebook, but a process to look at whether defined functions performed by pre-existing

groups of employees could be more efficiently performed.  It is that group-choice process that any statistician should have looked at, yet plaintiffs' expert simply did not look at whether it was or was not statistically improbable that the <u>group</u> chosen would, in a random process, have been as old as the flight service specialists.  Siskin Rep't ¶ 7.  Defendants' expert did look at that issue.  He found that the data showed that there were only six workgroups large enough for their selection to satisfy the requirements of the President's Management Agenda for agencies to consider A-76 competitions.  *Id*. ¶ 10.  The odds that the flight service would be the group chosen if the choice among those six groups were random (*i.e.*, before even considering that the FAA may have had good reason not to do an A-76 study for one or more of the other groups) would be, once one crunches the numbers, one in six.  Belman Dep. 60, 62.  Given that probability, its actual selection would be "within the range that statisticians and Courts consider as consistent with random selection."  Siskin Rep't ¶ 10.  Indeed, the odds that a group randomly selected from those six would be as <u>old or older</u> than the flight service specialists would have been <u>one in three</u> since the older safety inspectors were one of the six groups.  *Id*. at 9 n.14.  There is simply no statistical basis for inferring discrimination based on that data.  *Id*. ¶ 10.  Siskin even did calculations "ignoring the fact that it is much more efficient to select a single workgroup than multiple workgroups for public/private competition," and assuming that the FAA could have selected multiple workgroups until reaching the required total, which means that the choice would not have been limited to the six largest workgroups.  *Id*. ¶ 11.  Even under that assumption, the selection of flight service as the group or one of the groups to be subject to a competition was "<u>not</u> statistically significantly different from what one would expect from an age-neutral process."  *Id*. (emphasis in original).

Plaintiffs' expert Belman also opined that "[o]utsourcing of human resources positions has become increasingly common in the private sector" at least with respect to "functional, as opposed to strategic, human resources positions." Belman Rep't at 6. "Payroll functions," for example, "get outsourced all the time." Belman Dep. 78. Belman compared the age of flight service specialists to the age of FAA human resource employees, without distinguishing between functional and strategic employees. *Id.* This analysis has all the problems of his other age comparisons and an additional one besides: Belman acknowledged that he knows very little about policies concerning outsourcing of federal government human resources jobs or what outsourcing has been done. *Id.* at 74-75. As it turns out, in the very same month as the outsourcing of flight service, pursuant to policy set by the Office of Personnel Management, the FAA actually <u>did</u> complete outsourcing classic functional human resources roles, the processing of payroll and the maintenance of a computerized human resources information system, which functions are now performed for the FAA by the Department of Interior. Gibson Dep. 41-43, 60-61; Olson Dep. 21; Yoo Dep. 8.

2.  Plaintiffs' Statistical Evidence Does
    Not Support A Conclusion That There
    <u>Was A Disparate Impact On Older Workers</u>

Plaintiffs' expert does not even attempt to present any statistics showing that the RIF had a "disparate impact" on workers 40 or older.[53] And, even if he had, it would not be enough for plaintiffs merely to allege that some generalized policy had a disparate impact. *Meacham v. Knolls Atomic Power Laboratory*, 128 S. Ct. 2395, 2405 (2008). Instead, "plaintiff[s] [are]

---

[53] In denying the motion to dismiss, this Court held that disparate impact claims are available in federal sector ADEA cases, *Breen v. Peters*, 474 F. Supp. 2d 1, 6-7 (D.D.C. 2007). Defendants, without waiving any appeal rights, do not seek to revisit that issue in this motion.

-63-

obliged to . . . isolate and identify the <u>specific</u> employment practices that are allegedly respons-ible for any observed statistical disparities." *Id.* (citations and internal quotations omitted) (emphasis in original). *Accord Reshard v. Peters*, 579 F. Supp. 2d 57, 75-76 (D.D.C. 2008); *Aliotta v. Bair*, 576 F. Supp. 2d 113, 127 (D.D.C. 2008)*.* This specificity requirement is no "trivial burden" and is meant to have real "bite." *Meacham*, 128 S. Ct. at 2406. Otherwise, employers may become "potentially liable for the myriad of innocent causes that lead to statisti-cal imbalances." *Id.* (citations and internal quotations omitted). As we explained above, the only personnel action at issue in this case is the RIF and that resulted in no statistical imbalance: the young and old were treated the same, all were subject to the RIF. But, if this Court accepts plaintiffs' invitation to review underlying structural decisions that led to the RIF, plaintiffs must isolate what decision or policy created a statistical disparity, not merely generalize about some unitary decision to have a RIF, a decision that, as we explained in the prior section, simply never existed. Their expert presented no such evidence.

> D.     Defendants' Designation Of Flight Service Specialist Positions
>        <u>As Commercial Was Correct Rather Than Discriminatory</u>

We begin our analysis of the decisions that, together, led to the RIF with the FAA's decision to classify the flight service positions as either "commercial" or "inherently govern-mental." The latter designation would have exempted the positions from being outsourced.

The FAA's decision that flight service positions were commercial was correct. Of course, in order to rebut any claim that the FAA was guilty of "disparate treatment," in making that decision, it is not the FAA's burden to show that its decision was "correct." After all, "'[w]hatever the employer's decisionmaking process,' a plaintiff alleging disparate treatment cannot succeed unless the employee's age '<u>actually played a role in that process and had a</u>

determinative influence on the outcome.'" *Kentucky Retirement Systems v. EEOC*, 128 S. Ct. 2361, 2366 (2008), *quoting Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (emphasis added by *Kentucky Retirement*).  Where, as here, the employer identifies a non-age reason for its decision, i.e., that flight service positions were identified as commercial because the agency thought they met the criteria for being commercial, the question for the Court is not "the correctness or desirability of" the "reasons offered, but whether the employer honestly believes in the reasons it offers."  *Fischback v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citations and quotations omitted).  To be sure, if the employer's offered reason is an error "too obvious to be unintentional, perhaps it had an unlawful motive" for its actions.  *Id.*  But "[s]hort of finding that an employer's stated reason was indeed a pretext, however – and here one must beware of using 20/20 hindsight," liability cannot rest solely on a judge's determination that the employer made a misjudgment.  *Id.; accord*, *e.g.*, *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495-96 (D.C. Cir. 2008).  Decisions on how positions should be classified, in particular, are not to be subjected to "'judicial micromanagement.'"  *Barnette v. Chertoff*, 453 F.3d 513, 519 (D.C. Cir. 2006), *quoting with approval Barnette v. Ridge*, 2004 WL 3257071, at *5 (D.D.C. Nov. 15, 2004) (GS-level classification).

The agency had reasonable non-age grounds for concluding that flight service positions were commercial rather than inherently governmental.  Under section 5(e) of the FAIR Act, 31 U.S.C. § 501 note, inherently governmental activity includes, *inter alia*, "activities that require either the exercise of discretion in applying Federal Government authority or the making of value judgments in making decisions for the Federal Government, including judgments relating to monetary transactions and entitlements" and functions "that significantly affect the life,

liberty, or property of private persons."   The agency reasonably concluded that flight service positions do not meet that standard and should be classified as commercial.  The explanation for the decision makes no mention of age and does not turn on any age-related factors.  Ex. 12.

Private companies have long sold similar flight services to general aviation customers. *E.g.*, Brown Dep. 51-52.  Moreover, work similar to flight service is performed every day by airline dispatchers.  *E.g.*, *Elias* Dep. 95; Sturgell Dep. 52.  If airline dispatchers, and, for that matter, airline pilots and airline meteorologists who are responsible for moving hundreds of souls safely across the breadth of the country can be private sector employees, it would have been absurd to conclude that interpreting the weather for a small-plane pilot flying a few hundred miles with few or no passengers is somehow inherently governmental work that must be entrusted only to a civil servant.

Plaintiffs' statistical expert does not argue that the agency's classification of its positions as commercial or governmental positions had a disparate impact on older workers.  Defendants' expert, who did look at that issue, concluded that the commercial/governmental decision did not show a statistical disparity adverse to older workers.  Siskin Rep't ¶ 33.

Even if there had been a statistical disparity adverse to older workers as a result of the classification of FAA positions as commercial or governmental, it would not have violated the ADEA, because the agency action was based on a reasonable factor other than age ("RFOA"). We anticipate that plaintiffs will argue that, if the government is a defendant in an ADEA case, it, unlike private employers, must justify even neutral practices that happen to have a disproportionate impact under a "business necessity" test.  "The business necessity test," however, "should have no place in ADEA disparate-impact cases."  *Meacham v. Knolls Atomic Power Laboratory*,

128 S. Ct. 2395, 2404 (2008).  After all, "age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment," so that "it is not surprising that certain employment criteria that are routinely used may be reasonable despite their adverse impact on older workers as a group." *Smith v. City of Jackson*, 544 U.S. 228, 240-41 (2005).  Plaintiffs' rejoinder may be that, however persuasive such views might be to Congress, the statutory language authorizing an RFOA defense is in the private-sector version of the ADEA, 29 U.S.C. § 623(f)(1), and is not also set forth in the public-sector ADEA provision, 29 U.S.C. § 633a.  The better view, however, is that the business necessity test should indeed have no place in ADEA disparate-impact cases, and that the RFOA defense available to private employers in ADEA cases is also available to federal agency defendants.  *Schmid v. Frosh*, 680 F.2d 248, 250 n.7 (D.C. Cir. 1982); *Summers v. Winter*, 303 Fed. Appx. 716, 719 (11th Cir. 2008) (not designated for publication); *Aliotta v. Bair*, 576 F. Supp. 2d 113, 126-28 (D.D.C. 2008); *Silver v. Leavitt*, 2006 WL 626928, at *14 (D.D.C. Mar. 13, 2006); *but see Lumpkin v. Brown*, 898 F. Supp. 1263, 1271-72 (N.D. Ill. 1995).

In any event, whether the test is RFOA or business necessity, the classification decision here is unassailable for two reasons.  First, there was no statistically significant adverse impact on older workers, as we have noted above.  Siskin Rep't ¶ 33.  Second, classification of positions as either commercial or inherently governmental is not just a reasonable factor other than age and not just a mere "business" necessity.  It is a legal necessity.  Section 2 of the FAIR Act, 31 U.S.C. § 501 note, which was enacted after the ADEA, requires agencies to make such classifications.  The FAA's compliance with what the FAIR Act mandated in no way violated the ADEA.

      E.      Plaintiffs' Assertion That The FAA Should Have Outsourced
               Aircraft Separating Controllers Rather Than Flight Service
               <u>Specialists Does Not Establish Any Age Discrimination</u>

Plaintiffs argued in their preliminary injunction motion and in opposing the motion to dismiss that, instead of outsourcing flight service, defendants should have considered out-sourcing aircraft separating controllers by expanding a pre-existing program in which low-usage towers are staffed by contractors. Pls' PI Mem. at 100-01; Pls' Opp. to Mot. To Dismiss at 16-17. The argument fails for several reasons.

As we explained above, *supra* at 4-5, the functions of flight service specialist and aircraft separating controller are different and not interchangeable. *See* Reyna Decl. ¶ 6; Turner Rep't; Sturgell Dep. 52. Even if the FAA could or should have outsourced some or all of the aircraft separating controllers, any decision to do so would not have justified not <u>also</u> outsourcing flight service, which presented a different and discrete question. For one thing, at the time the FAA was making its decisions regarding the flight service functions, expanding the contract tower program would have saved less money than outsourcing flight services. Even if plaintiffs were right in claiming that outsourcing towers would save about $65 million per year, Pls' Opp. to Mot. To Dismiss at 17, that is only about a third of savings the FAA hoped to achieve from the Lockheed contract. Moreover, such an expansion would not have been an <u>alternative</u>, non-discriminatory or otherwise, to taking a hard look at whether efficiencies could be achieved in the flight service function. If, as the FAA thought as a result of the open public-private competi-tion, Lockheed would be able to do a better job technically of providing flight services and save the FAA about $2 billion, it made sense for the FAA to sign the contract with Lockheed <u>regard-</u>

less of what made sense with respect to air traffic control operations.[54]  Suppose plaintiffs were right that the FAA could save money by contracting out more aircraft separating controller positions.  If the flight service function itself needed reorganization and modernization, plaintiffs' supposition would establish only that the FAA should have looked at both functions.  If an agency is overspending on functions *A* and *B*, ending the waste with respect to function *A* in no way justifies continued wasteful spending on function *B*.

Second, then Secretary of Transportation Norman Y. Mineta issued a formal written determination that the agency's "core" mission would not have allowed it to contract out air traffic control services at the agency's center or larger terminal operations.  Mineta Determination, Ex. 27.[55]  Mineta's decision first explained that the functions performed by aircraft separating controllers are not "inherently governmental."  *Id*. at P01267-69.[56]  Mineta then addressed the "core" mission question.  Although, as Mineta noted, "[s]ome portions of the air traffic control system ha[d] previously been determined to not have a significant impact on the national airspace system as a whole," the "same could not be said for the composite total of

---

[54] Indeed, though plaintiffs' attorneys have argued after the fact that outsourcing towers should have been an alternative to outsourcing flight service, plaintiffs' union never made any such suggestion before the fact to the FAA and instead opposed outsourcing of towers.  *Breen* Dep. 149-50; Pike Dep. 73, 75.

[55] "Terminal" operations include operations at both TRACONs and towers.  Reyna Decl. ¶ 4; *compare* Turner Rep't at ¶ 1 *with* Turner Rep't at ¶¶ 3-4.

[56] The question of whether at least some air traffic control functions are inherently governmental is, however, a closer question than whether flight service functions are inherently governmental.  On the former question, two past presidents expressed different views.  President Clinton, in Executive Order 13180, 65 Fed. Reg. 77493, 77493 (Dec. 11, 2000), referred to "provision of air traffic services," as "an inherently governmental function."  President George W. Bush amended that Executive Order by, *inter alia*, deleting the phrase "an inherently governmental function."  Exec. Order 13264, 67 Fed. Reg. 39243 (June 7, 2002).

air traffic services provided by FAA's en route and larger terminal facilities." *Id.* at P01271.  In Mineta's judgment, "[a]t many air traffic control facilities, the consequences of any contractor performance are so serious that the risks attendant to contractor-provided air traffic services at these facilities are unacceptable." *Id.*  In reaching this judgment that precluded outsourcing at such facilities, Mineta did not rely on any stereotypical assumptions about what older workers could do.  Declaration of Norman Mineta ¶¶ 10, 16.

Third, even if the FAA had wanted to outsource some aircraft separating controller functions, it was politically impossible to do so.  Secretary Mineta recognized that, though "competitive sourcing is a goal for the Department of Transportation and is a priority for the President's Management Agenda . . . . any large-scale privatization of air traffic control would be highly controversial in Congress."  Ex. 28.  Mineta therefore acknowledged that he had "no present intention of initiating that debate" with respect to aircraft separating controllers.  *Id.*  Mineta served for twenty years in the House of Representatives, and chaired both the full Transportation committee and its Aviation subcommittee.  Mineta Decl. ¶¶ 1, 3.  He served as a cabinet officer for presidents of both major parties, having been both President Clinton's Commerce Secretary and President Bush's Transportation Secretary.  *Id.* ¶ 1.  Given that experience, Mineta's judgment on the political feasibility of outsourcing aircraft separating controllers is far more likely to have been accurate than any second-guessing by plaintiffs that maybe it would have been politically feasible after all.  And, of course, it was his, rather than plaintiffs', political judgment to make.  His judgment was certainly not so "obvious[ly]" wrong that it could raise any inference that he "perhaps it had an unlawful motive" for his decision, *Fischback v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996), an especially dubious inference with

respect to Mineta, who had experienced discrimination first-hand as a boy when he was interned with other Japanese-Americans, Mineta Decl. ¶ 10.

Mineta's judgment of the political obstacles to outsourcing aircraft separating controllers was confirmed by actual congressional consideration of that very issue.  In November 2003, a cloture vote to allow Senate consideration of the Century of Aviation Reauthorization Act failed because of opposition to outsourcing of any air traffic control tower functions.  *See* 149 CONG. REC. S15386 (daily ed. Nov. 21, 2003) (statement of Sen. Hollings); *id.* at S15389-90 (statement of Sen. Jeffords).  Only after the FAA assured the Senate that the FAA would "not proceed with the privatization or outsourcing of any FAA air traffic separation and control functions in fiscal year 2004," was the Senate willing to pass that FAA reauthorization act.  *Id.* at S15387 (statement of Sen. Hollings) (emphasis added).[57]

We acknowledge that defendants' own statistical expert calculates that it was the exclusion of the (on average) younger aircraft separating controllers from any outsourcing initiative combined with the inclusion of flight service specialists that produced any age-based statistical disparity in this case.  *See* Siskin Rep't at 21-22.[58]  Siskin also points out, however,

---

[57] Even after fiscal 2004, the FAA realized, based in part on this experience, that it lacked the support necessary in Congress to outsource more towers.  Sturgell Dep. 66-67.

While the FAA had promised not even to initiate any new competitive sourcing processes with respect to air traffic control positions, it noted that it would proceed with the competitive sourcing process already under way with respect to flight service, 149 CONG. REC. at S15387, *quoting* Letter from Marion C. Blakey to John McCain.  The Senate thus understood that the FAA would be "allowed to continue the on-going evaluations" under the A-76 process "of how best to revamp the" flight service program.  149 CONG. REC. at S15389 (statement of Sen. Hollings).

[58] This disparity is of potential relevance only to a disparate impact claim.  As Siskin explained elsewhere in his report, there is no statistical evidence of disparate treatment.  Siskin

(continued...)

that the disparity is of a sufficiently small magnitude that it would not be deemed of "practical significance" under the EEOC's *Uniform Guidelines on Selection Procedures*. *Id*. at 15-16, 21-22, *citing* 29 C.F.R. § 1607.4(D).  Moreover, any decision not to outsource aircraft separating controllers was clearly based on a reasonable factor other than age and (though this is not the proper test, as we explain above) by business necessity.  Mineta's determination that outsourcing of the center or larger terminal controllers would present unacceptable risks to the FAA's "core" mission explains why retaining sufficient air traffic capacity in-house is indeed a business necessity.  And the <u>inability</u> of the FAA to outsource <u>any</u> aircraft separating controllers because of opposition in Congress is likewise bowing to necessity.  An agency that decides not to proceed with an action because Congress will oppose its doing so is not discriminating on the basis of age.  It is recognizing the restraints imposed on agencies by republican democracy.

> F.    The Determination By FAA's Office of Financial Services
> That Flight Services Was A Suitable Subject For A
> <u>Competitive Sourcing Study Was Not Based On Age</u>

The decision of the FAA's Office of Financial Services that the FAA should conduct an A-76 study of the flight service function was made for reasons other than the age of the employees or their age relative to other employees.  Bertram Dep. 111-12; 1st Hennigan Dep. 164-65.  There were plenty of good reasons for the decision to conduct such a study.

First, as Deputy Chief Financial Officer John Hennigan had long been noticing, 1st Hennigan Dep. 25-26, the work required from flight service was in secular decline because of the decline in general aviation and the alternatives to flight service specialists briefings opened up by the internet and other technologies.  *See supra* at_8-14.  There had been calls for

--------------------------------------------

[58](...continued)
Rep't ¶¶ 8-11.  *See supra* at 59-63.

consolidation and cost reduction from, among others, both the Inspector General and the

National Civil Aviation Review Commission.  NCARC Report; Defs' Exs. 5 & 7.  As far back as

1996, the Department of Transportation's Inspector General had strongly suggested that the FAA

look at having the private sector take over all or most of flight service before it invested in new

technology.  Ex. 5 at 8-9.  The Inspector General's 2001 Report urging consolidation was issued

at the same time the Office of Financial Services was faced with OMB resistance to including

money in the proposed budget for an expensive replacement for antiquated flight service

computer systems for many offices that the Inspector General was saying should instead be

closed.  Bertram Dep. 21-24.  Yet the FAA was painfully aware, having spent nearly two

decades in its prior consolidation of flight service, how difficult it would be to choose which

offices to close without a systematic process.  *Id*. at 28; *see supra* at 14-15 (discussing prior

round of consolidation).

Such a systematic process, "an established way of actually analyzing a function and

trying to see how you could make it more efficient," Bertram Dep. 32, was in fact available.

After all, "[w]hen private performance is feasible and no overriding factors require in-house

performance, the taxpayer deserves and expects the most economical performance and therefore

rigorous comparison of contract cost versus in-house cost should be used when appropriate to

decide how the work will be done."  *National Federation of Federal Employees v. Cheney*, 883

F.2d 1038, 1049 (D.C. Cir. 1989), *quoting* S. REP. No. 96-144, at 4 (1979).  That very A-76

process, moreover, was one that Congress had urged, and the President was requiring, agencies

to use.  Bertram Dep. at 29; 1st Hennigan Dep. 51, 58; Hennigan Decl. (Docket # 23-19) ¶¶ 9,

16.  Indeed, the President had made it clear to Secretary Mineta and other cabinet officers that

they were expected to meet the competitive sourcing goals of the President's Management Agenda, Mineta Decl. ¶¶ 6-7, and Mineta realized that the FAA was the most logical component within the Department of Transportation to contribute to meeting the goal, *id*. at ¶ 12.  It thus made sense to Bertram to respond to these related pressures at once, by using the A-76 process Congress and the President wanted agencies to use more often to perform the kind of rigorous study of a function that clearly was due for overhaul and consolidation of some kind.  As Bertram's deputy (whose interest in the comparative efficiencies of private and public performance dated back to his doctoral dissertation, *see* 1st Hennigan Dep. at 20-21), put it, given the proposed "invest[ment]" of "hundreds of millions of dollars in new equipment at 61 facilities," it was the appropriate "time to take a hard look at" flight service.  *Id.* at 129-30.

Plaintiffs disagree with that decision and the reasoning behind it.  In doing so, it would not be "'enough for the plaintiff[s] to show that a reason given for a job action is not just, or fair, or sensible. [They] must show that the explanation given is a phony reason."  *Pignato v. American Trans Air, Inc*, 14 F.3d 342, 349 (7th Cir. 1994), *quoted with approval*, *Fischbach v. Dist. of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996); *accord*, *e.g.*, *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495-97 (D.C. Cir. 2008).  Even if there were arguments that could have been made to reach some other decision or otherwise second guess Bertram's reasoning and decision, his decision was certainly not the kind of "error too obvious to be unintentional," *Fischbach*, 86 F.3d at 1183, that might raise some inference that the plaintiffs' age was the real reason for the decision.[59]  In fact, Bertram, who had only arrived at the FAA in

---

[59] The text addresses the standard for a disparate treatment claim.  It is unnecessary to address a disparate impact claim with respect to Bertram's decision.  Plaintiffs' statistical expert does not show that Bertram's decision produced any age-related statistical disparity, and

(continued...)

mid-2001, did not even <u>know</u> the age of the flight service specialists.  Bertram Dep. 13-14, 111-12.

We acknowledge that a number of agency officials involved in the acquisition said that an "aging workforce" was a reason for the decision to conduct an A-76 decision.  On that point, however, they were mistaken.  The actual decisionmaker, Bertram, testified that he did not consider age, as did his deputy, Hennigan, and they both pointed to sensible reasons that fully justify the decision without any reference to age.  And it is the decisionmaker's views, not the opinions of non-decisionmakers, that count.  *E.g.*, *Hall v. Giant Food, Inc*., 175 F.3d 1074, 1079-80 (D.C. Cir. 1999); *May v. Shuttle, Inc*, 129 F.3d 165, 173 (D.C. Cir. 1997).  Even when important officials of an employer make statements about the employer's reasons for a decision, if those officials were not the actual decisionmakers, their statements do not override the testimony of the decisionmaker about the real basis for his or her decision.  Thus, in *Loeb v. Best Buy Co.*, 537 F.3d 867, 872-74 (8th Cir. 2008), the court disregarded factually erroneous explanations for why a personnel action was taken even though those statements were made by the employer's Vice President for Human Resources and Director for Human Resources, since neither of those officials had been involved in making the decision they inaccurately attempted to explain.  Similarly here, for example, Kansier, though an important figure in the acquisition,

---

[59](...continued)
defendants' expert showed that the decision did <u>not</u> produce any statistically adverse impact on older workers.  Siskin Rep't ¶¶ 23, 24, 27, 32, 33.  In any event, the FAA had a business necessity and *a fortiori* (the only thing it would have to prove even assuming a statistical disparity) a reasonable factor other than age for using an A-76 study.  *See Nat'l Fed'n of Federal Employees v. Cheney*, 883 F.2d 1038, 1049 (D.C. Cir. 1989) (explaining benefits of A-76 process).  When the competition was in fact held, the agency found that it could save about $2 billion compared to the *status quo ante*.  *See* Ex. 20 at 3-4; Exs.21-22; DeGaetano Dep. 85-87; Blakey Dep. 156-59; Sturgell Dep. 23-25; Kansier Dep. 170.

had not been involved at all in Bertram's prior decision that there <u>would be</u> an acquisition, Kansier Dep. 33-34; Jackson-Brame had been an <u>opponent</u> of that decision, Jackson-Brame Dep. 111-12; and Blakey (who is alleged to have also used "aging workforce") did not even arrive at the FAA until after Bertram's decision had been made, *compare* Bertram memorandum to Acting Administrator Belger, Ex. 11, *with* Blakey Dep. 30-31.[60]

Their mistaken assumption that an "aging workforce" had been considered in deciding to conduct an A-76 is, moreover, understandable, as concern about succession planning with respect to the FAA's most prominent workforce, the aircraft separating controllers, had become a key issue demanding FAA attention by the time the A-76 competition began.  Recall that President Reagan had fired most of the aircraft separating controllers in 1981, so that a large proportion of that workforce had been hired in the early 1980s, and that air traffic controllers may retire with as little 25 years of service at any age or only 20 years of service at age 50, 5 U.S.C. §§ 8336, 8412.  Given the hard math of that situation, in the early years of this decade the FAA knew that it would soon be faced with a retirement crest of aircraft separating controllers.  As Secretary Mineta put it with respect to aircraft separating controllers, by the end of 2002, the FAA realized that "[l]arge numbers of controllers will be eligible for retirement in the next few years," and that the FAA would need to "aggressively pursu[e] succession planning for the current controller workforce."  Mineta Determination, Ex. 27 at P01271.

The FAA is by no means alone in expressing concern about an aging workforce.  "Like many executive branch agencies, the judiciary," for example, "is concerned about its aging work

---

[60] For purposes of defendants' summary judgment motion only, we assume *arguendo* that persons alleged to have made references to an "aging workforce" actually did so.

force."[61]  The problem that such concern with an aging workforce highlights is <u>not</u> what has been

referred to as the "very essence of age discrimination," the belief "that productivity and compe-

tence decline with old age," *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).  As

Secretary Mineta recognized, the concern is instead that an employer is faced with a challenge of

assuring that the next generation of workers will be brought on board in time to be "fully and

timely trained," Mineta Determination, Ex. 27 at P01271, a process that, for aircraft separating

controllers, can take three years, Reyna Decl. ¶ 6.  If anything, this concern is the <u>opposite</u> of

ageism: It is a worry, not that the oldest workers are no longer sufficiently competent, but that

the youngest are not yet sufficiently experienced.

   The courts therefore recognize that an employer may have an understandable and lawful

concern that retirement of a large portion of the workforce would "result in a sudden loss of a

'critical mass of expertise and knowledge in certain areas.'"  *Mereish v. Walker*, 359 F.3d 330,

337 (4th Cir. 2004) (quoting employer).  Employers may therefore <u>legitimately</u> have and express

concerns about an "aging workforce" without running afoul of the ADEA.  *E.g.*, *Rowan v.

Lockheed Martin Energy Systems, Inc.*, 360 F.3d 544, 548-49 (6th Cir. 2004); H.R. REP. NO.

90-805, *reprinted in* 1967 U.S. CODE CONG. & AD. NEWS 2213, 2219-20; *Cochrane v. Norton*,

2003 WL 21768006, at *4 (N.D. Cal. July 28, 2003) ("strongly disagree[ing]" with assertion that

agency report "highlighting the difficulty of an aging workforce demonstrates a discriminatory

animus"); *Duffy v. Barnhart*, 2002 WL 1933236, at *8 n.11 (E.D. Pa. Aug. 21, 2002) (rejecting

class-action ADEA claim despite agency's "concern[ ]" with "general aging" of its workforce);

---

[61] *Executive and Judicial Compensation in the Federal Government (Quadrennial Commission): Hearing Before the Subcomm. on the Federal Workforce and Agency Organization of the H. Comm. on Gov't Reform*, 109th Cong. 57 (2006) (statement of Judge D. Brock Hornby and Chief Judge Philip M. Pro on behalf of Judicial Conference of the United States).

*Hanan v. Corso*, 1999 WL 320858, at *16-17 (D.D.C. May 18, 1999) (Facciola, M.J.) (employer's speech noting that, as "relatively large numbers" of employees became eligible for retirement, there were not "adequate numbers of younger employees in the pipeline to maintain a stable internal succession system" did not evidence an intent to discriminate).  Simply stated, "[g]eneral comments about the aging workforce are not the sort of discriminatory comments that give rise to an ADEA claim."  *Cox v. Infomax Office Sys., Inc.*, 2009 WL 124700, at *7 (S.D. Iowa. Jan. 16, 2009).

G.     The Agency's Decision That Lockheed's Bid Offered
       Taxpayers The Best Value Was Not Based On Age

The final decision in the chain of decisions that led to the RIF, that Lockheed's bid offered the best value to the taxpayers, was, like the earlier decisions, free of any age discrimination.  We address first an argument by plaintiffs that the entire competition should have been terminated prematurely and then address the decision that Lockheed's bid won the competition.

1.     The Alleged "NAATS Proposal"

In 2003, after years of telling Congress in public that all existing stations should remain open and more specialists should be hired,[62] almost a year after Bertram decided to undertake the A-76 study, and after the ACA and its teams were already hard at work, in private Wally Pike, the then president of plaintiffs' union (NAATS), allegedly handed the FAA Administrator a short and informal proposal for consolidation that NAATS might have been able to get its

---

[62] *E.g.*, *Department of Transportation and Related Agencies Appropriations for 2002: Hearing Before the Subcomm. on Transportation and Related Agencies of the H. Comm. on Appropriations*, 107th Cong. 471 (2001) (statement of Wally Pike).

members to agree to, if the FAA promised to kill the A-76 study and managed to successfully

negotiate four other agreements with the union.  Ex. 29 ("NAATS proposal").[63]

Actually, the exhibit we just cited as the "NAATS proposal" that was allegedly given to

the Administrator is a document that the parties know was <u>not</u> given to her.  Whatever was given

to her (we continue to assume only for purposes of argument that something was given to her,

but will not continue repeating "allegedly" from here on) was given to her in a private one-on-

one meeting, Pike Dep. 104, with instructions by the union president that it be subject to a "close

hold," which meant in his opinion that the Administrator could talk about the proposal with a

few people but not make copies for them to analyze, *id*. at 118.  Meanwhile, although the union's

leadership knew the details of the proposal (to the extent there were details), the union

membership did not.  *Jaffe* Dep. 75, 81-84.  The requested secrecy worked all too well as a true

copy of whatever proposal was given the Administrator was apparently not integrated into the

FAA record system and could likewise not be found in even NAATS' own records or by the

three principal drafters of the document, plaintiffs Jaffe and Breen and dismissed plaintiff

Dodson (*see Dodson* Dep. 28-29 (identifying their roles)), all of whom were deposed.  *See*, *e.g.*,

*Dodson* Dep. 123 ("I don't have a copy of the original").

The exhibit that we are calling the "NAATS proposal" was created "over two years" after

an earlier version had been presented to the Administrator.  NAATS proposal at 1 (header

"note").  In the interim, it was edited.  It is not known what changes were made.  Wally Pike

---

[63] We assume *arguendo* for purposes of defendants' summary judgment motion that some proposal was handed over to the Administrator.  Doubt whether it was actually handed over is fueled in part by the circumstances to be set forth in the text and in part by the discrepancy between the union president's 2005 declaration that he handed the proposal to the Administrator on June 29, 2003, Pike Decl. (Docket 31-7) ¶ 3, and his 2008 deposition testimony that he never met with her on a Sunday, Pike Dep. 91, 93, 145.

thought that the actual proposal had not included the charts that are the last four pages of the thirteen-page "NAATS proposal."  Pike Dep. 85.  Although he thought first in his deposition that, except for font and formatting changes, the text preceding the charts had been unchanged, *id*. at 84-85, he later acknowledged that the union's in-house counsel and a successor union board of directors had inputs, *id*. at 98-99, and that, as a result, "even after this proposal went to the administrator there were still refinements going on in this," *id*. at 98.

A recurring feature of the NAATS proposal, or at least of the "refine[d]" version of the proposal that is all we have to go by, is that it sought to save flight service specialist jobs by raiding work done by other trades.  The central NOTAMs office, whose workers were not represented by plaintiffs' union, Pike Dep. 109, was, according to the proposal, "redundant and unnecessary" and should be "clos[ed]."  NAATS proposal at 5.  According to the NAATS proposal, the FAA should have terminated a contract with the Commerce Department, which provides the FAA with Center Weather Service Unit (CWSU) meteorologists who advise aircraft separating controllers about the weather.  Those jobs, according to the proposal, should have gone to specialists with "appropriate" additional training, NAATS proposal at 6, never mind that specialists who wanted to get the appropriate training to become meteorologists would <u>already</u> have been able to compete for job openings at the Commerce Department.  What would happen to the careers of the CWSU meteorologists that the specialists wanted to displace – probably a RIF – would be the Commerce Department's problem.[64]  NAATS also proposed that specialists

---

[64] In his deposition, the former union president claimed that the Commerce Department employees would lose their jobs to his union's members only by attrition.  Pike Dep. 115-16. That is inconsistent with what the proposal actually says.  The proposal pegs the cost to the FAA of its contract with Commerce at $10 million per year, NAATS proposal at 6, and then touts $70 million savings over the first seven years from cancelling that contract, *id.* at 13, i.e., it assumes
(continued...)

take over Visual Flight Rules ("VFR") flight following, work currently assigned to aircraft separating controllers.  NAATS proposal at 5-6.  Such VFR flight following includes providing, upon request, radar vectors for purposes of separating aircraft.  FAA, AERONAUTICAL INFORMATION MANUAL § 4-1-15(b)(2) (Feb. 14, 2008 web version).  However, specialists were not trained in separating air traffic, and did not have the necessary radar to separate air traffic, *see Mitchell* Dep. 20; Turner Rep't at 4-5.  Even if the FAA bought the needed equipment and provided the needed training, having two sets of controllers giving aircraft separating directions in the same airspace implies that neither would have really had sole control.

   To the limited extent that the NAATS proposal envisioned job cuts in the flight service workforce itself, the cuts were concentrated on the oldest, supervisory portion of that workforce, with more than twice the salary and benefit savings proposed through cuts in managerial positions (average age 53, McDaniel Decl. ¶ 11) than through cuts in the more numerous line positions (average age, 50, *id*. ¶ 12).  NAATS proposal at 13.

   NAATS claimed that its proposal would have saved about either $1 billion or $800 million over seven years.  NAATS proposal at 8, 13.  Even if one of those back-of-the-envelope calculations were accurate, not only is that less than the $1.6 billion over ten years that the FAA expected to save from the Lockheed contract (not counting the "cost avoidance" savings), but it

---

[64](...continued)
that the FAA would immediately stop paying Commerce for all CWSU work.

   It is by no means certain that, even if the FAA had wanted to eliminate CWSU meteor-ologists, it would have been able to do so.  The FAA recently proposed a consolidation of these positions, and even that consolidation proposal has been highly controversial.  *See*, *e.g.*, Alfonso Castillo, *Schumer Urges FAA To Reconsider Moving Jobs*, NEWSDAY, Apr. 15, 2009, at A22 ; Jim Tharpe, *Controllers Blast FAA Plan To Shift Meteorologists*, ATLANTA JOURNAL-CONSTITUTION, Feb. 24, 2009, at B1; Michael Sangiacomo, *Weather Outlook Cloudy for FAA Plan: Industry Workers Object to Relocating*, CLEVELAND PLAIN DEALER, Dec. 25, 2008, at A1.

is a gross, rather, than net, savings.  Under the NAATS proposal, the FAA would have to agree

to increase specialist compensation out of that $1 billion or $800 million (a condition of union

agreement to its own proposal, *see id.* at 2, 8), and then would have had to use whatever was left

of that alleged savings after giving the specialists pay raises to buy the needed new technology,

*id.* at 8.  By contrast, under the outcome of the A-76 process, Lockheed bought the new technol-

ogy, so that was an expected $1.6 billion savings <u>plus</u> having the benefits of new technology,

rather than $800 million to $1 billion savings minus pay raises <u>to buy</u> new technology.

 In any event, the A-76 process itself is designed to more thoroughly capture the ideas for

streamlining and efficiency of the union and its members.  Dismissed plaintiff Donna Dodson,

one of the principal authors of the NAATS proposal, became a full-time member of the MEO

team along with a union colleague, *Dodson* Dep. 33-34, Pike Dep. 61-62, Grace Dep. 42-51.

They were joined, not only by workers from FAA management, *see* Grace Dep. 42-51, but also

by consultants hired to advise and assist the MEO and by industry partners that would be supply-

ing equipment, systems, or buildings to the make the MEO's proposed solution work, including

Sprint, Harris Consulting Corp., Avaya Communications, SolaCom Technologies, and ICF

Consulting, *id*.  The result of the manpower and array of talent available to think through the

issues was a several hundred page proposal by the MEO dense with specifics compared to the

short sketch of even the "refine[d]" NAATS proposal.  *See* Kansier Decl. ¶ 24 (NAATS proposal

did not meet standard required of A-76 proposals).[65]  Moreover, the A-76 process also harnessed

the benefit sought by Congress in the FAIR Act, 31 U.S.C. § 501 note,  of having <u>different</u> teams

---

[65] While the proposals of Lockheed and the other private bidders are proprietary, and
even parts of the MEO proposal are proprietary given the involvement of the MEO's industry
partners, volume VII of the MEO proposal is not proprietary, and illustrates the detail found in
the competing proposals.  *See* Ex. 30, MEO Proposal, Volume VII.

competing to come up with the most efficient way of completing the necessary tasks, which would be far more likely to give to arrive at a superior solution.  It is no wonder if the FAA pre-ferred to complete the A-76 process rather than kill it prematurely on the off-chance that the FAA would be able to reach an agreement on the NAATS proposal; that NAATS would be able to sell the plan to its members once it disclosed the details; that the FAA and NAATS would reach agreement on all the other conditions to the plan insisted on by NAATS as the price of its proposal, NAATS proposal at 1-2; that the FAA would be able to get out of its contract with Commerce and deal with the other employees that NAATS wanted to displace; and that the NAATS proposal, though developed without the benefits of the A-76 process, would result in serious savings or efficiency improvements.

### 2.     The Decision That Lockheed's Bid Was Best

The evaluation of the proposals during the A-76 competition did not turn on the evalua-tors' perceptions that the workforce was aging.  Blakey Decl. (Docket # 23-36) ¶ 5; Blakey Dep. 228; DeGaetano Dep. 98; DeGaetano Decl. ¶ 8; Kansier Decl. ¶ 26; Vorce Decl. ¶ 4. While people involved in the A-76 process pointed to an "aging workforce" as a reason for the prior decision to have a competition, those comments do not even purport to relate to any effect of an "aging workforce" in choosing among the competitive bids.  In fact, all the competitors, MEO and private-sector competitors alike, were on level playing field and had the same existing workforce, which was no more aging for any one of them than for the others, as a starting point for their labor force.  The A-76 rules of competition, moreover, helped avoid a potential disadvantage for the agency's in-house MEO team of starting with an aging workforce.  As required by Circular A-76 (Attachment C, § B(2)(e)(1)), the "COMPARE" software used to

evaluate the cost of the MEO bid requires agencies to assume payroll and benefit costs based on the mid-career salary and benefit cost (here, GS-12, step 5), Grace Dep. 76-77.  Thus the cost of an MEO proposal is deemed by the agency to be the same whether the employees are mostly younger employees not yet receiving their mid-career salaries or mostly older employees with higher than mid-career salaries.[66]  The MEO's competitors were told that the FAA's assessment of the "realism" of their proposed labor costs would be judged by that same GS-12, step 5 benchmark.  Neill Op. at 13; Kansier Dep. 152 ("We did not want someone to low-bid and basically underpay the employees because the employees would not stay, so we told the offerors that for purposes of evaluation . . . we considered a 12 step 5 to be reasonable").

Lockheed's winning proposal was "built around a carefully modeled consolidation" of the existing facilities "and a staffing plan that was <u>designed to take advantage of the existing skills and experience in the</u>" pre-existing "federal workforce."  Courain Decl. ¶ 18 (emphasis added).  Lockheed proposed to "strategically consolidate the" pre-existing "stand-alone facilities into a totally integrated network of 3 hubs" and pre-existing facilities that would be "refurbished and outfitted with modernized system infrastructure equipment."  *Id*. ¶ 19.  "With respect to new technology," Lockheed promised that its "new integrated system [would] display all available meteorological and aeronautical information at each specialist's workstation in a unified, inte-grated manner," and that "[a]ll flight plans, pilot and aircraft profiles, contact histories, and other data will be universally accessible from every . . . workstation at any time, anywhere in the coun-try."  *Id*. ¶¶ 22-23.  "Among other things," and in contrast to the prior "'stove-piped'" system, the Lockheed proposal featured "'load balancing' among all facilities and specialists and

---

[66] A detailed explanation of the COMPARE software may be found at <u>http://www.comparea76.com/</u> (last visited April 22, 2009).

flexibility in routing customer requests for assistance with minimal wait time for the caller."  *Id.*
¶ 23.

        The agency officials who evaluated the competitive proposals concluded that, of the five

bidders, Lockheed's proposal was clearly the best on technical merit and a close second (to

another private bidder) on cost.  The technical assessment was made by a highly experienced

technical team of more than twenty-five core members plus over thirty advisors, and the cost

assessment by a thirteen- member cost team.  Neill Opinion at 20; Def's Responses To Pls' 3d

Set of Interrogatories at 18-19.  The Source Selection Evaluation Board co-chaired by Kansier

disagreed with some of the teams' subsidiary findings and viewed the MEO bid somewhat more

favorably, but still concluded that Lockheed had the "'best technical solution'" and "'clearly

provided the greatest benefit to the Government.'" Neill Opinion at 100, *quoting* SSEB Report.

The SSEB did not consider the age of the workforce.  Kansier Decl. ¶ 26; Vorce Decl. ¶ 4.  Even

Marilyn Jackson-Brame, Deputy Director of ACA, who had opposed the decision to conduct the

A-76 acquisition, concluded that Lockheed's bid was better than that prepared by the MEO for

the in-house organization to which she had devoted her thirty-year FAA career.  Jackson-Brame

Dep. 208-09.  The deciding official, Vice President of Acquisition and Business Services Dennis

DeGaetano, likewise concluded on the merits that Lockheed had the best bid.  DeGaetano Dep.

98; DeGaetano Decl. ¶¶ 7-8.[67]

---

[67] The decision before Administrator Marion Blakey on the administrative appeal of the
bid protest made to the Office of Dispute Resolution was not whether Lockheed had the best bid,
but whether DeGaetano's decision that Lockheed had the best bid was arbitrary and capricious.
She agreed with Judge Neill's recommendation that it was not arbitrary and capricious.  Ex. 25.
Age played no role in her decision.  Blakey Decl. (Docket # 23-36) ¶ 5; Blakey Dep. 228.

Any notion that all these recommending and deciding officials reached the conclusion that Lockheed had the better bid after such painstaking consideration of the opposing bids as a mere pretext to cover for naked age discrimination is simply not plausible.  An agency does not take sixty people away from other work or hire them as consultants just to staff and advise the tech team alone (Neill Opinion at 20, 54-55) and have them engage in detailed evaluation of complex bids merely as some Potemkin façade to screen the real decision process plaintiffs' theory supposes, one involving no more effort than looking at the employees' ages and seeing that they were old.

In assessing whether the painstaking evaluation of Lockheed's bid by so many agency employees was just some vast pretextual conspiracy to cover up a pre-determined decision to fire workers because they were old, the question for the Court is <u>not</u> whether those agency officials <u>correctly</u> viewed Lockheed's bid as best.  Instead, as *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495-97 (D.C. Cir. 2008), strikingly illustrates, even where there is a sharp and genuine dispute over whether the employer's stated non-discriminatory reasons for a personnel action were wholly unfounded as a matter of fact, the employer is <u>still</u> entitled to summary judgment (<u>to summary judgment</u>, not merely an opportunity to win after an expensive trial) unless there is also a genuine dispute whether the stated reason, mistaken or not, was the actual reason.  Only if an employer made an error "too obvious to be unintentional," is there "perhaps" a basis to infer that it instead "had an unlawful motive" for its actions.  *Fischback v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  The FAA's decision to award the contract to Lockheed, whether or not the best decision it could have made, was certainly not an error "too obvious to be unintentional."

That very agency decision has already been tested in a full and fair administrative litiga-

tion between the same parties – Breen was allowed over Lockheed's objection to represent all

the bargaining unit members, ODRA Intervention Decision,  Ex. 24  – and upheld by Judge

Neill's careful 102-page single-spaced opinion in the Office of Dispute Resolution proceedings

and the FAA's Administrator's affirmance of that decision.  The standard of review in the

ODRA proceedings was the familiar "arbitrary and capricious" standard.  Neill Opinion at 61.

That standard, though deferential, is plainly less deferential than the standard for determining

whether an employer's reason for its action is merely a pretext.  As *Brady* illustrates, even if an

employer's decision is flat-out wrong it may not be pretextual; but an employer error "too

obvious to be unintentional" will necessarily be arbitrary and capricious.  If DeGaetano's deci-

sion that Lockheed's bid was best had in fact been too obviously wrong for the error to be

unintentional, Judge Neill would not have needed 102 pages to say so and he could not possibly

have recommended sustaining an obviously wrong action at the end of his opinion.

Indeed, on the question whether the assessment of Lockheed's bid as best was pretextual,

Neill's opinion and the FAA order affirming it have issue-preclusive effect.[68]  Where there has

been a full and fair opportunity for litigating whether a decision of an employer was justified in a

federal administrative scheme that is not part of the ADEA itself, and where there is an

opportunity for federal judicial review, findings of administrative tribunals sustaining the legiti-

macy of an employer's decision are entitled to issue-preclusive effect in subsequent ADEA

---

[68] In the motion to dismiss, defendants argued that the entire case ought to have been dis-
missed for "lack of jurisdiction" as a "collateral attack" on the Lockheed contract award that
should have been litigated entirely in the ODRA proceedings and any petition for review in the
Court of Appeals.  This Court rejected that broader argument, *Breen v. Peters*, 474 F. Supp. 2d 1,
4-6 (D.D.C. 2007).  Without waiving any potential appeal rights, defendants do not renew it
here.

proceedings on the issue whether that same decision was a mere pretext for discrimination.  *Tice v. Bristol-Myers Squibb Co*., 515 F. Supp. 2d 580 (W.D. Pa. 2007), *aff'd*, 2009 WL 943838 (3d Cir. Apr. 8, 2009).[69]  Applying the doctrine of issue preclusion in this circumstance "eases the backlog of cases that exist on the dockets of all courts by keeping issues that have already been resolved at rest," and "serves as an aid to judicial fairness, preventing parties who have previously litigated . . . factual issues from having to relitigate those very same issues which have already been proved."  *Tice*, 515 F. Supp. 2d at 600.

Plaintiffs here had a full and fair opportunity to litigate this matter before ODRA.  Breen and the flight service specialists on whose behalf she was acting were represented by counsel whom the special master complimented for "helpful" briefing, and discovery was available and taken in the ODRA proceedings.  *See* Neill Opinion at 46, 48, 50, 62 & n.11.  The contesters "challenged virtually every phase of this procurement once proposals were submitted," including "the adequacy of discussions, the reasonableness of the technical evaluation, the accuracy of the cost evaluation, the validity of the SSEB deliberations, and the correctness of" DeGaetano's decision.  Neill Opinion at 61.  Plaintiffs also had, though they chose not to exercise, an opportunity for judicial review.[70]

---

[69] The Third Circuit affirmance of *Tice* was not selected for publication even though it addressed an issue of "first impression," 2009 WL 943838, at *1, and drew a partial dissent. While we rely primarily on the extensive district court opinion, Rule 32.1 of the Federal Rules of Appellate Procedure permits citation of the appellate decision as well in this circumstance.

[70] The reply brief on the motion to dismiss noted that, in light of  *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038 (D.C. Cir. 1989), there may have been some question whether judicial review of the ODRA decision would have been available had plaintiffs sought such review.  In *NFFE,* the avenue of review was a civil action pursuant to 5 U.S.C. § 702, which required the plaintiff to show that it was within the zone of interests of a relevant statute, and the Court of Appeals found that a union of employees displaced by an A-76 com-

(continued...)

Even if the ODRA decision were not technically issue preclusive, it would still be entitled to weight. *See, e.g., Alexander v. Denver-Gardner Co.,* 415 U.S. 36, 60 & n.21 (1974).[71] Judge Neill's opinion, together with the other evidence, is more than sufficient to compel the conclusion that the decision to choose Lockheed, if not correct, was at least not merely pretextual.

In any event, the decision to choose Lockheed rather than the MEO or, for that matter, a decision to continue the A-76 competition rather than fly off with the alleged NAATS proposal, could not have been <u>discriminatory</u> no matter how it came out. Once the A-76 competition was started, it was a "competition" among vendors for providing the flight service function, not a "competition" between older and younger flight service specialists or between flight service specialists and any other set of employees, younger or otherwise. Whether Lockheed or the

---

[70](...continued)
petition was not within the zone of interests protected by the statutes establishing the A-76 process. By contrast, as the FAA was careful to point out to plaintiffs in its final decision, judicial review of the ODRA proceedings, if available, would have been by petition for review to a court of appeals pursuant to 49 U.S.C. § 46110. Unlike the situation with civil actions under 5 U.S.C. § 702, for petitions for review under 49 U.S.C. § 46110, the question who is within the zone of interests to have prudential standing is one that "Congress has already answered . . . in section 46110(a)" itself, namely "'a person disclosing a substantial interest in an order issued by the'" FAA with respect to aviation. *Safe Extensions, Inc. v. FAA,* 509 F.3d 593, 600 (D.C. Cir. 2007). Since plaintiffs had a substantial interest in the ODRA order, under the reasoning of *Safe Extensions* they had standing to pursue review in a court of appeals. *NFFE* also pre-dated the FAIR Act, which, though not addressing the precise issue of administrative or judicial review of A-76 awards, did make clear that the head of a federal employee union is an "interested party" who may bring an administrative challenge to a decision about whether a function performed by the union members is commercial. Section 3(b)(4) of the FAIR Act, 31 U.S.C. § 501 note.

[71] In the Third Circuit affirmance of *Tice,* the judge who dissented in part because he thought the administrative proceedings ought not be given issue-preclusive effect nevertheless concurred in the judgment because, even on the employer's summary judgment motion, "the District Court could permissibly *adopt* the ALJ's findings of fact." 2009 WL 943838, at *12 (Garth, J., dissenting in part and concurring in part) (emphasis original).

MEO won the competition, the result would apply to all the flight service employees, young and

old alike, and only to the flight service employees.  The flight service employees might have

preferred that the FAA choose the MEO rather than Lockheed, but the FAA was not about to,

and did not in fact, choose Lockheed for the older employees and the MEO for the younger ones.

The decision to choose Lockheed was not at all discriminatory.

> H.      Even If Plaintiffs Had Demonstrated That Consideration
>         Of Age Played A Role In The Decisions They Challenge,
>         Defendants Would Have Made The Same Decisions

We have explained above why the decisions that plaintiffs seek to challenge were made

without regard to age.  However, even if plaintiffs were able to show that age had played some

role in one or more of the decisions, defendants would still be entitled to summary judgment if

they would have reached the same decisions without consideration of age.  *Price Waterhouse v.

Hopkins*, 490 U.S. 228, 242 (1989).[72]

That is the case here.  As John Hennigan explained in his declaration, Hennigan Decl. ¶

23, he would have made the same recommendations whether to have an A-76 competition

regardless of whether he did or did not consider the age of the workforce.[73]  DeGaetano likewise

indicated that Lockheed Martin's bid would have represented the best value for the government

whether or not age was considered.  DeGaetano Decl. ¶ 8; *see also* Vorce Decl. ¶ 4 (SSEB did

not consider age in making recommendations to DeGaetano).  Mineta's declaration similarly

---

[72] In response to *Price Waterhouse*, Congress amended Title VII by limiting the effect of
this same-action defense to the scope of relief.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94
(2003).  The ADEA, however, was not so amended, and the same-action defense remains a
complete defense in ADEA cases.  *E.g.*, *Baqir v. Principi*, 434 F.3d 733, 735 (4th Cir. 2006).

[73] Moreover, the classification of the flight service specialist positions as commercial is
clearly correct as a matter of law, *see* Part III.D, *supra*, no matter what the FAA's motivation for
arriving at that correct answer may have been.

noted that his decision against further outsourcing of towers was justified quite apart from any consideration of age.  Mineta Decl. ¶ 16.[74]  So too, Bertram clearly would have reached the same decision regardless of any consideration of age, because in the actual world he <u>did</u> reach that decision without even knowing the workers' age.  Bertram Dep. 111-12.  Similarly, James Washington explained that, as all the positions were being eliminated, age did not play a factor in his request that the RIF process begin.  Declaration of James H. Washington (Docket # 23-35) ¶¶ 4,6.  In short, even if plaintiffs had shown that impermissible stereotyping of an aging workforce somehow had been a factor taken into account in some decision, the decisionmakers' explanations for their actions plainly show that the legitimate non-discriminatory reasons for their decisions would have resulted in the same actions.  Defendants are accordingly entitled to summary judgment.

---

[74] In any event, the FAA clearly would <u>not</u> have outsourced more towers whether or not Mineta's reasoning had relied on age stereotypes: No matter what <u>Mineta</u> (let alone the FAA) thought of the issue and no matter why he thought what he thought, the <u>Senate</u> clearly would not have permitted any such outsourcing, *see* Part III.E, *supra*, so the same action (in this case, inaction) would have resulted.

<u>Conclusion</u>

We noted above how the facts of this case differ in some respects from some other kinds of termination cases.  One final difference should be mentioned.  Defendants did not terminate these plaintiffs because of any view that plaintiffs had done something wrong; because of any view that plaintiffs could not, for age or any other reason, do the jobs they were asked to do; or even because of some view that, though good employees, plaintiffs were not as good as some other employees.  Plaintiffs rendered years of honorable service.

Their federal employment, however, was not ended by age discrimination, but by events that made it no longer a sensible idea for the taxpayers to have the FAA operate flight service as it once existed in the pre-internet 20th century heyday of general aviation.

For the reasons stated above, defendants' motion for summary judgment should be granted.

Respectfully submitted,

TONY WEST
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

STUART A. LICHT
Assistant Branch Director
Civil Division

Of Counsel:

Eden Brown Gaines, Esq.
Michael Doherty, Esq.
Julia A. Rhodes, Esq.
Personnel & Labor Law Staff
Office of Chief Counsel
Federal Aviation Administration
600 Independence Ave., S.W.
Room 1E100
Washington, D.C. 20591
Phone: (202) 385-8254
Fax: (202) 493-5085

/s/ Brian G. Kennedy
BRIAN G. KENNEDY (DC Bar No. 228726)
ADAM D. KIRSCHNER (IL Bar No. 6386601)

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7126
Washington, D.C.  20530
Telephone:  (202) 514-3357
Fax:  (202) 616-8470
Email: brian.kennedy@usdoj.gov

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2009, a true and correct copy of the foregoing Defendants' Motion for Summary Judgement, Defendants' Statement of Material Facts as To Which There are No Genuine Issue, and accompanying Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgement were served by first-class mail upon the following pro se plaintiffs who are not served through the Court's ECF system:

Duane Swanson
RD #1 Box 300BB
Roaring Spring, PA 16673

Eddie Krenzelok
108 Lincoln Cove
Jonesboro, AR 72404

Jim Wilkerson
605 Audrey Drive
Fairbanks, AK 99709

Norman B. Buckallew
3519 Kites Landing Rd
Florien, LA 71429

Randell Liles
737 Highland Crest
Hurst, TX 76054


_____/s/ *Adam D. Kirschner*___
ADAM D. KIRSCHNER