**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KATHLEEN A. BREEN, <u>et al.</u>,          )
                                          )
          Plaintiffs,                     )
                                          )
     v.                                   )  Civil Action 05-654 (RMR)
                                          )
RAY H. LAHOOD                             )
SECRETARY OF TRANSPORTATION, <u>et al.</u>,  )
                                          )
          Defendants.                     )
_____   )

**PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT AND**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**[1]

Plaintiffs, Kathleen A. Breen, <u>et al.</u>, by and through undersigned counsel, hereby move this honorable Court to grant summary judgment in their favor on the grounds that Plaintiffs have demonstrated that Defendants' A-76 process and resulting reduction-in-force had an unlawful disparate impact on Defendants' Flight Service Controllers based on their age. Plaintiffs also move this honorable Court to find, in light of the considerable evidence of Defendants' deliberate and intentional discrimination against its "aging workforce" of Flight Service Controllers, that there is at a minimum a genuine dispute of material fact over the issue of Defendants' intentional age discrimination. For that reason, and because

_____

[1]This Brief fully incorporates Plaintiffs' Statement of Material Facts in Opposition to Defendants, attached hereto.

Defendants are not entitled to judgment as a matter of law, Plaintiffs request that the Court grant summary judgment on disparate impact and that the Court deny Defendants' Motion for Summary Judgment, and, as appropriate, schedule the disparate treatment issue for trial.

I.    **The Evidence Shows That Defendants' A-76 Process Unlawfully Imposed an Adverse Disparate Impact on Plaintiffs Based on Age.**

Plaintiffs are entitled to summary judgment on the issue of disparate impact because a) the Age Discrimination in Employment Act (ADEA) holds the federal government to an especially high standard with respect to age discrimination, b) the law prohibits personnel actions that impose a disparate impact on older employees, c) the statistical evidence in this case clearly demonstrates that Defendants' A-76 process, and its subsidiary processes, imposed a statistically incontrovertible disparate impact on Plaintiffs because of their age, and d) Defendants have no meritorious defense to their unlawful actions.

A.    **The ADEA Holds the Federal Government to a Higher Standard than the Private Sector.**

The government of the United States is governed by the ADEA exclusively through the provisions of 29 U.S.C. 633a, which states in pertinent part as follows: "All personnel actions

affecting employees or applicants for employment who are at least 40 years of age . . . **shall be made free from any discrimination** based on age." (emphasis added). The Act further provides, in subsection (e), that this is the only section that governs federal employees: "Any personnel action of any department, agency, or other entity referred to in subsection (a) of this section shall not be subject to, or affected by, any provision of this chapter, other than the provisions of section 631 (b)[2] of this title and the provisions of this section." <u>See also</u> Mem. Opinion and Order dated Sept. 30, 2005, at 5. This strong mandate has been rigorously interpreted by the Courts. In its sweeping language, the ADEA clearly provides for actions for age discrimination against the government based on either theories of disparate impact or disparate treatment. <u>See</u> Mem. Op. at 9-11 (Jan. 8, 2007).

> **B.     The Congress and the Courts Have Stated a Strong Mandate for Eliminating Discrimination Based on Age in the Federal Government.**

As this Court has clearly stated, the sweeping language of the Act as it applies to the federal government makes no

---

[2] Section 631(b) provides: "In the case of any personnel action affecting employees or applicants for employment which is subject to the provisions of section 633a of this title, the prohibitions established in section 633a of this title shall be limited to individuals who are at least 40 years of age."

distinction as to method of proof (_i.e._, it does not state whether discrimination must be intentional or unintentional, or proven through disparate treatment or disparate impact), and a demonstration of discrimination through either disparate impact or disparate treatment is equally available to Plaintiffs. See Mem. Op. at 11 (Jan. 8, 2007). At the same time, this Court also notes that it is important to apply a disparate impact analysis to the federal government that is appropriate in light of the special provisions of 29 U.S.C. 633a. See Mem. Op. at 11 n.3 (citing Lagerstrom v. Mineta, 408 F. Supp. 2d 1207, 1212 (D. Kan. 2006)). The Supreme Court has observed that, unlike the remainder of the ADEA, which is based on the Fair Labor Standards Act, Section 633a is based on Title VII of the Civil Rights Act of 1964. Lehman v. Nakshian, 453 U.S. 156, 166-67 (1981). As the D.C. Circuit has explained at some length, Congress clearly intended the ADEA to hold the federal government to a higher standard than the law imposed on the private sector. "Congress's actions show that it intended its mandate to reach more broadly in the federal sector than in the private sector." Forman v. Small, 271 F.3d 285, 296-97 (D.C. Cir. 2001). Defendants' conduct in this case presents multiple departures from the federal norm imposed by Congress which

mandates that the government's personnel actions shall be free of age discrimination, and it is perhaps not surprising that in a case in which the government strayed so far from so many of the its normal personnel procedures that it should have found itself straying onto the forbidden ground of age discrimination. In fact, there is a compelling combination of statistical and anecdotal evidence that makes a conclusive case of age discrimination based on disparate impact and a compelling case of age discrimination based on disparate treatment. The statistical analysis of the Defendants' own expert demonstrates beyond a shadow of a doubt that the A-76 process imposed an adverse disparate impact on the Flight Service Controllers based on their age, 92 percent of whom were over the age of 40. See Ex. 1, Report of Bernard Siskin, Defendants' expert. In addition, the FAA's own actions, coupled with the statistics, give rise to a strong inference that the FAA intended to rid itself of its older Flight Service Controllers. Particularly probative in this regard is the analysis of Plaintiffs' expert, Dr. Dale Belman, of the rehiring pattern of younger RIF'ed Controllers by the FAA. See Ex. 2, Report of Dr. Belman, at 5-6. During the RIF process, approximately 305 younger Flight Service Controllers were able to continue at the FAA as Controllers. See

Ex. 3, George Williams' Chart.[3] What Dr. Belman's analysis reveals is that through sleight of hand, the FAA selectively purged its ranks of its older workers, by RIFing all Flight Service Controllers and then selectively rehiring younger Controllers. <u>See</u> <u>id</u>.[4] Contrary to Defendants' contorted reasoning, Plaintiffs do not seek to challenge the retention and rehiring of younger Controllers as a personnel practice but simply to reveal it as a pretext. The result, in any case, has far-reaching implications for the analysis of disparate treatment. Dr. Bernard Siskin, Defendants' expert, argued strenuously that no statistical conclusions were possible with respect to disparate treatment. <u>See</u> Ex. 1, Siskin Dep. at 21-23. Any such analysis, he claimed, would have to be based on selection among a few large groups, too few to analyze by statistics. <u>Id</u>. In fact, however, the FAA's policy of "pick and choose" its younger RIF'ed Controllers during and immediately

---

[3]This Chart is Exhibit 5 to FAA's Deputy HR Director George Williams' deposition on July 20, 2005.

[4]Defendants question Dr. Belman's selection of data, but like an ostrich with its head in the sand, they have been able but not willing to perform their own calculation of the ages of the rehired Flight Service Controllers versus those not rehired with the data in their possession. Plaintiff's expert, Dr. Belman's calculation is therefore unrebutted.

after the RIF process strongly suggests that Dr. Siskin is incorrect, and that statistical analysis on the individual level is appropriate. As Dr. Siskin admitted in his deposition, if analysis of disparate treatment by individual is appropriate, then the statistical analysis is identical to the statistical analysis of disparate impact. In that case, the statistics, coupled with the anecdotal evidence of record, lead to the same ineluctable conclusion: the FAA discriminated against the Flight Service Controllers based on their age when it fired them through the A-76 process in the contracting out to Lockheed Martin.[5] Of course, the catastrophic effect of Defendants' discriminatory policy has not been borne by the Flight Service Controllers alone. As is all too often the case with discriminatory actions, the repercussions extend well beyond the immediate targets of the discriminatory employer. In this case, the casualties include pilots, the aviation community, and ultimately the Flight Service system itself. In ironic counterpoint to Defendants' prediction of the death of general aviation, Defendants' statistics show that general aviation has actually been on an uptick since 2005, increasing by

---

[5] Not to mention the families of the RIF'ed Controllers who could not find comparable employment.

approximately a percent point. In contrast, usage of Flight Service, now run by Lockheed,[6] has plummeted by approximately 66 percent. See Ex. 4, Administrative Fact Book, 2005-2008. The cause is readily apparent not in a decline in flights (about the same) or a sudden spike in Internet usage, but in the monumental incompetence of Lockheed, which is dramatically illustrated by the long waits, personnel chaos, geographic confusion, and inadequate technological support to which the Controllers themselves attest. <u>See</u> Declarations attached as Exhibit 5.

### C. Plaintiffs Must Show a Significant Statistical Disparity in Order to Demonstrate Disparate Impact.

Plaintiffs can prove discrimination based on age if they can show that Defendants' implementation of a facially neutral practice resulted in a statistically significant adverse effect on older employees. The Supreme Court defined disparate impact discrimination in the landmark case of <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424 (1971), and has since applied it in the context of age discrimination in such significant cases as <u>Smith v. City of Jackson</u>, 544 U.S. 228 (2005) (disparate impact a viable theory under ADEA), and <u>Meacham v. Knolls Atomic Power</u>, 128 S.Ct. 2395 (2008) (holding that employers bear burden of

---

[6]Lockheed Martin will be referred to simply as Lockheed for the remainder of this Brief.

production and persuasion on affirmative defenses to disparate impact). To the extent the Congress addressed disparate impact and the Age Discrimination in Employment Act in the Civil Rights Act of 1991 at all, it addressed the private sector rather than the higher standard imposed on the federal government by 29 U.S.C. § 633a.

In Griggs, the defendant power company required applicants for employment in any department but labor (which were the lowest salaried jobs) either to have a high school diploma or to pass an intelligence test for which the cut-off score approximated that of high school graduates. Neither qualification was shown to be particularly related to any specific job. In North Carolina at that time, 34 percent of whites had high school diplomas, compared to only 12 percent of African Americans, and 58 percent of whites passed the intelligence test as opposed to six percent of African Americans. Finding that the tests or possession of a diploma were not rationally related to the jobs for which they were required, and that African Americans were disproportionately affected by these tests, the Court found these practices barred by the Civil Rights Act:

> What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the

> barriers operate invidiously to discriminate on the basis
> of racial or other impermissible classification. . . . The
> Act proscribes not only overt discrimination but also
> practices that are fair in form, but discriminatory in
> operation. The touchstone is business necessity. If an
> employment practice which operates to exclude Negroes
> cannot be shown to be related to job performance, the
> practice is prohibited.

401 U.S. at 431. See also Albemarle Paper v. Moody, 422 U.S. 405

(1975), and Smith v. City of Jackson, 544 U.S. 228 (2005).

In order to prove disparate impact, Plaintiffs must first

identify a facially neutral employment practice or set of

practices that operates to impose an adverse effect or impact

on older employees. In this case, Plaintiffs are challenging

Defendants' A-76 process (including its particular components:

the classification of some Air Traffic Controllers as "core"

commercial functions and others as "non-core" commercial

functions; the selection of Flight Service for an A-76 study

rather than other more suitable FAA functions that would not

have impacted older employees in the same manner; and the

selection of Flight Service for contracting out).

In each case, the analysis of disparate impact is

undertaken as the calculation of the likelihood that the

observed outcome with respect to age would have resulted from

a process that was blind to age. The more likely the observed

proportion of older employees affected by the practice at issue

could have been generated by an age blind random sample, the less likely it is that the practice has a discriminatory effect. Conversely, the smaller the likelihood that the observed outcome could have been produced by a random draw, the more likely it is that the practice has a discriminatory effect. Generally speaking, the Courts will find that a disparate impact is "statistically significant" and probative of discrimination if the difference is 1.96 standard deviations or greater.  In the instant case, the 14, 19, and 22 standard deviations calculated by Defendants' expert, Dr. Siskin, reflect a likelihood that there was a disparate impact in the case approximating the likelihood that the sun will rise tomorrow.  See infra.

In a previous opinion, this Court also addressed the question of the magnitude of the impact on the individual controllers of loss of their retirement, particularly since older workers are likely to have less of a chance to recoup the pensions they lost when they were forced out of federal employment shortly before vesting. See Mem. Op. (Sept. 30, 2005). In this case, the losses to the Controllers were devastating. Using a judgment sample constructed by separating Controllers into different categories by post-RIF employment status and retirement status, Plaintiffs' damages expert,

Professor Joseph Tryon, formerly Chairman of the Department of Economics at Georgetown University, calculated the lost wages and retirement benefits of eleven Plaintiffs. Professor Tryon used a standard methodology based on calculating the difference between the lifetime income a Plaintiff expected to receive from the federal government had there been no RIF and the lifetime income the Plaintiff expected to receive in actuality post-RIF. See Ex. 6, Tryon Report.[7]  Dr. Tryon's figures are conservative in a number of respects, including the fact that they are calculated based on 182 Plaintiffs rather than 237 and the fact that the subsequent mass layoffs of former FAA Controllers by Lockheed are likely to swell Plaintiffs' damages beyond Dr. Tryon's calculations. Dr. Tryon made the assumption, reasonable at the time, that the former FAA Controllers employed by Lockheed would be able to mitigate their damages until the time they would have been required to retire from Flight Service, but it now appears that for many of them, their careers are once again being cut short. "Five flight Service stations to close," AOPA Online http://www.aopa.org/advocacy/articles/2008/

---

[7]Defendants' expert William Carrington, although he differed from Dr. Tryon in certain inputs and assumptions, concurred in Dr. Tryon's methodology. See Ex. 7, Carrington Report at 11.

081015fss.html (last visited June 15, 2009). Of the $63 million dollars Dr. Tryon conservatively calculated for 182 Plaintiffs based on present value at a generous 6 percent discount rate, the losses attributable to lost retirement amount to approximately $30 million. Defendants, although they cherry-pick several Plaintiffs and attempt to question Dr. Tryon's assumptions, have no competing estimate of the retirement losses. See Ex. 7, Carrington Report. The "practical significance" of Defendants' actions on the lives of the employees affected is enormous.

## II. The Evidence Is Conclusive that Defendant's A-76 Process Had a Disparate Impact on its Aging Flight Service Controllers.

The statistical evidence of disparate impact presented by Defendants' expert, Dr. Siskin, is clear, uncontroverted, and incontrovertible. Dr. Siskin, working for Defendants, conducted statistical analyses of both Disparate Impact and Disparate Treatment. Dr. Siskin's analysis found a statistically significant Disparate Impact resulting from the A-76 process well beyond the usual requirement of the Court for Disparate Impact. In addition to his overall analysis of the A-76 process, Dr. Siskin also analyzed component practices of the A-76 process and also found overwhelming evidence of disparate impact. Dr.

Siskin found that not only did the differentiation between core and non-core commercial functions have an adverse disparate impact on older employees, but also the actual selection of the Flight Service Controllers had an adverse disparate impact on older employees of the FAA.

**A.    The Evidence Demonstrates that the FAA's A-76 Process Imposed a Disparate Impact Based on Age.**

Dr. Siskin, Defendants' statistical expert, conducted analyses of the statistical effect of firing and contracting out the Flight Service Controllers both in terms of disparate treatment and disparate impact.   Setting aside for one moment the analysis of disparate treatment, Dr. Siskin explained that his analysis of disparate impact was based on the study of comparable employees not as members of groups but as individuals, a methodology which he described as the standard for statistical analysis of disparate impact. See Ex. 1, Siskin Report at 14-15.  Dr. Siskin laid out the fundamental nature of any statistical analysis of age bias in simple terms: 1) the population within which comparisons are being made must be similarly situated, and 2) the discrepancy between the results found for older and younger employees must be sufficiently large to be statistically significant.

In defining the parameters of his analysis of disparate impact, Dr. Siskin stated that disparate impact analysis requires scrutiny of a particular employment practice to determine the probability that the observed effect by age is the result of a random process in which age is not a factor. Dr. Siskin conducted his disparate impact analysis calculating the probability that the age distribution with respect to the proportion age 40 or older in the group adversely affected by the practice was a random (age blind) draw from the appropriate FAA workforces. For each decision, he calculated the likelihood that the observed adverse outcome with respect to age was the result of an age blind draw from the appropriate FAA workforce and whether this likelihood met the standard for disparate impact of a 5% or less likelihood established by the courts. In making this comparison, he was able to determine whether the percentage of Flight Service Controllers who were over 40 was greater by a statistically significant degree than the percentage one would expect if they had been selected at random. See Ex. 1, Siskin Report at 15. Courts and statisticians have established that there is disparate impact, in this case by age, if the likelihood that an observed outcome was the result of a random (in this case age blind) process is 5% or less. The 5%

likelihood can also be expressed as the result being 1.96 standard deviations away from the proportion of the population age 40 or older. See Ex. 1, Siskin Report at 5 n.4. The standard deviation is a statistical measure of the likelihood that an observed event was the product of chance. An event which is calculated to be 1.00 standard deviations from 0 would occur by chance about 16 times in 100. An event calculated to be 1.96 standard deviations from 0 would occur by chance 5 times in 100. An event which is calculated to be 3.0 standard deviations from 0 would occur by chance 1.4 times in 1,000. Events calculated as 5.0 standard deviations from zero would occur 3 times in 10 million by chance. Six Sigma, the statistical process control method, pioneered by Motorola and extensively used by firms such as General Electric, which virtually eliminates production errors, was titled six sigma[8] because the likelihood of an event which is six standard deviations from zero is so small as to be inconsequential for decision making. Advanced statistics texts do not go beyond five standard deviations, if they go that far, in their tables because the likelihood of the event being the result of a random process is too small to be meaningful.

---

[8]Sigma is a symbol statisticians use to designate standard deviation.

In Dr. Siskin's study, he found the likelihood that the age distribution of the labor force fired through the A-76 process arose by chance was a mind-blowing 14.72 standard deviations. See Ex. 1, Siskin Report at 39, Table 4. Dr. Siskin's first point of comparison was the number of Flight Service Controllers RIF'ed from among all FAA employees based on 2005 data supplied by Defendants (and also used by Plaintiffs' expert Dr. Dale Belman). See Ex. 1, Siskin Report at 39, Table 4. Not only does the statistical measure of 14.72 standard deviations demonstrate a disparate impact to a statistical certainty, but Dr. Siskin's figures on the 15.6 percent shortfall also indicate a high degree of practical significance.

Dr. Siskin mentions, but does not discuss, the idea of "shortfall" as a measure of practical significance in his report. The shortfall is the actual number of employees who would have to change to achieve a neutral, nondiscriminatory result consistent with random chance. In this case 1,957 Flight Service Controllers over 40 were RIF'ed, and 35,799 FAA employees over 40 were not RIF'ed. That means that 5.2 percent of the older employees were RIF'ed and 94.8 percent were not RIF'ed. In contrast, 150 of the Flight Service Controllers were under 40 and were RIF'ed, and 9,085 FAA employees who were under

40 were not RIF'ed. That means that 1.6 percent of younger employees were RIF'ed and 98.4 percent were not RIF'ed. The percentage of older employees who were RIF'ed is more than three times the percentage of younger employees who were RIF'ed, and the disparity in terms of standard deviations is so great that it is certain not to be a chance outcome. Dr. Siskin calculates the "shortfall" in this instance as 264 employees each way. What this means is that if 264 more younger employees had been RIF'ed (414/8,821 = 5 percent) and 264 fewer older employees (1,693/36,063 = 4.7 percent), then the results would have been roughly neutral, and there would not be statistical evidence of disparate impact. To put this number in perspective, the Plaintiffs in this lawsuit are fewer than 264 fired older Controllers.

The analysis of the overall A-76 process is Dr. Siskin at his most conservative. By comparison, when he analyzes the effects of the subsidiary practices of selection of core and non-core functions and the selection of Flight Service from among the available non-core group functions, the evidence of disparate impact becomes even starker. Under the terms of the FAIR Act P.L. 105-270 (1998), federal agencies were first expected to make determinations as to which of their functions

were "inherently governmental" and which were "commercial."
Thereafter, the agencies were expected to further divide the
commercial functions into functions that were "core" and could
not be contracted out to the private sector and functions that
were "non-core" and could be contracted out. Perversely, for
reasons explored more thoroughly below, the FAA classified some
of its Series 2152 Controllers as "core" and some as "non-core"
based on a loose set of criteria that left the FAA wide latitude
for the discriminatory decision-making that led to the
termination contracting out and termination of Flight Service
Controllers.

In statistical terms, the decision to carve up Air Traffic
Control into "core" and "non-core" had clear discriminatory
implications. Based on a comparison of the six largest
workgroups at the FAA (those over 1,101 FTE), Dr. Siskin finds
again a clear disparate impact in the process of designating
groups as "core" or "non-core" on the order of an astonishing
19.73 standard deviations. Only if 441 employees over 40 had
switched places with 441 employees under 40 would there have
been neutrality in the age distribution of employees subjected
to the RIF. Put another way, the FAA would have had to have
classified as "core" a quarter of the FAA Controllers subject

to the RIF in order to achieve a nondiscriminatory result, or approximately twice the number of employees in this lawsuit.

Finally, Dr. Siskin calculated the adverse disparate impact of the selection of Flight Service for contracting out based on the 2002 population of FAA employees. In this case, Dr. Siskin measured the disparate impact at 22.01 standard deviations. The shortfall, or number of older Controllers who would have had to be retained (and younger employees who would have had to be fired) is 527, or 27.1 percent of the Controllers fired and more than two and a half times the number of Plaintiffs in this lawsuit.

Dr. Siskin does not address one other component of the A-76 process which, if not readily quantifiable, nevertheless had a clear adverse disparate impact on the Flight Service Controllers' "aging workforce." In the usual course of events, and consistent with the past practice of the FAA, any reduction-in-force by the Agency of its federal workforce would have entitled the employees to "bump and retreat" rights under the federal RIF procedures. See 5 C.F.R. § 701ff. The FAA deliberately circumvented the usual federal RIF process through the A-76. Only by denying "bump and retreat" rights could the FAA purge its older Controller workforce. At the same time,

20

there existed no civilian equivalent of the federal Flight
Service workforce (a normal concomitant of an A-76 competition),
and hence the FAA was obliged to create an artificial
anticompetitive environment (a "monopsony"), in which the aging
Controllers had no realistic choice but to work for Lockheed,
even if it meant sacrifices in their compensation and retirement
benefits. Plaintiffs' expert, Dr. Belman, recapitulating
standard economics texts, explained in his Report and at his
deposition a fact of economic life that is simply common sense.
See Belman Report at 6-7. A young person in a highly skilled job
like Flight Service can afford to get training in another job,
and he has his whole working life ahead of him to recoup the
cost of the training. Under such circumstances, he almost
certainly will pay for retraining and make the cost back. An
older person in a highly skilled job like Flight Service,
however, may have a decade or less to work. If he elects to pay
for training in another field, he is unlikely once his training
is complete even to make up the cost of his training, much less
close the gap between what he would have made if he had not been
laid off. (For a 20-year-old, law school makes good economic
sense; for a 50-year-old, it is a more dubious proposition,
economically, assuming the two will incur the same debt.) In

light of the fact that Flight Service is a well-paid and highly
skilled   occupation,   but   that   aerial   navigation   and
meteorological skills are in demand almost nowhere else other
than in Air Traffic Control, Controllers had few palatable
alternatives other than to work for Lockheed on whatever terms
Lockheed offered. <u>See</u> Belman Report.  Controllers who did not
go to work for Lockheed generally either retired on low-end
discontinued service pensions, accepted low wage federal jobs
in the hopes of securing a retirement, or went to work at low
wage, low skill jobs like sales clerk or bricklayer. <u>See</u> Tryon
Report.  Such a result is not surprising when one considers that
despite  their  high  skill  level  and  responsible  jobs,  many
Controllers do not have a college degree.

B.  Defendants'   Only   Legal   Defense   Is "Business
     Necessity."

Unlike the remainder of the ADEA, which is based on the
Fair Labor Standards Act, Section 633a is based on Title VII of
the Civil Rights Act of 1964. <u>Lehman v. Nakshian</u>, 453 U.S. 156,
166-67 (1981).  The District of Columbia Circuit has observed
that the purpose and implication of this distinction is that the
federal prohibition of age discrimination is stricter and more

far-reaching than the provisions applying to other sectors of the economy:

> . . . Congress's actions show that it intended its mandate to reach more broadly in the federal sector than in the private sector. In amending the ADEA in 1978, Congress eliminated the upper age limit for federal employees in order to effectively end mandatory retirement in the federal sector in most instances, whereas it merely increased the coverage from 65 to 70 for private employers, limiting the protection from mandatory retirement in the private sector. See H.R. Rep. No. 95-950, at 2, 7-8, 10-11 (1978) (Conference Report); 124 Cong. Rec. 8, 218 (1978) (Sen. Javits, ranking minority member of the Human Resources Committee).

> This focus on the sweeping language used by Congress is the same reasoning that the court relied upon in holding that § 2000e-16, in which Congress waived sovereign immunity for claims under Title VII, includes a claim for retaliation. See Ethnic Employees of the Library of Congress v. Boorstin, 243 U.S. App. D.C. 186, 751 F.2d 1405, 1415 & n.13 (D.C. Cir. 1985) (citing Porter v. Adams, 639 F.2d 273, 277-78 (5th Cir. 1981)). In Porter, the Fifth Circuit explained that § 2000e-16 differs from §§ 2000e-3 and 2000e-4, which are narrowly drawn and prohibit only specific forms of discrimination, because § 2000e-16 is drafted broadly to prohibit "any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16; see Porter, 639 F.2d at 277-78. The court reasoned that "the reasonable conclusion, therefore, is that by drafting [§ 2000e-16] to prohibit 'any discrimination,' Congress intended to bar the federal government from engaging in all those forms of discrimination identified in [§§ 2000e-3 and 2000e-4], and others as well." Porter, 639 F.2d at 278; see also White v. Gen. Servs. Admin., 652 F.2d 913, 917 (9th Cir. 1981). Sections 633a and 2000e-16 use identical language in creating a cause of action for federal

> employees under the ADEA and Title VII, respectively,
> and thus should be interpreted consistently.

Forman v. Small, 271 F.3d 285, 296-97 (D.C. Cir. 2001).
Accordingly, the exceptions and defenses that apply to non-
federal age discrimination, such as observing the terms of a
bona fide seniority system or benefit plan, or discrimination
resulting from a "reasonable factor other than age" (see Section
623(f)), are not available to the federal government. Valaris
v. Army & Air Force Exchange Service, 577 F. Supp. 282 (N.D.
Cal. 1983). Age discrimination in the federal government is
treated exactly like discrimination on the basis of race, sex,
or other Title VII-protected groups.

The courts have long recognized that discrimination can
take two forms: disparate treatment, in which the plaintiffs are
targeted because of their membership in a protected class, and
disparate impact, in which the members of a protected class are
disproportionately affected by a practice which, on its face,
appears to be neutral and without discriminatory purpose. The
seminal case on disparate impact is Griggs v. Duke Power Co.,
401 U.S. 424 (1971). In Griggs, the defendant power company
required applicants for employment in any department but Labor
(which were the lowest-salary jobs) either to have a high school

diploma or to pass an intelligence test for which the cut-off score approximated that of high school graduates. Neither qualification was shown to be particularly related to any specific job.  In North Carolina at that time, 34 percent of whites had high school diplomas, compared to only 12 percent of African Americans, and 58 percent of whites passed the intelligence test as opposed to six percent of African Americans.  Finding that the tests or possession of a diploma were not rationally related to the jobs for which they were required, and that African Americans were disproportionately affected by these tests, the Court found them barred by the Civil Rights Act:

> What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.
>
> . . . The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

401 U.S. at 431.  The Court went on:

> [G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms

that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability.

. . . More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question.

Id. at 432.  In Smith v. City of Jackson, 544 U.S. 228 (2005), the Supreme Court made clear that employment practices with a disparate impact upon older workers are prohibited by the ADEA.

The many cases on disparate impact describe the factors that must be demonstrated to prevail in such a case.  Anderson v. Zubieta, 180 F.3d 329, 338-39 (D.C. Cir. 1999) provides a clear exposition:

In a disparate impact case, a three-step, burden-shifting framework is also employed. As with disparate treatment, the plaintiff must first make out a prima facie case. Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). This "may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group." [International Bhd. of Teamsters v. United States, 431 U.S. 324, 349 [1970]. In the second step, the burden shifts to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2 (k)(1)(A)(i); see Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Finally, if the defendant demonstrates business necessity, plaintiffs must be given an opportunity to demonstrate that an alternative employment practice could meet the employer's legitimate needs without a similar discriminatory effect. See 42 U.S.C. §

> 2000e-2(k)(1)(A)(ii); <u>Albemarle Paper Co.</u>, 422 U.S. at
> 425.

On the same page, in footnote 12, the Court added that, "[f]or
the purposes of the disparate impact test, Title VII defines the
term 'demonstrates' as 'meets the burdens of production and
persuasion.' 42 U.S.C. § 2000e(m)." <u>Anderson</u>, 180 F.3d at 339.

In this context, there are two important concepts to be
observed.  The first is that, because this case is brought
pursuant to Section 633a, not Section 623, the only possible
defense is "business necessity," not, as in private sector cases
brought under the latter section, a "reasonable factor other
than age." <u>Valaris v. Army & Air Force Exchange Service</u>, <u>supra</u>,
577 F. Supp. at 286-88 and n. 1.  The second is that "business
necessity" is a very high standard:

> "Business necessity" is more than mere convenience to the
> employer.
>
> [T]his doctrine of business necessity, which has
> arisen as an exception to the amenability of
> discriminatory practices, "connotes an irresistible
> demand." The system in question must not only Foster
> safety and efficiency, but must be Essential to that
> goal.  *  *  *  In other words, there must be no
> acceptable alternative that will accomplish that goal
> "equally well with a lesser differential . . .
> impact." (<u>United States v. St. Louis-San Francisco Ry.
> Co.</u>, 464 F.2d 301, 308 (8th Cir. 1972), <u>cert. denied</u>,
> 409 U.S. 1116, 93 S. Ct. 900, 34 L. Ed.2d 687 (1973).)

Green v. Missouri Pacific R. Co., 523 F.2d 1290, 1298 (8th Cir. 1975).   This is completely consistent with the categorical instruction in Section 633a that employment practices in the federal government "shall be made free from any discrimination based on age."

It is absolutely clear that the mere fact that a non-discriminatory alternative is more costly (or produces smaller savings) than the discriminatory practice does not fulfill the "business necessity" requirement.   It is intuitively obvious that in every disparate impact case that involves compensation, continued discrimination will always be less expensive, sometimes significantly so, than equal treatment, yet courts do not permit the tainted practice to continue on that basis.   In City of Los Angeles v. Manhart, 435 U.S. 702 (1978), the Supreme Court rejected an argument that women could be required to pay more into a pension fund than men because

> there is a like difference in the cost of providing
> benefits for the respective classes.  That argument
> might   prevail   if   Title   VII   contained   a
> cost-justification   defense   comparable   to   the
> affirmative   defense   available   in   a   price
> discrimination suit.   But neither Congress nor the
> courts have recognized such a defense under Title VII.

Id. at 716-17 (footnotes omitted); accord, Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 685 n. 26

(1983); Laffey v. Northwest Airlines, Inc., 740 F.2d 1071, 1082 (D.C. Cir. 1984). Similarly, it is not a defense to a disparate impact under the ADEA to aver that the savings will be diminished if older employees are treated fairly.

A few examples suffice:  In Segar v. Smith, 738 F.2d 1249 (D.C. Cir. 1984), the Agency's requirement that a prospective employee have an additional year of law enforcement experience for GS-9 positions, versus GS-7 positions, unquestionably saved substantial salary expenses for the DEA but was considered a discriminatory impact by the Court.  Similarly, in Anderson v. Zubieta, 180 F.3d 329 (D.C. Cir. 1999), it was clear that the Panama Canal Commission saved money by not extending retention and recruitment incentives to black employees and those of Hispanic or Panamanian origin.  The discriminatory practices were not allowed to continue merely because elimination of the disparate impact would be more expensive than not eliminating it.  Similarly, in Valaris v. Army & Air Force Exchange Service, supra, the district court invalidated an employee benefit package that eliminated long-term disability benefits for employees aged 62 or older, although it was certainly less expensive not to purchase such benefits for older employees.

## C. Defendants' Business Rationalizations Cannot Be Credited.

Defendants offer three major rationalizations in the name of business necessity: 1) a wholly new history of Flight Service, described in their Motion, in which the FAA wanted to get out of the declining business of Flight Service, 2) a spurious distinction between different kinds of Air Traffic Controllers based on an <u>ad hoc</u> Reason Code analysis that served as a cover for discrimination, and 3) a disingenuous cost/benefit analysis that overstated savings, ignored clear technical and organizational hurdles, and served as a cover for firing older controllers while covertly retaining younger ones.

### 1. Defendants' Self-serving "new history" of Flight Service Cannot be Credited.

In their Motion for Summary Judgment, Defendants have concocted a wholly novel defense based on the questionable premise that general aviation was in decline and demand for Flight Service so low that the FAA simply decided to "get out of the business" of providing Flight Service. Defendants do not explain how letting a multi-billion single-source contract constitutes "getting out of the business" of Flight Service, but perhaps this is because no one involved in the A-76 process

articulated a need to "get out of the business" at the time.
If anything, they were paying lip-service to improvement. The
idea that the FAA wanted to get out of the business of Flight
Service the way a leather manufacturer might want to get out of
making buggy whips in order to manufacture flight suits is
simply a defense lawyer's post hoc rationalization, one that is
particularly poignant in light of the fact that the FAA truly
has wrecked Flight Service in its zeal to shed its older
Controller workforce.

The FAA's actual reasons articulated at the time were 1)
compliance with the FAIR Act and the President's Management
Agenda and 2) cost savings. On June 19, 2002, Chris Bertram,
then Chief Financial Officer of the FAA, announced by memorandum
to the then-Acting Administrator, Jane Garvey, that he had
determined to hold an A-76 competition to determine if the
Flight Service could be more effectively provided by a private
contractor than by the federal government. Ex. 8, Dkt. # 256-12.
(In fact, the decision to compete the Flight Service had been
made in late 2001. Jackson-Brame Dep. at 94-96.) The ostensible
reasons for this competition were the need to reduce the cost
of Flight Service, allegedly exacerbated by an aging workforce

31

and aging facilities and equipment, and the need to comply with
the President's Management Agenda ("PMA").  The Office of
Management and Budget ("OMB") interpreted the PMA to require
each federal Agency to compete or directly convert to private
contract at least 15 percent of its "commercial" activities (as
defined in the Agency's inventory for the Federal Activities
Inventory Report Act — "FAIR Act") by 2003 and eventually a
total of 50 percent of such activities. OMB Competitive Sourcing
Plan, Dkt. # 256-11, at p. 7 of 14, Ex. 11; Dkt. # 256-12, Ex.
8.  Even among "commercial" activities, however, not all
functions of an Agency are subject to competition. The OMB has
provided a list of "Reason Codes" (Ex. 11) that permit some
activities to be classified as "core" missions of the Agency and
not subject to outsourcing, Reason Code "A."  Activities coded
as "B" are suitable for competition under Circular A-76.  At the
FAA, prior to 2002, Reason Codes were generally assigned by the
offices that reported their statistics for FAIR Act purposes.
As a result, both Flight Service Controllers and other Air
Traffic Controllers (Tower and En Route) were inconsistently
coded, sometimes A and sometimes B. Hennigan I Dep. at 60, 70-
73; Page Dep. at 44. In 2002, however, after the decision to

32

subject the Flight Service to competition, the Flight Service Controllers were all assigned Reason Code B; the Tower and En Route Controllers were all assigned Reason Code A. Hennigan I Dep. at 80; Page Dep. at 44, 74-75; Mineta Memorandum, Dkt. 256-29, P01267-P01271.

Because no private workforce existed for the performance of Flight Service, the bid solicitation (called a Screening Information Request, or SIR) was designed to provide a workforce to the successful bidder.  Bidders were required to offer jobs to existing Flight Service Controllers before hiring from the general public (see SIR, at 5, Ex. 15) and bidders were told that the FAA would retain in other positions only a minimal number of the approximately 2,300[9] Flight Service Controllers. See Sturm Dep. at 15-21, Ex. 16.  The existing employees were also told that options for other jobs in the Agency would be limited because of the need to provide a workforce to the winning bidder. See Briefer, Ex. 18, at P01288.

There were five competitors for the contract, including the winning bidder, Lockheed, and the existing FAA Controllers,

_____

[9]    As of October 3, 2005, the effective date of the RIF, 2,300 Controllers were released from Flight Service.  Ex. 5 to Williams Dep.

33

known as the MEO (an abbreviation for "Most Efficient Organization"). Of the bidders, only the MEO had an existing workforce. Lockheed won the award, despite not being the lowest bidder, and on July 19, 2005 it was announced that the entire work force would be terminated in a reduction-in-force to take effect on the first day of the Lockheed contract, October 3, 2005. See RIF Notice, Ex. 19. Of the 2,300 Controllers subject to the RIF, 308 found other Air Traffic Controller ("ATC")[10] jobs in the FAA, 159 found non-ATC jobs in the FAA or elsewhere, 127 retired voluntarily,[11] and the remainder were either involuntarily retired — mostly with reduced benefits because they had not attained the necessary age for a full ATC retirement — or simply lost their federal jobs. Of those who are Plaintiffs in this case and thus over 40, the vast majority of those who were subject to the RIF were within a short period

---

[10]   Because Air Traffic Controllers, along with certain law enforcement positions, are subject to a mandatory retirement age, they pay into the federal retirement system at an increased rate and in return receive an augmented retirement benefit that allows them to retire at an earlier age than employees not so affected.

[11]   This figure includes three mandatory (age 56) retirements, 13 disability retirements, 11 resignations, two terminations not resulting from the contract award, and two deaths.

of attaining the necessary combination of age and years of service for an ATC retirement.[12]  Of course, with the exception of those who voluntarily retired, even those who received retirements are deprived of the opportunity to have a larger retirement payment throughout their lives based on a larger "high three" that would have been attained had they continued to work for the federal government.

Approximately 1,900 Controllers initially went to work for Lockheed.  See Sturm Dep. at 20-21, Ex. 16.  However, as Lockheed has closed legacy sites and reduced the number of Flight Service Controllers, hundreds of these Controllers have also lost their Lockheed jobs.  Even those who retained their jobs (except those who were eligible for some form of retirement) have no retirement benefits (other than a modest contribution to a 401-K fund), have had no cost-of-living increases, and, once they

---

[12]  An Air Traffic Controller can retire with full benefits, based on his or her highest three years of salary, at age 50 with 20 years of ATC service or at any age with 25 years of ATC service.  Those who have at least 20 years of service but are forced out by elimination of their jobs, as in this case, qualify for a discontinued service retirement ("DSR"), in which their retirement benefit is permanently reduced for each year they were short of 20 years. Employees who had attained 30 combined ATC and non-ATC years of service were entitled to a non-ATC retirement, but they are disadvantaged by having paid into the system a larger employee contribution than similarly retired persons who have never been Air Traffic Controllers.

leave Lockheed, will have no health benefits.  The calculations by Plaintiffs' damages expert, Dr. Joseph Tryon, indicate that the combined loss of income and benefits totals thousands of dollars for each Plaintiff, and in many cases, hundreds of thousands of dollars. <u>See</u> Tryon Report, Ex. 6.

In this case, the facially neutral practice at issue is the A-76 process to which the Flight Service was subjected. Although the fact as to whether the Flight Service was targeted because it contained disproportionately older employees (the "aging workforce") is disputed,[13] Defendants now assert <u>post hoc</u> that the motivation for selecting the Flight Service for the A-76 process was two-fold:

1) <u>Expense</u>.  Defendants assert that the Flight Service cost over $500 million per year to maintain,[14] that many of its

---

[13]  As explained elsewhere, Defendants' officials gave at least two PowerPoint presentations touting the advantages of the A-76 that listed as a primary reason for the competition the existence of an "aging workforce" in the Flight Service. See, e.g., D007311-D007319; D007682-D007698, Ex. 20.  Subsequently, perhaps because of the blatant discrimination inherent in this characterization, the phrase "aging workforce" was replaced with "retirement-eligible workforce" (<u>see</u> D007189-D007199, Ex. 20), a manifestly untrue statement, since only 356 of the 2,300 Flight Service Controllers qualified for the full ATC retirement toward which they had been working. Ex. 5 to Williams Dep.

[14]  In his June 18, 2008, deposition ("Hennigan II Dep."), John Hennigan, Deputy Chief Financial Officer for the FAA,

components were already commercially available elsewhere and thus no longer needed to be provided by the government, and that the existence of 58 facilities in the lower 48 states was unnecessary as well as expensive.  The FAA further asserts that OMB refused to authorize the expenditures necessary to fully deploy its essential new computer system, OASIS, unless the Flight Service was consolidated to significantly fewer stations.

2) The President's Management Agenda.  Defendants assert that the PMA required them to compete 15 percent of their commercial functions, that only six or seven functional groups that were coded B ("non-core," suitable for competition) contained enough full-time equivalent employees to satisfy the 15-percent requirement, and that Flight Service was the most

---

acknowledged that, except for the cost of personnel compensation and benefits ("PC&B"), which totaled about $300 to $500 million annually, the Agency had no good idea of the true cost of maintaining the service. Hennigan II Dep. at 38-39, 56-59. Moreover, as demonstrated elsewhere in this Memorandum, the maintenance cost of facilities and equipment has been significantly exaggerated by the Defendants.  Finally, it is evident that most of the savings could have been realized through a consolidation plan that did not involve an A-76; such plans were proposed by Coopers & Lybrand, the FAA's Flight Architecture Working Group, the Office of the Inspector General, and NAATS ("National Association of Air Traffic Specialists"), the Flight Service Controllers' Union, which presented its proposal in 2003. See NAATS proposal, Ex. 42.

logical of these based on the expense factors described above.[15]

Defendants — and particularly Defendants' expert, Dr. Siskin, — insist that the disparate impact created by the contracting out of the Flight Service was an inevitable and unavoidable result of the fact that Tower and En Route Controllers were not subject to competition, because they had been assigned Reason Code "A" ("exempt from the cost comparison requirements" of Circular A-76; Ex. 11), whereas Flight Service Controllers were assigned Reason Code "B" ("subject to the cost comparison . . . requirements";), and thus one of the few large groups of employees whose functions were subject to competition. See Siskin Report, Ex. 1.  However, the evidence shows that 1)

---

[15]  Most of these facts are disputed as well.  Although OMB did set a 15 percent target for the end of 2003, it also set an eventual target of 50 percent of all commercial activities, yet FAA never again designated any function for an A-76 competition or direct conversion.  Because there were no standards for what activities were "core" and what were "non-core," the assertion that only seven non-core groups contained enough employees is highly suspect, as is the decision that a highly specialized workforce, some of whose major functions have never been performed commercially in the United States, is suitable for outsourcing.  Additionally, although Defendants argue that it is simpler to outsource one function of over 2,300 employees rather than two or three functions containing fewer employees, the size and complexity of the Flight Service A-76 is acknowledged to be sui generis and obviously greater than a larger number of competitions of such traditionally-outsourced functions as Human Resources.

the FAA's decision to subject the Flight Service to an A-76 competition (in 2001) was made before the Reason Codes of the different types of Air Traffic Controllers diverged (in 2002); and 2) there were no principled criteria for the assignment of Reason Codes; rather, the  designations were without rational basis, and were assigned solely for the purpose of justifying the decisions to compete or not to compete the different types of Air Traffic Controllers, rather than being the basis of those decisions.

The Federal Activities Inventory Reform Act ("FAIR Act"), 31 U.S.C. § 501 note, requires agencies annually to report which of their functions are "inherently governmental" and which are "commercial" in nature.  The Office of Management and Budget has further refined the Act to require that agencies assign "Reason Codes" to their activities that are commercial, to indicate which activities are subject to cost comparisons with private contracting pursuant to Circular A-76 and whether such comparisons have been done. Ex. 11.  OMB provides the following definitions of Reason Codes A and B:

> A - Indicates that the function is performed by Federal employees and is specifically exempt by the agency from the cost comparison requirements of the Circular and this Supplement.

This Reason Code is designed to permit the Agency Head to identify specific commercial activities as those that he/she does not believe should be subjected to privatization, outsourcing or competition. Certainly, these are core mission activities that are commercial in nature. Many core activities may however, be achieved through contract support and may also be found in Reason Code "B" or "C." Functions assigned Reason Code "A" are commercial functions that the Agency Head has determined must remain in-house.

B - Indicates that the activity is performed by Federal employees and is subject to the cost comparison or direct conversion requirements of the Circular and this Supplement.

This Reason Code should be applied to any Function or Activity where the decision as to who should perform the work is a quality and cost based decision and the agency would expect that this decision would be based upon the results of a direct conversion competition (when authorized), or a cost comparison, conducted in accordance with OMB Circular A-76 and its Supplemental Handbook.

Ex. 11.

Ronald Page, who worked in the finance office of FAA, was the project manager for OMB circular A-76 and implementing A-76's requirements within the FAA from 1999 until his retirement in 2004. Page Dep. at 16-17.   He explained the process of compliance with FAIR Act requirements as follows:

Every year in June the Agency was required to submit an updated, revised FAIR Act inventory to the Department of Transportation. Preparation began in January. Page Dep. at 24.  Page would send

the requirements for data to all of the major offices within FAA and ask them to submit data to him about their organizations. The data they submitted was the number of full-time equivalent positions that performed each activity in that office.  The responding offices made the determination of whether an activity was commercial or inherently governmental, and what Reason Code should be assigned to each activity. Id. at 25-26; Hennigan Dep. at 59-60.  The information was then consolidated into an FAA-wide database. Page Dep. at 27.  However, because each office made its own determination of Reason Codes, the result was substantial inconsistency in the assignment of Reason Codes to the same functions in different regions, some being coded A in one region and B in another.  Page Dep. at 30; Hennigan Dep. at 59-60, 71-72.

On December 7, 2000, the President issued Executive Order 13180, which ordered the reorganization of the FAA to create the Air Traffic Organization, and which explicitly described all Air Traffic Control Functions as "inherently governmental." Ex. 21. That all Air Traffic Control functions should be viewed the same way is inherent in the statutory definition of Air Traffic Controllers in 5 U.S.C. § 2109(1):

41

(1) "air traffic controller" or "controller" means a civilian employee of the Department of Transportation or the Department of Defense who, in an air traffic control facility or flight service station facility—

(A) is actively engaged—

(i) in the separation and control of air traffic; or

(ii) in providing preflight, inflight, or airport advisory service to aircraft operators; or

(B) is the immediate supervisor of any employee described in subparagraph (A)

Clearly, Congressional intent was that all Controllers are comparable.

Given the existence of the Executive Order, one would anticipate that the 2001 FAIR Act inventory would describe all Air Traffic Controllers as "inherently governmental." That did not occur, however; instead, the 2001 inventory coded all Air Traffic Controllers (Flight Service as well as Tower and En Route) as commercial, Reason Code A. Hennigan Dep. at 74-75.

Despite both the Executive Order and the FAIR Act designation of Flight Service as not subject to A-76 cost comparisons, the decision was made in late 2001 to subject the Flight Service to an A-76 competition. Marilyn Jackson-Brame, who had been made Flight Service Division Manager (Jackson-Brame

42

Dep. at 33), testified that she was called to a meeting in the fall of 2001 and was told that "Flight Service was a strong likelihood for competition" and "that it was a decision that was being made because of the President's Management Agenda." Id. at 64-65.[16]  She was instructed to become well-versed in A-76 procedures. Id. at 65.

The next FAIR Act inventory, for 2002 — *after* the decision had been made to compete the Flight Service — designated Flight Service Controllers as Reason Code B and all other Controllers as Reason Code A. Hennigan Dep. at 80, Ex. 12.  At this point, however, there remained certain Flight Service functions that were designated as "inherently governmental," those associated with the issuance of NOTAM-Ds.  Ex. 22, Grant-Thornton Report, P00881.  NOTAMs ("Notices to Airmen") are advisories to pilots concerning flight restrictions (for security reasons), major hazards (such as forest fires), or "outages" (unavailability of facilities) in the National Airspace.  Id. at P00877-P00800.[17]

_____

[16]  Ms. Jackson-Brame initially identified the meeting as having taken place in late 2002, but corrected herself when it was called to her attention that the Grant-Thornton "feasibility study" took place in 2002, because the meeting took place before Grant-Thornton became involved in the A-76. Id. at 95-96.

[17]  NOTAM-Ls are advisories that are purely local in nature, such as a deer on a runway. Jackson-Brame Dep. at 37-38.

43

The collection and dissemination of this data is considered to have national security implications, and the activity was considered through mid-1993 at least to be inherently governmental.    Curry Dep. At 15-17, 20-23; Grant-Thornton Report, at P00881; Memorandum from Associate Administrator for Air Traffic Services to Associate Administrator for Financial Services, Apr. 9, 2003, P00913-914.   During the time the 2002 inventory was being prepared, Executive Order 13180 was amended to remove the designation of Air Traffic Control functions as inherently governmental.   The purpose of the amendment to the Executive Order was to avoid requiring the FAA to discontinue its contract tower program, the program under which approximately 200 control towers in smaller markets are operated by private contractors with privately employed controllers.

There is no clear-cut explanation of who made the decision to designate Flight Service Controllers as Reason Code B while retaining Reason Code A for other Controllers.   John Hennigan, then the FAA's Deputy Chief Financial Officer, stated that the decision was made jointly by the CFO ("Chief Financial Officer"), Deputy CFO, and the Air Traffic Organization, but was then sent to the Administrator and the deputies. Hennigan Dep.

44

at 100.  Christopher ("Chris") Bertram, at that time the Chief Financial Officer, testified that he did not remember that the Reason Code for Flight Service had been changed or having any involvement in the assignment of a Reason Code to Flight Service. Bertram Dep. at 96-98.   Steven Brown, who was the Deputy Associate Administrator for Air Traffic Services, stated that he had no personal involvement in the assignment of a Reason Code to Flight Services. Brown Dep. at 27-28.   Ronald Page, who — as noted above — was in charge of collecting the data for the FAIR Act inventory, testified that when the draft 2002 inventory left the finance office, the Flight Service was assigned Reason Code A, but that it was assigned Reason Code B in the final version of the inventory.  Page Dep. at 74-75. He did not know why. Id.

Nor does there exist any clear and consistent statement as to why the Flight Service was re-classified as Reason Code B. John Hennigan, Ronald Page, and Steven Brown all agree that no documents exist to explain the change.[18] Hennigan Dep. at 100-01; Page Dep. at 48; Brown Dep. at 31.

---

[18]  Mr. Hennigan did prepare a draft of the document that designated Tower and En Route Controllers as Reason Code A. Page Dep. at 46.

Mr. Hennigan attempted to justify the Reason Code, but his explanations are inconsistent with other known facts. One reason he gave was the recommendations of the Office of the Inspector General and of Coopers & Lybrand that the Flight Service be consolidated, but neither of the recommendations recommended that the service be performed by non-governmental entities and Mr. Hennigan gave no reason that necessarily connected consolidation with an A-76 study. <u>Compare</u> Hennigan Dep. at 80-82 <u>with</u> Coopers & Lybrand Report (Ex. 26); 2001 Report of Inspector General at 4 (Ex. 27). Mr. Hennigan also stated that many of the same services provided by Flight Services were already being provided by DUATS and other private services. Hennigan Dep. at 82-83. However, Mr. Hennigan did not appear to realize that Flight Plans filed through DUATS are forwarded to the Flight Service (<u>compare</u> Hennigan Dep. at 86 <u>with</u> Jackson-Brame Dep. at 24) and could not name any other specific functions that were performed in the private sector. Hennigan Dep. at 85-86. In fact, from the very beginning of the A-76 process, the FAA's Office of Competitive Sourcing made it clear that a substantial part of the existing workforce would have to be employed by whatever entity won the competition, precisely because there was no entity providing the

Flight Service functions to most of general aviation.  As Joann Kansier, the head of the Office of Competitive Sourcing testified,

> you couldn't just hire people off the street to do this job, so whoever [won] had to be able to hire the people that were actually working in the Flight Service Stations. . . .  This was a skilled and certified position, so the people who were doing it had to remain doing it.

Kansier Dep. at 118; <u>see</u> <u>also</u> Screening Information Request ("SIR") at 5, Ex. 15; Briefer, at 4, P01288, Ex. 18.  By necessary logical implication, if there was no skilled workforce available to perform the Flight Service functions, that means that many of these functions were not in fact being performed by the private sector as claimed by Mr. Hennigan.

Steven Brown, who headed Air Traffic Services, also gave unconvincing and self-contradictory explanations of why Reason Code B was more appropriate for Flight Service Controllers than for Tower and En Route Controllers.  Mr. Brown defined a "core" service of the FAA as

> one that's critical to the safety and the continuation of air navigation in the United States.  Without air navigation, there is certainly an impediment to commerce and the efficient delivery of people and goods.  So one of the core missions of FAA is to provide that safe air navigation service both for

> supporting the national defense as well as supporting
> the national economy.

Brown Dep. at 37.   In his Memorandum concerning the 2003 NAATS

challenge to the FAIR Act inventory,[19] P00913, <u>supra</u>, Mr. Brown

wrote:   "The functions performed by FAA specialists support the

FAA's mission of aviation and security," and noted that functions

relating to NOTAM-Ds are inherently governmental.[20]   Yet he stated

that Flight Service is not a "core" mission of the FAA because

Flight Service Controllers do not separate aircraft, which is the

function of Tower and En Route Controllers. Brown Dep. at 47-48.

He acknowledged, however, that at some towers in the United

States (as well as in other countries), that function is already

provided by private contractors. <u>Id.</u> at 46-47.   Brown stated that

---

[19]   The NAATS challenge took issue with the designation of
Flight Service as "commercial" rather than "inherently
governmental" and did not deal with Reason Codes at all.   While
there are sound arguments to be made that Air Traffic Control
services are inherently governmental, the purpose of this issue
is whether — regardless of whether Air Traffic Control is
commercial or inherently government — there is any rational
justification for designating one type of Air Traffic Controller
as suitable for A-76 competition while recognizing that most Air
Traffic Control functions are not suitable for A-76 competition.

[20]   Although many witnesses purported not to know that
NOTAM-D functions are now performed by Lockheed, despite
widespread agreement that they are inherently governmental,
<u>e.g.</u>, Brown Dep. at 76, that is the case. <u>E.g.</u>, Reimann Dep. at
137-38.

"ensuring the separation of aircraft makes the system available for commerce as well as ensuring the facilities and safe navigation for national defense" was a "core" function, and acknowledged that flight planning, advisory, and search and rescue[21] also made the system available for commerce and safe navigation, but stated that these were not core because they did not involve the separation of aircraft. Id. at 49.  Brown argued that large companies that utilize general aviation do not utilize Flight Service (Id. at 52-43), although that is contradicted by the testimony of working Flight Service Controllers (e.g., Reimann Dep. at 78-79, 115-16, 174-75), and essentially argued that safety and efficiency are not important to private pilots because they have no published schedules.  Brown Dep. at 53-56. Eventually, he acknowledged that the importance of efficiency to general aviation was something he could only judge from his personal experience as a pilot.  Id. at 56.

In this context, it is important to note that Ronald Page testified that, in the performance of his duties, he utilized the draft 2002 FAIR Act Inventory to compile a list of eleven commercial activities of the FAA that were available to be

---

[21]Search and rescue requires local and state law enforcement and the U.S. Air Force to look for missing planes.

considered for A-76 competition. Page Dep. at 22-23 and D003770-D03773; see also Hennigan I Dep. at 55.   The list does not include the Flight Service.

Finally, it was only after the completion of the 2002 inventory and long after the decision to compete the Flight Service that Secretary Mineta issued his formal determination that Tower and En Route services are a core capability that must be exempt from A-76 procedures. P01267-P01271.

Accordingly, there was nothing inevitable or even particularly logical about the designation of Flight Service as Reason Code B and the remaining Air Traffic Controllers as Reason Code A.  It is clear that the Reason Code for Flight Service was changed in 2002 to justify the 2001 decision to compete the Service.

## III. Plaintiffs Are Entitled to a Trial to Prove that They Were Subjected to Illegal Disparate Treatment Based on Age.

In order to obtain summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine what facts are "material," the Court must look to

the substantive law on which each count or claim rests. <u>Anderson</u> <u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A "genuine issue" exists if the resolution of that issue could establish an element of a claim or defense and, therefore affect the outcome of the action. <u>Celotex</u>, <u>supra</u>, 477 U.S. at 322; <u>Anderson</u>, <u>supra</u>, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. <u>Id.</u>; <u>accord</u>, <u>Adickes v. S.H.</u> <u>Kress & Co.</u>, 398 U.S. 144, 158-59 (1970).   Morever, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the district court should view summary judgment motions in such cases with special caution. <u>Aka v. Washington Hosp. Ctr.</u>, 116 F.3d 876, 879-80 (D.C. Cir. 1997) (<u>aff'd en banc</u>, 156 F.3d 1284 (D.C. Cir. 1998)); <u>Johnson v.</u> <u>Digital Equip. Corp.</u>, 836 F. Supp. 14, 18 (D.D.C. 1993).

Disparate treatment claims are analyzed under the three-part framework set forth in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

> Under   the   <u>McDonnell-Douglas</u>   framework,   the
> complainant must first establish a prima facie case of
> prohibited discrimination. <u>See</u> <u>McDonnell-Douglas</u>, 411
> U.S. at 802, 93 S.Ct. 1817. Once he has done so, the

burden then shifts to the employer to articulate
legitimate, nondiscriminatory reasons for the
challenged employment decision. See id. Should the
employer succeed in presenting such reasons, the burden
then shifts back to the complainant, who then has an
opportunity to discredit the employer's explanation.
See id. at 804-05, 93 S.Ct. 1817.

Aka v. Washington Hosp. Ctr., supra, 156 F.3d at 1288.

The District of Columbia Circuit has clearly established

what is required for a *prima facie* case of discrimination:

> [A] plaintiff makes out a prima facie case of
> disparate-treatment discrimination "by establishing
> that: '(1) she is a member of a protected class; (2)
> she suffered an adverse employment action; and (3) the
> unfavorable action gives rise to an inference of
> discrimination.'" Stella v. Mineta, 284 F.3d 135, 145
> (D.C. Cir. 2002) (quoting Brown v. Brody, 199 F.3d 446,
> 452 (D.C. Cir. 1999)). One method by which a plaintiff
> can satisfy the third prong of this test is by
> demonstrating that she was treated differently from
> similarly situated employees who are not part of the
> protected class. See Holbrook v. Reno, 196 F.3d 255,
> 261 (D.C. Cir.1999).

George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005).

At the summary judgment stage of a discrimination case, the

Judge's function is not to weigh the evidence, but to determine

whether there is a genuine issue for trial. Credibility

determinations, weighing the evidence, and drawing legitimate

inferences from the facts are functions reserved to the trier of

fact, inappropriate at the summary judgment stage. Id. at 410,

413.   To establish a *prima facie* case, a plaintiff needs to show merely that the unfavorable action gives rise to an inference of discrimination, not that there is undisputed proof of such discrimination.  Summary judgment will be affirmed only where no factfinder, hearing the evidence the plaintiff proposes to present, could find in plaintiff's favor.  Mastro v. Potomac Electric Power Co., 447 F.3d 843, 855 (D.C. Cir. 2006), cert. denied, 549 U.S. ___ (Jan. 16, 2007); Salazar v. Washington Metro. Transit Auth., 401 F.3d 504, 505, 507 (D.C. Cir. 2005); Aka v. Washington Hosp. Center, supra, 156 F.3d at 1289-90.

Especially where the disparate treatment is alleged by group of plaintiffs, the Supreme Court has long recognized that statistical proof can establish a *prima facie* case of discrimination.  International Brotherhood of Teamsters v. United States, 431 U.S. 324, 339 (1977).   The Teamsters Court additionally recognized the force of anecdotal evidence in conjunction with statistics.  Id.

In this case, Plaintiffs' *prima facie* case is virtually undisputed.   Plaintiffs are a protected class (older than 40 years of age), and they suffered an adverse action (termination of their federal employment).   Significantly, however, both

Plaintiffs' *and Defendants'* expert witnesses agree that the statistical evidence gives rise to an inference of discrimination, in that — as discussed above at pages 5 to 22 in great detail — it demonstrates conclusively that the A-76 and concomitant RIF impacted older workers to a far greater extent than younger workers, resulting in the termination of older workers far out of proportion to their numbers.  In addition, there is significant non-statistical evidence that supports the inference that the disparate impact is not an accidental by-product of legitimate managerial decisions, but rather an intentional course of action by Agency officials.  The burden of a *prima facie* case having been met, it is the obligation of Defendants to provide a non-discriminatory explanation.

Although Defendants have put forth what they contend to be legitimate non-discriminatory reasons for the disproportionate termination of the older Controller workforce, the facts to which they point in support of those reasons are subject to significant dispute. There are also a number of facts, many incontrovertible, to indicate that the proffered non-discriminatory reasons are pretext, and that the RIF was the result of disparate treatment because of Plaintiffs' age.

54

A.   **The Facts Show Disparate Treatment**.

1.   **The statistical evidence.**

As explained above at pages 5 and following, Plaintiffs' expert witness, Dr. Belman, compared ages of the population of the Flight Service Controllers to those of several different populations with the FAA, and concluded that, to a statistically significant degree, the Flight Service workforce was older than the comparator populations, and that the difference cannot be explained by random selection. See Belman Report., passim. Further, Dr. Belman compared the ages of those Flight Service Controllers who were rehired by the FAA to those who were not rehired, and discovered that those rehired, too, were younger to a statistically significant degree.  Belman Report. at 5-6, 14.[22]

Strikingly, although Defendants' expert, Dr. Siskin, does not agree that the statistics are indicative of discrimination, he does agree that there is a very strong statistical indicator of a disparate impact on older workers. See Siskin Report. at 3, 19; Siskin Dep.

_____

[22]  As has already been noted, the issue with regard to the retained/rehired workers is not whether Plaintiffs have made a claim of discriminatory refusal to hire.  Rather, the point is that firing all workers and rehiring exclusively younger workers is a slightly more sophisticated form of ridding oneself of the older workers, and is equally unlawful.

Accordingly, the statistical evidence in this case raises a strong inference that age discrimination occurred.

**2.   The Non-Statistical Evidence.**

Were it not for the fact that the rehired Controllers were younger than the other Controllers, it might be said that the statistical evidence could equally evidence of disparate impact on or disparate treatment of the older workers.   However, the non-statistical evidence in this case provides a powerful implication that the discrimination against the older Controller workforce was intentional.

**a.   The "Aging Workforce" and the "Retirement-Eligible Workforce"**

Among the most striking evidence of intentional discrimination on the part of Defendants are the presentations they gave in promoting the A-76 process for Flight Service.   In two separate slide presentations, one on January 12, 2003, (P01128ff., at P01155) and one on June 25, 2003 (P01176ff., at P01179), prominent in the list of reasons for the A-76 is Flight Service's "aging workforce."   A subsequent slide presentation and a FAA web page used the more diplomatic term, "retirement eligible workforce" to describe one of the reasons for the A-76, P04428, P00003.   FAA Administrator Marion Blakey, who must be

presumed to speak for the Agency, in the prepared text of a speech, also listed the "retirement eligible" workforce as a reason for the A-76, P01166, and in a different presentation described the alleged retirement eligibility of 40 percent of the Flight Service workforce[23] as a "dilemma."[24] P00633.

In their summary judgment brief, Defendants attempt to flee this blatant display of age-ism by contending that the "aging workforce" was not a reason of the decision-makers, but rather a creation of Joann Kansier, the head of the Office of Competitive Sourcing. However, it is simply not believable that Joann Kansier, who had no intimate acquaintance with the Flight Service prior to being named director of the Office of Competitive Sourcing, would have decided on her own initiative that the aging workforce was a primary reason for the competition. She was not the first FAA employee to use the term "aging workforce." The first slide presentation in which it appears was made before she

---

[23]  In fact, as the chart prepared by George Williams demonstrates, far less than 40 percent (i.e., 15 percent) of the Flight Service Controllers were eligible for the full ATC retirement for which they had been working. Ex. 5 to Williams Dep.

[24]  By contrast, the fact that a large number of Tower and En Route Controllers are nearing retirement age was cited by Secretary Mineta as a reason *not* to subject those services to an A-76 study.

joined the A-76 effort.  Jack Nimmo, formerly a manager at the Jonesboro, Arkansas, Flight Service Station who worked with Ron Page and Marilyn Jackson-Brame, testified in deposition that in 2001 he was detailed to a group of FAA employees developing a feasibility study of an A-76 competition of the Flight Service. Nimmo Dep. at 39.  Asked about the term, "aging workforce," Mr. Nimmo said, "when I was drawn into the working group as a subject matter expert, this terminology was being used." Id. at 120.  The only possible conclusion is that it was used by the decisionmakers to explain to Mr. Nimmo and Ms. Kansier why they had been called upon to assist in competing the Flight Service.

Perhaps more importantly, following award of the contract to Lockheed, Administrator Blakey herself made it plain to NAATS officials that she considered the retirement eligible controllers to be a liability.  Union President Kathleen Breen attended a meeting in the course of which Ms. Breen asked Ms. Blakey to permit the Flight Service controllers to be hired for other jobs within FAA.  Ms. Blakey responded:  "Kate, it wouldn't be in the best interest of the taxpayers to give these jobs to them with their current age and they're ready for retirement."

Breen Dep. at 101; <u>see also</u> Malon Dep. at 130-32 (corroborating the description of the conversation).

    b.   **Handicapping of the MEO.**

Another indicator of the Agency's intention to rid itself of the older workforce is in the treatment of the MEO during the solicitation process and in the evaluation of its bid.  Although Joann Kansier touted the existence of a "level playing field," it was anything but.

Although a consultant from Human Resources was supposedly assigned to the MEO team to assist them in preparing a transition package, in fact they had very little assistance in that regard, which resulted in the transition package being downgraded by the technical evaluators.  Dodson Dep. at 48-50.

Similarly, during the period that the proposal was being developed, the FAA was delaying the bargaining with the Union on RIF procedures and refusing to agree on procedures to rehire surplused Flight Service Controllers in other vacant positions to minimize job losses.  This conduct resulted in the Union's existence being deemed a risk in the evaluation of the MEO proposal, despite that fact that, by law, the Union could not

strike even if the bargaining was unsuccessful.   Malon Dep. at 65, 71-72, 74-76; P05667-P05668; see also Dodson Dep. at 52-53.

The evaluation of the MEO's proposed equipment components is similarly suspect.[25]   Lockheed's untested FS-21 system was rated more highly than the OASIS system already in successful use in some Flight Service Stations. Dodson Dep. at 87-88, 98; Grace Dep. at 143-44.   The voice switch and automated broadcast components proposed by the MEO were deemed risks, yet after contract award the FAA permitted Lockheed  to substitute those very same components when the ones approved by the technical evaluation team failed in actual use. Dodson Dep. at 89-90; Grace Dep. at 137, 139.

Finally, the Union members of the MEO, the members who had actual recent experience in Flight Service Stations, were not permitted to speak at the "orals" in which the bidders explained their proposals.   The result was that the technical evaluation

---

[25]   It is anticipated that Defendants will object that the issue of the fairness of the technical evaluation has already been disposed of in the bid protest proceeding that took place in 2005.   However, because the contract performance had not yet begun, information about the dramatic under-performance of the Lockheed  components was not available to the administrative law judge who presided over the bid protest.   Moreover, the administrative law judge was not asked to consider the possibility of age discrimination.

team perceived important gaps in the MEO proposal that contributed to their recommendation of Lockheed . Dodson Dep. at 43-48; Jackson-Brame Dep. at 208-09.

The unfair treatment of the MEO in the solicitation and evaluation process strongly implies an intention on the part of FAA management not to permit the older workforce to remain employed by the Agency.

### c.   FAA's Refusal to Retain or Rehire Most Employees

Further evidence of discrimination is evident in the obstacles placed in the paths of older Controllers who attempted to remain in the FAA or be rehired by it.  On the one hand, employees were promised transition assistance and preferred consideration for FAA jobs.  On the other hand, the Office of Competitive Sourcing made it clear that internal transfers and rehiring would be limited because the contract could not be subjected to competition unless the winning bidder could be guaranteed the same workforce that had performed the Flight Service function as government employees. Kansier Dep. at 118; Briefer, October 2003, at P01288.  At least one bidder, Lockheed , was promised that the FAA would only retain a very small number of the Flight Service Controllers. Sturm Dep. at 18-19.

The main way in which the FAA guaranteed that the majority of the Flight Service Controllers would go to work for Lockheed was in the way that the RIF was implemented.  Normally, federal employees who are threatened with job loss are entitled to "bump and retreat" rights in their "competitive area," usually the geographic region, a procedure in which those with greater seniority (usually older workers) can fill vacancies or displace workers with less seniority.  See generally 5 C.F.R. Part 351; "Summary of Reduction in Force Under OPM's Regulations," at http://www.opm.gov/rif/general/rifguide.asp (last visited June 15, 2009).  However, in the case of the Flight Service, the FAA defined the "competitive area" as each individual Flight Service Station.  As the federal Flight Service Stations were all being turned over to Lockheed , there were no positions whatever in the "competitive areas" to which the Flight Service Controllers could fill, bump, or retreat.

In the event, the promised consideration for FAA jobs was extremely minimal.  As Dr. Belman's report demonstrates, most of those who were rehired were younger than 40.   Scott Malon, the Union negotiator for the RIF Memorandum of Understanding, was led to believe that Flight Service Controllers would be considered

62

"well qualified" for vacancies in the FAA.  Malon Deposition.  In fact, however, the FAA has given preference to new hires "off the street," apparently finding them more qualified that Flight Service Controllers with more than a decade of aviation experience.  Charlene Argo testified in deposition that applications from former Flight Service Controllers, even those with Tower and En Route experience prior to age are not accepted for most vacancy announcements.  Argo Dep.

The FAA justifies the absence of placements within the Agency by asserting that the A-76 could not be accomplished unless the successful bidder was guaranteed a workforce.  As Joann Kansier, the head of the Office of Competitive Sourcing testified,

> you couldn't just hire people off the street to do this job, so whoever [won] had to be able to hire the people that were actually working in the Flight Service Stations. . . .  This was a skilled and certified position, so the people who were doing it had to remain doing it.

Kansier Dep. at 118; see also Briefer, October 2003, at P01288. This statement, however, makes no sense in terms of the President's Management Agenda, which is purported to be one of the main reasons for competing the Flight Service.

63

Defendants argue vigorously that Flight Service was available for A-76 competition because, under the FAIR Act, it was a "commercial" activity and not a "core" mission of the Agency. However, "commercial" in the FAIR Act context is a term of art. It does not mean that a function is actually available in the marketplace, only that the function, because it does not make policy or obligate the United States, need not be performed exclusively by government employees. Circular A-76, at p. A-2 (http://www.whitehouse.gov/omb/circulars/a076/a76_rev2003.pdf, last visited June 15, 2009). The President's Management Agenda ("PMA"), on the other hand, is quite clear about the sorts of activities that are actually intended to be subjected to A-76 competitions or conversions to private contractors: "tasks that are readily available in the commercial marketplace — tasks like data collection, administrative support, and payroll services." President's Management Agenda at 17; see also Belman Report at 6. And indeed, the FAA commissioned a feasibility study from Grant-Thornton which purported to show that the functions of Flight Service are readily available in the commercial marketplace.

Defendants cannot have it both ways. Either the functions performed by Flight Service were "readily available in the

64

commercial marketplace" — in which case there was no need to insure that the same workers who performed this function for the government were available to the winning bidder — or these were functions not available in the commercial marketplace, in which case they were inappropriate for outsourcing, whether or not they were inherently governmental.  Having accepted the conclusions of the feasibility report which it ordered, which stated that there were companies ready and willing to perform the Flight Service functions, the FAA had no legitimate need to force out its Flight Service workforce so as to guarantee a skilled workforce to the winning bidder.

One of two conclusions is mandated by this set of facts.  One possibility is that forcing out the older workers was entirely unnecessary because the functions they performed were available for offer in the commercial marketplace.  If that is the case, the only explanation for forcing out the older workers is age discrimination.  The second possibility is that the Agency knew that the Flight Service functions were not commercially available, and that the only way to accomplish an A-76 of a commercially unavailable function was to sacrifice the well-being of the older workers — to create a situation in which the Flight

Service Controllers, because they are specialized and older and therefore have fewer options, must go to work for a contractor that would otherwise be unable to offer the service.[26]  Either possibility is illegitimate age discrimination.[27]

## B. Defendants' Proffered Legitimate Non-Discriminatory Rationales Are Unconvincing.

Defendants allege two non-discriminatory rationales for the selection of Flight Service for competition, the cost of continuing Flight Service as it existed before the A-76, and the

---

[26]  Younger workers were either rehired by the Agency or had the luxury of years in which to retrain and find careers that have the potential — through higher incomes and/or pension plans — to replace the salary and benefits that had been provided by the FAA.  Older workers, as Dr. Belman's report explains, do not have enough working life remaining to them to recoup the cost (both direct cost and loss of income while retraining) of retraining and were forced to sign on with the monopsony employer, Lockheed — virtually the only potential customer for their specialized skills.  See Belman Report at 6-7.

[27]  An analogy will clarify the situation.  Suppose an employer is the only employer in town and has two groups of workers, one older and one younger, either of which is technically qualified for a hazardous or otherwise extremely undesirable job.  Because younger employees will quit and move out of town if they are assigned the job, the employer assigns the job to the older workforce.  There can be no doubt that this would be age discrimination.  That is the situation of the present case, as explained by Dr. Belman.  Because the Flight Service Controllers are a specialized and older workforce, there is no other "town" (metaphorically speaking) to which they can take their skills.

imperatives of the President's Management Agenda.   Neither of these reasons withstands serious scrutiny.

### 1. Asserted Cost Reduction and Hiring of Younger Controllers

Defendants cite to numerous studies that recommend, among other cost-cutting measures, the consolidation of the Flight Service, reducing the number of facilities in the lower 48 states (and Puerto Rico) from 58 to approximately 20. Coopers & Lybrand Report at D004846-D004850; Flight Service Architecture Core Group Report, P00758-P00776; 2001 Inspector General Report, P00141-P00158.  Indeed, even the Flight Service Controllers' Union had a consolidation plan.  **CITE** Nothing, however, in any of those consolidation plans mandated contracting out the Flight Service to a private entity.  The two concepts are simply unrelated.

Defendants significantly overstate the money to be saved from contracting out the Flight Service, as the General Accounting Office has observed. GAO Report Number GAO-05-724 (Jun. 23, 2005), at P00582.  It is noteworthy that John Hennigan, the Agency's deputy chief financial officer, has conceded that, in fact, the Agency had no clear idea of the costs of providing the Flight Service, other than the cost for personnel compensation and benefits.  Hennigan II Dep. at 56-58.  Moreover,

67

a comparison of the recommendations of the various studies with the money-saving claims of the Agency indicate that the money saved comes primarily from having consolidated the number of facilities — which did not require contracting out.  <u>See</u> Coopers & Lybrand Report at D004848; 2001 IG Report at P00149.[28] Furthermore, it is not clear that the reduced cost of the service is a bargain:  Lockheed  has never met its performance metrics and pilot usage has decline by two thirds, resulting in a significantly higher per-contact cost.

Finally, the Agency's vaunted concern with cost-savings would be more convincing if it had ever followed any of the other significant cost-saving suggestions put forth by the Office of the Inspector General and the other entities to which Defendants point.  These suggestions have included consolidating the number of regional offices of the FAA to reduce administrative and overhead expenses (at a projected savings of $100 million per year), increasing the use of contract control towers in small airports, and even collecting funds owed to it by contractors. In the absence of any apparent attempt to control costs in any

---

[28] Of course, some of the savings may come from Lockheed's lower labor costs, which are made possible by the fact that, as Lockheed  employees, the Controllers have no pension benefits.

other significant way, the Defendants' protestations of the necessity of cost control by contracting out the Flight Service are unconvincing.

## 2. The President's Management Agenda.

The FAA's other principal defense to the charge of disparate treatment is that the A-76 competition was mandated by the President's Management Agenda. However, as noted above, the fact that there was no existing private workforce to provide the services to be competed — unlike, as recommended in the PMA, services such as data or payroll processing — the selection of the Flight Service as the function for FAA's first and only A-76 is problematic.

More importantly, as described above, FAA interest in complying with the PMA extended only to the Flight Service. Despite the PMA's goal of competing or converting fifty percent of each Agency's commercial functions, the FAA has conducted no A-76 studies before or since the Flight Service. Although both Joann Kansier and Ronald Page compiled lists of additional functions that should be considered for competitive sourcing, none was. Little Dep. at 58-64. Even the name of the Office of Competitive Sourcing has been changed to indicate a focus on

69

procurement assistance rather than cost comparisons. Id. at 65.

## IV. Conclusion.

In this memorandum, Plaintiffs have demonstrated that there is no factual dispute as the existence of disparate impact discrimination against the Flight Service Controllers over 40. Both Plaintiffs' and Defendants' experts agree that the statistical evidence proves that there was a disparate impact. Because this is a federal sector age discrimination case under 29 U.S.C. § 633a, which holds the government to a more rigorous standard than the private sector, the Defendants, in order to defend against this uncontroverted demonstration, must show that the disparate impact was caused by a business necessity.  They have attempted to do so, claiming the disparate impact to be caused by the need to lower costs and to comply with the President's Management Agenda.  In fact, however, it is evident that many alternatives existed to the A-76 path the Defendants chose, including:

· correctly recognizing that, in view of the unavailability of a commercial workforce to fulfill the mission of Flight Service, it was more suitably characterized as Reason Code A, exempt from competition as a core function of the Agency

- contracting out functions of the Agency that are more customarily outsourced, such as data processing or human resources, which would not have disproportionately impacted older workers

- consolidated the Flight Service as suggested in the multiple reports, including the NAATS proposal, that were presented to the FAA over the years, utilizing the superior OASIS system which the FAA paid to develop, without contracting out the Flight Service.   The reports and the experiential evidence indicate that the savings would have been comparable, if not exactly equivalent, to the savings the FAA now claims to be experiencing, with a significantly greater quality of service.

- competing the Flight Service, but requiring prospective contractors to furnish their own workforce, either by locating commercially available workers or by offering sufficient compensation to federal Controllers to induce them to leave their federal jobs instead of exercising the RIF rights normally available to federal workers whose jobs have been outsourced

71

·   availing itself of other cost-saving proposals, such as the consolidation of FAA regions, which would have yielded savings equivalent to (or, in combination, possibly greater than) the outsourcing of the Flight Service

Accordingly, Plaintiffs having met their burden to demonstrate that the FAA had at its disposal equally effective, non-discriminatory ways to meet their business necessity, this Court should grant summary judgment to Plaintiffs and find that Defendants have discriminated against them on the basis of age.

Plaintiffs have also demonstrated that dispute exists as to the material facts that would determine their claim that Defendants engaged in disparate treatment of them. Accordingly, summary judgment on the issue of disparate treatment must be denied.

This Brief is submitted on behalf of the Plaintiffs represented by the Gebhardt & Associates law firm. A proposed Order and Plaintiffs' Statement of Facts in Opposition to Defendants are attached.

Respectfully submitted,

_____/s/_____

JOSEPH D. GEBHARDT
    (D.C. Bar No. 113894)

72

CHARLES W. DAY, JR.
    (D.C. Bar No. 459820)
LENORE C. GARON
    (D.C. BAR No. 172205)
VALENCIA R. RAINEY
    (D.C. Bar No. 435254)
DANIEL K. GEBHARDT
    (D.C. Bar No. 975703)
GEBHARDT & ASSOCIATES, LLP
1101 17th Street, N.W.
Suite 807

Washington, DC 20036-4716
(202) 496-0400

June 15, 2009                  Counsel for Plaintiffs