IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

KATHLEEN A. BREEN, <u>et al.</u>,                )
                                                )
        Plaintiffs,                             )
                                                )
                v.                              )        Case No. 1:05CV00654-RWR
                                                )
RAY LAHOOD, <u>et al</u>.,                      )
                                                )
        Defendants                             )
_____        )

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO PLAINTIFFS' CROSS MOTION FOR SUMMARY
JUDGMENT AND REPLY MEMORANDUM IN SUPPORT
<u>OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Introduction ............................................................................................................... 1

I.    BECAUSE PLAINTIFFS HAVE NOT RESPONDED TO DEFENDANTS'
      PRINCIPAL ARGUMENTS THAT THE ONLY PERSONNEL
      ACTION PROPERLY AT ISSUE IN THIS CASE, THE
      REDUCTION IN FORCE, APPLIED TO YOUNG AND OLD ALIKE,
      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ............................... 1

II.   EVEN IF THE COURT WERE TO LOOK BEYOND THE PERSONNEL
      ACTION AT ISSUE — THE OCTOBER 3, 2005 REDUCTION
      IN FORCE — AND EXAMINE THE BUSINESS DECISIONS
      THAT LED TO THE RIF, THERE WERE SOUND
      NON-DISCRIMINATORY REASONS FOR THOSE DECISIONS ............................ 4

      A.    Any Specific Practice By Defendants That Generated
            Any Adverse Statistically Significant Disparity With
            Respect To Older Workers Was Justified By A Reasonable
            Factor Other Than Age And By Business Necessity ........................................... 5

            1.    In Order To Prove A Disparate Impact Violation
                  Plaintiffs Must Isolate And Identify The Specific Employment
                  Practices Responsible For Any Statistical Disparity ............................... 5

            2.    As Plaintiffs Concede, Secretary Mineta's Decision
                  That En Route Center And Larger Terminal Controllers
                  Perform "Core" Functions That Could Not Be Outsourced
                  Was Based On Reasonable Factors Other Than Age ............................... 7

            3.    Reliance On Reasonable Factors Other Than Age
                  Is A Defense To An ADEA Disparate-Impact Claim ............................... 7

            4.    Even If The Business Necessity Test Were Applicable,
                  It Would Not Require The FAA To Show That
                  Not Outsourcing Its Core En Route And Terminal
                  Controllers Was "Essential" To Its Operations ....................................... 12

            5.    Secretary Mineta's Decision Not To
                  Outsource The Core Functions Performed
                  By En Route And Larger Terminal
                  Controllers Was Justified By Necessity ................................................ 14

B.    Defendants Are Entitled To Summary Judgment
On Plaintiffs' Disparate Treatment Claim
Because Age Was Not The But-For Cause Of
Any Adverse Employment Action In This Case ................................................... 17

      1.    Plaintiffs Cannot Show, As They Must To
Prevail On An ADEA Disparate-Treatment
Claim, That Age Was A But-For Cause Of
A Challenged Adverse Employment Action ........................................... 18

      2.    Statistical Evidence Does Not Support
Plaintiffs' Disparate Treatment Claims .................................................... 20

      3.    There Are No Issues of Material Fact With
Regard To The FAA's Use Of "Aging
Workforce" And "Retirement Eligible" ................................................. 23

      4.    The Treatment Of The Most Efficient
Organization Does Not Suggest Discrimination ..................................... 27

      5.    The FAA's Hiring Decisions After the RIF Are
Not Material To Any Claim Properly Raised In
This Case And, In Any Event, Plaintiffs Have
Not Shown Discrimination In Those Decisions ...................................... 30

           a.    Any Question Of Discrimination In Post-
RIF Hiring Decisions For Other FAA
Positions Is Not Properly Before The Court .............................. 30

           b.    Plaintiffs Have Not Shown That Hiring
For Other Positions Was Discriminatory ................................... 32

      6.    Plaintiffs Fail To Rebut Defendants' Proffered
Reasons For Conducting The A-76 Study ............................................. 37

           a.    The Demand For Flight Service Has
Been In Long-Term Secular Decline .......................................... 37

           b.    The FAA Considered Compliance With The
President's Management Agenda To Be Important .................. 39

           c.    A Desire To Save Taxpayers Two Billion
Dollars In Unnecessary Expenditure Was An
Actual Reason For The Challenged Decisions ........................... 43

Conclusion ...................................................................................................................... 46

**<u>CASES</u>**                                                                                    **<u>PAGE(S)</u>**

*Aliotta v. Bair,*
     576 F. Supp. 2d 113 (D.D.C. 2008), *motion to alter or amend judgment denied,* 673 F.
     Supp. 2d 73 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ….. 32, 35

*Anderson v. Zubieta,*
     180 F.3d 329 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Auto Workers v. Johnson Controls, Inc.,*
     499 U.S. 187 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*Barbour  v. Browner,*
     181 F.3d 1342 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

*Brady v. Office of Sergeant at Arms,*
     520 F.3d 490 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

*Breen v. Mineta,*
     2005 WL 3276163 (D.D.C. Sept. 30, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . .  33

*Brown v. Small,*
     437 F. Supp. 2d 125 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

*Buggs v. Powell,*
     293 F. Supp. 2d 135 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Canning v. Dep't of Defense,*
     499 F. Supp. 2d 14, (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Carswell v. Air Line Pilots Ass'n,*
     540 F. Supp. 2d 107, (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

*City of Los Angeles v. Manhart,*
     435 U.S. 702 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Cochrane v. Norton,*
     2003 WL 21768006 (N.D. Cal. July 28, 2003) . . . . . . . . . . . . . . . . . . . . . . . .  26

*Cox v. Infomax Office Sys., Inc.,*
2009 WL 124700 (S.D. Iowa. Jan. 16, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Doan v. Seagate Technology, Inc.,*

82 F.3d 974 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

*Evers v. Alliant Techsystems, Inc.*,
241 F.3d 948 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

*Farris v. Clinton*,
602 F. Supp. 2d 74 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Fischback v. District of Columbia Dep't of Corrections*,
86 F.3d 1180 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

*Forman v. Small*,
271 F.3d 285 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9, 10

*Glenn v. Bair*,
2009 WL 2430627 (D.D.C. Aug. 10, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*Green v. Missouri Pacific R. Co.*,
523 F.2d 1290, 1298 (8th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*Gross v. FBL Financial Services*,
129 S. Ct. 2343 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Hall v. Giant Food, Inc.*,
175 F.3d 1074 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

*Hopkins v. Whipple*,
2009 WL 1874076 (D.D.C. June 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . .   10, 11

*Horvath v. Thompson*,
329 F. Supp. 2d 1 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*International Broth. of Teamsters v. United States*,
431 U.S. 324 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Laffey v. Northwest Airlines, Inc.*,
740 F.2d 1071 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Licausi, v. Symantec Corp.*,
2009 WL 1873663, at *15 (S.D. Fla. June 30, 2009) . . . . . . . . . . . . . . . . . . . .   36

*May v. Shuttle, Inc.*,
129 F.3d 165 (D.C. Cir. 1997), *cert. denied*, 524 U.S. 927 (1998) . . . . . . . . . .   2

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Meacham v. Knolls Atomic Power Laboratory*,
   128 S. Ct. 2395 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

*Menoken v. Whipple*,
   605 F. Supp. 2d 148 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Mereish v. Walker*,
   359 F.3d 330 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*National Federation of Federal Employees v. Cheney*,
   883 F.2d 1038 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

*Newport News Shipbuilding and Dry Dock Co. v. EEOC*,
   462 U.S.  669 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Parcinski. v. The Oulet Co.*,
   673  F.2d 34 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

*Powers-Bunce. v. District of Columbia*,
   576  F. Supp. 67(D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Reeves v. Sanderson Plumbing Prods.*,
   530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*Ridenhour v. Lawson Co.*,
   791 F.2d 52 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

*Rowan v. Lockheed Martin Energy Systems, Inc.*,
   360 F.3d 544 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Sauzek v. Exxon Coal USA, Inc.*,
   202  F.3d 913 (7th Cir. 2000)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 32

*Segar v. Smith*,
   738 F.2d 1249 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Shaw v. Marriot International, Inc.*,
   570 F. Supp. 2d 78 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Smith v. City of Jackson*,
   544 U.S. 228 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

*Smith v. Napolitano*,
    2009 WL 1740520 (D.D.C. June 22, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*Tice v. Bristol-Myers Squibb Co.*,
    515 F. Supp. 2d 580 (W.D. Pa. 2007), aff'd, 2009 WL 943838 (3d Cir. Apr.
    8, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*United States v. St-Louis-San Francisco Ry.*,
    464 F.2d 301 (8th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*Valaris v. Army and Air Force Exchange Service*,
    577 F. Supp. 282 (N.D. Calif. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11, 12

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13, 14

*Wells v. United States*,
    578 F. Supp. 794 (D.D.C.  1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

*Williams v. Dodaro*,
    576 F. Supp. 2d 72 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

## <u>STATUTES</u>

5 U.S.C. § 2109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

5 U.S.C. § 8336 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

5 U.S.C. § 8339(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

5 U.S.C. § 8339(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

5 U.S.C. § 8421 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

29 U.S.C. § 623 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

29 U.S.C. § 623(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

29 U.S.C. §§ 623(*l*)(1)(a)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

29 U.S.C. § 633(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

## <u>LEGISLATIVE MATERIALS</u>

S. REP. NO. 96-144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

149 CONG. REC. S15386-90 (daily ed. Nov. 21, 2003) (statements of Senators Hollings
and Jeffords) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Department of Transportation and Related Agencies Appropriations for 1998:
Hearing Before the Subcomm. on Transportation and Related
Agencies of the H. Comm. on Appropriations*, 105th Cong. 48 (1997) . . . . . . . . . . . . 24

*Department of Transportation and Related Agencies Appropriations for 2002:
Hearing Before the Subcomm. on Transportation and Related Agencies
of the H. Comm. on Appropriations*, 107th Cong. 471 (2001) . . . . . . . . . . . . . . . . . . 24

## **EXECUTIVE MATERIALS**

Exec. Order 13180, 65 Fed. Reg. 77493, 77494 (Dec. 11, 2000) . . . . . . . . . . . . . . . . 17

Exec. Order 13264, 67 Fed. Reg. 39243 (June 7, 2002) . . . . . . . . . . . . . . . . . . . . . . . 17

FAA Order 3350.2c, *Staffing Adjustments and Reductions In Force* (Oct. 17, 1994) . 36

5 C.F.R. § 351.701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## **OTHER**

Matthew L. Wald, *Up, Up, and . . . Never Mind*,
NEW YORK TIMES, Apr. 26, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

National Civil Aviation Review Commission Final Report,
http://www.library.unt.edu/gpo/NCARC/reports/pepele.htm,
Part II, § V.C. (last visited April 22, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**INDEX OF EXHIBITS (INCLUDING EXCERPTS OF DEPOSITIONS) TO
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO PLAINTIFFS' CROSS MOTION FOR SUMMARY
JUDGMENT AND REPLY MEMORANDUM IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

<u>TAB NO.</u>          <u>DESCRIPTION OF DOCUMENTARY EXHIBITS</u>

1          Deposition of Dale Belman
           *Represented plaintiffs' liability expert witness*

2          Deposition of Marilyn Jackson-Brame
           *Served as FAA Deputy Director, Office of Competitive Sourcing; previously,
           director of Flight Services*

3          Deposition of Jack Nimmo
           *Served as member of FAA Automated Flight Service Stations Feasibility Study
           Workgroup*

4          Deposition of Marion Blakey
           *FAA Administrator (September 2002- September 2007)*

5          Bertram's Presentation to the Administrator

6          Deposition of Walter Pike
           *President, National Association of Air Traffic Specialists (1998-2004)*

7          Deposition of George Williams
           *FAA Human Resources Official*

8          Defendants' Response to Plaintiffs' Interrogatory No. 24

9          Deposition of James Little
           *FAA Official; Technical Team Lead, FAA Office of Competitive Sourcing*

10         Deposition of Richard Freed
           *Plaintiff*

11         Deposition of Ronald Page
           *FAA Official; Helped to Coordinate the FAA's Compliance with the Federal
           Activities Inventory Reform (FAIR) Act of 1998*

12         Deposition of Robert Sturgell
           *FAA Deputy Administrator (2002-2007); FAA Acting Administrator (2007-2009)*

13            Defendants' Response to Plaintiffs' Interrogatory No. 13

14            Deposition of Gregory Mitchell
                     *Plaintiff*

15            Deposition of John Hennigan (1st Hennigan Dep.)
                     *FAA Deputy Assistant Administrator for Financial Services*

16            July 12, 2003, Department of Transportation and Federal Aviation
                     Administration, Grant Thornton Feasability Study (Grant Thornton Report)

17            Deposition of Joseph Tryon
                     *Represented plaintiffs' damages expert witness*

18            Deposition of William Carrington
                     *Defendants' expert witness for damages and also for liability*

**Introduction**

Defendants are entitled to summary judgment in this case.  Plaintiffs neither responded to the principal arguments that defendants made in support of defendants' motion for summary judgment nor discussed the principal case on which defendants relied.  Part I, *infra*.  The arguments plaintiffs did make in their brief, all on points that need not be reached by the court, lack merit in any event.  Part II, *infra*.

I.   **BECAUSE PLAINTIFFS HAVE NOT RESPONDED TO DEFENDANTS' PRINCIPAL ARGUMENTS THAT THE ONLY PERSONNEL ACTION PROPERLY AT ISSUE IN THIS CASE, THE REDUCTION IN FORCE, APPLIED TO YOUNG AND OLD ALIKE, DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT**

It is "well-settled that where a non-moving party fails to oppose arguments set forth in a motion for summary judgment, courts may treat such arguments as conceded."  *Shaw v. Marriot International, Inc.*, 570 F. Supp. 2d 78, 89 n.20 (D.D.C. 2008); *accord, e.g.*, *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) (applying principle to foreclose claims in Title VII case).  The represented plaintiffs chose not to respond to the principal arguments defendants made in support of their summary judgment motion.  Those arguments are by themselves sufficient to compel summary judgment for defendants even if defendants are utterly wrong about each and every one of the arguments that the represented plaintiffs did respond to.  Defendants are accordingly entitled to summary judgment.[1]

_____

[1] The *pro se* plaintiffs are in no better position.  The represented plaintiffs' brief indicated (page 75) that it was "submitted on behalf of the Plaintiffs represented by the Gebhardt and Associates law firm," and none of the other plaintiffs made any separate submission opposing defendants' motion for summary judgment.

In the remainder of this memorandum, references to arguments made by "plaintiffs" are intended to refer to the arguments made by the represented plaintiffs, while references to "plaintiffs" as parties or persons affected by the RIF will generally include unrepresented

(continued...)

The only "personnel action" at issue in this case, and therefore the only action that can be challenged under the ADEA, is the Reduction in Force ("RIF") of October 3, 2005.  Defendants moved for summary judgment because the RIF was "utterly indiscriminate" and applied to all the flight service specialists "whether they were 39 or 59, [so] there was no discrimination on the basis of age."  Defs. SJ Mem. (Dkt. 256-1) at 2.  By page 2 of their summary judgment brief, defendants had already identified the Court of Appeals case that compels that conclusion, *May v. Shuttle, Inc.*, 129 F.3d 165 (D.C. Cir. 1997), *cert. denied*, 524 U.S. 927 (1998).  These points were developed at length in Part I of defendants' argument, which defendants quite openly argued "fully addresse[d] any issue of discrimination."  Defs. SJ Mem. at 32 (emphasis added).  The brief compared the facts of this case to *May* and explained that, under the holding in *May*, on the common facts of the two cases, defendants were entitled to summary judgment.  *Id*. at 32-35.

Defendants provided additional arguments for summary judgment in Part II of the argument, showing why the Court ought not accept any invitation from plaintiffs to expand the scope of the ADEA to challenge the underlying structural decisions that helped lead to the RIF.  Part III then began by asserting that none of the points it would address would need to be reached since defendants were entitled to summary judgment for the reasons already set forth in Parts I and II.  *Id.* at 54-55.  Defendants' contention that the arguments set forth in Parts I and II of defendants' opening brief were by themselves sufficient to compel summary judgment for defendants was not hidden.

_____

[1](...continued)
plaintiffs as well.

-2-

The represented plaintiffs' opposition to defendants' summary judgment motion does not address those arguments that defendants' motion for summary judgment had made first and principally.  With one partial and ultimately immaterial exception, plaintiffs do not respond to Part I or Part II of defendants' argument at all.[2]  Plaintiffs ignore entirely the Court of Appeals decision in *May,* the case defendants had identified, Defs. SJ Mem. at 32-34, as controlling.  This case involves a RIF, and defendants therefore pointed the Court to other ADEA cases involving RIFs.  Defs. SJ Mem. at 32-34 & nn.32-33, 43, 55-57.  Plaintiffs, on the other hand, do not focus on termination cases, let alone RIF cases, let alone cases (like this one and *May*) involving RIFs of an entire workgroup.  Plaintiffs instead draw their conceptual framework of the legal issues from cases and hypotheticals addressing hiring, promotion, and pay issues.  Pls. Mem. at 23-30, 68 n.27.  With respect to the issue presented here, whether an across-the-board RIF of an entire workgroup somehow violates the ADEA even though the young as well as the old are let go, plaintiffs do not even attempt to explain why this Court should not follow *May* by granting summary judgment for defendants.

Defendants do not summarize those principal arguments of their opening brief in order to invite some belated response.  For whatever reason, plaintiffs chose not to respond to defendants principal arguments, and they must now abide by that considered choice.  The Court's rules and

---

[2] In support of a premise of Part I that the only personnel action at issue was the RIF, defendants argued in Part I.C.1 that any post-RIF hiring decisions for other positions were, though personnel actions, not personnel actions properly at issue in this case, and, in the alternative, in Part I.C.2 that those actions were in any event non-discriminatory.  Plaintiffs actually do respond to the alternative argument, Pls. Mem. (Dkt. 265-3) at 5-7, 57, 63.  But they concede the first point, that the post-RIF hiring decisions are not themselves adverse personnel actions that can be challenged in this case, *id.* at 6, which is the only thing defendants needed to establish in Part I.C of the argument in order to support the premise of Part I that the only personnel action at issue in this case is the RIF.

practices on motion briefing are not mere technicalities.  They are designed to assure fairness to the parties and to help the Court reach decisions by assuring that each party is willing to confront and address its adversary's arguments-in-chief and has an opportunity to do so.  Plaintiffs cannot undo their decision to ignore the principal arguments set forth in defendants' motion by sandbagging a belated response into a reply memorandum for their cross-motion for summary judgment on disparate impact.[3]  That memorandum, to which defendants will have no opportunity to respond, is supposed to address only the <u>different</u> points plaintiffs did choose to address in their cross-motion and our responses below to the points raised by the cross-motion.

For the unresponded-to reasons stated in Parts I and II of the memorandum supporting defendants' motion for summary judgment, defendants' motion for summary judgment should be granted.

## II.   EVEN IF THE COURT WERE TO LOOK BEYOND THE PERSONNEL ACTION AT ISSUE — THE OCTOBER 3, 2005 REDUCTION IN FORCE — AND EXAMINE THE BUSINESS DECISIONS THAT LED TO THE RIF, THERE WERE SOUND <u>NON-DISCRIMINATORY REASONS FOR THOSE DECISIONS</u>

In defendants' opening brief, after defendants had explained in Parts I and II of the argument why the only personnel action at issue, the RIF, was utterly non-discriminatory, and why the Court ought not accept plaintiffs' invitation to expand the scope of the ADEA to encompass plaintiffs' attacks on defendants' underlying structural decisions that led to the RIF, Defs. SJ Mem. (Dkt. 256-1) at 32-54, defendants explained that they would nevertheless address plaintiffs' arguments that the FAA's decisions were discriminatory on the "*arguendo*"

---

[3] Plaintiffs' cross-motion deals only with their disparate impact claim.  Plaintiffs are not moving for summary judgment on their disparate treatment claim.

assumption that those issues should be reached, *id.* at 32, 54-55.  Defendants did so in Part III of

the argument, some of which plaintiffs address.  Because plaintiffs do not respond to Parts I and

II of defendants' argument, the only issues plaintiffs do address need not and ought not be

reached.  However, on what is <u>again</u> <u>only</u> an *arguendo* assumption that these issues should be

reached, defendants address below plaintiffs' arguments that the structural decisions that in

combination led to the RIF were somehow discriminatory.

**A.**     **Any Specific Practice By Defendants That Generated
Any Adverse Statistically Significant Disparity With
Respect To Older Workers Was Justified By A Reasonable
<u>Factor Other Than Age And By Business Necessity</u>**

**1.**     **In Order To Prove A Disparate Impact Violation
Plaintiffs Must Isolate And Identify The Specific Employment
<u>Practices Responsible For Any Statistical Disparity</u>**

Plaintiffs argue that the FAA's actions had a disparate impact on older workers.  Pls.

Mem. (Dkt. 265-3) at 2.  In order to prove a disparate impact claim, plaintiffs must "isolate and

identify the *specific* employment practices that are allegedly responsible for any observed

statistical disparities."  *Meacham v. Knolls Atomic Power Laboratory*, 128 S. Ct. 2395, 2405

(2008) (citations and internal quotations omitted) (emphasis original).  Plaintiffs try to evade that

requirement of specificity, by arguing that they are challenging "Defendants' A-76 process" and

an ingredient list of separate decisions that, together, ultimately led to the RIF, in the apparent

hope that disparate impact will turn up somewhere in the goulash.  Pls. Mem. at 10.

Plaintiffs' statistical expert did not produce any statistics showing a disparate impact

caused by any specific practice (plaintiffs instead rely on him for their disparate treatment claim,

*see id.* at 55-56), so for their disparate impact claim plaintiffs rely on the report of <u>defendants</u>'

-5-

statistical expert, Bernard Siskin. *Id.* at 5, 14-15.[4]  However, unlike plaintiffs, Siskin did

recognize that it is important to identify which, if any, specific practice (which Siskin refers to as

a "test") resulted in any statistically significant disparity.  Report of Defs' Expert Bernard Siskin

("Siskin Rep't"), Defs. SJ Ex. 96 (Dkt. 256-98), ¶¶ 18, 19; *see also* Defs. SJ Mem. (Dkt. 256-1)

at 64-90 (discussing different "tests" that preceded the RIF).

As Siskin explained, the only "test" in this case that resulted in any statistically

significant disparity adverse to older workers was the decision that air traffic separating

controllers performed "core" functions of the FAA that could not be outsourced.  Siskin Rep't ¶

34.[5]  By contrast, flight service specialists like plaintiffs, whose jobs did not involve the core

function of separating air traffic,[6] were not deemed to be "core" and thus were potentially subject

to outsourcing.  That distinction between core and non-core functions caused any statistically

significant age-based disparity in this case.  Siskin Rep't ¶ 34.  Thus, analysis of any disparate-

---

[4] Siskin was asked to analyze statistics given the *arguendo* assumption that the classifications of the workgroups were subject to challenge, and Siskin's statistical report therefore did not address the legal issues addressed by Parts I and II of the argument in defendants' opening brief.  Siskin Rep't ¶¶ 23-24.  Thus, Siskin's report provides plaintiffs with no assistance on those antecedent legal issues.

[5] The other "tests" that Siskin examined were the classification of which functions were inherently governmental or commercial and which functions became subject to competitive sourcing among those deemed to be non-core to the FAA.  Siskin Rep't ¶ 33.

[6] For an explanation of the functional differences between what we term "aircraft separating controllers" at en route centers and terminals on the one hand and flight service specialists on the other, *see, e.g.*, Turner Rep't, Def. SJ Ex. 91 (Dkt. 256-93); *Brydon Dep.*, Defs. SJ Ex. 51 (Dkt. 256-53), at 30; Jackson-Brame Dep., Defs. SJ Ex. 68 (Dkt. 256-70), at 26-27; Sheridan Decl. (Dkt. 23-6) ¶¶ 7-8; Reyna Decl. (Dkt. 23-10) ¶ 6.  The two types of jobs are not interchangeable.  Reyna Decl. ¶ 6.

impact claim in this case must center on that specific distinction identified in Siskin's report as the cause of any statistically significant disparity.

> ## 2. As Plaintiffs Concede, Secretary Mineta's Decision That En Route Center And Larger Terminal Controllers Perform "Core" Functions That Could Not Be Outsourced Was Based On Reasonable Factors Other Than Age

The decision that the air traffic separating controllers at en route center and larger terminals performed "core" functions and that their functions could not be outsourced was made by then-Secretary Norman Mineta.  His decision was based on reasonable factors other than age and, indeed, was compelled by necessity, including a refusal by the Senate to reauthorize the FAA without a promise that such controllers not be outsourced.  Defs. SJ Mem. (Dkt. 256-1) at 68-72.

Plaintiffs do <u>not</u> argue that Mineta's decision was taken because of age.  They do <u>not</u> argue that the non-age factors Mineta did consider were unreasonable.  Plaintiffs, in short, do <u>not</u> contest defendants' showing that Mineta's decision relied on reasonable factors other than age.

> ## 3. Reliance On Reasonable Factors Other Than Age Is A Defense To An ADEA Disparate-Impact Claim

Plaintiffs instead attempt to argue that even if Mineta's decision had relied on merely <u>reasonable</u> factors other than age, that would not be a defense, because, in plaintiffs' view, only "business necessity" would qualify as a defense.  Pls. Mem. (Dkt. 265-3) at 23-25, 28-29.

However, "the business necessity test should have no place in ADEA disparate-impact cases."  *Meacham v. Knolls Atomic Power Laboratory*, 128 S. Ct. 2395, 2404 (2008).  Plaintiffs nevertheless argue that the business necessity test should have, not merely a place, but a central

role, in an ADEA disparate-impact cases whenever the defendant is a federal agency.  Pls. Mem. at 23-25, 28-29.  That view is mistaken.

Plaintiffs argue that the "reasonable factors other than age" or "RFOA" defense is not available to a federal-agency defendant because the RFOA defense is set out in 29 U.S.C. § 623, the private-sector ADEA provision, rather than in 29 U.S.C. § 633(a), the federal-sector provision.  Pls. Mem. at 23-25.

That an RFOA defense is set forth in the text of section 623 was one reason why the Supreme Court recognized that defense in private-sector cases.  *Smith v. City of Jackson*, 544 U.S. 228, 236-41 (2005).  But that textual provision for an RFOA defense, the Supreme Court recognized, was "*coupled with*" relevant "differences between age and the classes protected in Title VII."  *Id*. at 236 n.7 (emphasis original).  "Limit[ing] the coverage of the ADEA by including the RFOA provision," the Court explained, is "consistent with the fact that age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment."  *Id*. at 240.  "Thus," the Court emphasized, "it is not surprising that certain employment criteria that are routinely used may be reasonable despite their adverse impact on older workers as a group."  *Id*. at 241.  *Accord Meacham*, 128 S. Ct. at 2406.  Such relevant differences between age discrimination and other kinds of discrimination do not disappear merely because a federal agency happens to be the defendant.

Plaintiffs argue that, even in situations where age discrimination raises distinctive issues that sensibly call for a difference or modification of Title VII rules, federal-defendant ADEA cases must nevertheless be treated as if they involved race or gender rather than age.  Pls. Mem.

-8-

at 25.  Plaintiffs say this counter-intuitive result is required because language of the federal-sector ADEA is borrowed from the language of the federal-sector Title VII provision.  That is not correct.  The Supreme Court has recently explained in *Gross v. FBL Financial Services*, 129 S. Ct. 2343 (2009), that even where "'the substantive provisions of the ADEA were derived *in haec verba* from Title VII,'" the Court has not always interpreted the two statutes in lockstep. 129 S. Ct. at 2349 n.2, *quoting and responding to id.* at 2354 (Stevens, J., dissenting).  "[F]or example, the Court declined to interpret the phrase 'because of . . . age' in 29 U.S.C. § 623(a) to bar discrimination against people of all ages, even though the Court had previously interpreted 'because of . . . race [or] sex' in Title VII to bar discrimination against people of all races and both sexes."  *Id.*, 129 S. Ct. at 2349 n.2.  Plaintiffs themselves appear to argue for treating ADEA cases differently in at least one respect from the way gender discrimination is treated: If an employer, whether out of misguided chivalry or otherwise, will <u>not</u> hire women for hazardous jobs, it violates Title VII, *Auto Workers v. Johnson Controls, Inc.*, 499 U.S. 187 (1991), whereas according to plaintiffs if an employer <u>does</u> hire older workers for hazardous jobs there is "no doubt that this would be age discrimination" even if the only applicants are older workers, Pls. Mem. at 68 n.27.  And, in *Gross* itself, the Supreme Court held that, to state a disparate-treatment claim of <u>age</u> discrimination, a plaintiff must show "but for" causation, even though Title VII had previously been interpreted to allow for liability in some "mixed motive" cases. Thus, even where the language of the two statutes is the same, it can be appropriate to take into account the ways in which age discrimination is distinctive.[7]  And, as *Smith v. City of Jackson*

---

[7] Plaintiffs rely on the pre-*Gross* decision in *Forman v. Small*, 271 F.3d 285, 296-97 (D.C. Cir. 2001).  Pls. Mem. at 23-24.  *Forman* did not address the applicability of the RFOA.

(continued...)

and *Meacham* both recognize, it does make good sense to allow employers to use practices

justified by <u>reasonable</u> criteria other than age even though some such practices may have a

disparate impact on older workers.

It is no wonder then that courts in this circuit have indicated that an RFOA defense is

available in federal-sector ADEA cases.  Defs. SJ Mem. at 67 (citing cases).[8]  Plaintiffs did not

address or cite those cases.  Instead, plaintiffs rely principally on a 1983 case from outside this

circuit that does not address or decide RFOA issues, and that, on the different issue it does

address, appears to illustrate the dangers, rather than any virtues, of reflexively transposing race

or gender discrimination rules into the context of age discrimination.  Pls. Mem. at 25, 28, *citing*

*Valaris v. Army & Air Force Exchange Service*, 577 F. Supp. 282 (N.D. Calif. 1983).[9]  In short,

---

[7](...continued)
On the issue *Forman* did address (whether to recognize a cause of action for retaliation), both
section 623 and the federal-sector Title VII statute pointed in the same direction, *see* 271 F.3d at
296-97, so there was no need for *Forman* to choose whether to follow Title VII even when a
different rule in section 623 would be the more appropriate fit for a federal-sector ADEA case.

[8] More recently, this Court has noted in passing that "[d]isparate impact claims arise from
employment practices that are facially neutral in their treatment of different groups, but that fall
more severely on one statutorily protected group than another in practice, and which a defendant
cannot justify by <u>business necessity</u>."  *Hopkins v. Whipple*, 2009 WL 1874076, at *6 (D.D.C.
June 30, 2009) (emphasis added).  However, because Hopkins failed to exhaust his
administrative remedies on his disparate-impact claim, 2009 WL 1874076, at *6-7, this Court
had no occasion there to decide whether the available defense in an ADEA case is RFOA or
business necessity.  Because Hopkins was raising both Title VII and ADEA disparate-impact
claims, any justification for the challenged practice would necessarily have had to satisfy the
"business necessity" test under Title VII no matter what the standard under the ADEA.  In its
brief, one-sentence summary of disparate impact that prefaced the failure-to-exhaust holding,
this Court thus understandably referred only to business necessity.  Moreover, because that
sentence is directly followed by a citation to *Smith v. City of Jackson*, which applied an RFOA
defense, it should not be read as rejecting the applicability of an RFOA defense in a case, such as
this one, where disparate-impact issues arise only under the ADEA.

[9] A retirement plan at issue in that case was "integrated" with benefits under the Social
(continued...)

plaintiffs' attempt to jam the round peg of the Title VII business necessity test into the oval hole

of ADEA disparate-impact analysis should be rejected.[10]

---

[9](...continued)
Security system, 577 F. Supp. at 284, which usually means that under-62 retirees get from the retirement plan <u>alone</u> benefits equivalent (adjusting for years of service and other relevant factors) to what older retirees get from the <u>combination</u> of the retirement plan and Social Security (it is not entirely clear from the opinion that that is what "integrated" did mean in *Valaris*, an uncertainty that accounts for the "appears" in the text and in this footnote). Of course, that means that the retirement plan considered by itself paid more to workers under 62 than to older workers with the same years of service. Because extra payments for white retirees or male retirees would violate Title VII, the court assumed that such extra payments under the retirement plan for under-62 retirees would likewise violate the ADEA. But Congress subsequently made it clear that such integration of retirement plans is <u>not</u> what <u>Congress</u> considers age discrimination. That view that retirement-plan integration is not discriminatory has been codified into the private sector ADEA. 29 U.S.C. §§ 623(*l*)(1)(a)(ii). However, the lack of a comparable express provision in the public sector ADEA does not mean that such integration is discriminatory in the public sector. Congress itself writes retirement plans for federal employees, and only three years after *Valaris* it incorporated as a centerpiece of the federal employee retirement system the very kind of supplemental payments for under-62 retirees based on integration with Social Security that *Valaris,* by mistaken analogy to race and gender discrimination, appears to have condemned as age discrimination. *Compare Valaris with* 5 U.S.C. § 8421.

[10] This Court has ruled in this case that a disparate-impact claim is available against federal agency defendants. However, as this Court has recently noted, the issue remains an open one in the circuit. *Hopkins v. Whipple*, 2009 WL 1874076, at *6 & n.3 (D.D.C. June 30, 2009). Plaintiffs do not dispute that, if RFOA is the appropriate defense, defendants have met it. *See* Pls. Mem. (Dkt. 265-3) at 23-52. Thus, to prevail on appeal (when the existence of a cause of action for disparate impact will no longer be law of the case), they will need to show (in addition to the showing they have not made that the FAA's decision lacked justification) <u>both</u> that a disparate-impact claim is available <u>and</u> that an RFOA defense is <u>not</u> available. That required combination showing is in tension with *Smith v. City of Jackson*, which found that a disparate-impact claim was available in private-sector ADEA cases in part <u>because</u> an RFOA defense <u>was</u> <u>also</u> available. 544 U.S. at 238-39. That inter-relationship between the question whether a disparate impact claim is available at all and the question whether RFOA is an available defense need not be ignored by this Court in deciding the latter issue.

**4.      Even If The Business Necessity Test Were Applicable,
It Would Not Require The FAA To Show That
Not Outsourcing Its Core En Route And Terminal
Controllers Was "Essential" To Its Operations**

Plaintiffs err not only in asserting that the "business necessity" defense applies to an

ADEA case, but also in outlining the requirements of that defense in the event that it did apply.

Plaintiffs argue, Pls. Mem. (Dkt. 265-3) at 28, that the "mere fact that a non-

discriminatory alternative is more costly does not fulfill the 'business necessity' requirement,'

because "it is intuitively obvious that in every disparate impact case that involves compensation,

continued discrimination will always be less expensive."  To illustrate what is supposedly shown

by "every disparate impact case that involves compensation" (which this case does not involve)

plaintiffs discuss six cases, four of which are disparate-treatment, not disparate-impact, cases.

*Id.* at 29-30.[11]  Nor is it "intuitively obvious" that "continued discrimination will always be less

expensive."  One reason why discrimination is disfavored (other reasons justify stronger

pejoratives) is that an employer who makes personnel decisions affected by irrelevant

characteristics like skin color or gender will often cost his enterprise, the economy, and

ultimately society money or other resources compared to an employer who makes decisions

based on the fit between each individual's talents and job requirements.  *See*, *e.g.*, *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973).  Such baseless discrimination is often <u>costly</u>,

---

[11] The four disparate treatment cases are *City of Los Angeles v. Manhart*, 435 U.S. 702
(1978); *Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983); *Laffey v.
Northwest Airlines, Inc.*, 740 F.2d 1071 (D.C. Cir. 1984); and *Valaris v. Army and Air Force
Exchange Service*, 577 F. Supp. 282 (N.D. Calif. 1983).  The disparate-impact discussion in the
fifth case cited by plaintiffs is an alternative holding that follows a longer discussion of
disparate-treatment issues, and does not discuss, let alone adopt, plaintiffs' discrimination-is-
always-cheaper intuition.  *Segar v. Smith*, 738 F.2d 1249, 1288 (D.C. Cir. 1984).  The sixth case,
*Anderson v. Zubieta*, 180 F.3d 329 (D.C. Cir. 1999), is discussed in the text.

not cost-saving.  Even one of the cases plaintiffs rely on makes the point (180 degrees opposed

to plaintiffs' intuition) that, by adopting a practice that had a discriminatory impact, the

employer appeared to be <u>needlessly spending</u>, rather than saving, money.  *Anderson v. Zubieta*,

180 F.3d 329, 345-46 (D.C. Cir. 1999).  In this case, defendants did not save the taxpayers two

<u>billion</u> dollars by <u>discriminating</u>; they saved it by the non-discriminatory decisions that resulted

in the non-discriminatory outsourcing.

When plaintiffs turn beyond intuition for a statement of what an actual disparate-impact

case does say the "business necessity" defense requires, plaintiffs look to and block quote a 1985

Eighth Circuit case quoting a 1972 Eighth Circuit case, which indicates that business necessity

"connotes an irresistible demand" that must not merely "Foster" but be "Essential" to "safety and

efficiency."  Pls. Mem. at 28, *quoting Green v. Missouri Pacific R. Co.*, 523 F.2d 1290, 1298

(8th Cir. 1985), *quoting United States v. St-Louis-San Francisco Ry.*, 464 F.2d 301, 308 (8th Cir.

1972) (words emphasized by Eighth Circuit capitalized by plaintiffs).

That is not the law.  The Supreme Court explained in *Wards Cove Packing Co. v. Atonio*,

490 U.S. 642, 659 (1989)[12]:

> Though we have phrased the query differently in different cases, it
> is generally well established that at the justification stage of such a
> disparate-impact case, <u>the dispositive issue is whether a challenged
> practice serves, in a significant way, the legitimate employment
> goals of the employer</u>. . . .  The touchstone of this inquiry is a
> reasoned review of the employer's justification for his use of the
> challenged practice.  A mere insubstantial justification in this
> regard will not suffice, because such a low standard of review

---

[12] If the RFOA defense were not available in an ADEA disparate-impact case, then *Wards Cove*, rather than the 1991 amendments to Title VII, would supply the controlling understanding of the business necessity test.  *Smith v. City of Jackson*, 544 U.S. at 240; *see Meacham*, 128 S. Ct. at 2404.

-13-

would permit discrimination to be practiced through the use of spurious, seemingly neutral employment practices.  At the same time, though, <u>there is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet, and would result in a host of evils we have identified above</u>.

(emphasis added and citations omitted).  The Supreme Court also flatly rejected plaintiffs'

intuition that consideration of cost can play no role in disparate-impact analysis whether a

practice serves an employer's legitimate employment goals.  490 U.S. at 661.

> **5.      Secretary Mineta's Decision Not To
> Outsource The Core Functions Performed
> By En Route And Larger Terminal
> <u>Controllers Was Justified By Necessity</u>**

Whether the appropriate defense to a disparate impact claim is the reasonable factors

other than age test that applies in ADEA cases (and that therefore should apply here), the

Supreme Court's *Wards Cove* test whether a practice significantly serves "legitimate

employment goals," or even the overly strict version of the "business necessity" test proposed by

plaintiffs, the test is met here.

As Siskin, the defendants' expert upon whom plaintiffs' rely, explained, the specific

practice that had any statistically significant disparity here is not, as plaintiffs (ignoring Siskin on

this point) would have it, some global perception of the A-76 process in general.  Instead, one

must "isolate and identify the *specific* employment practices that are allegedly responsible for

any observed statistical disparities."  *Meacham v. Knolls Atomic Power Laboratory*, 128 S. Ct.

2395, 2405 (2008).  As Siskin explained, the specific decision responsible for any observed

statistical disparity was the decision that aircraft separating controllers (*i.e.*, en route center and

-14-

terminal controllers) performed core functions and could not be outsourced.  Siskin Rep't, Defs. SJ Ex. 96 (Dkt. 256-98), ¶ 34.

It is, to say the least, a "business necessity" and a "legitimate employment goal" that an agency be able to perform its core functions.  Secretary Mineta's decision that aircraft separating controllers performed core functions explained that "the FAA <u>must</u> . . . have the capabilities present to respond to the unique, critical, or other circumstances that substantively impact the safety and security of the national airspace system."  Determination as to the Inherently Governmental Nature of Air Traffic Control Services by Secretary Norman Y. Mineta ("Mineta Determination"), December 18, 2002, Defs. SJ Ex. 27 (Dkt. 256-29), at 5 (emphasis added).  He concluded that "'to ensure that the Government has the necessary capabilities to fulfill its mission responsibilities or to meet emergency requirements,'" the aircraft separating controllers at en route centers and larger terminal facilities performed activities that are a "core capability" of the FAA.  *Id*. at 6, *quoting* Revised Supp. Handbook to Circular A-76.  There is no basis for a court to second guess the Secretary of Transportation's determination that separation of air traffic involves a truly core function of the FAA.[13]

---

[13] By contrast, as plaintiffs admit, *see* Pls. Corrected Stmt. of Mat. Facts in Opp. to Defs.' (Dkt. 265-5) at ¶ 5, flight service specialists do <u>not</u> separate aircraft from each other.  With respect to flight service, the FAA determined that "private industry has the capability and interest in performing the [flight service] function, and that having a private company do so would not compromise aviation safety or homeland security."  *See* Memorandum from Bertram to Acting Administrator Belger ("Bertram Memo to Belger"), August 21, 2002, Defs. SJ Ex. 11 (Dkt. 256-13) (accepting results of feasibility study); *see also* 1st Hennigan Dep., Defs. SJ Ex. 65 (Dkt. 256-67), at 84 ("we commissioned a feasibility study in early 2002 . . .  to verify if what we were saying was accurate and if there was, among other things, private sector interest in doing this, capability to do this, and the lack of compromise of our mission").

As defendants also demonstrated in their summary judgment brief, Defs. SJ Mem. (Dkt. 256-1) at 70-72, and as plaintiffs did not even attempt to rebut, it would have been impossible in any event for the FAA to have outsourced aircraft separating controllers. Congress insisted, as a pre-condition of reauthorizing the FAA's existence, on a promise that the FAA not outsource aircraft separating controllers. *See* 149 CONG. REC. S15386-90 (daily ed. Nov. 21, 2003) (statements of Senators Hollings and Jeffords); *see also* Statement of Department of Transportation on Amendment of Executive Order on Air Traffic Organization, June 12, 2002, Defs. SJ Ex. 28 (Dkt. 256-30) (2002 Mineta decision not to pursue such outsourcing due in part to recognition that such outsourcing would be "highly controversial" in Congress).

Accordingly, the only specific decision that had a statistically significant disparity — the decision that aircraft separating controllers had core functions that exempted them from outsourcing efforts — was plainly based on reasonable factors other than age and by necessity.[14]

---

[14] Another test Siskin's Report looked at was the distinction between which jobs were "inherently governmental" and which jobs, like plaintiffs' jobs, were not. Siskin Rep't ¶ 25. Plaintiffs argue that their jobs should have been deemed "inherently governmental" and not subject to outsourcing because (1) Executive Order 13180 refers to "provision of air traffic services" as an "inherently governmental function," and (2) the Executive Order must have been meant to include flight services in that reference because 5 U.S.C. § 2109(1) includes flight service specialists within the definition of "air traffic controller." Pls. Mem. at 43-44. There are at least six reasons why this argument is wrong, irrelevant, or both: First, 5 U.S.C. § 2109(1) itself expressly distinguishes between flight service specialists and aircraft separating controllers "actively engaged (i) in the separation and control of air traffic." *Compare* 5 U.S.C. § 2109(1)(A)(i) *with* 5 U.S.C. § 2109(1)(A)(ii). Thus, the section simply does not say that flight service specialists separate and control air traffic, and, to the contrary, recognizes that they do not. Second, by its own terms, 5 U.S.C. § 2109 supplies a definition only "[f]or the purpose of this title," and an executive order is not part of that title. Section 2109 thus has no bearing on the Executive Order's meaning. Unlike section 2109, Executive Order 13180 does not have a term including "preflight" and other flight services in a definition of "air traffic controller," and the scope of the order's reference to "air traffic services" did not include flight service. Third, Executive Order 13180 did "not create any right or benefit, substantive or procedural,

(continued...)

### B.     Defendants Are Entitled To Summary Judgment On Plaintiffs' Disparate Treatment Claim Because Age Was Not The But-For Cause Of Any Adverse Employment Action In This Case

Plaintiffs present a variety of arguments that they contend entitle them to survive

defendants' motion for summary judgment on their disparate treatment claim.  First, they

contend that statistical evidence raises an "inference that age discrimination occurred."  *See* Pls.

Mem.  (Dkt. 265-3) at 55-56.  Second, they point to the inclusion of the phrases "aging

workforce" and "retirement eligible workforce" to describe the flight service workforce.  *Id*. at

56-59.  Third, plaintiffs argue that the "Most Efficient Organization" or "MEO," the in-house

group that bid on the flight services contract, was treated in such an unfair way that it implies an

intention by the FAA management to deny older workers the opportunity to remain employed by

the FAA.  *Id*. at 59-61.  Fourth, plaintiffs contend that less than half of the flight service

specialists obtained new positions at the FAA following the RIF, *id*. at 61-66, and that most of

them were "were younger than 40," *id*. at 64.  Finally, plaintiffs argue that defendants' proffered

non-discriminatory reasons are unconvincing.  *Id*. at 66-70.  Defendants address plaintiffs'

arguments in turn.  But, first defendants discuss the standard of review for summary judgment on

---

[14](...continued)
enforceable at law against the United States, its agencies, officers, or any person."  65 FED. REG.
77493, 77494 (Dec. 11, 2000).  Fourth, more than three years before the RIF, the reference in
Executive Order 13180 to "inherently governmental" was removed by Executive Order 13264.
67 FED. REG. 39243 (June 7, 2002).  Fifth, the FAA's distinction between specialists and aircraft
separating controllers is not a distinction based on age but a distinction on the basis of whether
employees are actively engaged in separating and controlling air traffic.  *See*, *e.g.*, Turner Rept.,
Defs. SJ Ex. 91 (Dkt 256-93).  Sixth, in any event, Siskin found that the FAA's division of its
workforce into jobs that were or were not inherently governmental did <u>not</u> have a statistically
adverse impact on older workers, and that in fact (at least as a statistical matter) it "<u>favored older
workers</u>,"  Siskin Rep't at table 5 (emphasis supplied).

ADEA disparate treatment claims, because after defendants filed their opening brief, the

Supreme Court issued a decision clarifying the burden plaintiffs must satisfy to present a

disparate treatment claim under the ADEA.  *Gross v. FBL Financial Services*, 129 S. Ct. 2343

(2009).

> **1.    Plaintiffs Cannot Show, As They Must To
> Prevail On An ADEA Disparate-Treatment
> Claim, That Age Was A But-For Cause Of
> A Challenged Adverse Employment Action**

Defendants' opening brief explained why the undisputed factual record shows that even

if age had played <u>some</u> role in a disputed decision — it did not — "defendants would still be

entitled to summary judgment if they would have reached the same decision without

consideration of age."  Defs. SJ Mem. (Dkt. 256-1) at 90-91.

Plaintiffs did not respond to this argument in their opposition brief, even though

defendants asserted it as a "complete defense," *id*. at 90 n.72.  Plaintiffs admit that age did not

play a factor in the request by James Washington, the Vice President of Flight Service, to initiate

the RIF.  *See* Pls. Corrected Stmt. of Mat. Facts in Opp. to Defs.' (Dkt. 265-5) ¶ 113 ("Once the

contract for Flight Service had been awarded to Lockheed Martin and the positions of the Flight

Service Controllers eliminated, Mr. Washington had no choice as to whether to request the

RIF").  Plaintiffs do not controvert defendants' statement that the "ages of flight service

specialists did not factor into Secretary Mineta's decision not to subject air traffic control

services at en route and larger terminal facilities to competitive sourcing."  *See id.* at 25 (not

responding to, and therefore admitting, Def. Stmt. Mat. Facts (Dkt. 256) ¶ 67).

In response to the sworn deposition testimony of other agency officials (Bertram,

Hennigan, and DeGaetano) involved in the intermediate decisions that led to the RIF that they

did not consider age in any of their decisions, plaintiffs merely state that the FAA officials'

uncontradicted explanations are "credibility question[s] to be decided at trial." *See* Pls.

Corrected Stmt. of Mat. Facts in Opp. to Defs.' at ¶¶ 50, 51, 98.  But a motion for summary

judgment cannot be defeated merely by an opposing party's speculating that  uncontradicted

deposition testimony relied on by the movant might be disbelieved. *E.g.*, *Powers-Bunce v.*

*District of Columbia*, 576 F. Supp .2d 67, 71 (D.D.C. 2008).   Plaintiffs also argue, Pls.

Corrected Stmt. of Mat. Facts in Opp. to Defs.' at ¶¶ 52, 99, that defendants' factual contentions

are legal conclusions, but a party likewise may not controvert a movant's undisputed facts by the

mere expedient of relabeling them as legal conclusions.  *See*, *e.g.*, *Canning v. Dep't of Defense*,

499 F. Supp. 2d 14, 16 (D.D.C. 2007).

 *Gross v. FBL Financial Services*, 129 S. Ct. 2343 (2009), now makes it clear that

plaintiffs' failure to show that age was a "but-for" cause of a challenged adverse employment

action is fatal to any claim of disparate treatment: "[A] plaintiff bringing a disparate-treatment

claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the

'<u>but-for</u>' cause of the challenged adverse employment action."  *Id*. at 2352 (emphasis added).[15]

Plaintiffs cannot satisfy their burden.

 Plaintiffs attempt to excuse their failure to show but-for causation by claiming that

"inference[s]" somehow "indicate" that the "RIF was the result of disparate treatment because of

Plaintiffs' age."  Pls. Mem. (Dkt. 265-3) at 54, 56.  These supposed inferences, however, do not

even show that age played any factor in any of the ancillary decisions, let alone that age was

---

 [15] *Gross* was a private-sector case, but this Court has recognized that its holding applies
in cases in which a federal agency is the defendant. *Glenn v. Bair*, 2009 WL 2430627, at * 4
(D.D.C. Aug. 10, 2009); *Smith v. Napolitano*, 2009 WL 1740520, at *5 (D.D.C. June 22, 2009).

"but-for" reason for any relevant FAA decisions.  Neither statistical evidence nor non-statistical evidence supports a contrary finding.

**2.      Statistical Evidence Does Not Support
Plaintiffs' Disparate Treatment Claims**

Defendants showed in their opening memorandum that there is no statistical evidence suggesting disparate treatment in this case.  *See* Defs. SJ Mem. (Dkt. 256-1) at 59-63.  Plaintiffs ignore this discussion and assert that "the statistical evidence in this case raises a strong inference that age discrimination occurred."  *See* Pls. Mem. (Dkt. 265-3) at 57.  To support this assertion, plaintiffs rely on their expert, Dale Belman, whom they claim showed to "a statistically significant degree, [that] the Flight Service workforce was older than the comparator populations, and that the difference cannot be explained by random selection."  *Id*. (citing Belman Rep't, Pls. Mem. Ex. 2 (Dkt. 263-4)).

But that, before the RIF, the flight service workforce was older than some (though not all) other work groups within the FAA is merely a statement of pre-existing fact no one disputes.  No one has suggested the possibility Belman needlessly rebuts, that the relative age of the workforce arose by "random" chance.  As <u>defendants</u> explained in their opening memorandum, the FAA had done very little hiring of flight service specialists for nearly two decades preceding the RIF in the face of the declining demand for flight service.  Defs. SJ Mem. at 15-16, 53.  <u>Of course</u>, the workforce had become relatively old and <u>of course</u> that did not arise by mere happenstance.

Plaintiffs, however, try to make an inference from Belman's rear-view mirror look at pre-RIF facts that the report itself is carefully phrased not to draw, namely, that the forward-looking selection of flight service for the RIF was discriminatory.  They try to argue not just that the

-20-

flight service workforce was relatively old (which is all that Belman's report actually says), but also that there is some statistical evidence that it was selected for outsourcing <u>because</u> it was old. That leap of logic by plaintiffs beyond Belman's report is, however, "fatally flawed" because it is based on the assumption that the FAA was selecting "individuals (rather than groups)" to potentially outsource.  *See* Siskin Rep't, Defs. SJ Ex. 96 (Dkt. 256-98), ¶ 7.

To illustrate why plaintiffs' analysis is fundamentally flawed, assume the FAA divided its workforce into different workgroups represented by six colors (red, orange, yellow, green, blue, purple) of gumballs.  And then assume that each gumball represents an individual employed within each of these workgroups, with one of these colors (e.g., purple) representing flight service specialists.  Plaintiffs' statistical analysis is based on an assumption that the FAA's process for choosing whom to RIF was akin to mixing thousands of differently colored gumballs into one machine and then ending up with a purple gumball every time it dropped in a dime.



Mixed gumballs

However, the FAA was not selecting <u>individuals</u> but choosing amongst different <u>workgroups</u>.  To use the gumball analogy, the FAA was not making separate decisions by picking individual gumballs on thousands of separate occasions; rather, the FAA was picking among gumball colors that had already been organized by color (*i.e.*, by workgroup) into six different machines.  Siskin Rep't ¶ 10.  Instead of using thousands of dimes to purchase the same-colored gumballs from a mixed machine, the FAA simply selected a machine of one color.

-21-



The chances that the FAA would pick any one machine, *i.e.*, the one with the purple gumballs rather than some other color, is the same as rolling a die, one in six.  *Belman Dep*., Defs. Op. Ex. 1, at 60:16.  Since flight service was the second oldest of those six major work groups, the probability that a group as old as or older than the flight service group would be selected if the groups had been chosen by chance was one in three.  Siskin Rep't at 9 n.14.  As defendants' expert Siskin found, such chance is "not statistically significantly different from what one would expect from an age-neutral selection process and thus, there is no valid statistical evidence that age was a factor in the process."  *Id*. ¶¶ 10, 11.

There is thus no <u>statistical</u> basis for plaintiffs' supposition that the FAA targeted the flight services specialist workforce because it was older than four of the other five large workgroups.  Even plaintiffs' own expert ultimately conceded this point.  *See Belman Dep*. at 59:18-59:22 (admitting that "statistics don't tell me" that the selection process of which gumball

-22-

to choose for a RIF was "guided by age"); *see also id*. at 60:16-61:2 (admitting that statistics do not provide insight into whether the "awareness of age became part of the FAA decision process").  In short, there is no statistical evidence of disparate treatment in this case.[16]

**3.     There Are No Issues of Material Fact With Regard To The FAA's Use Of "Aging Workforce" And "Retirement Eligible"**

Plaintiffs rely on the use of the phrase "aging workforce" in some FAA presentations.  As explained in defendants' opening brief, Defs. SJ Mem. at 75-78, 83-84, consideration of an "aging workforce" did not cause any of the agency's disputed decisions.

Plaintiffs' response misses the point.  Plaintiffs suppose that defendants contend that the phrase "aging workforce" was "a creation of Joann Kansier," who in early 2003 became head of the Office of Competitive Sourcing.  Pls. Mem. at 59 (Dkt. 265-3), *not citing* Defs. SJ Mem. (Dkt. 256-1) or anything else.  Plaintiffs then rebut that imagined contention with the observation that Kansier "was not the first FAA employee to use the term "'aging workforce,'" *id*.  Plaintiffs argue that Jack Nimmo, formerly a flight service manager, heard the phrase (before any involvement by Kansier) after he had been recruited by Marilyn Jackson-Brame (the then head

---

[16] Contrary to plaintiffs' suggestion, Pls. Mem. at 57, statistics regarding plaintiffs' disparate impact claim have no bearing on their disparate treatment claim.  The two theories of liability test different things.  *Compare* Siskin Rep't, Defs. SJ Ex. 96 (Dkt. 256-98)  ¶ 4 *with id*. ¶ 17.  Disparate treatment looks at whether an employer treated someone less favorably because he or she is in a protected class while disparate impact looks at whether an employment action that is neutral in its treatment falls more harshly on a protected class.  *See International Broth. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *see also Menoken v. Whipple*, 605 F. Supp. 2d 148, 153 (D.D.C. 2009) ("The Supreme Court has consistently recognized a distinction between discrimination claims based on disparate impact and discrimination claims based on disparate treatment").

of flight service) to work with her in providing subject-matter input for the Grant-Thornton

feasibility study.  Pls. Mem. at 59-60.

But no one disputes that there had long been awareness of an "aging workforce" within

the flight service community.  <u>Defendants</u> pointed out in their opening brief, Defs. SJ Mem. at

15-16, that the plaintiffs' union's presidents had been making that very point since at least

1997.[17]  As the union's congressional testimony had recognized, an "aging workforce" was a

symptom of the decline in the relative importance of flight service, including the nearly total

shutdown of hiring new flight service specialists (points <u>defendants'</u> brief also made, Defs. SJ

Mem. at 52-53).  Nimmo and Jackson-Brame likewise were steeped in flight service, having

spent their entire careers there.  Jackson-Brame Dep., Defs. SJ Ex. 68 (Dkt. 256-70), at 13-14;

Nimmo Dep., Defs. Op. Ex. 3 (Dkt. 256-80), at 85 ("built my life around that option and the

people that worked in it").  Both viewed flight service as having long been, in Nimmo's words,

the "redheaded stepchild," of the FAA that had for many years received less than what Jackson-

Brame, Nimmo, the union, and others in flight service thought should be its share of taxpayer

dollars.  *Id*. at 91-92; Jackson-Brame Dep., Defs. Op. Ex. 2, at 112, 205-06, 210.[18]  Like the

---

[17] *Department of Transportation and Related Agencies Appropriations for 1998: Hearing Before the Subcomm. on Transportation and Related Agencies of the H. Comm. on Appropriations*, 105th Cong. 48 (1997) (statement of Michael F. McAnaw); *Department of Transportation and Related Agencies Appropriations for 2002: Hearing Before the Subcomm. on Transportation and Related Agencies of the H. Comm. on Appropriations*, 107th Cong. 471 (2001) (statement of Wally Pike).

[18] Higher-level FAA officials, who had to consider the competing needs of all the FAA's functions, and Office of Management and Budget officials who had to consider competing needs across the entire spectrum of demands on the public fisc, did not necessarily agree.  *E.g.*, Blakey Dep., Defs. Op. Ex. 4, at 72 ("a half-billion dollars [per year for flight service] is a lot of money. That came out to almost $25 for every communication with a pilot at that point.")

union and other flight service specialists, as head of flight service Jackson-Brame knew long

before Kansier arrived in 2003 that, as a result of the lack of new hiring, her remaining

workforce was aging.  Jackson-Brame Dep., Defs. Op. Ex. 2, at 194.

But, even though Jackson-Brame and Nimmo became involved in collecting information

during the feasibility study, neither Jackson-Brame, nor Nimmo, nor anyone else who had spent

their careers inside flight service made the strategic decision to select flight service for an A-76

study.  Jackson-Brame Dep., Defs. Op. Ex. 2, at 62-63, 68; Nimmo Dep. at 84-85.  In fact, as

might be expected given their careers devoted to flight service, Jackson-Brame and Nimmo both

strongly opposed that decision.  Jackson-Brame Dep., Defs. Op. Ex. 2, at 112-15, 209-10;

Nimmo Dep. at 84-85.

Instead, the strategic decision that flight service would be subject to the A-76 study was

made by Chris Bertram, who was in the budget office, not flight service, Bertram Dep., Defs. SJ

Ex. 47 (Dkt. 256-49), at 29-30, 37-40, 71, and Bertram did not consider the age of the employees

when he made the decision, id. at 106-07, 111-12.   Bertram's testimony on this point is clear:

> Q. . . . At the time that the FAA started looking at the question of
> outsourcing and conducting an A-76 with regard to flight service,
> while you were there . . . Did you hear any discussion or see
> anything in writing that indicated that the flight service controllers
> then working for FAA were an aging workforce, [that] there was
> something about their age that was part of this decision-making?
>
> A.  No, the age was not part of the decision-making.

Id.  at 106-07.  Plaintiffs have cited no contrary evidence showing that Bertram considered the

age of the flight service specialists when making his decisions.[19]

---

[19] Plaintiffs note that Bertram used the word "we" in describing the work of the FAA's

(continued...)

Plaintiffs also rely on various slide presentations that show an "aging workforce" as <u>one</u> factor contributing for studying flight service for an A-76 study. However, <u>Bertram's</u> presentation to the Administrator, Defs. Op. Ex. 5, does not list an "aging workforce" (or any variant thereof) as a reason for action and lists reasons for action similar to those he later recalled at his deposition.

In any event, as explained in the cases set forth in yet another extended passage of defendants' summary judgment brief that plaintiffs did not respond to, Defs. SJ. Mem. at 76-78, even if an awareness of an "aging workforce" had played a role in a relevant decisional process, "[g]eneral comments about the aging workforce are simply not the sort of discriminatory comments that give rise to an ADEA claim," *Cox v. Infomax Office Sys., Inc.*, 2009 WL 124700, at *7 (S.D. Iowa Jan. 16, 2009). *See*, *e.g.*, *Rowan v. Lockheed Martin Energy Systems, Inc.*, 360 F.3d 544, 548-49 (6th Cir. 2004); *Mereish v. Walker*, 359 F.3d 330, 337 (4th Cir. 2004); *Cochrane v. Norton*, 2003 WL 21768006, at *4 (N.D. Cal. July 28, 2003).

Finally, even if, contrary to that case law plaintiffs fail to discuss, consideration of an aging workforce were tantamount to age discrimination, and even if it had been considered by the decision-makers, plaintiffs must do more than show that age was <u>a</u> reason for the challenged adverse employment action, plaintiffs "must prove, by a preponderance of the evidence, that age

---

[19](...continued)
finance office that he headed, *see* Pls' Statement of Material Facts in Opp. to Defs.' at 14-15 (citing Bertram Dep. 32), but it does not matter whether Bertram made the decision to subject flight services to the A-76 process with input from his subordinates or on his own. Either way, Bertram was the decision maker. *See* Bertram Memorandum to Administrator, June 19, 2002, Defs. SJ. Ex. 10 (Dkt. # 256-12). In any event, the uncontradicted evidence shows that Bertram's deputy, John Hennigan, also did not consider age, 1st Hennigan Dep., Defs. Ex. 65 (Dkt. 256-67), at 164-65, and plaintiffs cannot point to any evidence showing that anyone in Bertram's office both played a central role in any decision and considered age.

was the 'but-for' cause of the challenged adverse employment action." *Gross*, 129 S. Ct. at

2352.  As plaintiffs themselves recognize, "aging workforce" was just one of many reasons listed

on the slide presentations they cite.  Other reasons listed include "DOT IG recommendation on

consolidation," the "President's Management Agenda," an "imbalanced workload," and

"inadequate funding of AFSS related programs."  *See, e.g.*, Pls. Ex. 20 (Dkt. 265-13) at

D007314.  Nothing in these presentations even begins to suggest that consideration of the "aging

workforce" played a determinative, but-for role in the decision to conduct the A-76.  Plaintiffs

simply do not meet the standard of *Gross.*

### 4.      The Treatment Of The Most Efficient<br>Organization Does Not Suggest Discrimination

Plaintiffs argue that the agency attempted to rid itself of the flight service specialists by

handicapping the MEO, the internal group that bid on the flight service contract during the A-76

process.  Pls. Mem. (Dkt. 265-3) at 61-63.  Whether the MEO was fairly treated is not relevant to

any issue of <u>discrimination</u>.  Whether Lockheed or the MEO won, the result would apply equally

to old and young employees alike.  Lockheed won the contract with respect to all of flight

service, not just the with respect to the old specialists that the FAA allegedly wanted to get rid

of.

In any event, plaintiffs have not cited any evidence that would allow a fact-finder to

conclude that any alleged handicapping of the MEO was due to age discrimination.

Kate Breen, lead plaintiff in this action, on behalf of the other flight service employees,

contested the contract award to Lockheed through an administrative appeal.  Opinion by Judge

Edwin B. Neill of the General Administration Board of Contract Appeals ("Neill Opinion"),

Defs. SJ Ex. 18 (Dkt. 256-20), at 3.  Judge Neill, sitting as a special master in the FAA

administrative proceedings, considered Breen's challenge to "virtually every phase of this procurement once proposals were submitted" and rejected Breen's claim that there was institutional bias against the MEO.  Neill Opinion at 63.[20]  Judge Neill found that there was no evidence of prejudice.  *Id.*

Judge Neill also looked at Breen's specific allegations that the MEO was treated unfairly, and found the allegations to be without merit.  For example, Judge Neill found no persuasive evidence to support Breen's claim that the technical evaluators failed to take into consideration the status of the MEO as incumbent.  *Id.* at 73.  After considering Breen's and the flight service specialists' multifaceted attack on the process that led to the Lockheed contract award, Judge Neill recommended that Breen's contest be denied in its entirety.  *Id.* at 102.

Even though claims of age discrimination were not before Judge Neill, his findings on factual issues that were material to the decision before him are entitled to issue-preclusive effect to the extent that Breen and the other plaintiffs she represented are attempting to relitigate the same factual issues here.  Defs. SJ Mem. at 87-89.  Such issue preclusion "serves as an aid to judicial fairness, preventing parties who have previously litigated . . . factual issues from having to relitigate those very same issues which have already been proved."  *Tice v. Bristol-Myers Squibb Co.*, 515 F. Supp. 2d 580, 600 (W.D. Pa. 2007), *aff'd*, 2009 WL 943838 (3d Cir. Apr. 8, 2009).[21]

---

[20] Similarly, Neill found that there was no pattern of favoritism shown toward Lockheed. Neill Opinion at 67.

[21] Plaintiffs would discount Judge Neill's decision because he did not have information about how well or (in plaintiffs' view) badly Lockheed has subsequently been performing on the contract.  Pls. Mem. at 62 n.25.  But that is a reason <u>for</u>, not against, giving issue preclusive

(continued...)

In addition to repeating the assertion, rejected by Judge Neill, that the MEO did not participate in a "level playing field" during the A-76 process, plaintiffs point to several inconsequential facts about the MEO as purported evidence that the MEO was handicapped.  Pls. Mem. at 61-63.  Plaintiffs ask the Court to consider the fact that the flight service specialists' union was considered to be a risk factor by one of the technical evaluation teams, *id*. at 61, but plaintiffs fail to inform the Court that the Source Selection Evaluation Board, which reviewed the team's recommendations as part of the process of selecting a bidder, rejected the technical team's finding on that very point, *see* Neill Opinion at 55-56.  Plaintiffs complain, Pls. Mem. at 61, that the MEO did not receive high marks for the human resources / phase-in portion of its bid, one of several aspects of the MEO bid that was given low marks, even though the report by the technical evaluators "expressly states that the team's rating is not based on any single finding or its impact, but rather represents the [team's] judgment regarding *all* the findings of strengths and weaknesses and their impacts when considered together."  Neill Opinion at 29.  Plaintiffs argue that Lockheed's computer system should not have been rated higher than the MEO's competing "OASIS" system, Pls. Mem. at 62, but Judge Neill rejected this argument, noting that the OASIS system was at the time "available in only sixteen of the . . . fifty-eight facilities in operation."  Neill Opinion at 73.  "Furthermore," explained Judge Neill, "the MEO has specifically stated that OASIS will require enhanced technology development."  *Id.* at 73-74.

---

[21](...continued)
effect to that decision.  After all, in reviewing agency decisions for possible bias, the courts are supposed to "beware of using 20/20 hindsight," *Fischback v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (emphasis added).  Judge Neill's decision, closer in time to the decisions of the agency officials (who likewise had no information post-dating 2005), is less, not more, likely to be infected by hindsight than any later re-evaluation of the same issues.

Accordingly, the higher rating of Lockheed's system compared to the MEO's OASIS system does not establish unfairness, much less age-motivated unfairness, towards the MEO.

Finally, plaintiffs also speculate that if the MEO had chosen different persons to make its oral presentation, they might have done a better job than the actual presenters. Pls. Mem. at 62-63. Groups and parties are often put to choices about who will be their spokespersons, and it may be natural that other members of a non-prevailing party's team might guess that they could have done better (even those who do present arguments are often visited by *l'espirit de l'escalier*). Such second-guessing within the MEO team does not establish any bias on the part of the FAA, let alone bias due to age.

> **5.   The FAA's Hiring Decisions After the RIF Are Not Material To Any Claim Properly Raised In This Case And, In Any Event, Plaintiffs Have Not Shown Discrimination In Those Decisions**
>
> **a.   Any Question Of Discrimination In Post-RIF Hiring Decisions For Other FAA Positions Is Not Properly Before The Court**

Plaintiffs ask the Court to imagine a "sleight of hand" by which the FAA "purged its ranks of its older workers, by RIFing all Flight Service Controllers and then selectively rehiring younger Controllers." Pls. Mem. (Dkt. 265-3) at 6. But, if so, the discrimination would have occurred entirely, not in the indiscriminate RIF, but in the later "selective[ ]" hiring. And those hiring decisions are not at issue in this RIF case and are not properly before the Court. Plaintiffs' notice of intent to file this civil action did not raise any claim of discrimination regarding the hiring of flight service specialists for other FAA positions. Defs. SJ Ex. 23 (Dkt. 256-25). Nor did plaintiffs' Amended Complaint in this case assert any non-selection claims that post-October 2005 hiring decisions were discriminatory. Dkt. 3 (June 24, 2005). This Court

accordingly lacks jurisdiction over such claims.  *See* Defs. Mem. (Dkt. 256-1) at 38-41

(discussing issue and citing cases).  Plaintiffs concede as much.  Pls. Mem. at 6.

However, plaintiffs attempt to recast their hiring claims as somehow connected to their

claim that they were adversely affected by the RIF.  Plaintiffs assert that they "do not seek to

challenge the retention and rehiring of younger Controllers as a personnel practice but simply to

reveal it as a pretext."  Pls. Mem. at 6.  This makes no sense.  Defendants never averred that the

opportunity to hire flight service specialists for other FAA positions was even **a** reason for the

RIF.  Not being even a proffered reason, it certainly cannot have been be a pretextual one.

Plaintiffs' talk of "pretext" is thus merely their own transparent pretext to rely on hiring

decisions that they did not challenge administratively and that are immaterial to any issues in this

case.

Plaintiffs similarly attempt to justify addressing the hiring claims they did not make

instead of the RIF claim they did by arguing "that firing all workers and rehiring exclusively

younger workers is a slightly more sophisticated form of ridding oneself of the older workers,

and is equally unlawful."  Pls. Mem. at 57 n.22.  Again, the discrimination in any such scheme

(sophisticated or otherwise) could only occur, by definition, not in what plaintiffs concede is the

firing of "all" the workers, but in the alleged subsequent decisions to hire only younger workers.

However, plaintiffs' February 2005 notice of intent to file this lawsuit and their Amended

Complaint (June 2005) simply did not challenge any such alleged discrimination in hiring, and

did not put defendants on notice of a claim challenging post-October 2005 hiring decisions that

were still in the future.  This claim is not properly before the Court in this case.  *See*, *e.g.*, *Sauzek*

*v. Exxon Coal USA, Inc.*, 202 F.3d 913, 920-21 (7th Cir. 2000) (where employer shut down mine

and RIF'd hundreds of employees and later re-opened mine and rehired some employees,
plaintiffs who had challenged only the RIF could not rely on allegation that employer
discriminated on the basis of age in deciding which employees to rehire).[22]

### b.    Plaintiffs Have Not Shown That Hiring For Other Positions Was Discriminatory

Even if plaintiffs' post-October 2005 hiring claims were properly before the Court,
plaintiffs fail to present even a *prima facie* case.  They do not show that the plaintiffs applied for
but were not hired for those different kinds of positions were qualified or that the FAA otherwise
in any way favored <u>similarly situated</u> younger employees in considering job applications.  *See,
e.g.*, *Aliotta v. Blair*, 576 F. Supp. 2d 113, 128 (D.D.C. 2008) (finding former employees not
similarly situated to those who obtained new positions and rejecting argument that agency
conducted a RIF "as an elaborate ruse to flush the agency of senior staff"), *motion to alter or
amend judgment denied*, 623 F. Supp. 2d 73 (D.D.C. 2009).

Plaintiffs' argument that the FAA "selectively rehir[ed] its younger Controllers" rests on
the report of  Dale Belman.  Plaintiffs argue that "Dr. Belman's report demonstrates [that] most
of those who were rehired were younger than 40."  Pls. Mem. at 64.  Belman's report
demonstrates no such thing.  Belman included no findings on the median age of flight service

---

[22] Further, many of the plaintiffs do not have standing to challenge the FAA's hiring
practices around the time of the RIF because they did not apply for jobs at the FAA during this
time.  *Wells v. United States*, 578 F. Supp. 794, 796 (D.D.C. 1983) ("[F]ailure of the plaintiff to
apply for a job with the defendant agency deprived the plaintiff of standing to sue the agency for
discriminatory hiring practices.").  Many other plaintiffs do not have standing to assert a failure
to hire claim because <u>they</u> were in fact hired by the FAA for the positions to which they applied.
*See id.*

specialists hired into other FAA jobs after October 2005 and found instead that the mean age was either 45.04 or 46.77.  Belman Rep't, Pls. Mem. Ex. 2 (Dkt. 263-4) at 14.[23]

Indeed, Belman only compared: (1) the mean age of the flight service specialists subject to the RIF who were hired into other non-flight service specialist FAA jobs with (2) the mean age of flight service specialists subject to the RIF who were not hired into other FAA jobs. Belman Rep't at 5-6, 14.  However, Belman's statistics reveal nothing about whether those hired by the FAA were older or younger than those who <u>applied</u> for the positions.  Belman's incomplete statistics are thus not probative of age discrimination.  *See Farris v. Clinton*, 602 F. Supp. 2d 74, 84 (D.D.C. 2009) (statistics that fail to compare the proportion of qualified minority applicants to those chosen for senior-level positions "are not relevant to the question whether the defendant's choice not to hire [plaintiff] was a pretext for unlawful discrimination"); *Brown v. Small*, 437 F. Supp. 2d 125, 136 (D.D.C. 2006) ("[P]laintiff has offered an array of numbers which, though accurate, have no meaning by themselves . . . [P]laintiff has failed to offer statistics . . . even comparing the hiring rates among black and white applicants relative to their respective presence in the applicant pool."); *Horvath v. Thompson*, 329 F. Supp. 2d 1, 11 (D.D.C. 2004) ("[P]laintiff's numbers are simply irrelevant" to disparate treatment analysis where "plaintiff fails to provide any information about the pool of available and qualified applicants" for positions sought).

---

[23] The mean age of the represented plaintiffs, about 49 as of late 2005 (*see* McDaniel Decl., Defs. SJ Ex. 39 (Dkt. 256-41)), is not much higher.  *See Breen v. Mineta*, 2005 WL 3276163, at *4 (D.D.C. Sept. 30, 2005) ("[A]n age difference of less than ten years is not sufficient to support a prima facie inference of age discrimination.")

Belman's failure to compare the ages of those hired with the ages of those who applied is especially problematic here because most of the oldest flight service specialists would have been better off <u>not</u> applying for other jobs at the FAA after the RIF because they could make more money "double-dipping" by accepting federal retirement, going to work for Lockheed, and collecting both a Lockheed paycheck and a federal annuity.  Supplemental Rep't A of Defendants' Expert William J. Carrington, Defs. SJ. Ex. 94 (Dkt. 256-96), ¶¶ 33-40.[24]

_____

[24] Plaintiffs attempt to downplay the number of older specialists who were retirement-eligible by arguing that it is "manifestly untrue" that many specialists were "retirement-eligible . . . since only 356" of the specialists "qualified for the full ATC [air traffic control] retirement toward which they had been working."  Pls. Mem. at 37 n.13.  Plaintiffs' own statement is manifestly misleading.  The exhibit to which they cite, Pls. Mem. Ex. 3 (Dkt. 265-6), shows that there were <u>also</u> <u>556</u> "optional" retirements, which is precisely the kind of retirement that the <u>oldest</u> of the retirement-eligible specialists would have received and that, for them, was just as good as what plaintiffs call "full ATC retirement."  Here is why: Most federal employees hired before 1984 are covered by the Civil Service Retirement System ("CSRS").  Under CSRS, the annuity of an air traffic controller is computed under the same rules as for other employees except that it may not be less than 50% of the employee's average pay.  5 U.S.C. § 8339(e).  Under the normal CSRS retirement rules, the benefit calculation reaches a 50% annuity after twenty-six years and eleven months of service.  <i>See</i> 5 U.S.C. § 8339(a).  To retire with an "optional" retirement, a non-air traffic CSRS employee would ordinarily need thirty years of service at age 55 or twenty years of service at age 60 or five years of service at age 62.  5 U.S.C. § 8336.  Thus, once an air traffic controller reaches either age 55 with thirty years of service or age 60 with more than twenty-six years and eleven months of service, it no longer makes any practical difference under the CSRS whether service has been as an air traffic controller or not.  Once either of those age/service-year milestones is reached, the annuity calculation is the same and the retirement eligibility requirement is met no matter how many or how few years of service were as an air traffic controller.  Thus, for many of the oldest flight service specialists (those either born before October 1950 who had been continuously serving since October 1975 or earlier or those born before October 1945 who had been continuously serving since November 1978 or earlier) their retirements would have been the ordinary "optional" retirements, not the special "ATC retirement" that (with respect to CSRS) made a difference only for younger retirees.  <i>See</i>, <i>e.g.</i>, Pike Dep., Defs. Op. Ex. 6, at 15, 19, 26 (specialist born in 1947 and hired by FAA in 1973 retired in 2005 with enough air traffic control service for ATC retirement but received "standard" rather than ATC retirement); Williams Dep., Defs. Op. Ex. 7 at 110 (in discussing plaintiffs' exhibit 3, noting that retirees who met "full" retirement features under CSRS would not be "an ATC retirement at all").  Thus, in supposing that only "full ATC

(continued...)

Belman's statistics do not demonstrate disparate treatment in hiring decisions for another reason: the flight service specialists who did apply for continued FAA employment applied for diverse jobs around the country with different hiring criteria and different selection officials for each position.   To the extent that some plaintiffs claim that they were not hired for these various positions, those plaintiffs must show that they were disadvantaged in favor of similarly situated younger persons who obtained the jobs for which they applied.   *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000); *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999).   Neither Belman's report nor any of the plaintiffs present evidence comparing their qualifications to those of the persons hired for the positions for which some of the plaintiffs may have also applied.   In short, they have not shown that they were similarly situated to those who were hired for those positions.   *See* Defs. SJ Mem. (Dkt. 256-1) at 43 (citing *Aliotta v. Bair*, 576 F. Supp. 2d 113, 128 (D.D.C. 2008) and *Doan v. Seagate Technology, Inc.*, 82 F.3d 974, 979 (10th Cir. 1996)).

Plaintiffs also assert that "Charlene Argo testified in deposition that applications from former Flight Service Controllers, even those with Tower and En Route experience prior to age 31, are not accepted for most vacancy announcements," and cite to an eleven-page section of Argo's deposition testimony.   Pls. Mem. at 65; Pls. Mem. Ex. 7 (Dkt. 263-9).   But nothing in those eleven pages, or anywhere else in the deposition transcript, supports plaintiffs' characterization of Argo's testimony.   Flight service specialists had the opportunity to apply for

---

[24](...continued)
retirement[s]" are the measure of how many of the specialists were able to retire, plaintiffs fail to count the oldest specialists who received "optional" retirements and have had the largest retirement benefits.

a variety of jobs at the FAA around the time of the RIF, and they were assisted in their job seeking by the FAA itself.  *See* Defs. Response to Interrog. 24, Defs. Op. Ex. 8 (explaining activities undertaken by the FAA to assist flight service personnel with employment options).  Plaintiffs make no claim that the career transition services were only available to the younger flight service specialists.  The FAA also authorized special hiring programs to give priority to the displaced flight service specialists.  *Id.*  These programs allowed the flight service specialists to receive selection priority when applying for a variety of non-flight service jobs.  *Id.*

Plaintiffs also argue that the agency did not allow plaintiffs to "bump" other employees out of their jobs through use of the "bump and retreat" regulations of 5 C.F.R. part 351.  Pls. Mem. at 21, 64.[25]  However, those regulations apply in situations where an agency maintains employee positions <u>within</u> a given competitive area following a RIF, not where, as here, an agency vacates the entire competitive area.  *See* 5 C.F.R. § 351.701 (agency shall offer a position "in the same competitive area").  The availability, or non-availability, of "bump and retreat" rights has no relevance to plaintiffs' <u>ADEA</u> claim in any event.  Where an employer terminates an employee for age-neutral reasons, <u>the ADEA</u> imposes no duty to transfer the employee to another position.  *E.g.*, *Carswell v. Air Line Pilots Ass'n*, 540 F. Supp. 2d 107, 117 (D.D.C. 2008); *Ridenhour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1986); *Parcinski v. The Outlet Co.*, 673 F.2d 34, 37 (2d Cir. 1982); *Licausi v. Symantec Corp.*, 2009 WL 1873663, at *15 (S.D. Fla. June 30, 2009) (Rosenbaum, M.J.).

---

[25] Those regulations do not directly apply to the FAA, which instead uses the standards set forth in FAA Order 3350.2c, *Staffing Adjustments and Reductions In Force* (Oct. 17, 1994).

Finally, plaintiffs argue that the FAA refused to hire flight service specialists for other FAA positions in order to "guarantee a skilled workforce to the winning bidder."  Pls. Mem. at 67.  The FAA guaranteed no such thing.  To the contrary, one of the things the FAA carefully looked at in all the proposals was how the bidder proposed to <u>attract</u> workers that were <u>not</u> required to work for the winning bidder.  *E.g*., Kansier Dep., Defs. SJ Ex. 72 (Dkt. 256-74), at 152; Little Dep., Defs. Op. Ex. 9, at 47, 121-22; Pls. PI Ex. 5 (Dkt. 10-7) at M.2 ("The Government will assess the degree to which the staffing support approach provides for recruitment and retention"); Neill Opinion, Defs. SJ Ex. 18 (Dkt. 265-20), at 23 (quoting at length FAA evaluation of the "incentives and benefits" Lockheed would offer to "enhance recruitment and retention").  The FAA did require <u>Lockheed</u> to offer the incumbent workers a limited-time "right of first refusal" for available Lockheed jobs, Courain Decl. (Dkt. 23-5) ¶ 25; Sturm Dep. (Dkt. 256-89) at 36-37, 53-54.  But that requirement was a one-way street.  The employees were not obliged to accept those offers.  <u>See</u> Freed Dep., Defs. Op. Ex. 10, at 136-37. Plaintiffs' theory is also belied by Lockheed's recognition, Sturm Dep., Defs. SJ Ex. 87 (Dkt. 256-89), at 110, that it in fact faced competition from the FAA in the labor market.

**6.      Plaintiffs Fail To Rebut Defendants' Proffered<br>Reasons For Conducting The A-76 Study**

**a.      The Demand For Flight Service Has<br>Been In Long-Term Secular Decline**

The RIF in 2005 followed a long period of decline in demand for the work done by flight service specialists.  Plaintiffs charge that, by making that observation of the background facts, defendants write a "wholly new history of Flight Service" based on the "questionable premise that general aviation was in decline."  Pls. Mem. (Dkt. 256-3) at 31.  But defendants' brief cited

-37-

hard data that squarely supports that premise.  Defs. SJ Mem. (Dkt. 265-1) at 8-11.  And the

long-term decline in general aviation has been widely noted well beyond the confines of

defendants' opening brief.  *See*, *e.g.*, Matthew L. Wald, *Up, Up, and . . . Never Mind*, NEW YORK

TIMES, Apr. 26, 2007, at G1 ("longtime private pilots fear that an industry is withering").

Indeed, the decline in demand for flight services was one of the first things that John

Hennigan (later Deputy Chief Financial Officer) noticed when he arrived at the FAA in 1991:

> So very early in my career at the FAA, I was aware that there was — this was an
> interesting — interesting part of the FAA that required analysis, and this
> happened every year.  So in spite of the fact that the forecasts were generally that
> activity would increase every year, the activity in the flight service arena kept
> decreasing.  This happened very early on and sort of was one of the things I
> noticed.

1st Hennigan Dep., Defs. SJ Ex. 65 (Dkt. 256-67), at 26.  Similarly, the Core Architecture

Group, Defs. SJ Ex. 6 (Dkt. 256-8) at 13, had observed in 1998 that there was no "reason to

continue the current level of space requirements [for flight services] which were put in place in

anticipation of growth" that did not materialize.

Defendants' brief also noted a second reason why demand for the work done by

specialists was declining, the growth of automated alternatives to work that formerly need a

flight service specialist.  Programs to obtain weather briefings and to file flight plans over the

Internet became increasingly available and user-friendly.  Global positioning system navigation

assistance and streamed-to-the-cockpit satellite weather both became more widespread.  And the

use of instrumentation for weather observation largely displaced sensory observation by

specialists.  Defs. SJ Mem. at 11-13.  This point that automation had made so many inroads on

specialists' work is not post-hoc invention for purposes of this litigation, but had long been

documented.  For example, the 2001 Inspector General report observed both that "[d]emand for

flight services provided by flight services specialists has been declining steadily since the 1980s"

and that such services "are increasingly being replaced by on-line flight services accessed

directly by users." 2001 IG Rep't, Defs. SJ Ex. 7 (Dkt. 256-9), at 3. Similarly, the 1998 Core

Group Report had noted that "[o]ne-on-one weather briefing demand is projected to continue to

decrease as additional weather data is available via automated means and pilots become more

comfortable with computers." Defs' SJ Ex. 6 (Dkt. 256-8) at P00765. And in 1997, the National

Civil Aviation Review Commission had pointed out that "[c]onsolidation of Flight Service

Stations and relying on expanded" use by pilots of computers "to provide pre-flight briefings,

weather briefings, and flight plan filings could save the FAA over $1 billion over the next five

years while maintaining or improving safety and existing services to the general aviation

community." NCARC Final Rep't, http://www.library.unt.edu/gpo/NCARC/reports/

pepele.htm, Part II, § V.C. (last visited April 22, 2009) ("NCARC Report").

 In short, that demand for the work done by flight service specialists had been declining

had been cited in reports long before the RIF at issue in this case.

### b. The FAA Considered Compliance With The President's Management Agenda To Be Important

 Plaintiffs contend that compliance with the President Bush's Management Agenda as a

reason for competitive sourcing flight service does not "withstand[] serious scrutiny." Pls. Mem.

(Dkt. 265-3) at 69. But the question is not whether compliance with the President's

Management Agenda would have been plaintiffs' reason for taking the action, or whether it

would have been the Court's reason, or even whether it would have been a good reason. The

issue is only whether — good reason or bad, correct or mistaken — it was one of defendants'

actual reasons. *E.g.*, *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

We can therefore assume *arguendo* that outsourcing would not have placed high on plaintiffs' management agenda had they been elected to run the executive branch.  But it was an important part of President Bush's actual agenda in 2002.  And Secretary Mineta in fact took the President's Management Agenda "very seriously."  Mineta Decl., Defs. SJ Ex.40 (Dkt. 256-42) ¶ 6.  Indeed, President Bush "expressed his interest directly" to  Secretary Mineta.  *Id*.  It was thus important to the Secretary and the FAA that the agency pursue the goals the President had set out.  *Id*.  As Secretary Mineta described, "[i]n making decisions to meet the [President's Management Agenda]," the agency was trying to "distinguish what functions should be kept in-house and what functions should be potentially outsourced."  *Id.* at ¶ 8 (also stating that in trying to comply with President's Management Agenda, Mineta "did not consider the ages of the employees who would be potentially outsourced").  Plaintiffs may disagree with Mineta's decision as a matter of policy. But there is no dispute what decisions he did make nor that, in making them, he was not motivated by age.  *See* Mineta Decl. ¶¶ 6, 8.  Whether right or wrong, whether plaintiffs (or even the Court) would have made the same decision, Mineta actually did consider compliance with the President's Management Agenda to be vital.[26]

---

[26] Plaintiffs spend more than a dozen pages (Pls'. Mem. at 40-52) rebutting an argument defendants did not make, namely what plaintiffs call defendants' "ad hoc Reason Code analysis," Pls. Mem. at 31 (not citing any part of defendants' brief ).  Plaintiffs' own extended reason code analysis is beside any material point.  Reason codes ultimately reflect agency decisions — and some of those decisions were important — but reason codes themselves do not make policy decisions.  1st Hennigan Dep., Defs. Ex. 65 (Dkt. 256-67), at 84-85.  Plaintiffs stress that FAA employee Ronald Page collected reason code data, Pls. Mem. at 42, 47, and they ask (*id*. at 46) who can decide that a function falls within reason code "A," which is used in listing positions involved in core agency functions.  The answer to that question, found in material plaintiffs block quote, is that "'[t]his reason code is designed to permit the *Agency Head* to identify specific commercial activities as those that he/she does not believe should be subjected to privatization, outsourcing or competition.'"  *Id*. at 41, *quoting* Pls. Mem. Ex. 11 (Dkt. 263-11)

(continued...)

-40-

One way in which "agencies were evaluated" was "how they were expanding opportunities to conduct public-private computations (competitive sourcing)." *Id*. at ¶ 7.  In particular, agencies were under "pressure to save money and also to look at A-76," a tool for competitive sourcing.  Bertram Dep., Defs. SJ Ex. 47 (Dkt. 256-49), at 28-29.  When the Office of Management and Budget ("OMB") questioned the FAA's funding request for flight service during the fall of 2001 in light of the Inspector General's recommendation to consolidate and reduce the number of flight service offices, *id*. at 22-23, the FAA determined that "rather than do a consolidation [of flight service] and do A-76 on something else, to do one process for flight service," *id*. at 28-29.

Contemporaneous communications by Chris Bertram, the Chief Financial Officer of the FAA, with FAA administrators further reflect the importance that complying with the President's Management Agenda had on competitively sourcing flight service.  In June of 2002,[27] Bertram wrote to then-Administrator Jane Garvey that Bertram's Office of Financial Services had "determined that the Flight Service Stations (FSS) function, except in Alaska, should be used to

---

[26](...continued)
(original emphasis omitted by plaintiffs restored).  Page was not the agency head.  He was Mineta's subordinate's subordinate's subordinate's subordinate's subordinate's subordinate.  *See* Page Dep., Defs. Op. Ex. 11, at 28-29; Defs. SJ Ex. 31 (Dkt. 256-33); Sturgell Dep., Defs. Op. Ex. 12, at 11-14; 1st Hennigan Dep., Defs. Ex. 65 (Dkt. 256-67), at 18, 23.  For that reason, defendants focus in the text on <u>Mineta</u>'s decision that air traffic separating controllers performed core functions, not on how quickly or accurately Page's inventory reflected that decision.  The document for which Page was gathering reason codes was "an inventory document and <u>not a dispositive policy document</u> about what you would do."  1st Hennigan Dep. at 84 (emphasis added); *see also* Page Dep. at 75 (reason codes supplied to him by other agency employees were subject to higher-level review).

[27] Prior to June 2002, the FAA had established a team "to figure out what the next steps in the A-76 process were, and to start that process."  Bertram Dep. at 36.

meet the OMB requirement" for what must be competitively sourced, and, therefore, had "engaged a contractor to perform a feasibility study to clarify the scope of the review" of the potential A-76 of flight service.  June 19, 2002, Bertram Memo to Garvey, Defs. SJ. Ex. 10 (Dkt. 256-12).  In a memorandum two months later to Acting Administrator Monte Belger, Bertram again stressed that considering flight service for competitive sourcing "is a central part of our effort to meet the requirements of" the President's Management Agenda.  August 21, 2002, Bertram Memo to Belger, Defs. SJ Ex. 11 (Dkt. 256-13) (informing Belger that Bertram had "accepted the results of [the feasibility study] and decided to proceed with a study of the FSS function" excluding Alaska).

Plaintiffs also argue that "FAA interest in complying with the [Agenda] extended only to the Flight Service."  Pls. Mem. at 71.  As supposed support for this point, plaintiffs argue that the FAA did not meet what was at one time an OMB goal that agencies eventually consider competitive sourcing for the equivalent of 50 percent of their 2000 commercial workforce.  Pls. Mem. at 33, 39 n.15, 72.  However,  OMB, which oversaw the compliance with the agenda, discarded the 50% benchmark by July of 2003, after the FAA had selected flight service to be considered for competitive sourcing.  *See* Office of Management and Budget, *Competitive Sourcing*, 2003, Pls. Mem. Ex. 58 (Dkt. 256-46); *see also* Defs. SJ Mem. (Dkt. 256-1) at 19 n.20. In any event, the FAA's large undertaking to competitively source flight service, *see* June 19, 2002, Bertram Memo to Garvey ("This effort will require at least 18 months, could easily cost in excess of $12 million . . ., and may result in serious personnel disruptions"), satisfied the previous benchmark of 15 percent.  June 19, 2002, Bertram Memo to Garvey.

In short, plaintiffs adduce no evidence to discredit the central role that competitively sourcing flight service had in meeting the requirements of the President's Management Agenda. Meeting that goal was an important actual reason for the agency's decision.

**c.  A Desire To Save Taxpayers Two Billion Dollars In Unnecessary Expenditure Was An Actual Reason For The Challenged Decisions**

In trying to establish that age was "the 'reason' that the [FAA] decided to act," *see Gross v. FBL Financial Services*, 129 S. Ct. at 2350 (citation omitted), plaintiffs disparage the FAA's efforts to save money by suggesting that the agency's "vaunted concern with cost-savings" was not a true concern.  *See* Pls. Mem. (Dkt. 265-3) at 69-71.  Plaintiffs, however, concede that the FAA saved the taxpayers money by competitively sourcing flight service.  They argue only that the FAA saved merely $1.2 billion, and that the FAA did not adopt other recommendations that might have saved money.  *See id.*  Whether the FAA has saved more than two billion dollars in competitively sourcing flight service, *see* Reforecast Estimation, Defs. SJ Ex. 22 (Dkt. 256-24) or merely more than a billion dollars is immaterial.  The FAA intended to achieve considerable cost savings through competitively sourcing flight service.  And it did achieve such savings.  *Id.* (showing more than $2 billion in savings).

A desire to save money (even a mere billion or two) is certainly a valid reason for any agency to consider outsourcing.  Indeed, "'[w]hen private performance is feasible and no overriding factors require in-house performance, the taxpayer <u>deserves</u> and <u>expects</u> the most economical performance and therefore rigorous comparison of contract cost versus in-house cost <u>should</u> be used when appropriate to decide how the work will be done.'"  *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038, 1049 (D.C. Cir. 1989), *quoting* S. REP. NO. 96-

144, at 4 (1979) (emphasis added).  And, as plaintiffs concede, the FAA <u>was</u> under pressure

during fiscal 2002 to save money.  *See* Pls. Corrected Stmt. of Mat. Facts in Opp. to Defs.' (Dkt.

265-5) at 15 (not responding to, and therefore admitting, Def. Stmt. Mat. Facts (Dkt. 256) ¶ 38);

*see also* Bertram Dep., Defs. SJ Ex. 47 (Dkt. 256-49) at 28-29.  The FAA determined that the A-

76 process was "an established way of actually analyzing a function and trying to see how you

could make it more efficient."  *Id*. at 32.

Plaintiffs' attempts to discredit FAA's efforts to save money are also belied by the

evidence exchanged in discovery.  The FAA made considerable efforts to save money outside of

the context of flight service: for example, it consolidated its accounting operations from nine

regional offices into a single center, centralized human resource and travel processing support

from twelve locations into three, consolidated real property inventory and management into a

single database, and reduced in half its number of wireless communications contracts.  *See* Defs.

Resp. to Pls Interrog. No. 13, Defs. Op. Ex. 13, at 28.

Similarly, this Court should reject plaintiffs' invitation to second-guess whether some

different consolidation method for flight service might have been an even better way to save

money.  As plaintiffs admit, several internal and external studies, conducted from 1996 through

2001, found that the FAA could provide AFSS services differently and in a more-cost effective

manner.  Pls. Corrected Stmt. of Mat. Facts in Opp. to Defs.' (Dkt. 265-5) ¶ 21.  And, they admit

that these studies recommended that the FAA consolidate flight service stations.  *Id*. ¶ 22, Pls.

Corrected Stmt. of Mat. Facts in Opp. to Defs.' ¶ 10.  Plaintiffs further admit that a 1996

Inspector General report recommended that the FAA should "consider having the private sector

provide the full range of flight services," but claim that the 2001 Inspector General report

-44-

suggested that consolidation should be accomplished through attrition.  Pls. Corrected Stmt. of

Mat. Facts in Opp. to Defs.' ¶ 24.  However, what plaintiffs ignore is that the Inspector General

said in 2001 that its method was "one of many possible consolidation scenarios FAA could

consider, since it is ultimately the agency's decision to determine which facilities should be

consolidated."  Office of the Inspector General Report ("2001 IG Report"), Defs. SJ Ex. 7 (Dkt.

256-9), at 5.  Further, plaintiffs ignore the inherent difficulties of reorganizing flight service

through attrition.  Former Administrator Blakey highlighted those problems:

> The problem with using attrition as a way to realign your work force is that you do have
> to wait for the attrition to occur, number one.  Number two, you do not know where it
> will occur, and it has no relationship to where you have the actual need for the service
> and where you have the need for the workforce.  So the two things are out of alignment.
> That is very difficult to manage.
>
> Number two, to be able to reassign people, you have to have funding and the ability and
> the willingness on the part of the workforce to move to where the needs are.  Again, you
> will have alignment problems and difficulties with that.
>
> The third thing is you will have a period of time in which you have to [retrain] people.  If
> you are having to do that on a basis that is not predictable, it becomes a very difficult
> thing to do.
>
> There are other problems as well, but the ones I am pointing out are ones that are very
> significant and they are ones that are very costly, and they do not necessarily go to
> achieving a cost-efficient service on the basis that would have achieved the kind of cost
> savings and the kind of service delivery that the current contract is delivering.  You have
> to remember that the current contract is delivering roughly $2.1 billion of cost savings
> over a 13-year period.  That is very significant by anyone's standards.

Blakey Dep., Defs. SJ Ex. 48 (Dkt. 256-50), at 155:11-156:16.  Finally, the FAA had

experienced a previous round of consolidation and had found it to be a difficult process, 1996 IG

Rep't, Defs. SJ Ex. 3 (Dkt. 256-5), at 3; Jackson-Brame Dep., Defs. SJ Ex. 68 (Dkt. 256-70) at

89; Bertram Dep. 28, whereas the A-76 process was "an established way of actually analyzing a

function and trying to see how you could make it more efficient," Bertram Dep. 32.

In any event, the question of whether the agency exercised the best business judgment to meet pressures to save money and consolidate flight service is not a matter for a court to review. The "federal anti-discrimination statutes do 'not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions.'" *Williams v. Dodaro*, 576 F. Supp. 2d 72, 87 (D.D.C. 2008) (quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999)); *see also Evers v. Alliant Techsystems, Inc*., 241 F.3d 948, 956 (8th Cir. 2001) (because "a company's exercise of business judgment is not a proper subject for judicial oversight," when "a company exercises its business judgment in deciding to reduce its work force, it need not provide evidence of financial distress to make it a 'legitimate' RIF.'") (internal quotations omitted).  At the very least, the FAA's considered business judgment that competitively sourcing flight service would result in substantial savings shows that age was not the "but-for" cause for the decision to solicit competing bids to make flight service more efficient and to get more bang for the taxpayer's buck.

## Conclusion

For the reasons stated in the Memorandum Supporting Defendants' Motion for Summary Judgment and stated above, defendants' motion for summary' judgment should be granted and plaintiffs' motion for summary judgment should be denied.

Respectfully submitted,

TONY WEST
Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

-46-

STUART A. LICHT
Assistant Branch Director
Civil Division

Of Counsel:                              /s/ *Brian G. Kennedy*
                                         BRIAN G. KENNEDY (DC Bar No. 228726)
                                         ADAM D. KIRSCHNER (IL Bar No. 6386601)
Eden Brown Gaines, Esq.                  LISA ZEIDNER MARCUS (N.Y. Bar)
Michael Doherty, Esq.
Julia A. Rhodes, Esq.                    United States Department of Justice
Personnel & Labor Law Staff              Civil Division, Federal Programs Branch
Office of Chief Counsel                  20 Massachusetts Avenue N.W.  Room 7126
Federal Aviation Administration          Washington, D.C.  20530
600 Independence Ave., S.W.              Telephone:  (202) 514-3357
Room 1E100                               Fax:  (202) 616-8470
Washington, D.C. 20591                   Email: brian.kennedy@usdoj.gov
Phone: (202) 385-8254
Fax: (202) 493-5085                      Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2009, a true and correct copy of the foregoing

Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Cross Motion

for Summary Judgment and Reply Memorandum in Support of Defendants' Motion for

Summary Judgment was served by first-class mail upon the following pro se plaintiffs who are

not served through the Court's ECF system:

Duane Swanson                         Randell Liles
RD #1 Box 300BB                       737 Highland Crest
Roaring Spring, PA 16673              Hurst, TX 76054

Jim Wilkerson                         Norman B. Buckallew
605 Audrey Drive                      3519 Kites Landing Rd
Fairbanks, AK 99709                   Florien, LA 71429


/s/ *Brian G. Kennedy*
Brian G. Kennedy