IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
KATHLEEN A. BREEN, et al.,                )
                                                      )
     Plaintiffs,                              )
                                                      )
              v.                   )    Case No. 1:05CV00654-RWR
                                                      )
RAY H. LAHOOD, et al.,                      )
                                                      )
     Defendants                            )
_____)

DEFENDANTS' RESPONSE TO PLAINTIFFS'
CORRECTED STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

     Pursuant to Local Civil Rule 7.1(h), defendants hereby submit the following responses to

plaintiffs' statement of material facts not in dispute with regard to plaintiffs' motion for

summary judgment.[1]

     Defendants have filed a motion seeking summary judgment, which remains pending

before the Court.  *See* Dkt. 256.  The following responses identify disputed issues of fact on

matters raised by plaintiffs in support of plaintiffs' motion for summary judgment.  Plaintiffs

have moved for summary judgment solely on their disparate impact claim, not on their disparate

treatment claim, and the responses below identify facts that are not material to plaintiffs' motion

for summary judgment.  Defendants do not concede that any of the facts identified by plaintiff

_____

     [1] Plaintiffs filed multiple versions of their statement of facts not in dispute.  Pursuant to
plaintiffs' counsel's representation to defendants' counsel that plaintiffs rely on the version filed
on June 23, 2009, "Plaintiffs' Corrected Statement of Material Facts Not in Dispute in Support
of Their Cross-Motion for Summary Judgment" (Dkt.  265-4), defendants respond to that
version.

     Defendants set forth in *italic* type below the statements of plaintiffs and respond in
Roman type to those statements.

are material to the outcome of the case.  Each party's motion identifies different facts.  That defendants dispute facts regarding plaintiffs' motion does not affect defendants' entitlement to summary judgment.  The defendants are entitled to summary judgment regardless of how the facts identified by plaintiff might be resolved at a later stage in these proceedings.

To preclude any inference under Local Civil Rule 7.1(h) that a statement is undisputed, this response also contains defendants' statements regarding facts that are not necessarily material to the plaintiffs' entitlement to judgment but that are either disputed or set forth in the plaintiffs' statement in a manner that is incomplete or otherwise potentially confusing.

*1. Prior to October 3, 2005, the Federal Aviation Administration's Flight Service Controllers performed the following functions servicing general aviation (i.e., all civilian aircraft, including commercial air taxi services, other than commercial airliners):*
- *Pre-flight pilot briefing services (concerning weather and terrain conditions and advisable flight plans)*
- *Filing of flight plans, transmittal of flight plans to appropriate air traffic control facilities, and closing out flight plans upon completion of the flight*
- *Services to aircraft in flight (including weather updates and assistance to lost pilots)*
- *Initiation and coordination of Search and Rescue services*
- *Notices to Airmen (NOTAMs): advisories of temporary flight restrictions and "outages" in the National Airspace System (NOTAM-Ds) and of local hazard conditions (NOTAM-Ls). NOTAM-Ds have national security implications because they have the ability to modify the National Airspace System and because relevant information includes military activities, presidential movements, and nuclear facilities.*
- *Aviation and weather information broadcasting*
- *Navigation aid monitoring (in direct support of the NOTAM-D function)*
- *Weather observations*
- *En route flight advisory services (Flight Watch)*
- *International customs notification and international liaison concerning shared airspace and facilities (Flight Service Stations located on the nation's borders)*
- *Support of law enforcement agencies (including the Secret Service) and military aviation (after-hours support)*
- *Coordination with emergency facilities*

*Ex. 22, Grant-Thornton Report, at D00242, D00253-D00256; Ex. 23, Memorandum from Assoc. Admin for Air Traffic Services to Asst. Admin. for Financial Svcs., re: NAATS Challenge to the*

*FAIR Act Inventory at P00913; Ex. 38, Currier Dep. at 15-17; Ex. 29, Elias Declaration; Ex. 52, Elias Dep. at 26-49; Ex. 28, Reimann Dep. at 78-79, 84, 115-16, 174-75.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 1:**

Disputed. Although prior to October 3, 2005, the Federal Aviation Administration's Flight Service Controllers performed functions identified in plaintiffs' statement, they were not the only ones who performed these functions. *See Elias* Dep.[2], Defs. SJ Ex. 61 (Dkt. 256-63), at 95; Sturgell Dep., Defs. SJ Ex. 86 (Dkt. 256-88), at 52; *Brydon* Dep., Defs. SJ Ex. 51 (Dkt. 256-53), at 44; Brown Dep., Pls. Mem. Ex. 25 (Dkt. 265-18), at 52; Sheridan Decl., Defs. SJ Ex. 42 (Dkt. 256-44), ¶ 12; Pls. Corrected Resp. to Defs. Stmt. Mat. Facts (Dkt. 265-4) ¶¶ 8-10. Further, not everything that plaintiffs describe as a function is actually a function. Flight service specialists did not perform the NOTAM function; rather they <u>transmitted</u> notices to airmen by formatting and disseminating the information that they received from an authorized official. *See, e.g.*, Reyna Decl., Defs. SJ Ex. 41 (Dkt. 256-43), ¶ 3; *Campbell* Dep., Defs. SJ Ex. 52 (Dkt. 256-54), at 33-34; *Rufo* Dep., Defs. SJ Ex. 82 (Dkt. 256-84), at 42. Further, the statement that NOTAM-Ds have national security implications is conjecture rather than a statement of fact. Flight Service Controllers did not make decisions that airspace was restricted but rather an entity such as the secret service would make such decisions. *See Mitchell* Dep., Defs. Op. Ex. 14, at 22 .

*2. On December 11, 2000, President William J. Clinton signed Executive Order 13180, ordering the establishment of the Air Traffic Organization ("ATO") with the FAA, for the purpose of improving "the provision of air traffic services, an inherently governmental function." Ex. 21. 5*

---

[2] In citing depositions, names of deponents who are plaintiffs are in italics. Names of other deponents are in plain type.

*U.S.C. § 2109[(1)] defines an "air traffic controller" as*

> *a civilian employee of the Department of Transportation or the Department of Defense who, in an air traffic control facility or flight service station facility—*
>
> *(A) is actively engaged—*
>
> > *[(i)] in the separation and control of air traffic; or*
> >
> > *(ii) in providing preflight, inflight, or airport advisory service to aircraft operators; or*
>
> *(B) is the immediate supervisor of any employee described in subparagraph (A) . . . .*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 2:**

Disputed to the extent that plaintiffs suggest or contend (a contention that would be one of law rather than fact) that the definition set forth in 5 U.S.C. § 2109, which by its own terms is limited to title 5 of the United States Code, also applies to the Executive Order.  Also disputed to the extent that plaintiffs suggest that the term "air traffic controller," as defined in 5 U.S.C. § 2109, is not an umbrella term that includes three categories of employees that each handle different functions.  Any such suggestion is a suggestion of law rather than fact.  In any event, flight service employees constitute one category of employees that is distinct from air traffic controllers that are actively engaged in the separation and control of air traffic.  *Compare* 5 U.S.C. § 2109(1)(A)(i) *with* 5 U.S.C. § 2109(1)(A)(ii).

*3. The Federal Activities Inventory Reform Act, Pub. L. 105-270, Oct. 19, 1998, 112 Stat. 2382 (31 U.S.C. 501 note), as interpreted by the Office of Management and Budget, requires each federal agency to list the number of full-time equivalent ("FTE") employees performing each function, whether that function is "inherently governmental" or "commercial," and, if commercial, to assign a "Reason Code" indicating whether it is suitable for cost comparison or direct conversion to private industry performance. See OMB Circular A-76, available at*

*http://www.whitehouse.gov/omb/circulars/a076/a76_rev2003.pdf (last visited Jun. 14, 2009); Ex. 11, OMB Reason Codes.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 3:**

Disputed.  Plaintiffs do not provide any temporal scope to their statement.  They cite to OMB guidance as of May 29, 2003, and also to a description of different Reason Codes as of August 15, 2000.  *See* OMB Circular A-76, available at http://www.whitehouse.gov/omb/ circulars/a076/a76_rev2003.pdf (last visited Aug. 26, 2009); OMB Reason Codes, Pls. Mem. Ex. 11 (Dkt. 263-15).  Further, plaintiffs' description of these documents is not a complete representation of what is contained in them, although the revised OMB guidance of May 29, 2003, provides federal policy as of that date for the competition of commercial activities and the OMB FAIR Act Inventory User's Guide cited by plaintiffs provides an explanation for different Reason Codes as of August 15, 2000.  *See* OMB Circular A-76, available at http://www.whitehouse.gov/omb/circulars/a076/a76_rev2003.pdf (last visited Aug. 26, 2009); OMB Reason Codes,  Pls. Mem. Ex. 11 (Dkt. 263-15).


*4. In the FAA, annual reporting in accordance with the Fair Act begins with a request from the Office of Finance to the various offices of the Agency concerning the number of FTE employees performing each function, whether that function is inherently governmental or commercial, and, if commercial, what Reason Code the office assigns to that activity. The Office of Finance reviews Reason Code assignments. In 2000, the assignment of Reason Codes to Air Traffic Controllers was inconsistent; the same function might be designated Reason Code A, a "core" mission of the Agency (and thus not suitable for outsourcing) in one region and Reason Code B, subject to A-76 cost comparisons, in another. In 2001, all Air Traffic Controllers were designated Reason Code A. In 2002, the final Fair Act inventory designated Tower and En Route Controllers as Reason Code A, and Flight Service Controllers as Reason Code B. Ex. 12, Hennigan Dep., Feb. 1, 2008 ("Hennigan I"), at 70-82; Ex. 13, Page Dep. at 25-31.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 4:**

Disputed.  First, there is no temporal scope defined in the statement.  Second, the FAIR

Act does not classify individual employees.  Rather, the inventory is categorized by full-time

equivalent ("FTE") positions so if ten people performed 90% Reason Code B duties and 10%

inherently governmental duties, nine FTEs would be listed as Reason Code B and one would be

listed as inherently governmental.  *See* 1st Hennigan Dep., Pls. Mem. Ex. 12 (Dkt. 265-9), at 79;

Defs. SJ Ex. 65 (Dkt. 256-67), at 51; Bertram Dep. Defs. SJ Ex. 47 (Dkt. 256-49), at 60.  Third,

it is disputed that all Air Traffic Controller FTEs were designated Reason Code A in 2001.  *See*

Hennigan I, Pls. Mem. Ex. 12 (Dkt. 265-9), at 81-82.  Fourth, it is disputed that the final FAIR

Act Inventory for 2002 classified all flight service FTEs as Reason Code B.  Although flight

service FTEs were primarily classified as Reason Code B in the 2002 FAIR Act Inventory, there

were some FTE positions with other classifications.  *See* Report of Defs' Expert Bernard Siskin

("Siskin Rep't"), Table 1, Pls. Mem. Ex. 1 (Dkt. 263-3).


*5. In late 2001, the Office of Finance decided to subject the Flight Service to an A-76*
*competition. In furtherance of that goal, Christopher ("Chris") Bertram, Chief Financial*
*Officer, and/or his Deputy, John Hennigan, assembled or caused to have assemble a working*
*group whose members included, inter alia, Mr. Hennigan, Ronald Page of the Office of Finance,*
*Marilyn Jackson-Brame, and Jack Nimmo. Ex, 12, Hennigan Dep. at 111; Ex. 9, Jackson-Brame*
*Dep. at 64, 68-70, 95-96, 199-200; Ex. 54, Nimmo Dep. at 39.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 5:**

Disputed.  The statement that the Office of Finance decided to subject flight service to an

A-76 competition in late 2001 is not supported by the record cited.  Neither Hennigan's nor

Nimmo's cited deposition transcript mention a date of when Flight Service was selected for an

A-76 competition.  And, Jackson-Brame's transcript merely states that Hennigan requested

having a feasibility study in late 2001 to determine whether flight service was a potential

candidate for an A-76 competition.  *See* Jackson-Brame Dep., Pls. Mem. Ex. 9 (Dkt. 265-8), at

96-97.  Rather, in late 2001, the FAA decided to consider flight service for an A-76 competition.

*See* Bertram Dep., Defs. SJ Ex. 47 (Dkt. 256-49), at 28.  Bertram informed Administrator Garvey

in a June 19, 2002, memorandum that the FAA had engaged an outside contractor to perform a

feasibility study to clarify the scope of the review.  *See* Pls. Corrected Resp. to Defs. Stmt. Mat.

Facts (Dkt. 265-4) ¶ 42; *see also* Memorandum from Bertram to Administrator Garvey

("Bertram Memo to Garvey"), June 19, 2002, Pls. Mem. Ex. 8 (Dkt. 263-12).  Then, in an

August 21, 2002, memorandum, Bertram wrote to Acting Administrator Monte Belger that

Bertram had accepted the results of the feasibility study and decided to proceed with a study of

competitively sourcing the flight service function except for the flight service function in Alaska.

*See* Pls. Corrected Resp. to Defs. Stmt. Mat. Facts (Dkt. 265-4) ¶ 44; Memorandum from

Bertram to Acting Administrator Belger ("Bertram Memo to Belger"), August 21, 2002, Defs. SJ

Ex. 11 (Dkt. 256-13).  Defendants do not dispute that a working group developed an action plan

for considering flight service for an A-76 competition and that the working group included

Ronald Page, Marilyn Jackson-Brame, and Jack Nimmo.  *See* 1st Hennigan Dep., Defs. Op. Ex.

15,  at 111.

*6. The reasons that FAA officials have given for subjecting the Flight Service to an A-76
competition are 1) to reduce the cost associated with Flight Service; and 2) to comply with the
President's Management Agenda. E.g., Ex. 8, Memorandum to Administrator from Assistant
Administrator for Financial Services, re: OMB Circular A-76 Cost Comparison of Flight Service
Stations, June 19, 2002; Ex. 24, Bertram Dep. at 58-59; Ex. 12, Hennigan Dep. I, at 83-84,
128-29, 140-41; Ex. 9, Jackson-Brame Dep. at 73, 116; Ex. 41, Little Dep. at 50-52.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 6:**

Disputed.  Although reducing costs and complying with the President's Management

Agenda were two of the reasons given for selecting flight service for an A-76 competition, they

were not the only two reasons.  The need for consolidating flight service, *see* Bertram Dep. Defs.

SJ Ex. 47 (Dkt. 256- 49), at 28-29, the decline of general aviation, *see* 1st Hennigan Dep., Defs.

SJ Ex. 65 (Dkt. 256-67), at 26, and the advent of newer technology, *see* 2001 IG Report, Pls.

Mem. Ex. 27 (Dkt. 265-20), at 3, all contributed to the decision to have a public-private

competition for flight service.

*7. The President's Management Agenda ("PMA") called for agencies to compete or directly
convert to private contracting 15 percent of their commercial activities (based on their 2000
FAIR Act inventories) by 2003, and eventually to compete fifty percent of their commercial
activities. Ex. 53, President's Management Agenda; Ex. 58, OMB Competitive Sourcing Plan at
5; Ex. 8, Memorandum to Administrator from Assistant Administrator for Financial Services, re:
OMB Circular A-76 Cost Comparison of Flight Service Stations, June 19, 2002.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 7:**

Disputed.  There is no temporal scope in the statement.  OMB discarded all numeric

benchmarks cited in the statement by July, 2003, after the FAA had started considering flight

service for an A-76 competition.  *See* Office of Management and Budget, *Competitive Sourcing*,

2003, Pls. Mem. Ex. 58 (Dkt. 265-46).  It is undisputed, however, that the President's

Management Agenda of FY 2002, when flight service was selected to be studied for an A-76

competition, established the numeric benchmarks cited in plaintiffs' statement.

*8. In 2002, pursuant to his duties as project manager for implementing OMB Circular A-76,
utilizing the draft 2002 version of the FAA's FAIR Act inventory, Ronald Page prepared a list of
commercial activities that could be considered for A-76 review. The Flight Service was not on
that list. Ex. 13, Page Dep. at 21-23 and D003770-D003773.*

- 8 -

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 8:**

It is immaterial and irrelevant whether the FAA considered other functions for possible competitive sourcing in the fall of 2002, *see* Page Dep., Pls. Mem. Ex. 13 (Dkt. 265-11), at 23, after it had decided in the summer of 2002 to devote extensive resources to competitively sourcing flight service, *see* Bertram Memo to Garvey, June 19, 2002 , Pls. Mem. Ex. 8 (Dkt. 263-12); Bertram Memo to Belger, August 21, 2002, Defs. SJ Ex. 11 (Dkt. 256-13).

*9. In June 2002, Executive Order 13180 was amended to remove the description of the provision of air traffic services as "inherently governmental." The purpose of this amendment was to allow the FAA to continue to operate its contract tower program, whereby air traffic control towers in some cities are operated by private contractors. Ex. 21.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 9:**

Disputed in part.  It is undisputed that Executive Order 13180 was amended on December 7, 2000 and that one of the amendments was to delete ", an inherently governmental function," from the first sentence of the executive order.  According to the amendment itself, the purpose of the correction was to "*make clear* that the executive order did not inadvertently preclude the continuation of the successful contract tower program."  Pls. Mem. Ex. 21 (Dkt. 265-14) (emphasis added).  To the extent that plaintiffs are suggesting that the FAA would have been unable to operate its contract tower program without the Executive Order amendment, defendants dispute that suggestion as contrary to the scope of Executive Order 13180 and the plain language of the amendment.  Executive Order 13180 referred to the provision of air traffic services, but its purpose was to establish the Air Traffic Organization, not to determine that air traffic services were inherently governmental.  *Id.*

*10. Prior to the decision to hold an A-76 competition of the Flight Service, several governmental entities had prepared or commissioned reports recommending that the Flight Service in the lower 49 states and Puerto Rico be consolidated from 58 Automated Flight Service Stations ("AFSSs") to approximately 20. These reports did not recommend contracting out the Flight Service to private entities. These reports recommended reducing the Flight Service workforce through attrition and buyouts, without involuntary termination of Flight Service Controllers. These reports recommended retaining the OASIS computer system developed for the FAA at the Agency's expense. These reports provided estimates of the substantial savings that would be realized by following their recommendations. 1997 National Civil Aviation Review Commission ("NCARC") Report, Part II, § V.C., http://www.library.unt.edu/gpo/NCARC/reports/pepele.htm (last visited June 7, 2009); Ex. 39, Flight Architecture Core Group Report; Ex. 26, Coopers & Lybrand Report; Ex. 27, 2001 Report of the Inspector General.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 10:**

Disputed.  A report not cited by plaintiffs — the 1996 Office of the Inspector General Report ("1996 Inspector General Report"), Defs. SJ Ex. 5 (Dkt. 256-7) — *did recommend* that the FAA consider contracting out the flight service to private entities, *see*  Defs. SJ Ex. 5 (Dkt. 256-7) at 8-10.  The rest of plaintiffs' statement is not supported by the evidence that they cited.

The first report cited by plaintiffs, the 1997 National Civil Aviation Review Commission ("NCARC") Report, Part II, § V.C., identifies "[f]urther consolidat[ing] Flight Service Stations and rely[ing] more heavily on personal computers for pilot contacts and flight plan filing" as one of the "specific actions [that] *should be considered*" for potential FAA budget savings.  NCARC Report, *available at* http://www.library.unt.edu/gpo/NCARC/reports/pepele.htm (emphasis added).  *Id.*  The NCARC Report does not recommend consolidating from 58 Automated Flight Service Stations ("AFSS") to approximately 20.  *Id.*  The report does not recommended reducing the flight service workforce through attrition and buyouts, nor does it recommend against involuntary termination of Flight Service Controllers.  *Id.*  The report does not recommend retaining the OASIS computer system.  *Id.*

The second report cited by plaintiffs, the April 1998 Flight Architecture Core Group

Report, determined that consolidation to 23 to 27 AFSS in the continental United States and to 4

or 5 AFSS in the non-continental United States could handle the operational demand

demonstrated in calendar year 1996.  Pls. Mem. Ex. 39 (Dkt. 265-30) at P00770.  The report

does not make any recommendation with regard to buy-outs, nor does it recommend against

involuntary termination of Flight Service Controllers.  *See id.* at P00772.  The report discusses

the future deployment of the OASIS computer system, but it does not compare the OASIS

system to other potential alternatives to the status quo ante.  *See id.* at P00760, P00761, P00764,

P00768, P00774, P00775, P00776 (discussing OASIS).  To the extent that plaintiffs suggest that

the report recommends retaining OASIS over obtaining another new computer system, the report

does not support that suggestion.  *See id.*

The third report cited by plaintiffs, the Coopers & Lybrand Report, does not make

recommendations for the AFSS, and it does not make the recommendations claimed by

plaintiffs.  Pls. Mem. Ex. 26 (Dkt. 265-19) at D004850-51.  Contradicting plaintiffs' statement

that this report "did not recommend contracting out the Flight Service to private entities," the

report states that there is "a prevailing opinion that the private sector can provide many of these

[flight] services and that the number of flight service stations and flight service specialists can be

significantly reduced without an adverse impact on general aviation safety. . . .  As noted, many

of these services can, and are, being provided by the private sector."  *Id.* at D004850.

The fourth report cited by plaintiffs, the 2001 Report of the Inspector General, recognizes

that labor "reductions *could be* accomplished entirely through retirements and without a

reduction in force since nearly half of the flight service specialist workforce is currently eligible

to retire" but it does not make recommendations regarding attrition, buy-outs, or involuntary

termination of Flight Service Controllers.  Pls. Mem. Ex. 27 (Dkt. 265-20) at P00145 (emphasis

added).  The report discusses the deployment of the OASIS computer system, but it does not

compare the OASIS system to other potential alternatives to the status quo ante.  *Id.*  To the

extent that plaintiffs suggest that the report recommends retaining OASIS over obtaining another

new computer system, the report does not support that suggestion.  *Id.*


*11. The 1997 National Civil Aviation Review Commission Report, the Coopers & Lybrand
Report and the 2001 Report of the Inspector General, as well as the 2003 Report of the Inspector
General, had other recommendations that would save substantial costs for the FAA, including:*
  • *Expansion of the contract tower program, which contracts out the operation of lightly
  used controller towers to private entities. According to the Inspector General, this would
  save an estimated $917,000 per Tower per year. Ex. 27A, 2003 Report of the Office of
  Inspector General at P00679. The OIG noted in the same report that the FAA failed to
  collect $2.4 million from a contractor which had failed to properly staff its Towers. Id.*
  • *Consolidate the FAA's nine regions into three, which could save the agency $100
  million per year.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 11:**

Disputed.  The 2003 Report of the Office of Inspector General ("2003 OIG Report") did

not recommend expansion of the contract tower program.  Pls. Mem. Ex. 27A (Dkt. 265-21) at

P00691 ("We are making no recommendations in this report.").  The Inspector General

compared the fiscal year 2002 costs of 12 contract towers with the fiscal year 2002 costs of

comparable FAA-staffed towers and determined that in 2002 "the 12 contract towers, on

average, cost about $917,000 less to operate annually than the 12 FAA-staffed VFR towers."  *Id.*

at P00694.  The Inspector General did not say that expansion of the contract tower program

would save an estimated $917,000 per tower per year into the future.  *Id.*

Plaintiffs' statement that "[t]he OIG noted in the same [2003 OIG] report that the FAA

failed to collect $2.4 million from a contractor which had failed to properly staff its Towers" is

incomplete and misleading.  The 2003 OIG Report explained that the Inspector General had

previously recommended collecting $2.4 million made to one contractor who did not comply

with staffing plans but that "the old contracts were written as fixed price contracts and therefore

not subject to recoveries based on staffing differences."  *Id.* at P00697.  Further, according to the

Inspector General, the "FAA corrected the contract problem in FY 2000 when it issued new

contracts.  Those contracts contain specific provisions requiring contractors to report monthly

the number of controllers at each location and the hours they worked."  *Id.*


*12. Pursuant to the decision to hold an A-76 competition, the working group commissioned a feasibility study from Grant-Thornton, which reported that, with the exception of NOTAM-Ds, the functions of the Flight Service could be performed by private contractors, and that there were private contractors interested in bidding on a contract to perform Flight Service functions. Exhibit 22, Grant-Thornton Report.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 12:**

Disputed.  The decision to hold an A-76 competition was not made prior to the

commission of the feasibility study.  Bertram Memo to Garvey, June 19, 2002, Pls. Mem. Ex. 8

(Dkt. 263-12); Bertram Memo to Belger, August 21, 2002, Defs. SJ Ex. 11 (Dkt. 256-13); *see*

*also* Defs. Resp. To  Corrected Resp. to Defs. Stmt. Mat. Facts ¶ 5.  Further it is disputed that the

feasibility study found that NOTAM-Ds could not be performed by a private vendor.  Grant-

Thornton Report, Defs. Op. Ex. 16, at D00248 (identifying private vendor who has provided

such services outside of the United States).


*13. At the time of the Grant-Thornton Report, preflight weather briefing and filing of flight plans were available from commercial sources. Ex. 12, Hennigan I Dep. at 85-86; Ex. 26, Coopers & Lybrand Report at D004847; Ex. 27, 2001 Report of the Inspector General at P00143.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 13:**

      Undisputed.


*14. At the time of the Grant-Thornton report, and continuing until October 3, 2005, there existed no nongovernmental workforce that was trained and certified to perform all of the functions of flight service for general aviation. Ex. 16, Sturm Dep. at 21; Ex. 17, Kansier Dep. at 118; Ex. 18,*
*"The Briefer," October 2003.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 14:**

      Disputed to the extent that plaintiffs are suggesting that there was no set of non-

governmental employees who performed similar functions.  *See* Pls. Corrected Resp. to Defs.

Stmt. Mat. Facts (Dkt. 265-4) ¶ 13.  It is undisputed, however, that there may not be an exact

one-to-one overlap between the duties of the workers of one employer with the duties of another

employer even if those workers perform similar functions.  Here, there were employees in the

private sector who performed similar duties to those in flight service.  *See Elias* Dep., Defs. SJ

Ex. 61 (Dkt. 256-63), at 95; Sturgell Dep., Defs. SJ Ex. 86 (Dkt. 256-88), at 52; *Brydon* Dep.,

Defs. SJ Ex. 51 (Dkt. 256-53), at 44; Brown Dep., Pls. Mem. Ex. 25 (Dkt. 265-18), at 52;

Sheridan Decl., Defs. SJ Ex. 42 (Dkt. 256-44), ¶ 12; Pls. Corrected Resp. to Defs. Stmt. Mat.

Facts (Dkt. 265-4) ¶¶ 8-10.


*15. When the Screening Information Report ("SIR") was issued, contractors and Flight Service personnel were told that the majority of the Flight Service workforce would be made available to the winning bidder. Ex. 16, Sturm Dep. at 17-19; Ex. 17, Kansier Dep. at 118; Ex. 18, "The Briefer," October 2003; cf. Ex. 15, Excerpt from SIR.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 15:**

      Disputed in part.  This statement is not material to plaintiffs' motion for summary

judgment.  Further, this statement is unclear, incomplete, and misleading.  The official

solicitation for the FAA's public-private competition, the Screening Information Report ("SIR"),

included a provision by which the service provider would be required to give flight service

employees, "who ha[d] been or will be adversely affected or separated as a result of award of

this contract[,] the right of first refusal for employment openings under the contract in positions

for which they are qualified."  Excerpt from SIR, Pls. Mem. Ex. 15 (Dkt. 263-20), at §I.4.  When

the SIR was issued, contractors and flight service personnel were told that the flight service

workforce would be made available to be recruited by the winning bidder.  Sturm Dep., Pls.

Mem. Ex. 16 (Dkt. 263-21), at 15, 18-19.  To the extent plaintiffs claim that contractors and

flight service personnel were told that the majority of the workforce would be set aside for the

service provider, or that the winning bidder would not have to compete with the FAA and other

potential employers for the services of the existing workforce, defendants dispute those

assertions as not supported by the record.  The SIR made clear that the service provider would be

expected to recruit employees.  Neill Opinion, Public Version, Defs. SJ. Ex. 18 (Dkt. 256-20), at

10.  The SIR explained that in assessing the bids, the government would "assess the degree to

which the staffing approach provides for recruitment and retention to ensure delivery of effective

services to support safe and efficient flight."  *Id.* (quoting SIR).  The winning bidder, Lockheed,

in fact faced competition from the FAA in the labor market when it sought to hire flight service

personnel.  Sturm Dep., Defs. SJ Ex. 87 (Dkt. 256-89), at 110.


*16. Only four private entities submitted bids pursuant to the SIR. None of the potential
contractors identified in the Grant-Thornton report as interested in and capable of performing
Flight Service functions submitted a bid. Ex. 32, Washington Dep. at 96; Ex. 22, Grant-Thornton
Report.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 16:**

Disputed.  The copy of the Grant Thornton report that plaintiffs include as their exhibit

22 is missing page D00247.  *Compare* Pls. Mem. Ex. 22 (Dkt. 265-15) *with* Defs. Op. Ex. 16.

That page demonstrates that although they did not respond to Grant-Thornton's market survey,

three of the four private entities that bid on flight services had been identified as potential

contractors in the Grant-Thornton report.  Grant-Thorton Report, Defs. Op. Ex. 16, at D00247;

Washington Dep., Pls. Mem. Ex. 32 (Dkt. 265-24), at 96 (listing companies that bid on flight

services).


*17. In 2003, NAATS, the Flight Service Controllers' Union, submitted a consolidation proposal
to the FAA which would have reduced the number of AFSSs to 20 and reduced personnel
through attrition and buyouts, without involuntary terminations of Flight Service Controllers.
The proposal would have saved an estimated $600 million over a seven-year period.
Administrator Blakey told Walter Pike, then Union President, that she was not prepared to move
on it. Ex. 42, NAATS proposal; Ex. 56, Pike Dep. at 128-29.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 17:**

Disputed.  The exhibit cited by plaintiffs, Pls. Mem. Ex. 42 (Dkt. 263-45), "NAATS

proposal" is not the proposal that was allegedly given to the FAA administrator by then NAATS

President Wally Pike.  As evident from the face of the document, and as discussed by Wally Pike

at his deposition, the exhibit was created "over two years" after an earlier version had been

presented to the administrator.  Pls. Mem. Ex. 42 (Dkt. 263-45) at 1 (header "note"); Pike Dep.,

Defs. SJ Ex. 80 (Dkt. 256-82), at 85.  It is unknown to defendants what changes were made to

the proposal in the interim.  Wally Pike thought that the version that he submitted to the FAA

had not included the charts that are the last four pages of the thirteen-page "NAATS proposal"

on which plaintiffs now rely.  Pike Dep. at 85.  Although Pike thought first in his deposition that,

except for font and formatting changes, the text preceding the charts had been unchanged, *id.* at 84-85, he later acknowledged that the union's in-house counsel and a successor union board of directors had inputs, *id.* at 98-99.  Pike admitted that "even after this proposal went to the administrator there were still refinements going on in this."  *Id.* at 98.  The document claims estimated cost savings of $600 million over a seven-year period.  It is unknown whether this estimate was changed after the earlier version was given to the FAA administrator, and it is unknown what cost savings were claimed in the earlier version.  It is unknown whether any version of the proposal would have actually saved $600 million over a seven-year period.

*18. The MEO (FAA in-house) submitted a bid in response to the solicitation. The MEO would have consolidated the Flight Service to three hubs; used an enhanced version of the OASIS system then in successful use in some AFSSs; used the voice switch and automated broadcast equipment eventually adopted by the winning bidder, Lockheed Martin ("Lockheed"); and included several service enhancements not offered by the Lockheed and not currently in use. Ex. 35, Dodson Dep. at 89-90; Ex. 36, Grace Dep. at 137, 139, 142, 144.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 18:**

The extent to which the OASIS computer system was in successful use in the AFSSs is disputed.  At the time, the OASIS system was "available in only sixteen of the . . . fifty-eight facilities in operation," and the MEO – the in-house FAA group bidding on the flight service contract – "specifically stated that OASIS will require enhanced technology development." Opinion by Judge Edwin B. Neill of the General Administration Board of Contract Appeals ("Neill Opinion"), Defs. SJ Ex. 18 (Dkt. 256-20), at 73-74.  The last clause of this statement is immaterial and too vague to warrant a response.

*19. The contract was awarded to Lockheed.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 19:**

Undisputed.


*20. Pursuant to the contract award to Lockheed, on October 3, 2005, all Flight Service Controllers were terminated from their government positions. Ex. 19, Notice of Reduction in Force.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 20:**

Disputed.  To the extent that plaintiffs suggest that all flight service specialists were terminated from government positions, defendants dispute that suggestion.  *See, e.g.*, *Brydon* Dep., Defs. SJ Ex. 51 (Dkt. 256-53), at 74 (plaintiff continued as a tower controller following the RIF).  It is undisputed that on July 19, 2005, Reduction-in-Force notices were issued to all flight service specialists, except for those in Alaska, informing them that they were subject to the Reduction-in-Force ("RIF") that would terminate their government positions as flight service specialists effective October 3, 2005.  *See* Notice of Reduction in Force, Pls. Mem. Ex. 19 (Dkt. 263-24).


*21. In three separate slide presentations, on January 12, 2003, (Ex. 20 at P01155), on June 25, 2003 (Id. at D007314), and on August 1, 2003 (Id. at D007686), prominent in the list of reasons for the A-76 is Flight Service's "aging workforce."  Subsequent slide presentations and an FAA web page used the more diplomatic term, "retirement eligible workforce," to describe one of the reasons for the A-76. Id. at D007193, P04428, P00003. FAA Administrator Marion Blakey, who must be presumed to speak for the Agency, in the prepared text of a speech, also listed the "retirement eligible" workforce as a reason for the A-76 (Ex. 55 at P01166), and in a different presentation described the alleged retirement eligibility of 40 percent of the Flight Service workforce as a "dilemma." Id. at P00633.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 21:**

Disputed.  This statement is not material to plaintiffs' motion for summary judgment.

Further, "aging workforce" was listed among the reasons described on the slides, but it was no

more "prominent" than any other reason.  Pl. Mem. Ex. 20 (Dkt. 265-13) at P01155, D007314,

D007686.  The phrase "retirement eligible workforce" was listed among the reasons on some of

the slides.  *Id.* at D007193, P04428, P00003.  Defendants dispute plaintiffs' suggestion, not

supported by the record, that the phrase "retirement eligible workforce" was used because it was

more diplomatic than the phrase "aging workforce."  The plaintiffs' union itself used the phrases

"aging" and "retirement eligible" interchangeably.  *Department of Transportation and Related

Agencies Appropriations for 1998: Hearings Before the Subcomm. on Transportation and

Related Agencies of the H. Comm. on Appropriations*, 105th Cong. 48 at 42,48 (1997) (statement

of Michael F. McAnaw, then-president of plaintiffs' former union, the National Association of

Air Traffic Specialists) ("McAnaw Testimony") ("Our workforce is rapidly aging; in fact 40-

50% are eligible to retire today.").

In the September 2004 and October 2004 prepared texts of speeches, which plaintiffs

cite, FAA Administrator Marion Blakey did not list the workforce itself as a reason for the A-76.

 Pl. Mem. Ex. 55 (Dkt. 265-44) at P01166, P00633.  She discussed the challenge that "[a]lmost

40 percent of Flight Service employees [were] eligible to retire" and that "[m]ore than half of the

managers in this room are eligible as well."  P01166.  The FAA faced waves of retirements that

could leave the agency short-staffed.  *Id.*; Federal Aviation Administration, Building the FAA

Twenty-First Century Workforce: A Framework for FAA Workforce Planning (2001), available

at https://employees.faa.gov/org/staffoffices/ahr/human_capital/media/FAA_Workforce_

Planning_Guide_2001.pdf (last visited Aug. 26, 2009).

*22. The difference in age between the older Flight Service Controllers and the FAA workforce in 2005 was statistically significant, as measured by the Kolmogorov-Smirnov test. See Ex. 2, Belman Report, at 2-5; see also Plaintiffs' Opp. to Def. (First) Motion for Summary Judgment, Sept. 16, 2005, Ex. 4 (Tryon Report).*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 22:**

This statement is immaterial.  Contrary to what is required under a disparate impact theory, plaintiffs fail to identify what specific neutral employment practice had a statistical disparity.  *See* Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3) ¶ 32.  Further, plaintiffs are inappropriately comparing average ages instead of comparing the impact on the protected class (i.e., those 40 and older) versus those not in the protected class (i.e., those under 40).  *Id*. ¶ 31.

*23. The accepted standard to show disparate impact is that the probability that the actual proportion by age of the employees selected for contracting out would occur by chance equals or exceeds 1.96 standard deviations from the norm. See Ex. 1, Siskin Report at 4 n.8.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 23:**

Disputed.  It is inappropriate to compare average ages in a disparate impact statistical analysis.  Rather, one must compare the impact on those in a protected class versus those not in the protected class.  Siskin Rep't ¶ 29, *id*. at 18 n.24, Pls. Mem. Ex. 1 (Dkt. 263-3).  Further, a result could have statistical significance but not practical significance.  Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3) ¶¶ 20-22.  It is undisputed, however, that some courts have defined the minimum standard for a disparity to be deemed statistically significant as meeting or exceeding 1.96 units of standard deviation.  Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3), at 4. n.8.

*24. Another way of expressing the disparate impact standard is that the probability that actual proportion by age of the employees selected would occur by chance is less than five percent. Cf. Ex. 50, Siskin Dep. at 86-87; see also Britannica Online Encyclopedia, http://www.britannica.com/EBchecked/topic/564172/statistics#; Elementary Concepts in Statistics, http://www.statsoft.com/textbook/ecs.html.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 24:**

Disputed. It is inappropriate to compare average ages in a disparate impact statistical analysis. Rather, one must compare the impact on those in a protected class versus those not in the protected class. Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3), ¶ 29, *id*. at 18 n.24. Further, this statement is not supported by the record cited; neither of the documents cited refers to disparate impact analysis requiring a comparison by age. In addition, a result could have statistical significance but not practical significance. Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3), ¶¶ 20-22.

*25. The actual standard deviation from the norm by age of the fired controllers is 14.79 based on the 2005 population of the FAA. See Ex. 1, Siskin Report Appendix, Table 4.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 25:**

Disputed. Dr. Siskin did not analyze the standard deviation from the norm by age but rather compared the impact of the outcome on the protected class versus the impact on the non-protected class. *See* Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3), ¶ 31; *id*. at Table 4. This statement is also irrelevant and immaterial. An analysis is not appropriate if it fails to measure a specific practice or decision rather than the combined bottom-line effect of all practices. *Id*. at ¶ 32. The test cited by plaintiffs, Siskin Appendix, Table 4, is a bottom-line test, *id*. at ¶ 31, and therefore not the appropriate test, *id*. at ¶ 32. Further, a result could have statistical significance but not be of practical significance. *See* Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3), ¶¶ 20-22. Here, the comparison cited by plaintiffs greatly exceeded the 80 percent rule at 96.4%, *see id*. at

Table 4, and has no practical significance under the Equal Employment Opportunity

Commission guidelines, *see id.* at p. 3 n. 6; *id.* at ¶ 21.


*26. The actual standard deviation from the norm by age of the employees classified as "non-core" or "outsourceable" from among the six largest job functions at the FAA (over 1,101 FTE) is 19.73. See Ex. 1, Siskin Report Appendix, Table 5.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 26:**

Disputed.  Dr. Siskin did not analyze the standard deviation from the norm by age but

rather compared the impact of the outcome on the protected class versus the impact on the non-

protected class.  *See* Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3), ¶ 31; *id.* at Table 5.  Further, a

result could have statistical significance but not be of practical significance.  *See* Siskin Rep't,

Pls. Mem. Ex. 1 (Dkt. 263-3), ¶¶ 20-22.  Here, the comparison cited by plaintiffs greatly

exceeded the 80 percent rule at 91.6%, *see id.* at Table 5, and has no practical significance under

the Equal Employment Opportunity Commission guidelines, *see id.* at p. 3 n.6; *id.* at ¶ 21.


*27. The actual standard deviation from the norm by age of the FSS Workgroup selected for outsourcing from the July 2002 population of the FAA is 22.01. See Ex. 1, Siskin Report Appendix, Table 4A.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 27:**

Disputed.  Dr. Siskin did not analyze the standard deviation from the norm by age but

rather compared the impact of the outcome on the protected class versus the impact on the non-

protected class.  *See* Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3), ¶ 31; *id.* at Table 4A.  This

statement is also irrelevant and immaterial.  An analysis is not appropriate if it fails to measure a

specific practice or decision rather than the combined bottom-line effect of all practices.  *Id.* at ¶

32. The test cited by plaintiffs, Siskin Appendix, Table 4A, is a bottom-line test, *id*. at ¶ 31, and therefore not the appropriate test, *id*. at ¶ 32. Further, a result could have statistical significance but not be of practical significance. *See* Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3), ¶¶ 20-22. Here, the comparison cited by plaintiffs greatly exceeded the 80 percent rule at 95.4%, *see id*. at Table 4A, and has no practical significance under the Equal Employment Opportunity Commission guidelines, *see id*. at p. 3 n.6; *id*. at ¶ 21.

*28. The maximum number of standard deviations normally employed by statisticians to demonstrate statistical significance is five.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 28:**

There is no record citation to this statement, which is required Local Rule 7.1(h), and, the statement is therefore disputed. In addition, something could be of statistical significance but have no practical significance. *See* Siskin Rep't, Pls. Mem. Ex. 1 (Dkt. 263-3), ¶¶ 20-22.

*29. Pursuant to the contract award to Lockheed, on October 3, 2005, all Flight Service Controllers were terminated from their government positions. Ex. 19, Notice of Reduction in Force.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 29:**

Disputed. Plaintiffs' statement of fact no. 29 is a duplicate of plaintiffs' statement of fact no. 20. For defendants' response to this statement of fact, see the response to plaintiffs' statement of fact no. 20.

*30. Of the 2,300 Flight Service Controllers who were terminated, only 356 – 15 percent – received full Air Traffic Control ("ATC") pensions. Ex. 3, Williams Chart (Ex. 5 to Deposition of George Williams).*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 30:**

Disputed and immaterial.  Defendants dispute that only 356 flight service specialists had vested retirements under the special Air Traffic Control ("ATC") provisions.  The 556 flight service specialists listed on the Williams Chart as having received "optional" retirements received full federal pensions under the CSRS and FERS retirement systems.  Williams Chart, Pls. Mem. Ex. 3 (Dkt. 265-6); Williams Dep., Def. Op. Ex. 7, at 110.  In certain circumstances, the regular retirement provisions provide benefits equal to or greater than the ATC benefits, so flight service specialists may have retired under the regular retirement provisions instead of the ATC provisions even if they had vested under the ATC provisions.  CSRS and FERS Handbook for Payroll and Personnel Offices, *available at* http://www.opm.gov/retire/pubs/handbook/ hod.htm (last visited Aug. 26, 2009), at Chap. 54 §§ 54A3.1-2; 54C1.1-2, example 4.  Former plaintiffs' union president Walter Pike, for example, retired under regular CSRS even though he had already vested under the special ATC retirement provisions. Pike Dep., Defs. SJ Ex. 80 (Dkt. 256-82), at 26.

*31. Of the 2,300 Flight Service Controllers who were terminated, only 456 – fewer than 20 percent – remained employed by the FAA, and only 123 – five percent – were rehired by FAA after the termination. Not all of those retained or rehired are in jobs that qualify them for ATC pensions. Ex. 3, Williams Chart.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 31:**

Disputed and immaterial.  The figure 456 represents the number of flight service specialists who obtained other non-flight service positions at the FAA between February 1, 2005 and October 3, 2005; it does not represent all of the former flight service specialists who remained employed by the FAA after the RIF.  Williams Dep., Defs. Op. Ex. 7, at 104; Williams

Dep. Chart, Pls. Mem. Ex. 3 (Dkt. 265-6).  The figure 123 represents those flight service specialists who obtained other positions at the FAA through the Selection Priority Program from October 3, 2005 to September 30, 2007; it does not include former flight service specialists who obtained new positions at the FAA during that time using methods other than the Selection Priority Program, nor does it include former flight service specialists who have obtained new positions at the FAA since September 30, 2007.  Williams Dep. Chart.

*32. The Controllers have suffered economic losses whose present value is equal to tens of millions of dollars. Ex. 6, Report of Dr. Joseph L. Tryon; Ex. 51, Supplement to Tryon Report. Defendants' expert, Dr. William Carrington, does not disagree with Dr. Tryon's methodology. Ex. 7, Carrington Report at 11.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 32:**

Disputed and immaterial.  Dr. Tryon inflated the damages estimate by, for example, improperly including voluntarily foregone income as damages.  Carrington Rep't, Pls. Mem. Ex. 7 (Dkt. 263-9), ¶ 17.  Defendants' expert, Dr. William Carrington, employed a framework of comparing two income streams: what a plaintiff would have earned had the RIF not occurred (the "but-for" income stream) and what she could have earned as a result of the RIF (the "mitigation" income stream).  Plaintiffs' expert, Joseph L. Tryon, also compared two income streams to calculate plaintiffs' alleged damages.  *Id.* at ¶ 37.  Dr. Carrington disagreed with Dr. Tryon's approach to determining the two income streams.  By incorrectly calculating (and overestimating) the but-for income stream and incorrectly calculating (and underestimating) the mitigation income stream for each of the eleven plaintiffs that he analyzed, Dr. Tryon greatly overvalued the damages of the plaintiffs.  *See id.* at ¶¶ 46-51.

Dr. Tryon estimated the represented plaintiffs' alleged total economic losses by

averaging the individual damages estimates that he calculated for eleven individual plaintiffs and

multiplying that figure by the number of represented plaintiffs in the lawsuit.  Tryon Dep., Defs.

Op. Ex. 17, at 40.  Dr. Tryon's estimates for the eleven plaintiffs that he analyzed, averaged

together, do not produce a reliable estimate of damages for the entire collection of plaintiffs

because Dr. Tryon's estimates for the eleven individuals are themselves incorrect and unreliable,

as discussed above, and because of issues with the sampling method on which Dr. Tryon relied.

The eleven plaintiffs analyzed were a self-identified, non-random sample.  *See id.* at ¶¶ 65-67

(discussing proposed sampling and the dangers of "cherry-picking"); Tryon Dep. at 36

(plaintiffs' sample was not random).  Plaintiffs' expert Dr. Tryon conceded at his deposition that

the eleven plaintiffs could not be used as representatives of the different groups from which had

been chosen because "there is too much variation within a group."  Tryon Dep. at 30-31

(plaintiffs' scheme of using one or two plaintiffs from each of ten groups to be representative of

each group failed).  Taking the amount of damages allegedly incurred by a non-random sample

within each of ten groups designated by plaintiffs and applying those figures across all the

groups does not produce a reliable figure for calculating the damages incurred by the greater

population.  Carrington Dep., Defs. Op. Ex. 18, at 165-68.


*33. Dr. Tryon's calculations of the damages suffered by the older Controllers do not include losses from the post- October 2008 closures of Lockheed Flight Service Stations and the RIFs experienced by the affected Controllers. See Ex. 6, Tryon Report.*

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACT NO. 33:**

Disputed.  Plaintiffs cite as evidence for this proposition their Mem. Exhibit 6, the March

19, 2008, report of plaintiffs' expert, Dr. Joseph Tryon. In that report, Dr. Tryon analyzed the

purported losses of plaintiff Cathy Campbell.  Tryon Rep't, Pls. Mem. Ex. 6 (Dkt. 263-8). Cathy

Campbell worked for Lockheed from October 4, 2005, immediately following the FAA's

Reduction-in-Force, until retiring on May 14, 2006.  *Id.*; Carrington Rep't, Pls. Mem. Ex. 7 (Dkt.

263-9), at ¶ 5 (noting that Campbell voluntarily left her Lockheed position).  Because Cathy

Campbell left Lockheed in May 2006, the post-October 2008 closures of Lockheed Flight

Service Stations would not have had any impact on her.  Further, as defendants' expert Dr.

William Carrington explained, Dr. Tryon already — and according to Dr. Carrington,

improperly —  included as damages earnings foregone by Ms. Campbell due to her resignation

from her job at Lockheed in early 2006.  Carrington Rep't at ¶¶ 5, 51; Tryon Rep't at 3 .

Respectfully submitted,

TONY WEST
Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

STUART A. LICHT
Assistant Branch Director
Civil Division

Of Counsel:

/s/ *Brian G. Kennedy*
BRIAN G. KENNEDY (DC Bar No. 228726)
ADAM D. KIRSCHNER (IL Bar No. 6386601)

Eden Brown Gaines, Esq.
Michael Doherty, Esq.

LISA ZEIDNER MARCUS (N.Y. Bar)

Julia A. Rhodes, Esq.
Personnel & Labor Law Staff
Office of Chief Counsel
Federal Aviation Administration
600 Independence Ave., S.W.
Room 1E100
Washington, D.C. 20591
Phone: (202) 385-8254
Fax: (202) 493-5085

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7126
Washington, D.C.  20530
Telephone:  (202) 514-3357
Fax:  (202) 616-8470
Email: brian.kennedy@usdoj.gov

Attorneys for Defendants