## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHLEEN A. BREEN, <u>et al.</u>, | ) |
| | ) |
|       Plaintiffs, | ) |
| | ) |
|     v. | ) C.A. 05-cv-0654 (RWR) |
| | ) |
| RAY H. LAHOOD | ) |
| SECRETARY OF TRANSPORTATION, <u>et al.</u>, | ) |
| | ) |
|       Defendants. | ) |
| ———————————————————— | ) |

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION
## TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

By any analysis, the October 3, 2005 contracting out and RIF'ing of the Federal Aviation Administration's Flight Service Controllers — the FAA's "aging workforce" — constituted a discriminatory act.  Defendants, in their initial Motion for Summary Judgment, have sought to demonstrate, despite all evidence to the contrary, that they did not intend to target the "aging workforce," as they termed it, because of its age, but for some other reason.  Defendants grudgingly concede what their own expert has clearly demonstrated, namely that 1) the decision to make Flight Service eligible for contracting out, 2) the A-76 process, and 3) the reduction-in-force (RIF) had a statistically adverse impact on the Controllers based on their age.  After a

lengthy discourse on the appropriate standard, Defendants unsurprisingly argue that they should be held to the minimum level of accountability, and that the statistical disparity between the treatment of older employees and younger employees under any standard should be excused.

In addition to vigorously disputing Defendants' disparate treatment analysis, Plaintiffs in their Cross Motion for Summary Judgment are seeking to have the Court decide this case in their favor on the basis of the stark statistical disparities between the severe impact of the contracting out of older employees and its slight impact on younger employees.  In addition to the weight of the statistical evidence developed by Defendants' expert, there are strong legal and policy reasons why the statistical impact of the contracting out and reduction-in-force should not be overlooked.

As the Supreme Court has stated in <u>Watson v. Fort Worth Bank & Trust</u>, analyses of discrimination as disparate treatment and disparate impact are not wholly distinct, but are complementary means of ferreting out bias, conscious and unconscious, as well as curbing the effects of discrimination on employees:

> Simply because no inference of discriminatory intent can be drawn from the customary and reasonable

practice in some businesses of leaving promotion
decisions to the unchecked discretion of the lower
level supervisors most familiar with the jobs and
candidates, it does not follow that these supervisors
always act without discriminatory intent. Even if it
is assumed that discrimination by individual
supervisors can be adequately policed through
disparate treatment analysis, that analysis would not
solve the problem created by subconscious stereotypes
and prejudices that lead to conduct prohibited by
Title VII.

487 U.S. 977, 978 (1988).

The Court should not maintain such a rigid and sterile

distinction between the two theories as to conclude that the

Defendants' manifest knowledge of the age of the Controllers

from the outset, its hamstringing of the Most Efficient

Organization (MEO) in the bidding competition, and its cynical

retention and rehiring of younger workers even as it fired older

ones (92 percent of the Controller workforce was over 40) should

not color its consideration of gross statistical impact on older

workers.  It would be a strange theory of justice, and contrary

to the best thinking of the Supreme Court, to conclude that

because statistical analysis is all that is <u>necessary</u> to prove

discrimination, the Court has to put on blinders and disregard

3

all the additional evidence that the discriminatory conduct was knowing and intentional. <u>See</u> <u>id</u>.[1], [2]

Disparate impact analysis envisions that Plaintiffs will show discrimination by challenging a facially neutral practice and showing that, in actuality, it has an adverse statistical impact.  However, there is no stricture against showing more than is required.  For example, Defendants' expert, Bernard Siskin, has amply demonstrated that there was a statistically significant adverse impact on older employees as a result of the

---

[1]  Plaintiffs' disparate treatment case is much stronger than the case considered by the Court in <u>May v. Shuttle</u>, 129 F.3d 165 (D.C. Cir. 1996), <u>cert. denied</u>, 524 U.S. 927 (1998), cited at Def. Opp. at 33.  <u>May</u> was a private-sector case, brought under the more lenient Section 623 of the ADEA, rather than under Section 633a.  <u>See</u> Section II.A and B, <u>infra</u>. Although it is undisputed that the <u>May</u> defendants knew that the majority of the RIF'ed workforce in that case were over 40, they did not — unlike this case — cite that as a reason for the outsourcing or state that older workers were not a good use of the defendants' money. Ex. 20 and PowerPoint Presentation attached to Ex. 70; Ex. 33, Breen Dep. at 101; Ex. 34, Malon Dep. at 130-32.  It goes without saying that, although awareness of a work group's nearness to retirement does not prove the existence of discrimination, terminating the group to avoid the risk of incipient retirement *is* impermissible.  <u>May</u> also did not involve the rehiring of younger workers.  Of course, <u>May</u> did not address at all the issue of disparate impact.

[2]  As the last Exhibit numbers in Plaintiffs Cross Motion for Summary Judgment and Opposition to Defendants' Motion, (Document 265, hereinafter "Pl. Cross-Mot"), was  62, Exhibits attached to this memorandum begin with 63.  All Exhibit numbers in this Memorandum refer to Plaintiffs' Exhibits.

classification and selection of Flight Service for contracting out. Ex. 1, Siskin Report, Tables 4, 4A, 5.  This conclusion is hardly surprising in light of the determination of Plaintiffs' expert, Dale Belman, that the fired FAA Flight Service Controllers represented an older workforce at the FAA, or indeed the widespread knowledge at the FAA from the outset of the A-76 process that the Flight Service Controllers were an "aging workforce."[3]

Indeed, while Plaintiffs can prevail simply by showing that the A-76 process and the resulting RIF were facially neutral but had a disparate impact, the Court should bear in mind that Defendants intentionally undercut the facial neutrality of the RIF process by, inter alia, limiting the ability of the MEO to compete fairly in the bid process, denying RIF rights in order to provide a private contractor with a captive workforce[4], and

_____

[3]  Plaintiffs' Exhibit 70, based on  all of the documents and depositions in produced by either side in discovery, collects every instance in which an employee of the FAA referred to the Flight Service workforce as "aging" or "retirement eligible."  It is apparent that everyone who worked on the A-76 in any capacity was aware that the workforce was overwhelmingly over 40 years of age and that many of those involved in the A-76 considered that a negative factor.

[4]  Defendants argue, Def. Mem. at 36, that case law demonstrates that there is no obligation for an employer to provide other employment opportunities for RIF'ed employees. However, all the cases cited are private sector cases, and thus

retaining and rehiring younger employees at the time of the RIF.[5]  In fact, these employment practices of the Defendants at the time of the RIF heightened and exacerbated the discriminatory impact of the A-76 process and the resulting RIF.[6]

---

irrelevant.  The federal government, and the FAA specifically, provide by regulation that RIF'ed employees *must* be given the opportunity to retain employment via "bump and retreat" rights in their competitive area. 5 C.F.R. part 351; FAA Order 3350.2c. As Plaintiffs have explained, defining the competitive areas as each AFSS (instead of, as is more usual, as geographic regions) to prevent the Flight Service Controllers from taking positions for which they were qualified was an essential element of the discriminatory nature of the RIF. Pl. Cross-Mot. at 64 and Ex. 34, Malon Dep. at 102-03.

[5] The crucial point underlying the rehiring of younger workers is that if it was done so as to allow Defendants to cherry pick younger employees in such a way that only older employees were effectively RIF'ed, then statistical analysis on an individual level is appropriate to both disparate impact and disparate treatment. See Ex. 63, Siskin Dep. at 72-76.  In EEOC v. Allstate Ins. Co., 528 F.3d 1042 (8th Cir. 2008), the EEOC challenged a reorganization plan in which Allstate terminated all of its agents and then rehired some of them.  The EEOC alleged that the rehiring policy had a disparate impact on former agents over 40.  The court held that where the same group of individuals were subject to both the termination and the rehiring plan, the rehiring plan was part and parcel of the termination. Id. at 1048.  Here, where any rehiring of the Flight Service Controllers was, of course, rehiring from the group that was subject to the RIF, the rehiring must equally be deemed part of that RIF.

[6] Defendants criticized Plaintiffs' statistical analysis of rehiring on the grounds that Plaintiffs conducted the analysis using the mean age of the populations rehired and not hired rather than the median age. Defendants' Memorandum in Opposition to Plaintiffs' Cross-Motion for Summary Judgment,

There is no material fact in dispute as to whether a disparate impact was created by the outsourcing. Even Defendants' expert, Bernard Siskin, conceded that the fired Flight Service Controllers were subjected to an adverse disparate impact. Ex. 50, Siskin Dep. at 32-34; see also Ex. 1, Siskin Report, Tables 4, 4A, 5. Accordingly, as this is a federal sector case under 29 U.S.C. Section 633a, to

---

Document 269 (hereinafter "Def. Opp.") at 32-33. However, both the mean and the median analyses show that the discriminatory impact of the RIF was exacerbated by Defendants' rehiring policy. As demonstrated by Exhibit 69, the attached Supplemental Declaration of Dale Belman, the median age of those rehired (i.e., the age point at which 50 percent of those rehired were above that age, and 50 percent below) was 44.6, and the median age of those not rehired was 53.2. In fact, the median numbers are quite astonishing, as they indicate that there is less than a one in 1,000 likelihood that those whose age was above the median age of terminated Flight Service Controllers would be rehired as compared to those whose age was less than the median for that group. This result, that a test of the medians produces the same result as a test of the means, should not be a surprise. The large discrepancy in the number of rehires from those above the median, only 6 of 747, against those under the median age, 73 of 747, makes statistical testing useful confirmation of a fact which was, on its face, obvious to those experienced with applied statistical analysis. Where such large discrepancies are present, statistical results will almost never vary according to whether a test uses a mean or a median. As to Defendants' further contention, Def. Opp. at 33, that Plaintiffs have not shown the ages of those who applied for the rehire positions, Exhibit 68, shows the FAA jobs (very often multiple jobs) for which Plaintiffs applied and whether they were rehired. It demonstrates that, in fact, the Plaintiffs overwhelmingly applied for any FAA position for which they were qualified, without success.

successfully defend the challenged practices, Defendants must show that they had a "business necessity" to fire the Controllers, admittedly the FAA's oldest (or second-oldest) workforce.  This they have not done and cannot do.  Moreover, as Plaintiffs have shown, there were ample alternative practices available to accomplish the FAA's goals that would have avoided the contracting out and the firing of the Controllers and the indisputable disparate impact on them.  Accordingly, summary judgment must be granted for the Plaintiffs on disparate impact.

<u>**ARGUMENT**</u>

I.  **Defendants Have Failed to Present a Disputed Issue of <u>Material Fact Concerning Disparate Impact.</u>**

In order to defeat Plaintiffs' Cross-Motion for Summary Judgment, Defendants must demonstrate that there is a disputed issue of material fact concerning Plaintiffs' claim that the A-76 process regarding the Flight Service and the concomitant RIF had a disparate impact on the older workforce that made up the Flight Service Controllers.  They have failed to do so.

To reiterate briefly, there were two specific actions of Defendants that had a disparate impact on the Plaintiffs:  1) the selection of the Flight Service for an A-76 process; and 2) the specific manner in which this A-76 was carried out, guaranteeing a workforce to the successful bidder, which

required a restriction of normal RIF procedures and strictly limited rehiring of fired Flight Service Controllers.[7]

A.  **The Parties' Expert Witnesses Agreed that the Selection of the Flight Service for the A-76 Created A Disparate Impact.**

Plaintiffs' expert, Dale Belman, compared ages of the population of the Flight Service Controllers to those of several different populations within the FAA, and concluded that, to a statistically significant degree, the Flight Service workforce

---

[7]  In addition, artificial limitations were placed on the MEO, preventing a fair competition from taking place. Pl. Cross-Mot. at 61-63.  While it is impossible to be certain that the MEO would have won the competition had the procedures been fair, it is possible to state that, given the handicaps placed on the MEO, there was no possibility that it would win the competition as it was run.  It is notable that most of the proposals of the MEO, rejected as inferior to the winning Lockheed proposal, have now been substantially adopted by Lockheed — the contraction of the service from the 20 sites proposed in Lockheed's bid (three hubs plus 17 AFSS stations) to a planned three hubs and only two stations (compared to the MEO's planned three hubs) and the use of the MEO's proposed voice switch, automated broadcast, and voice recording technology. Compare http://tinyurl.com/ycozubw, last visited Sept. 30, 2009 (Aviation Week online:  Lockheed "plans to consolidate 58 FSS facilities into 20 facilities") with Ex. 65 (Sims Decl.); see Ex. 35, Dodson Dep. at 89-90; Ex. 36, Grace Dep. at 137-140.  This implies strongly that the MEO would in fact have won a fairly run competition, even with the guaranteed workforce provisions.  Of course, had the competing bidders been required to either find their own workforces or offer existing Flight Service Controllers benefits that would induce them not to seek other FAA jobs or exercise their RIF rights, the non-governmental bidders could not possibly have won the contract.  By contrast, the MEO planned to avoid involuntary terminations.

was older than the comparator populations, and that the difference cannot be explained by random selection.[8] <u>See</u> Ex. 2, Belman Report, <u>passim</u>.  Further, Dr. Belman compared the ages of those Flight Service Controllers who were rehired by the FAA to those who were not rehired, and discovered that those rehired, too, were younger to a statistically significant degree.  <u>Id.</u> at 5-6, 14.[9]  While Dr. Belman did not offer an opinion as to whether the statistically significant effect on the older workers reflected disparate treatment or disparate impact, he did discuss the disparate impact of the monopsony effect on the older workers.  <u>Id.</u> at 6-7.

---

[8]  Defendants purport to rebut Dr. Belman's analysis with colored pictures of gumball machines, to demonstrate that the Plaintiffs were not randomly selected for the A-76 and RIF, but rather, selected from a particular "gumball machine," the Flight Service, whose workforce was for historical reasons substantially older than the FAA workforce as a whole. Def. Opp. at 20-22.  This simplistic argument completely misapprehends the nature of Dr. Belman's conclusions.  By stating that the ages of the RIF'ed Controllers deviate statistically from random prediction, he is merely pointing out what all discrimination plaintiffs must prove — that the victims of the discriminatory practice were older, to a statistically significant degree, than those not affected by the challenged practice.

[9]  As observed in footnote 5, <u>supra</u>, where the workers rehired are part of the same group that is terminated, at least one court has held that the rehiring plan is part of the termination.  <u>EEOC v. Allstate Ins. Co.</u>, <u>supra</u>, 528 F.3d 1042.

The FAA's expert, Bernard Siskin, also found a statistically significant difference between the ages of the RIF'ed Controllers and other agency workforces. As explained in Plaintiffs' previous memorandum at pages 14-21, Dr. Siskin acknowledged that the selection of the Flight Service for the A-76 study created an adverse disparate impact on the Plaintiffs. Dr. Siskin analyzed whether the percentage of Flight Service Controllers who were over 40 was greater by a statistically significant degree than the percentage one would expect if they had been selected at random from the FAA's workforce. See Ex. 1, Siskin Report at 15. This was expressed in standard deviations, the statistical term for the degree to which an event differs from what would be expected at random.

The statistical disparity found by Dr. Siskin was overwhelming. Comparing the older Flight Service workers RIF'ed to the total workforce of the FAA, Dr. Siskin found 14.72 standard deviations from what one would expect had the workforce RIF been random. Id., Table 4. Designating the Flight Service Controllers as "non-core" (compared to workgroups that were designated "core") produced a disparate impact of 19.73 standard deviations. Id., Table 5. And the selection of the Flight Service for contracting out, compared to the 2002 population of

the FAA, produced a disparate impact of 22.01 standard deviations from a random age distribution. Id., Table 4A.   By comparison, courts in this circuit have held that a standard deviation of less than 2.00 indicates discrimination:

> A "manifest imbalance" can be shown by statistical evidence alone or through a combination of statistical and anecdotal evidence. Palmer [v. Shultz, 815 F.2d 84, 91 (D.C. Cir.1987)]. Even when the statistical evidence shows less than 1.96 standard deviations, the Court of Appeals for the District of Columbia has held that a prima facie case of discrimination can be made relying on anecdotal evidence supporting the statistical showing. Palmer, 815 F.2d at 96-97.

Stewart v. Rubin, 948 F. Supp. 1077, 1094 (D.D.C. 1996); see also cases cited therein.

Defendants assert that Dr. Siskin characterized this disparate impact as a result of the non-Flight Service Controllers (i.e., the Tower and En Route Controllers) having been designated as a "core" capacity of the FAA (OMB "Reason Code A") and thus not suitable for outsourcing.   Defendants accordingly argue that, as there existed a business necessity to retain the Tower and En Route Controllers as government employees, they have a defense to the disparate impact found by their expert.

In fact, however, as described above, Dr. Siskin analyzed both the selection of Flight Service from the entire FAA

12

workforce and the decision to declare other controllers "core" and Flight Service "non-core."[10]  He conclusively established that there was a disparate impact in the selection of Flight Service for the A-76 contracting out process.

Dr. Siskin's statement that an even greater disparity resulted from the decision to characterize the non-Flight Service controllers as "core"[11] can just as easily and correctly be rephrased to state that it resulted from the decision to

---

[10]  Although Plaintiffs have never contended that the Tower and En Route Controllers should have been subjected to an A-76 process, it is worth noting that OMB has stated that the mere fact that a function is a "core" function of an agency does not operate as a bar to outsourcing some or all of the function. Ex. 11.  It is evident that the real reason the Tower and En Route Controllers had to be designated as Reason Code A, exempt from competition, was the political unpopularity of contracting out those Controllers. Defendants' Memorandum in Support of its Motion for Summary Judgment, Document No. 257, at 70.

[11]  Although Plaintiffs have never asserted that the Tower and En Route Controllers should have been designated as suitable for competition, it is arguable that, had reduction of costs been a paramount concern of the FAA, the Agency would have followed the recommendation of the Inspector General and others to expand the contract tower program, under which lightly used airports are served by private sector controllers. See, e.g., Ex. 26, Coopers & Lybrand Report, at VI-5, VI-29 through 35; Ex. 27B, 2003 Report of Inspector General.  The purpose of the 2002 change in Executive Order 13180 that eliminated the finding that Air Traffic Control is inherently governmental was to permit the continuation of that program. Ex. 21, June 12, 2002, Statement of the Department of Transportation.  Thus, there is apparently no conflict between the finding that the separation and control of aircraft is a core capacity and the FAA's hiring of contract controllers at some airports.

declare the Flight Service Controllers "non-core."  Moreover, as was demonstrated in Plaintiffs' previous memorandum Pl. Cross-Mot. at 42-44), the decision to designate the Flight Service as suitable for competition was made *after* the decision to compete the Service.  Accordingly, it is clear that what Dr. Siskin has found to be the cause of the disparate impact was the selection of Flight Service to be subjected to the A-76 process. It is this decision that Defendants must demonstrate to be a "business necessity," which they cannot do.

**B.    Dr. Belman's Analysis Demonstrates the Disparate Impact Caused by the Manner in Which the A-76 Was Designed and Run.**

It is somewhat more difficult to quantify the exact effect of the second practice which created the disparate impact on the Plaintiffs, the manner in which the A-76 process was designed and run.  As described above, there were two major flaws in the process, 1) the decision to guarantee a workforce to the winning bidder[12], which prevented use of the normal amelioration devices

---

[12]    That the A-76 process could not have ended in outsourcing without a mechanism to guarantee bidders a labor force — at least, not at the labor prices offered by the private sector bidders — is acknowledged frankly by the testimony of Joann Kansier, who stated in her deposition that re-employment rights had to be limited to provide a labor force. Ex. 17, Kansier Dep. at 118; see also Ex. 16, Sturm Dep. at 18-19, 21 ("[I]t takes a special skill for flight service, you can't just pull them off the street.") Mr. Sturm testified that the FAA

of a RIF — the filling of vacant jobs with affected employees
and the exercise on a regional basis of the "bump and retreat"
rights afforded RIF'ed employees by regulation (see fn. 6,
supra, and sources cited therein); and 2) the handicapping of
the MEO team such that there was not a "level playing field" on
which it could compete.[13]  Cf. Ex. 17, Kansier Dep. at 97.

────────────────────

agreed to rehire no more than 240 of the fired Controllers
(2,300 in October 2005, according to the chart prepared by the
FAA's George Williams, Ex. 3). Id. at 18-19.  In fact, the FAA
actually rehired 429 of those who had initially accepted
Lockheed's offer, id. at 21, but it is evident from the promise
made to Sturm that the Agency's intent was, as Joann Kansier
testified, to supply the existing workforce to the contractor.
As the October 2003 "Briefer" put it:  "The AFSS function cannot
be performed without its existing, highly skilled employees. .
. . The agency has to maintain a balance between its desire to
provide a soft landing to its employees while continuing to
provide a high level of service." Ex. 18 at 4.

[13]     The MEO faced several handicaps, as described in
Plaintiffs' prior memorandum, Pl. Cross-Mot. at 61-63, including
the refusal of the Agency to pay for MEO staff overtime work,
the failure of the Agency to assign a dedicated Human Resources
professional to assist in the creation of a "soft landing
package," the refusal of the Agency to negotiate contract issues
(which prevented creation of such a package), and the refusal
of the FAA management members of the team to permit the most
knowledgeable team members, the working Controllers, to
participate in the "orals" in which questions of the technical
evaluators were to be answered.  Even if these handicaps were
not intentional, they certainly had a disparate impact on the
Plaintiffs, all or most of whom would have been retained by the
FAA if the MEO had won the A-76 competition, because even the
excess Controllers would not have been restricted from other
jobs in the Agency and the exercise of ordinary RIF rights.
Defendants dismiss the refusal to permit the working Controllers
to participate in orals with a fancy French phrase referring to

15

Dr. Belman, the Plaintiffs' expert on labor economics, described the effect of the A-76 process as creating a monopsony situation in which the RIF'ed Controllers over 40, having very specialized skills for which there is no or an extremely limited market, had no choice but to go to work for Lockheed,[14] at frozen salaries and without benefits, until, in many cases, they were again involuntarily terminated, this time by Lockheed as it closed seven of the stations that were part of its original proposal.[15]   Ex. 2, Belman Report, at 6-7.

hindsight. Def. Opp. at 30.  However, this is not the hindsight of equals on a team; this is the recognition that Defendants' management, either intentionally to handicap the MEO or uninterested in the expected outcome of the competition, refused to permit those who would be impacted, the Controllers, to put forth the most knowledgeable spokespersons. See Ex. 35, Dodson Dep. at 43-47.  Moreover, contrary to the arguments of Defendants (Def. Opp. at 27-28), this evidence of intentional or careless handicapping of the MEO was not presented to the Administrative Law Judge who ruled on the bid protest, as he did not consider questions of discrimination, either as disparate treatment or as disparate impact.

[14]   It is indisputable that, had Lockheed — or any non-MEO bidder — been forced to compete with the FAA by inducing workers not to accept vacant FAA positions or exercising RIF rights, it would have had to offer compensation for the pension benefits that Plaintiffs had to forgo to work in the private sector instead.  In that event, higher labor costs would have resulted in a significantly higher contract price, or, more likely, in the selection of the MEO as the winning bid, in which case most or all of the Plaintiffs would not have been harmed.

[15]   When Lockheed took over the Flight Service, it employed approximately 1,471 former federal Flight Service Controllers. Ex. 16, Sturm Dep. at 20.  By the date of Mr. Sturm's

16

The Seventh Circuit has observed that a monopsony situation like the one produced by the A-76 process and the resulting RIF is one of the very effects that the ADEA was intended to prevent:

> Congress enacted the ADEA in response to the problems that the older worker faces in the job market, including the obstacles that the long-term employee encounters when he or she is suddenly without work. *See generally* Report of Secretary of Labor to Congress, The Older American Worker: Age Discrimination in Employment 11-17 (1965), reprinted in EEOC, Legislative History of the Age Discrimination in Employment Act, 16, 28-34 (1981). These difficulties have been attributed in large part to the worker's development of firm-specific skills not easily transferable to a different job setting. National Commission for Employment Policy, 9th Annual Report, Rep. No. 17, Older Workers: Prospects, Problems and Policies 4 (1985). Therefore, while the older employee's higher salary reflects the value of improved skills and the increased productivity that results, it is also indicative of one of the very

---

deposition, July 10, 2008, Lockheed had consolidated from 58 AFSS stations to the planned three hubs and 17 stations and employed only 1,084 Controllers, a contraction of nearly 300 Controllers. At that time, the company was offering buyouts to further reduce the number of Controllers to an unspecified level. Ex. 66, Sturm Dep. at 51-53. Lockheed now operates only 13 Flight Service facilities and employs about 800 Controllers. See http://tinyurl.com/yeews43, last visited Oct. 1, 2009 (Lockheed list of AFSS facility addresses); http://www.lockheedmartin.com/products/afss/index.html, last visited Oct. 1, 2009. Additionally, Lockheed has reduced staffing at existing sites, terminating even Controllers who were not stationed at closing facilities. See, e.g., Ex. 67, Eastman Decl. Accordingly, it appears that approximately 600 former federal Flight Service Controllers — many of them Plaintiffs in this case — have now lost their Lockheed jobs.

problems the ADEA was intended to address: the likelihood that the employee will be less employable in other settings.

Metz v. Transit Mix, Inc., 828 F.2d 1202, 1205 (7th Cir. 1987).[16]

Because it is impossible to determine all the jobs that Plaintiffs might have obtained if the FAA had not limited rehiring and manipulated the "competitive areas" in order to guarantee a workforce to the winning bidder,[17] it is difficult to compare the Plaintiffs statistically to those who obtained the positions. However, Exhibit 68, which shows the vacancies for which Plaintiffs applied and whether they obtained them, demonstrates the extent to which each individual Plaintiff was impacted by the policy of guaranteeing a workforce to the winning bidder.[18] As of the date of Plaintiffs' discovery responses, on which the chart is based, the overwhelming

---

[16] Although the specific holding of Metz, a private-sector case, is no longer viable, see Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1125 (7th Cir. 1994), its summary of the purpose and history of the ADEA remains correct.

[17] In addition to calculating which vacant jobs might have been filled by displaced Plaintiffs, one would also need to determine which FAA jobs not then vacant might have been filled by Plaintiffs taking advantage of their "bump and retreat" rights under the RIF regulations.

[18] As explained in the Declaration of Diane Cummings (included in Exhibit 68), who prepared the chart, the information contained therein was derived from the Plaintiffs' responses to Defendants' interrogatories.

18

majority of Plaintiffs applied for at least one, and more often multiple, FAA jobs, both Controller and other positions, without success.

Furthermore, as indicated by some of the comments of the Plaintiffs (noted on the chart), many Plaintiffs were discouraged by the perception that the FAA wanted to be rid of them and either did not apply or applied for very few positions. Given the small number of over-40 Plaintiffs who received a favorable response to their FAA applications, they cannot be said to be wrong.  Both Dr. Belman and case law recognize that this is an established phenomenon, one that should not bar relief to the discouraged Plaintiff who declined to engage in a futile act.  Ex. 71, Belman Dep. at 87-88; <u>International Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 365-67 (1977).

**II.  The Disparate Impact of the Selection of the Flight Service For the A-76 and the Manner in Which the A-76 and RIF Were Designed and Implemented Cannot Be Justified as "Business Necessity" or a "Reasonable Factor Other than Age."**

**A.    The Correct Standard for Federal-Sector ADEA Cases Is "Business Necessity."**

Defendants assert, relying on <u>Meacham v. Knolls Atomic Power Laboratory</u>, 128 S. Ct. 2395 (2008), that reliance on a "reasonable factor other than age" (RFOA), as set forth in

Section 623 of the ADEA, is an affirmative defense to disparate impact discrimination in the federal sector.   However, while Meacham explains the rationale for Congress's use of the term, nothing in the decision indicates Congressional intent to apply any portion of the ADEA other than Section 633a to the federal government.   "Congress deliberately prescribed a distinct statutory scheme applicable only to the federal sector." Lehman v. Nakshian, 453 U.S. 156, 167 n.15 (1981), quoted in  Forman v. Small, 271 F.3d 285, 296 (D.C. Cir. 2001), cert. denied, 536 U.S. 958 (2002).  The language of the two sections of the ADEA, Section 623 for the private sector and state and local governments and Section 633a for the federal sector, is different.  Both prohibit discrimination based on age, but only the former (for the private sector) contains the RFOA provision. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Barnhart v. Sigmon Coal Co., 534 U.S. 438, 452 (2002) (internal quotation marks omitted).

Defendants attempt to buttress their argument that age discrimination is somehow different from race or other Title VII

20

discrimination by arguing that we already treat the two statutes differently:  We interpret Title VII also to prohibit reverse discrimination (a preference for minority or female employees), but do not construe the ADEA to prohibit similar reverse discrimination (a preference for older employees).  Def. Opp. at 9 (citing <u>Gross v. FBL Financial Services</u>, 129 S. Ct. 2343, 2349 n.2 (2009).  But this argument is without merit, because a comparison of the two statutes shows that the difference is not based on some notion of the differences between the two kinds of discrimination, but rather on specific statutory language that is present in the ADEA but not in Title VII.[19]  42 U.S.C. Section 2000e-2(a) makes it "an unlawful employment practice for an employer . . . to discriminate against *any individual* . . . because of such individual's race, color, religion, sex, or national origin," whereas 29 U.S.C. Section

---

[19]     Indeed, the very footnote of the <u>Gross</u> decision cited by Defendants bases the difference between the two statutes on the differences in statutory language.  In this context, it is important to point out that Defendants' contention, Def. Opp. at 18, that <u>Gross</u> mandates judgment for Defendants because Plaintiffs do not contend that the RIF is the "but-for" cause of their termination, is incomprehensible.  The RIF itself was required by (and part of) the discriminatory (whether disparate treatment or disparate impact) A-76 decision, which *is* the "but-for" cause of Plaintiffs' termination.  Absent the discriminatory decision to conduct the A-76, which ended in the RIF, Plaintiffs would have remained employed by the FAA.

631(a) states that "[t]he prohibitions in this chapter shall be *limited to individuals who are at least 40 years of age*. This cannot reasonably be read to mean that Congress generally intended looser protections for age discrimination than for other kinds of discrimination; the most it can be read to say is that Congress found discrimination against any individual on the basis of race or other Title-VII protected characteristics to constitute a societal problem, but did not find discrimination against younger workers to be a societal problem.[20]

Of the cases cited by Defendants in their opening brief at page 67, none provides substantive support for the proposition that RFOA is a defense to discrimination in federal cases. With the exception of <u>Lumpkin v. Brown</u>, 898 F. Supp. 1263, 1271-72 (N.D. Ill. 1995), all the cases cited assume without discussion of any kind that RFOA is the applicable standard in federal sector cases. None states that the "business necessity" defense

---

[20] It is important to note that Plaintiffs have never contended, as Defendants state at page 9 of their Opposition, that it would be illegal to hire older workers to perform hazardous work. Rather, by way of analogy, Plaintiffs observed that it would be illegal to assign *only* older workers to perform hazardous work. Pl. Cross-Mot. at 68, n.27. That Defendants would so misstate Plaintiffs' argument indicates either very careless reading or indifference to accuracy in discussion.

from Title VII is inappropriate.  In fact, they all turn on factors other than an affirmative defense.  <u>Lumpkin</u>, by contrast, the only one of the cited cases to hold that "business necessity" is the appropriate standard, did analyze the difference between Sections 623 and 633a:

> Section 633a contains no textual counterpart to Section 623(f), and by its terms it is the exclusive prohibition against age discrimination within the federal government (Section 633a(f)). If the plain language of Section 633a(f) had left any doubt on the latter point, <u>Lehman v. Nakshian</u>, 453 U.S. 156, 168, 101 S. Ct. 2698, 2705-2706, 69 L. Ed. 2d 548 (1981) would have dispelled it by its statement that the enactment of Subsection (f) in 1976 "clearly emphasized" that Section 633a embodies a "selfcontained" [sic] prohibition against age discrimination in the federal workplace, "unaffected by other sections, including those governing procedures applicable in actions against private employers."

<u>Id</u>. at 1271.

**B.   "Business Necessity" Is a Strict Standard.**

Defendants further contend (Def. Opp. at 13-14), in reliance on <u>Wards Cove Packing Company, Inc v. Atonio</u>, 490 U.S. 642 (1989), that "business necessity" simply means that "the challenged practice serves, in a significant way, the legitimate employment goals of the employer," that it need not be "essential" or "indispensable." <u>Id.</u> at 659.  This statement is simply wrong and inexplicable in a government brief, because

23

that holding of <u>Wards Cove</u> was explicitly reversed by the Civil Rights Act of 1991, 42 U.S.C. § 1981 note ("CRA 1991").

Section 3 of CRA 1991 specifically states:

The purposes of this Act are -

. . .

(2) to codify the concepts of "business necessity" and "job related" enunciated by the Supreme Court in <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424 (1971), and in the other Supreme Court decisions prior to <u>Wards Cove Packing Co. v. Atonio</u>, 490 U.S. 642 (1989);

(3) to confirm statutory authority and provide statutory guidelines for the adjudication of disparate impact suits under title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.); and

(4) to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination

Section 105 of the Act, which added 42 U.S.C. 2000e-2(k) to Title VII (requiring the complaining party, when confronted by a defense of business necessity, to make a showing — as Plaintiffs did, Pl. Cross-Mot. at 28-29 — to demonstrate that alternative practices would substantially accomplish the same legitimate goals as the practice at issue), further directed:

(b) No statements other than the interpretive memorandum appearing at Vol. 137 Congressional Record S 15276 (daily ed. Oct. 25, 1991) shall be considered legislative history of, or relied upon in any way as legislative history in construing or applying, any

> provision of this Act that relates to Wards Cove -
> Business necessity/cumulation/alternative business
> practice.

The interpretive memorandum states in relevant part: "The terms 'business necessity' and 'job related' are intended to reflect the concepts enunciated by the Supreme Court in <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424 (1971), and in the other Supreme Court decisions prior to <u>Wards Cove Packing Co. v. Atonio</u>, 490 U.S. 642 (1989)." The official interpretive memorandum goes on to quote then-Senator John Danforth:

> [F]or nearly 2 years many of us have been attempting
> to put together a civil rights bill that would redress
> problems created by the Supreme Court of 1989,
> particularly a bill that would reinstate the <u>Griggs</u>
> decision and that would overrule the <u>Wards Cove</u>
> decision.
>
> This amendment would do that.

Accordingly, "business necessity" cannot be defined by reference to <u>Wards Cove</u>. Because, as discussed above, Section 633a of the Act, the federal-sector provision, must utilize the Title VII standard of "business necessity" as the only affirmative defense to disparate impact discrimination, "business necessity" should be judged as it is for all other cases to which the defense is applicable. Plaintiffs have found no post-1991 cases that purport to judge "business necessity" by the standard of <u>Wards Cove</u>.

Defendants would no doubt contend that, as the CRA 1991 did not amend the ADEA, <u>Wards Cove</u> still applies to define "business necessity" where it is used to judge federal-sector ADEA claims. However, if, as <u>Lehman v. Nakshian</u> instructs, Section 633a is a self-contained prohibition against discrimination unaffected by the rest of the ADEA, Congress's failure to amend the ADEA in 1991 is irrelevant.  As already discussed, the "business necessity" provision is not contained in the rest of the ADEA. It is contained in Section 633a only, by implication because of that section's parallel structure to Title VII, on which it was based.  The only existing correct definition of "business necessity" is that established in the 1991 Act.

While <u>Smith v. City of Jackson</u>, *not* a federal sector case, states that <u>Wards Cove</u>'s "pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA," 544 U.S. at 240, the fact is — as <u>Meacham v. Knolls Atomic Power Laboratory</u>, 554 U. S. ___ (2008), points out — the language of Section 623 is *not* identical to Title VII. <u>Id.</u>, slip op. at 3.  Nor is the language of Section 623 identical to the language of Section 633a, which controls in this federal-sector case.

Although courts have not been uniform in strictly construing business necessity, <u>see</u>, <u>e.g.</u> <u>Spurlock v. United</u>

Airlines, Inc., 475 F.2d 216, 219 (10th Cir. 1972); Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251, 1261-62 (6th Cir. 1981), the majority of courts construes the defense quite narrowly. See, e. g., Kirby v. Colony Furn. Co., 613 F.2d 696 (8th Cir. 1980); Blake v. City of Los Angeles, 595 F.2d 1367, 1377 (9th Cir. 1979) (the business necessity defense is "very narrow"); Parson v. Kaiser Aluminum & Chemical Corp., 575 F.2d 1374, 1389 (5th Cir. 1975); Green v. Missouri Pac. R. R., 523 F.2d 1290, 1298 (8th Cir. 1975) (business necessity "connotes an irresistible demand"); United States v. St. Louis-S.F. Ry., 464 F.2d 301, 308 (8th Cir. 1972) (en banc), cert. denied, 409 U.S. 1116, 93 S. Ct. 913, 34 L. Ed. 2d 700 (1973); (the test is whether there is "compelling need"); and United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971) ("compelling need").[21]   And although, as Watson v. Fort Worth Bank & Trust, supra, 487 U.S. at 998, observes, "[f]actors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals," cost cannot be the sole

---

[21]   No District of Columbia case of which Plaintiffs are aware has defined "business necessity."

determinant.[22]  This is all the more true in this case, in which the evidence demonstrates that the supposed cost savings from the discriminatory practice have from the beginning been inflated. See Pl. Cross-Mot. at 69-70 and sources cited therein. The Agency, in attempting to rebut Plaintiffs' statement of the obvious — that discrimination, when it takes the form of depriving workers of compensation[23], is often less expensive than nondiscrimination — asserts that discrimination is prohibited because it is economically inefficient.  Def. Opp. at 12-13. Common experience, however, tells us that most discrimination in employment — and certainly most disparate impact discrimination, in which there is no conscious discriminatory motive — is carried out because the discriminator believes that it is better for the business to do so.  Congress did not enact the ADEA (or Title VII, for that matter) to police the economic efficiencies of the nation's business, but to end discrimination

_____

[22]  In suggesting, as they do at page 14 of Defendant's Opposition, that Plaintiffs claim cost to be an illegitimate consideration, Defendants once again blatantly distort the plain statements of Plaintiffs.

[23]  The Agency inexplicably claims this case is not about compensation.  Def. Opp. at 12-13.  It is an absolute certainty that none of the Plaintiffs would be bringing suit if their compensation, including benefits, had remained unaffected by the RIF.

— both intentional and as a result of disparate impact — against vulnerable classes of persons.

   **C.   Defendants Have Not Shown a Business Necessity for the A-76 Contracting Out of the Flight Service.**

The cost savings alleged by the FAA to be achieved by the outsourcing of the Flight Service do not provide a "business necessity" for the practice.  Defendants notably did not respond to Plaintiffs' explanation, Pl. Cross-Mot. at 69-71, that according to the Inspector General and other sources, including the Agency's own John Hennigan, the FAA has significantly overstated (*not miscalculated*) the cost savings it will realize from the A-76.  Similarly, the Agency, while continuing to assert that the legitimate goal of complying with the President's Management Agenda was considered very important by Secretary Mineta (Def. Opp. at 15), fails to explain how that can possibly be believed when the Agency ignored the OMB injunction eventually to compete 50 percent of its "commercial" positions and the recommendations of Ronald Page and Chris Bertram, its own employees charged with A-76 implementation, that other FAA functions be subjected to similar competitions. See Pl. Cross-Mot. at 71-72 and sources cited therein.

The FAA's Opposition brief spends substantial energy (Def. Opp. at 7-17) defending Secretary Mineta's decision not to

compete Tower and En Route Controller functions, something
Plaintiffs have never suggested.  Defendants are suggesting a
false choice.  Plaintiffs have always asserted not that other
Controller functions should have been subjected to an A-76, but
rather that the Flight Service should not have been competed,
either.  This was so because — as everyone knew — outsourcing
would have a devastating impact on the majority of the
Controllers, who would be deprived of their pensions, and
because, as Joann Kansier acknowledged, the existing workforce,
whether or not they were to be federal workers, were essential
to the continued operation of the Flight Service function
because no commercial workforce existed. Fn. 12, _supra_.  It is
impossible to understand how an activity can be suitable for
competition where no competitors exist in the marketplace and
the federal workforce must therefore be privatized to serve the
contractor's need.

In their opening Memorandum, Plaintiffs demonstrated (as
required by CRA 1991 and case law) that a number of alternatives
existed that would have fulfilled the FAA's legitimate goals
(significantly reducing costs and complying with the President's
Management Agenda) without wholesale termination of the older

Controllers and while retaining better service to general aviation pilots.  These options included, among others,

· outsourcing functions as to which a genuine commercial market existed;

· consolidation of the Flight Service without outsourcing, as proposed by Coopers & Lybrand (Ex. 26), the Inspector General (Ex. 27), and the Flight Service Architecture Committee (Ex. 39), and the NAATS union (Ex. 42);

· designing and conducting an A-76 process that, instead of guaranteeing the contractor a workforce, assumed that most Flight Service Controllers not eligible and desirous of retirement would fill vacant positions in the FAA or exercise their RIF rights unless induced by attractive compensation to move to the private sector, which would almost certainly have led to an award to the MEO.

Pl. Cross-Mot. at 73-74.

Accordingly, Plaintiffs having demonstrated both the absence of business necessity and the availability of other effective means of accomplishing the legitimate goals, no defense exists to the disparate impact created by the A-76 process and the resulting RIF of the Flight Service.

D.    **The FAA Cannot Prevail Even if the Standard is
      "Reasonable Factor Other than Age."**

Even assuming that RFOA constitutes a defense to disparate impact in the federal sector, the FAA cannot meet that burden.

Congress enacted the ADEA in response to the problems that the older worker faces in the job market, including the obstacles that the long-term employee encounters when he or she is suddenly without work. *See generally* Report of Secretary of Labor to Congress, The Older American Worker: Age Discrimination in Employment 11-17 (1965), reprinted in EEOC, Legislative History of the Age Discrimination in Employment Act, 16, 28-34 (1981); *see also* 29 U.S.C. § 621(a)(1); <u>see also</u> <u>EEOC v. Chrysler Corp.</u>, 733 F.2d 1183, 1186 (6th Cir. 1984).   Those obstacles and harms are the same whether the loss of employment is due to disparate treatment or disparate impact.

<u>Smith v. City of Jackson</u>, 544 U.S. 228 (2005), explains quite well what Congress intended in including RFOA as a defense despite the severe harm of age discrimination.   In <u>Smith</u>, the police department, in an attempt to improve its ability to compete with surrounding jurisdictions in hiring officers, altered its pay scale to be competitive with those jurisdictions.   To do so, it raised the pay of all officers; but competitiveness with the surrounding jurisdictions dictated a

larger percentage raise to newer officers and a lesser
percentage raise to officers who had served more than five
years. Thus, the challenged practice, adopted to fulfill an
important goal (police recruitment), might have had a disparate
impact on older officers (a smaller raise)[24] because persons who
have served longer in a job tend to be older than those who have
served a shorter time.

> Congress' decision to limit the
> coverage of the ADEA by including the RFOA
> provision is consistent with the fact that
> age, unlike race or other classifications
> protected by Title VII, not uncommonly has
> relevance to an individual's capacity to
> engage in certain types of employment. To be
> sure, Congress recognized that this is not
> always the case, and that society may
> perceive those differences to be larger or
> more consequential than they are in fact.
> However, as Secretary Wirtz noted in his
> report, "certain circumstances ...
> unquestionably affect older workers more
> strongly, as a [544 U.S. 241] group, than
> they do younger workers." Wirtz Report 11.
> Thus, it is not surprising that certain
> employment criteria that are routinely used
> may be reasonable despite their adverse
> impact on older workers as a group.

Id. at 240-41; see also EEOC v. Johnson & Higgins, Inc., 91 F.3d
1529, 1541 (2nd Cir. 1996) ("The statute supplies an exception

_____

[24]    It appears that the complaining officers were also
unable to explain with specificity what it was about the new pay
plan that created the alleged disparate impact. 544 U.S. at 241.

for 'age-neutral' decisions based on other factors such as health or even education that might be correlated with age.").

In other words, because age may also be correlated with *other characteristics* that are relevant for some purposes — physical strength and reaction time are two that come to mind immediately, beside (as in <u>Smith</u>) length of employment — reliance on those characteristics (the reasonable factors other than age) for an important business purpose is permissible. The RFOA then, is not any business purpose, regardless of its disparate impact, but rather a legitimate business purpose that relates to a characteristic of aging, conceptually similar to the "bona fide occupational qualification" defense contained in the same paragraph of the statute. <u>See</u> 29 U.S.C. § 623(f)(1). "The focus of the defense is that the factor relied upon was a 'reasonable' one for the employer to be using." <u>Meacham v. Knolls Atomic Power Laboratory</u>, No. 06-1505 (2008), slip op. at 14. This necessarily involves a weighing of the interest said to be served by the challenged practice against the impact of the practice on older workers. For example, a strength test discriminating against older employees might not be reasonable if the need for that strength on the job rarely arises — or might be entirely reasonable if the inability to muster the

34

necessary strength could pose a serious safety hazard. "Congress, through the ADEA, has assigned the task of assessing the reasonableness of [practices disparately affecting older workers] to the courts — a responsibility that should not be shirked lightly." Camacho v. Sears, Roebuck, 939 F. Supp. 113, 122 (D.P.R. 1996).

Smith v. City of Jackson itself provides an example, although the Supreme Court was not explicit in weighing the factor. The disparate impact was not enormously severe — even the older workers received some pay increase — but the goal of the City, to be competitive in hiring for the police, an essential public service, was obviously important. Tying the proportion of the wage increase inversely to length of service was thus a reasonable factor other than age, despite close correlation.

In this case, by contrast, the FAA's challenged practices are not reasonable when measured against its alleged goals. This is not a choice among reasonable methods, which might be permissible even if the best method were not selected. Cf. Smith v. City of Jackson, supra, 544 U.S. at 243. Rather, for the alleged purposes of saving money and complying with the President's Management Agenda — important goals if they were

35

genuine, but not in the category of public safety, national security, or even economic survival of the Agency — the FAA chose the method with the most devastating impact on approximately 2,000 of its older employees, depriving them of their federal jobs and, in more than 60 percent of the cases, much or all or their federal pensions.[25]   Under these circumstances, it cannot be said that the Agency employed a *reasonable* factor other than age.

---

[25]   Defendants imply that the 556 Controllers who retired with "optional" retirements (see Ex. 3) did so in preference to full ATC retirement because the optional retirement was more generous. Def. Opp. at 34 n.24.   Examination of the data, however, demonstrates that this is not necessarily correct.   To test Defendants' contention, Plaintiffs' counsel, using data provided by Plaintiffs, examined all of the Flight Service CSRS retirements (Plaintiffs and non-Plaintiffs alike) to determine whether those individuals were eligible for ATC retirement as well.   Because of the limitations of the data, it was not possible to determine whether all of the dual eligibles took CSRS retirements, so an assumption was made that Defendants are correct that, where a choice is possible, the CSRS retirement is preferable and the retiree so elected.   The chart contained in Exhibit 64 lists all of the CSRS retirees who were eligible for ATC retirement: There are only 396.   The only conclusion that can be drawn from this data is that, while in some cases it is possible that a combination of years of service and age will make the CSRS retirement more favorable than an ATC retirement, at least 160 of the "optional" retirees did not qualify for a full ATC retirement.   They were forced from their jobs without having attained the benefit toward which they had been working for many years (a more generous retirement), and for which they had been paying into the system at a higher rate than other federal employees.   Seen in the light most favorable to Defendants, less than one-third of the 2,300 fired Controllers received a full retirement.

36

## **CONCLUSION**

In their prior Memorandum and in this one, Plaintiffs have demonstrated that there is a strong likelihood that they suffered disparate treatment because of their ages (over 40), and that it is indisputable that they suffered a serious disparate impact because of their ages, unjustified by business necessity. Accordingly, this Court should deny Defendants' Motion for Summary Judgment, grant Plaintiffs' Cross-Motion for Summary Judgment, and order further proceedings to determine the amount of damages.

A proposed Order is attached.

Respectfully submitted,


_____/s/_____
LENORE C. GARON
    (D.C. BAR No. 172205)
CHARLES W. DAY, JR.
    (D.C. Bar No. 459820)
JOSEPH D. GEBHARDT
    (D.C. Bar No. 113894)
VALENCIA R. RAINEY
    (D.C. Bar No. 435254)
DANIEL K. GEBHARDT
    (D.C. Bar No. 975703)
GEBHARDT & ASSOCIATES, LLP
1101 17th Street, N.W.
Suite 807
Washington, DC 20036-4716
(202) 496-0400

October 2, 2009                Counsel for Plaintiffs