**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| KATHLEEN BREEN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-cv-654 (PLF) |
| | ) | |
| ANTHONY FOXX, SECRETARY OF | ) | |
| TRANSPORTATION, DEPARTMENT OF | ) | |
| TRANSPORTATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

FACTUAL BACKGROUND ...................................................................................... 2

ARGUMENT ............................................................................................................. 4

I.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
PLAINTIFFS' DISPARATE TREATMENT CLAIM ...................................... 4

    A.    Defendants' Statements Show That Age Was a Factor in the Decision to
Outsource Flight Service .................................................................................. 5

    B.    The Procedural Irregularities in the FAA's Decisions Leading Up to and
Following the RIF Show That the FAA's Proffered Reasons Were
Pretextual ........................................................................................................ 7

        1.    The Designation of Flight Service as a Non-Core Function, a
Necessary Pre-Condition to Outsourcing These Workers, was
Neither Required by the PMA nor Consistent with the FAA's Own
Procedures ................................................................................................ 7

        2.    The Terms of the Contract the FAA Entered with its Consultant to
Assess the Feasibility of Outsourcing Flight Service Created an
Incentive to Ensure that the Consultant Would Support
Outsourcing this Function ...................................................................... 11

        3.    The FAA Ensured the Failure of the Alternative Option to
Outsourcing the Flight Service Function, Which Would Have
Permitted the FSCs to Remain Employed and Retain their
Retirement Rights ................................................................................... 11

        4.    The FAA Ignored Other Consolidation Proposals That Did Not
Require Laying Off FSCs ....................................................................... 13

        5.    The FAA Deviated from the Bump-and-Retreat Process to Ensure
FSCs Could Not Stay in the Agency ...................................................... 14

II.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
PLAINTIFFS' DISPARATE IMPACT CLAIM ............................................ 14

        1.    There is No Dispute that the FAA's Classification of Flight Service
as a Non-Core Function Had an Adverse Impact on Older Workers ....... 15

        2.    Regardless of the Standard Prescribing the Defense the FAA Must
Present, the Evidence Adduced by Plaintiffs Either Rebuts the
Defense or Creates Genuine Issues of Material Fact ............................... 16

        3.    Defendants' Justification for the Actions Challenged Here Do Not
Satisfy the Business Necessity Test ........................................................ 18

        4.    Even If the Reasonable Factor Other Than Age Defense is
Available, Defendants Fail to Satisfy It .................................................. 20

CONCLUSION ........................................................................................................ 20

2178556.1

# TABLE OF AUTHORITIES

<u>Page</u>

**CASES**

*Aliotta v. Bair,*
    614 F.3d 556 (D.C. Cir. 2010) ............................................................................. 16

*Anderson v. Duncan,*
    20 F. Supp. 3d 42 (D.D.C. 2013) (J. Collyer) ..................................................... 16

*Breen v. Peters,*
    474 F. Supp. 2d 1 (D.D.C. 2007) ......................................................................... 18

*Christie v. Foremost Ins. Co.,*
    785 F.2d 584 (7th Cir. 1986) ............................................................................... 13

*Ercegovich v. Goodyear Tire & Rubber Co.,*
    154 F.3d 344 (6th Cir. 1998) ................................................................................. 6

*Evans v. Atwood,*
    38 F. Supp. 2d 25 (D.D.C. 1999) ......................................................................... 14

*Evans v. Sebelius,*
    716 F.3d 617 (D.C. Cir. 2013) ......................................................................... 7, 10

*Ford v. Mabus,*
    629 F.3d 198 (D.C. Cir. 2010) ................................................................... 4, 17, 18

*Forman v. Small,*
    271 F.3d 285 (D.C. Cir. 2001) ............................................................................. 18

*Hazen Paper Co. v. Biggins,*
    507 U.S. 604 (1993) ............................................................................................... 5

*Jones v. D.C.,*
    273 F. Supp. 2d 61 (D.D.C. 2003) ......................................................................... 7

*Lehman v. Nakshian,*
    453 U.S. 156 (1981) ............................................................................................. 17

*Matuskey v. Medlantic Healthcare Grp.,*
    1997 WL 161952 (D.D.C. Apr. 3, 1997) (Friedman, J.) ........................................ 7

*May v. Shuttle, Inc.,*
    129 F.3d 165 (D.C. Cir. 1997). Dkt. 256 ............................................................... 7

# TABLE OF AUTHORITIES

<u>Page</u>

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)......................................................................................................4

*Smith v. City of Jackson*,
    544 U.S. 228 (2005)....................................................................................................17

*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011)......................................................................................................6

*United States v. Utah Constr. & Min. Co.*,
    384 U.S. 394 (1966)....................................................................................................13

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989)....................................................................................................16

*Wilson v. Cox*,
    753 F.3d 244 (D.C. Cir. 2014).....................................................................................6

**S**TATUTES

5 U.S.C. § 2109(1) .......................................................................................................2, 8

29 U.S.C. § 623a (2012) ...........................................................................................16, 17

29 U.S.C. § 633a (2012) .....................................................................................16, 17, 18

**O**THER **A**UTHORITIES

5 C.F.R. § 351.402 (2016) ..............................................................................................14

29 C.F.R. § 1625.7(e)(1) (2015) .....................................................................................20

65 Fed. Reg. 77493 (Dec. 11, 2000) ............................................................................2, 8

2178556.1

In 2005, the Federal Aviation Administration ("FAA" or "Agency") conducted a Reduction in Force ("RIF") that left the nearly 2,300 air traffic controllers of the Flight Service[1] workgroup—about 92 percent of whom were age 40 or older at the time—jobless and without the option to remain employed with the FAA, due to the peculiar manner in which the FAA carried out the RIF.  Although publicly hailed by Agency officials as a neutral action to save money, the RIF and the circumstances and decisions surrounding it reveal a process that was wrought with irregularities, inconsistencies, and signs of age-based animus that can only be reasonably explained as intentional discrimination.  Additionally, it is undisputed that critical decisions giving rise to the RIF of Flight Service had a disparate impact on older workers, as demonstrated by overwhelming statistical disparities.  The RIF, coupled with the general inability of these older workers to remain employed with the FAA, wreaked havoc on the lives of the FSCs, many of whom were only a few years shy of obtaining their pension benefits at the time the FAA proceeded with its mass layoff.  More than a decade later, Plaintiffs, a group of former FSCs, continue in their longstanding pursuit of relief—and closure—in this matter.

Presently before the Court is Defendants' 2009 motion for summary judgment as to Plaintiffs' disparate treatment and disparate impact claims.  As explained more fully below, Defendants have not, nor can they, demonstrate the absence of genuine disputes of material fact bearing on Plaintiffs' claims and their asserted defenses.  Accordingly, Defendants' motion should be denied.

---

[1] Flight Service Controllers ("FSCs" or "Flight Service") are air traffic controllers who provided preflight, inflight and airport advisory service to aircraft operators.  FSCs also initiated and coordinated search and rescue services, issued advisories of temporary flight restrictions and "outages" in National Airspace System and of local hazard condition, and separated planes from bad weather.  Pls. Mot., Dkt. 262, Ex. 22 (Dkt. 265-14), at D00242, D00253-55; Attached Ex. 1, Pike Dep. 175.

**FACTUAL BACKGROUND**

While the facts underlying this action have been advanced in prior briefing,

Plaintiffs set forth below the evidence and facts central to their opposition to Defendants'

motion:

> 1.    The President Directed Agencies to Compete Functions Typically Performed by the Private Sector, but Flight Service Was Not One of These Functions

- In 2002, pursuant to a Presidential Management Agenda ("PMA"), federal agencies were directed to use the Office of Management and Budget ("OMB") Circular No. A-76 to select job functions that could be outsourced.[2]  Dkt. 256-9; Office of Management and Budget (OMB) Circular No. A-76 (Revised 1999), August 4, 1983 [hereinafter OMB A-76]; Circular No. A–76 Revised Supplemental Handbook (Revised 2000), March 1996 [hereinafter OMB Handbook].

- The OMB directed agencies to put up for public-private competition those job functions already available in the private sector.  Dkt. 265-45 at 4.  The PMA specifically identified tasks such as data collection, administrative support, and payroll services, as examples of functions readily available in the private marketplace and, thus, appropriate for outsourcing.  Dkt. 256-9, at 17.

- FSC jobs did not exist in the private sector until they were outsourced by the FAA because they required highly specialized skills and served the nation's national security. Dkt. 265-11, Kansier Dep. 118; Dkt. 263-20, Sturm Dep. 21; Dkt. 263-22, at P01288.

> 2.    The FAA Departed from Normal Procedures Governing Outsourcing In Order to Ensure Only Flight Service Was Submitted to an A-76 Competition and that Its Jobs Were Outsourced to the Private Sector Rather than Remain Within the Agency

- Historically, the President and Congress treated Flight Service as an important governmental function closely related to other Air Traffic Controller ("ATC") functions. 65 Fed. Reg. 77493 (Dec. 11, 2000); 5 U.S.C. § 2109(1).

- Before jobs can be outsourced, they must be classified as non-core (*i.e.*, not essential to an agency's mission), rather than core.  *See FAIR Act*, The White House, https://www.whitehouse.gov/omb/procurement_fairact (last visited September 28, 2016); Dkt. 263-14; Dkt. 265-8, Hennigan Dep. 71-72.

---

[2] Unless attached to the instant brief, all documents were previously submitted with the parties briefing and are identified by docket number.  Documents not already in the record are attached as exhibits to this brief.

- While FAA managers had decided in late 2001 that Flight Service should be outsourced pursuant to an A-76 competition, it did not classify all Flight Service jobs as non-core until September 2002.  Dkt. 265-7, Jackson-Brame Dep. 94-96, 199-200; Dkt. 265-9, Hennigan Dep. 40; Dkt. 265-10, Page Dep. 21-23, 74-75, DD003770-73; Dkt. 265-42, Nimmo Dep. 39; Dkt. 256-38, Hennigan Decl. ¶ 6; Attached Ex. 2, Nimmo Dep. 40.

- Ronald Page, whom the FAA charged with implementing the A-76 requirements, created a list of workgroups eligible for outsourcing, but Flight Service was not on this list.  Dkt. 265-10, Page Dep. 22-23, D003770-73.

- After the FAA had already determined Flight Service jobs could be outsourced in 2001, the FAA hired Grant Thornton, an outside contractor, in 2002 to determine whether Flight-Service functions could be performed by private contractors.  Dkt. 265-7, Jackson-Brame Dep. 94-96; Dkt. 265-9, Hennigan Dep. 40; Dkt. 256-38, Hennigan Decl. ¶¶ 14-15.

- While Grant Thornton was retained to conduct an independent study, its contract with the FAA provided that Grant Thornton would be paid at least an additional $1.5 million per year, for up to five years, to assist with the A-76 competition *if* Grant Thornton concluded that Flight Service was suitable for outsourcing.  Dkt. 265-47.

- In July 2002, Grant Thornton concluded that Flight-Service could be outsourced.  Dkt. 265-15, at D00253-55.  The next month, the FAA announced that Flight Service would go through an A-76 competition.  Dkt. 256-12.

- As part of the A-76 bidding process, the FAA was required to formulate an alternative proposal, known as the Most Efficient Organization ("MEO"), that would achieve significant cost savings but retain the jobs within the Agency rather than outsourcing them.  OMB Handbook, at 10.  But the FAA imposed limitations on the MEO proposal that handicapped the MEO's ability to compete with the outsourcing option.  Dkt. 265-26, Dodson Dep. 43-48, 89-90, 160-162 (collectively, identifying evidence of the competitive disadvantages).  *See also* discussion *infra* at 11-13.  In addition, an FAA manager told one Plaintiff in December 2004, while the Agency was still allegedly considering the MEO, that the Agency would award the Flight Service contract to a private bidder "no matter what."  Attached Ex. 3, Bowman Decl.

- By choosing to outsource a function with no private sector analogue, workforce, or private-sector history, the FAA elected to guarantee a workforce to Lockheed Martin when that company won the A-76 bidding process.  Dkt. 265-11, Kansier Dep. 118, 160; Dkt. 263-20, Sturm Dep. 21.  In doing so, the FAA took steps to prevent FSCs from remaining within the Agency by preventing them from exercising their bump-and-retreat rights.  *See* discussion *infra* at 14.

3.     The Age of Most FSCs was a Factor in the Decision to Outsource These Jobs

3

- FAA Administrator Marion Blakey, who oversaw the A-76 competition, cited the "aging workforce" of the FSCs as a reason to subject the Flight Service job function to outsourcing.  Attached Ex. 4, Blakey Dep. 98-99.

- Administrator Blakey told Union president Kathleen Breen that retraining FSCs for new positions would not be worthwhile because they were old and close to retirement.  Dkt. 265-24, Breen Dep. 101; Dkt. 265-25, Malon Dep. 131; Attached Ex. 5, Breen Dep. 160.

- Administrator Blakey also told a Flight Service worker, Homer McCready, that he could not be rehired because he was too old.  Attached Ex. 6, McCready Decl.

- On average, employees holding FSC jobs were older than the other ATC workgroups and the other FAA employees as a whole.  Dkt. 263-3, Report of Prof. Dale Belman, 1-5 (Mar. 13, 2008).

## ARGUMENT

## I.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' DISPARATE TREATMENT CLAIM

There are genuine issues of material fact as to whether direct evidence shows that age played a role in the decision to terminate the FSCs through the RIF and whether the irregularities in the process leading up to the layoffs creates an inference of pretext.  These issues can only be resolved through trial, and therefore summary judgment should be denied.

The authority governing consideration of these claims comes primarily from *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), and *Ford v. Mabus*, 629 F.3d 198 (D.C. Cir. 2010).  *Reeves* makes clear that evidence that the defendant's proffered reason for the adverse employment action is pretextual may be sufficient to demonstrate discrimination. *Reeves*, 530 U.S. at 146-49.  *Ford*, issued after earlier briefing in this case, establishes a more exacting standard to assess federal government employment discrimination claims than had been previously recognized.  *Ford*, 629 F.3d at 206-07.  Considered according to these authorities, the evidence set forth below would allow a reasonable factfinder to hold that "consideration of age was *a* factor in the challenged personnel action." *Id.* at 200.

2178556.1

**A.      Defendants' Statements Show That Age Was a Factor in the Decision to Outsource Flight Service**

There is a clear dispute of material fact as to whether the age of the Flight Service workforce played a role in the decision to outsource that group.  While FAA Administrator Marion Blakey denied in deposition that age was considered in outsourcing this group, Attached Ex. 4, Blakey Dep. at 46-47, in a more candid moment, during an Automated Flight Service Station ("AFSS") Managers Conference in 2004, the minutes reflect that Ms. Blakey expressed concern about Flight Service's "aging workforce," *id*. at 98-99.  Not surprisingly, Ms. Blakey denied making the statement that the minutes recorded.  *Id*. at 99.

Likewise, the head of the FAA's Office of Competitive Sourcing, Joann Kansier, who oversaw the outsourcing process, listed "aging workforce" in PowerPoint presentations to the OMB and the Air Traffic Controllers Association ("ATCA") as a primary reason for selecting Flight Service for the A-76 competition.  Dkt. 265-12, at P001128, P001155, D007311, D007314, D007682, D007686; Attached  Ex. 7.  Again not surprisingly, in later iterations of this explanation in a slide presentation and on the FAA web page, the explanation for this action was rephrased more euphemistically as "retirement eligible workforce."  Dkt. 265-12, at P00003, D007189, D007193, P004428.  In addition to admitting in deposition that she had offered "aging workforce" as an explanation for selecting Flight Service for competition, Ms. Kansier then added that the group was "disgruntled,"  Attached Ex. 8, Kansier Dep. 167, as another rationale for the action, resorting to the type of "inaccurate and stigmatizing stereotype[] about older workers" that the ADEA forbids. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 604 (1993).

In deposition, FAA Administrator Blakey confirmed that reference to the "aging workforce" did not simply mean the FSCs were "retirement eligible."  Attached Ex. 4, Blakey Dep. at 89-90.  Instead, Blakey explained that "aging workforce" meant it would be difficult to

2178556.1

recruit and retrain new workers when the older workers retired.  *Id*. at 90.  Like Ms. Kansier, Ms.

Blakey, therefore, engaged in impermissible stereotyping by assuming an "aging workforce"

would retire.  And, as she was well aware the FAA was not replacing retiring FSCs with younger

ones, *id.* at 84, her expressed concern over difficulty in training new FSCs was just not credible.

Thus, Blakey admits that by initially labeling these workers as an "aging workforce," the FAA

regarded the age of the FSCs, by itself, as a rationale for outsourcing them.[3]

In less public settings, Ms. Blakey was more candid about why the FSCs were being

removed.  In a meeting with Union President Kathleen Breen and Union negotiator Scott Malon,

Ms. Blakey said that retraining FSCs for new positions would not be worthwhile because of their

age.  Dkt. 265-24, Breen Dep. 101; Attached Ex. 5 Breen Dep.160; Dkt. 265-25, Malon Dep.

131.  She also told one Plaintiff that he could not be rehired because he was too old.  Attached

Ex. 6, McCready Decl.  As the D.C. Circuit recently concluded, assuming an older worker will

retire rather than continue to work creates an inference of bias.  *See Wilson v. Cox*, 753 F.3d 244,

246, 248 (D.C. Cir. 2014).[4]

---

[3] Defendants go to great lengths to point out that an aging FSC workforce was simply a symptom of the decline in private aviation and use of the Flight Service program. Dkt. 268 at 24-25.  But an explanation *why* the FSCs were older does nothing to refute the evidence that age was a factor in the decision to subject them to the RIF.

[4] Seeking to discount this incriminating evidence, the FAA contends that, as the FAA CFO and Deputy CFO selected the Flight Service for competition, bias cannot be inferred from anyone other than them.  Defs. Mem., Dkt. 256, at 75.  The decision at issue here, of course, was the product of input from a number of people at the FAA.  As the Supreme Court observed recently about the workplace today, multiple managers are often involved in personnel decisions, and bias they harbor may taint a personnel decision if the decision maker relied upon it.  *See Staub v. Proctor Hosp*., 562 U.S. 411, 420 (2011).  Indeed, Ms. Blakey set up the Office of Competitive Sourcing and testified that she was the Agency official "overall responsible" for the Agency's actions.  Attached Ex. 4, Blakey Dep. 143-46.  Nor can the PowerPoint presentation made to the OMB and ATCA be discounted as simply the stray remarks of a rogue manager, as it was presented as the rationale for a stated policy of the Agency.  *See Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 354–55 (6th Cir. 1998).

6

While this evidence alone may be sufficient to demonstrate that age was a factor, at the

very least it presents genuine issues of material fact about whether the decision was biased.

### B. The Procedural Irregularities in the FAA's Decisions Leading Up to and Following the RIF Show That the FAA's Proffered Reasons Were Pretextual

The FAA has sought to justify its outsourcing of Flight Service by contending it was

mandated by the PMA and it saved taxpayers money.  Dkt. 268 at 37-46.[5]  But outsourcing this

group of workers was hardly required by the PMA, and outsourcing other groups would have

achieved significant costs savings.  Indeed, in outsourcing Flight Service, the FAA departed from

its own procedures and those set forth in the PMA, creating the inference that the proffered

rationale for this action was pretext.  *See Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013)

(an employer's "failure to follow established procedures or criteria" is evidence of pretext).

### 1. The Designation of Flight Service as a Non-Core Function, a Necessary Pre-Condition to Outsourcing These Workers, was Neither Required by the PMA nor Consistent with the FAA's Own Procedures

The decision that Flight Service was the only workgroup suitable for outsourcing was at

odds with prior FAA practice, the practice of other agencies, and guidance from the OMB and

the PMA.

First, the designation of Flight Service as a non-core function, a prerequisite to deciding

to outsource the Service, ignored the longstanding treatment of this Service as an important

---

[5] Defendants also argue that a RIF of an entire work function, including both old and young workers, is incapable of being challenged under the ADEA, citing *May v. Shuttle, Inc.*, 129 F.3d 165 (D.C. Cir. 1997). Dkt. 256 at 33-35.  Defendants grossly misstate *May*.  The *May* Court made no determination that the RIF was unchallengeable, but only that the plaintiffs had improperly compared their age to the age of the workers in the non-defendant company to which they had been RIFed, rather than the defendant company.  *May*, 129 F.3d at 173.  Defendants also ignore that this Court has permitted ADEA claims when an older worker is RIFed along with younger ones.  *Matuskey v. Medlantic Healthcare Grp.*, 1997 WL 161952, at *4 (D.D.C. Apr. 3, 1997) (Friedman, J.) (permitting ADEA claim where 61% of RIFed employees were over the age of 40).  *See also Jones v. D.C.*, 273 F. Supp. 2d 61 (D.D.C. 2003) (permitting Title VII claims by female former employees where male employee was also part of RIF).

governmental function.  The President's Executive Order 13180 creating the Air Traffic

Organization explicitly describes all Air Traffic Control functions, including FSCs, as

"inherently governmental."  65 Fed. Reg. 77493 (Dec. 11, 2000).  In defining these functions,

Congress also viewed FSCs and other ATCs as equals.  *See* 5 U.S.C. § 2109(1) (2012).  Yet,

despite the essential role Flight Service played and continues to play in ensuring flight safety, the

FAA decided to label Flight Service non-core while designating as core all other air traffic

functions that Congress regarded as equally essential.  The timing of the classification of Flight

Service as non-core, moreover, raises the question whether an ulterior motive was behind the

designation.  FSCs as a group were classified as non-core only *after* the FAA decided to subject

FSCs to competition.  Dkt. 262 at 32-33, 41, 43.  Indeed, Ronald Page, whom the FAA charged

with implementing the A-76 requirements, testified that a list of workgroups eligible for

outsourcing listed Flight Service as core, but was inexplicably changed to non-core after leaving

his office.  Dkt. 265-10, Page Dep. at 21-23, 74-75, D003770-73.

Second, Defendants' contention that Flight Service was one of only a few workgroups

large enough to satisfy the PMA requirements is simply untrue.  The PMA does not require that

agencies limit the workgroup outsourced to a single work function.  Dkt. 256-9.  Nor was this the

practice of other agencies.  In 2003, the OMB listed the commercial activities that had been put

up for competition by five other agencies.  Dkt. 265-45.  None of these agencies put up one

individual workgroup for competition, and all of the agencies as large as or larger than the FAA

selected between four and eight groups.  *Id*.

Third, the choice of Flight Service to outsource was at odds with the types of jobs the

PMA described as suitable for competition. The PMA directs that agencies choose jobs for

outsourcing that are already performed in the private sector, such as payroll and data collection.

8

Dkt. 256-9, at 17.  The OMB provided the same guidance, and provided a list showing the types of commercial activities selected for competition by five other agencies: Human Resources, Administrative Support, Property Maintenance, Data Processing, and Payment Processing, all functions already performed in the private sector.  Dkt. 265-45, at 4, 6.  *See also* Attached Ex. 9, *Memorandum for Heads of Departments and Agencies* (May 23, 2005) (citing with approval the Bureau of Engraving and Printing rationale for designating printers as a core function because they "have specialized knowledge" and "are in short supply in the private sector").  There is no dispute that FSCs had specialized knowledge and were unavailable in the private sector.  Dkt. 265-11, Kansier Dep. 118.  In fact, there were other workgroups within the FAA that had a workforce available in the private sector, such as administrative support, IT management, and property maintenance and repair.  Dkt. 263-2, Siskin Report Table 1.  That the FAA selected Flight Service rather than other workgroups normally regarded as suitable for outsourcing also calls into question the real reason for this selection.

Indeed, the FAA compiled lists of other workgroups suitable for outsourcing but never appeared to give them serious consideration.  Joann Kansier, head of the FAA's Office of Competitive Sourcing, prepared a list of outsourceable commercial functions typically found in the private sector, including Human Resources Management and Computer Support.  Dkt. 265-46.  No action was taken on these activities.  Dkt. 265-31, Little Dep. at 59-64.[6]  And Mr. Page

---

[6] The FAA may argue that it was simpler to outsource one function that included over 2,300 employees rather than multiple functions, each containing fewer employees.  Yet by outsourcing Flight Service, the FAA chose to undergo the largest and most complex A-76 outsourcing ever done, employing a process far more complicated than would have been necessary had it outsourced jobs with private sector analogues.  Dkt. 265-12, Kansier Dep. 117-19.

Nor does the FAA's transfer of its computerized payroll and HR processing functions to the Department of Interior demonstrate it has taken steps to comply with the PMA, as the FAA contends.  Dkt. 256-64, Gibson Dep. 41-43.  This limited transfer is hardly comparable to the

9

also created a list of 11 outsourceable workgroups, including two groups that alone had enough employees to satisfy the PMA (Administrative Support and Maintenance Tech), and one nearly that large (Program Implementation), but did not list Flight Service.  Dkt. 265-10, Page Dep. 22-23, D003770-73.[7]  Nonetheless Flight Service, which had no private sector analogue, was selected for outsourcing.

Fourth, the FAA's claim that outsourcing the Flight Service function was mandated by the PMA is belied by its failure to adhere to the process prescribed by the PMA.  While the PMA directed each agency first to compete 15% of its full-time employees ("FTEs") and then compete another 35% (50% total), the FAA abandoned the A-76 process after it hit the first benchmark and terminated its FSCs.  Dkt. 265-45, at 4-5; Dkt. 256-11; Dkt. 265-16, Bertram Dep. 62-63.  The FAA's failure to adhere to the PMA protocol calls into question the credibility of the FAA's defense that outsourcing the Flight Service function was mandated by the same PMA it declined to follow after the Flight Service jobs were outsourced.  *See Evans*, 716 F.3d at 620.[8]

---

outsourcing that the A-76 process required.  But transferring of these functions to another government employer, which were indisputably not core functions, confirms that the FAA understood that jobs related to these functions could be outsourced through an A-76 process.

[7] Defendants' expert relied on a different list of workgroups, provided by the FAA, that was pre-ordained to lead to the conclusion that Flight Service was the only single outsourceable workgroup.  Dkt. 263-2, Siskin Report, Table 1.  For example, Page's list contained an Administrative Support group, a "function [that] involves general office work … [and] clerical and routine administrative procedures and office skills," with 1,750 employees (enough to satisfy the PMA).  Dkt. 265-10, D003771.  The list Defendants provided their expert contained many smaller Administrative Support groups, with at most several hundred FTEs in each, and even fewer that are listed as outsourceable.

[8] Defendants' contention that the OMB "discarded" the 50% target in 2003, relieving the FAA from any obligation to follow it, is false.  Dkt. 268 at 42 (citing OMB, Competitive Sourcing, July 2003).  Rather than eliminate the 50% benchmark, as the FAA contends, OMB simply created an incentive system: agencies moved from a score of "red" to "yellow" when they competed 15% of their FTEs, and from "yellow" to "green" when they competed 50% of their FTEs.  Dkt. 265-45 at Attachment B.  Nothing in the OMB's new approach relieved the FAA, which supposedly took the PMA "very seriously," Dkt. 256-41, Mineta Decl., ¶ 6, from proceeding to reach the 50% level.

Accordingly, there was nothing inevitable or even logical about designating Flight Service as non-core, and targeting this highly specialized workforce—most of whose major functions had never been performed commercially—deviated from the direction provided by the OMB, the PMA and the practice at other agencies.

    2.    <u>The Terms of the Contract the FAA Entered with its Consultant to Assess the Feasibility of Outsourcing Flight Service Created an Incentive to Ensure that the Consultant Would Support Outsourcing this Function</u>

The terms of the contract the FAA entered with Grant Thornton posed a clear conflict of interest.  Defendants defend their decision to outsource the Flight Service function by relying upon a 2002 study undertaken by the consultant company Grant Thornton, which concluded the Flight Service function could be outsourced.  But Grant Thornton was hardly a disinterested arbiter of this question, as the FAA included in the contract the provision of business worth approximately $1.5 million annually for up to five years *if* Grant Thornton determined that contracting out Flight Service was feasible.  Dkt. 265-47.[9]  This large financial incentive provided to an allegedly independent arbiter is evidence that the proffered basis for the RIF is pretextual.

    3.    <u>The FAA Ensured the Failure of the Alternative Option to Outsourcing the Flight Service Function, Which Would Have Permitted the FSCs to Remain Employed and Retain their Retirement Rights</u>

The FAA was required to formulate an alternative to outsourcing the Flight Service function, (the "MEO"), in order that its feasibility could be considered in a competitive process. *See OMB Handbook* at 10.  The MEO would have consolidated the Flight Service program but kept it within the Agency, permitting FSCs to retain their pensions and retirement benefits, as

---

[9] Also indicative of a conflict of interest is the fact that Joann Kansier went to work for Grant Thornton right after directing the Office of Competitive Sourcing.  Attached Ex. 8, Kansier Dep. 41.

well as the right to find alternative suitable employment within the federal government ("bump-and-retreat").  Dkt. 265-26, Dodson Dep. 143-45. The FAA took steps to ensure this alternative would fail.

The testimony from multiple witnesses reveals that the FAA made a concerted effort to ensure that the terms and presentation of the MEO in the competition process would not compare favorably with the private sector options.  First, the HR representative assigned to assist in the development of the MEO proposal was also working with the FAA's internal Office of Competitive Sourcing which oversaw the bidding process to ensure impartiality, a conflict of interest prohibited by the A-76 Circular.  Dkt. 265-26, Dodson Dep. 49.  Second, the HR representative failed to provide the assistance in preparing the transition package necessary to ensure it offered a feasible alternative to outsourcing, resulting in the package being downgraded by the technical evaluators.  *Id*. at 48-50.  Third, the FAA delayed its bargaining with the Union over the terms of the RIF procedures and possible rehiring procedures, which resulted in the Union's existence being deemed a risk in the evaluation of the MEO proposal.  *Id*. at 52-53; Dkt. 265-25, Malon Dep. 65, 71-72, 74-76, P05667-68.  Fourth, FSCs knowledgeable about the duties of the Flight Service jobs were prohibited from speaking at the "orals" in which the bidders explained their proposals, resulting in findings that the MEO presentation was deficient.  Dkt. 265-26, Dodson Dep. 43-48; Dkt. 263-12, Jackson-Brame Dep. 208-09.  Fifth, the FAA refused to waive the requirement setting a mandatory retirement age for FSCs at 56, although it had authority to do so, but allowed private bidders to waive this requirement.  Attached Ex. 10.  The evidence that the FAA handicapped the option that could have permitted the FSCs to remain in the federal service, retain their retirement benefits, and increase their years of government

12

service provides another basis on which a reasonable fact finder could conclude its proffered defense is pretextual.[10]

Additional evidence corroborates that the FAA was predisposed to outsource Flight Service. Marilyn Jackson-Brame, Deputy Director of the Office of Competitive Sourcing, told Plaintiff Angela Bowman that the Office was instructed to award the contract for Flight Service to a private contractor "no matter what." Attached Ex. 3, Bowman Decl..[11]

4.    The FAA Ignored Other Consolidation Proposals That Did Not Require Laying Off FSCs

There were numerous alternative avenues, in addition to the MEO, by which the FAA could have achieved significant cost savings, none of which required contracting out Flight Service to a private entity and stripping FSCs of their pensions and benefits. Dkt. 256-5, Coopers & Lybrand Report, at D004846-51; Dkt. 265-29, Flight Service Architecture Core Group Report, at P00758-76; Dkt. 256-8, 2001 Inspector General Report, at P00141-58. Nor did the FAA take any action on another consolidation proposal from the FSCs Union. Attached Ex. 1, Pike Dep. 118, 128. While the FAA disputes how different the proposal submitted to this Court is from the draft presented to FAA Administrator Blakey, that dispute cannot be resolved at this juncture. Dkt. 263-44; Dkt. 268-1 at 16-17.

---

[10] The FAA is wrong in asserting that the issues before this Court were already decided by an ALJ that rejected a challenge to the FAA's decision to grant the Flight Service contract to Lockheed Martin. Dkt. 256 at 87-89. An agency decision has preclusive effect only if the agency resolved the disputed facts before it. *United States v. Utah Constr. & Min. Co.*, 384 U.S. 394, 422 (1966). None of the facts presented here were before the ALJ, as the issue presented in that forum was entirely different than the issues in dispute here. The ODRA proceeding addressed whether the FAA had properly examined and rated the MEO bid; the issue here is whether the FAA handicapped the MEO bid and whether the FAA's actions create an inference that its proffered defenses are pretextual.

[11] The FAA asks the Court not to second guess the choice of private contractor. Dkt. 268 at 30. Plaintiffs, however, challenge the process leading to outsourcing the Flight Service function, not the selection of a contractor itself, which was the inevitable result of the biased process the FAA created. *See Christie v. Foremost Ins. Co.*, 785 F.2d 584, 587 (7th Cir. 1986).

5.     The FAA Deviated from the Bump-and-Retreat Process to Ensure FSCs Could Not Stay in the Agency

Typically, when federal employees are subject to a RIF, they may bump and retreat into another Agency position in their "competitive area."  5 C.F.R. § 351.402 (2016).  Rather than define the competitive area as a "geographical location," *id.*, the FAA defined it for FSCs as each individual Flight Service station.  Dkt. 263-23; Dkt. 265-25, Malon Dep. 102; 2006 MSPB LEXIS 4491 at *5.  When these stations were shut down and turned over to Lockheed, there were no positions to which FSCs could bump and retreat.  Denying bump-and-retreat rights in order to preclude workers from remaining in federal service can be evidence of pretext.  *Evans v. Atwood*, 38 F. Supp. 2d 25, 32 (D.D.C. 1999).

## II.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' DISPARATE IMPACT CLAIM

For several reasons, Defendants fail to demonstrate they are entitled to summary judgment on Plaintiffs' disparate impact claim.  First, there is no dispute that the decision to designate Flight Service as a non-core instead of a core function had an adverse impact on older FSCs, including Plaintiffs.  As the decision to classify Flight Service as a non-core function made it available for outsourcing pursuant to the A-76 process and ultimately led to the RIF of Plaintiffs, there should be no dispute that Plaintiffs have established a prima facie case of disparate impact.

Second, while there is a dispute over the legal standard governing the burden of proof the FAA must satisfy after Plaintiffs establish a prima facie case, under either the more rigorous business necessity test or the reasonable factor other than age ("RFOA") standard, Plaintiffs have propounded evidence that either rebuts the reasonableness of Defendants' actions or, at minimum, raises genuine issues of material fact bearing on the reasonableness of their actions.

14

Third, even if Defendants can demonstrate the reasonableness of their actions, Plaintiffs

can show that alternatives were available that would have had a less adverse impact on Plaintiffs.

Accordingly, Plaintiffs' disparate impact claims should resolved at trial.

1.   There is No Dispute that the FAA's Classification of Flight Service as a Non-Core Function Had an Adverse Impact on Older Workers

Plaintiffs challenge as an integrated course of conduct the process by which FSCs were

removed from their jobs at the FAA—which began with, and was governed by, the designation

of the Flight Service function as non-core.  Defendants' own expert, Bernard Siskin, found that

the designation of Flight Service as a non-core function, compared to other workgroups, had an

adverse impact on older workers at a level of significance of 19.73 standard deviations.[12]  Dkt.

268, at 6-7 (acknowledging that the designation caused a "statistically significant age-based

disparity in this case"); *see also* Dkt. 262 at 18-19; Dkt. 271 at 11-14.  It was this decision to

classify Flight Service as non-core that led to the workgroup being RIFed.  *See supra* at 7-10.[13]

This evidence alone should suffice to establish a prima facie case of discrimination, as

Plaintiffs "need only offer statistical evidence of a kind and degree sufficient to show the

_____

[12] Siskin also found a statistically significant disparity at 14.79 standard deviations between the ages of RIFed FSCs and the total workforce of the FAA.  *See* Dkt. 262 at 14-21 and Dkt. 271 at 11-14.  Defendants also argue that the disparity is not meaningful, as the outsourcing of Flight Service was inevitable given its size and function, compared to other workgroups. While this argument, which is belied by the facts as false, *supra* at 18-20, may be Defendants' purported explanation for the disparity, it does not negate Plaintiffs' prima facie showing.

[13] Confronted by indisputable evidence that its classification of the Flight Service function had an overwhelmingly disparate effect adverse to older workers, the FAA seeks to portray the classification decision as somehow divorced from the RIF to which it led.  *See, e.g.,* Dkt. 256 at 49; Dkt. 268 at 2.  The FAA, of course, cites no authority to support this remarkable proposition and, in any event, the evidence shows that the classification decision was an integral part of the actions leading to the RIF of the FSCs.  *See supra* at 7-12 (describing evidence that the FAA decided that Flight Service function would be outsourced *before* it designated it as non-core; the FAA guaranteed the FSCs would be available in the private sector to the successful bidder of the A-76 competition prior to designating Flight Service as non-core and outsourcing it); *see also* Dkt. 262 at 30-50 (similarly collecting evidence).  At the very least, the extent of the interrelationship between these steps in the process presents a genuine issue of material fact.

employment decision disproportionately impacts older employees." *Aliotta v. Bair*, 614 F.3d 556, 565 (D.C. Cir. 2010).  *See also* Dkt. 271, at 9-14.

2.   Regardless of the Standard Prescribing the Defense the FAA Must Present, the Evidence Adduced by Plaintiffs Either Rebuts the Defense or Creates Genuine Issues of Material Fact

As evidence exists demonstrating that the FAA's integrated classification decision and subsequent RIF had an adverse effect on older workers, the burden shifts to Defendants to support their actions in a manner that satisfies the governing legal standard.  *See generally Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659 (1989).  While the parties differ over the legal standard by which to assess the sufficiency of the FAA's defense, the evidence shows either that Defendants fail to satisfy either standard or that there is a genuine issue of material fact as to whether those standards have been satisfied.  *See* Dkt. 271 at 19-31; Dkt. 268 at 7-11.

While there is no definitive authority as to whether the FAA must satisfy the business necessity test or the RFOA standard, *see Aliotta*, 614 F.3d at 561 n.4, the structure of the ADEA and the D.C. Circuit's interpretation of 29 U.S.C. § 633a (2012) favor application of the more demanding business necessity test.  First, the structure of the ADEA may be dispositive of the choice of standards to govern the FAA's defense of claims under Section 633a.  While the ADEA provision prohibiting discrimination in the private sector permits employers to assert a RFOA as a defense, the provision prohibiting discrimination in the federal sector does not provide for that defense.  *Compare* 29 U.S.C. § 623a (2012), *with* 29 U.S.C. § 633a (2012). Whatever Congress intended federal agencies to assert as their defense to claims under section 633a, plainly it did not intend to permit the defense of a RFOA.[14]

---

[14] Notwithstanding the Supreme Court's authority that Congress patterned Section 633a after Title VII, a district court judge has found otherwise.  *See Anderson v. Duncan*, 20 F. Supp. 3d 42, 62-64 (D.D.C. 2013) (J. Collyer).

Second, while the Supreme Court's decision in *Smith v. City of Jackson*, 544 U.S. 228 (2005), interpreted the ADEA provision governing private sector employers, Section 623a, its reasoning is instructive here.  There, the Court rejected the more demanding business necessity test, associated with Title VII of the Civil Rights Act of 1964, as governing an employer's defense because of the RFOA provision provided in Section 623a.  *Id.* at 233.  As there is no RFOA provision in Section 633a, which governs the pending claims, the Court's reasoning leads to the conclusion that the Title VII standard that would otherwise govern the defense of disparate impact claims—the business necessity test—should apply here.[15]  That test, as the Court explains, requires the FAA to demonstrate the action it took was reasonably necessary to its legitimate interests and that no other options were available that would have had less adverse impact on its older workers.  *Smith,* 544 U.S. at 243.[16]

This interpretation of the ADEA Section 633a is consistent with the D.C. Circuit's interpretation of this provision in *Ford v. Mabus*. *See* 629 F.3d at 205-06.  There, the Court held that Congress intended to create a more exacting standard to assess federal government employment discrimination claims under the ADEA.  Rather than subsume the federal government in the definition of "employer" applicable to the private sector under Section 623a, Congress chose to "deliberately prescribe[] a distinct statutory framework applicable only to the federal sector." *Id.* at 205.  This fact, coupled with the broad "free from discrimination"

---

[15] *See also Lehman v. Nakshian,* 453 U.S. 156, 166–67 (1981) (summarizing the legislative history of Section 633a  and finding that "Congress deliberately prescribed a distinct statutory scheme applicable only to the federal sector, and one based not on the FLSA but, as already indicated, on Title VII . . . .").

[16] Plaintiffs also incorporate by reference arguments advanced in prior briefing on application of the business necessity test to disparate impact ADEA claims against federal sector employers.  *See* Dkt. 262, at 22-50 and Dkt. 271, at 19-29.

17

language of Section 633a[17] led the Court to conclude that plaintiffs seeking to establish disparate treatment claims under the ADEA need only show that age was a factor in the challenged conduct.  *Id.*  at 206-07; *see also supra* at 3-4 (explaining the impact of *Ford* on ADEA disparate treatment claims).  This reasoning should apply equally to disparate impact claims arising under Section 633a, as the provision makes no distinction between theories of discrimination, and the language reflects an intention of Congress that this provision "reach more broadly in the federal sector than in the private sector." *Forman v. Small*, 271 F.3d 285, 297 (D.C. Cir. 2001).

> 3.     Defendants' Justification for the Actions Challenged Here Do Not Satisfy the Business Necessity Test

As evidence in the record directly rebuts the reasons Defendants have proffered for their classification of Flight Service as a non-core function and the ensuing RIF of Plaintiffs and shows less discriminatory options were available, there are genuine issues of material fact as to whether Defendants have satisfied the business necessity test.  *See* Dkt. 262 at 22-50 and Dkt. 271 at 19-31 (collecting authority).  Indeed, upon review, the balance of the evidence tips decidedly *against* Defendants' satisfaction of the business necessity test.

First, Defendants justify their classification of Flight Service as non-core and their selection of the Flight Service function for competition as necessary to cut costs, and that private industry had the capability and capacity to perform this function.  Dkt. 268 at 14-16.  However, evidence in the record directly refutes these proffered business justifications, including:

- The FAA had already decided to outsource Flight Service before designating it as a non-core function.  *See* Dkt. 262 at 38-50; *see also supra* at 7-14.

---

[17] This Court employed a similar analysis when it held Plaintiffs could pursue a disparate impact claim in this action.  *See Breen v. Peters*, 474 F. Supp. 2d 1, 6 (D.D.C. 2007) (finding that "the text of Section 633a broadly prohibits any discrimination based on age").  As this Court has already decided the availability of a disparate impact claim against Defendants, Defendants have agreed that the ruling is law of the case and is no longer disputed in this forum. *See, e.g.*, Dkt. 268, at n.10.

18

- There were inconsistencies in the RIF process, and FSCs were similar to ATCs, which remained a core function.  *See* Dkt. 262 at 38-50; *see also supra* at 7-12.[18]

- The estimated cost savings were grossly exaggerated and could have been achieved without adversely affecting older workers.  Dkt. 262, at 69-71 and Dkt. 271 at 28-30.

- The PMA and the OMB directed agencies to compete functions performed in the private sector; Flight Service was not such a function.  S*upra* at 8-10; *see also* Dkt. 262 at 33 and Dkt. 271 at 30.

Moreover, as the evidence shows, Defendants had available several less discriminatory alternatives that would have achieved the desired cost savings without an adverse impact on older FSCs.  Such evidence includes:

- The FAA could have selected the MEO or other proposals and achieved significant cost savings.  S*upra* at 11-14; *see also* Dkt. 262 at 68-72 and Dkt. 271 at 30-31.

- Ronald Page created a list of outsourceable functions, but Flight Service was not one of them.  S*upra* at 3-8; *see also* Dkt. 262 at 49-50.

- Outsourcing a single large workgroup that had no private-sector analogue was not the practice of other agencies.  S*upra* at 8-9; *see also* Dkt. 256-46 at 6.

- The FAA could have offered FSCs their bump-and-retreat rights, thus forcing Lockheed to offer benefits desirable enough to cause FSCs to *voluntarily* leave federal service.  S*upra* at 14; *see also* Dkt. 262 at 33, 64-65, 69.

Together this evidence calls into question whether the FAA can demonstrate its actions were reasonably necessary to a legitimate interest and that there were no other options available that would have had less adverse impact on the older workers.  While this evidence may be sufficient to warrant judgment for Plaintiffs, at the very least it presents genuine issues of material fact that preclude summary judgment against Plaintiffs.

---

[18] Contrary to Defendants' assertion, Plaintiffs have never argued that the FAA should have classified the other controller groups as non-core and outsourced those groups.  *See* Dkt. 268 at 14-15.  Plaintiffs argue, instead, that there is no legitimate business reason for the FAA to treat Flight Service differently from the other controller groups. *See* Dkt. 271 at 13 nn.10 & 11.

19

4.      <u>Even If the Reasonable Factor Other Than Age Defense is Available, Defendants Fail to Satisfy It</u>

While it is hard to conceive of how the RFOA defense is available to the FAA, as Congress omitted it from the section of the ADEA that applies to federal agencies, the FAA would be unable to satisfy it.  To qualify for the RFOA defense, Defendants must demonstrate that the factor other than age on which they purport to rely is "objectively reasonable when viewed from the position of a prudent employer mindful of its responsibilities under the ADEA. . . ." 29 C.F.R. § 1625.7(e)(1) (2015).

Evidence here shows that Defendants' proffered justifications for its actions were not reasonable for an employer "mindful of its responsibilities under the ADEA."  *See* Section I. A. *supra* at 4-14 (collecting evidence of (1) the FAA's predetermination that Flight Service would be selected for competition and outsourced before the process was initiated; (2) rationales for the decision to select Flight Service for competition and to outsource it that were internally inconsistent and at odds with the PMA and OMB directives; (3) various competitive handicaps placed on the MEO that ensured the proposal would not be selected and that older FSCs would be RIFed; and (4) the FAA's denial of meaningful bump-and-retreat rights for the FSCs, which had the effect of forcing the workers into the private sector and out of the Agency altogether.

Accordingly, the Defendants' motion for summary judgment on the disparate impact claim should be denied.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motion for summary judgment should be denied in its entirety.

Dated:  September 30, 2016

Respectfully submitted,

s/ Joseph M. Sellers
Joseph M. Sellers, Bar No. 318410
Shaylyn Cochran, Bar No. 1012977
Brian Corman, Bar No. 1008635
**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
1100 New York Avenue, N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699
jsellers@cohenmilstein.com

s/ Gary M. Gilbert
Gary M. Gilbert, Bar No. 15808
Linda A. Kincaid, Bar No. 416936
Stephanie M. Herrera, Bar No. MD17994
Lisa R. Sandoval, *admitted pro hac vice*
Michal Shinnar, Bar No. MD0033
**THE LAW OFFICES OF GARY M.
GILBERT & ASSOCIATES, P.C.**
1100 Wayne Avenue, Suite 900
Silver Spring, MD 20910
Telephone: (301) 608-0880
Facsimile:  (301) 608-0881
Gary@ggilbertlaw.com

*Attorneys for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via the CM/ECF electronic filing system on this 30th day of September, 2016, and thereby served upon the parties and/or their counsel.

By: */s/  Joseph M. Sellers*_____
Joseph M. Sellers