UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
KATHLEEN BREEN, et al.,                             )
                                                    )
          Plaintiffs,                               )
                                                    )
          v.                                        )          Civil Action No. 05-0654 (PLF)
                                                    )
ELAINE L. CHAO, SECRETARY OF                        )
TRANSPORTATION, DEPARTMENT                          )
OF TRANSPORTATION, et al.,[1]                       )
                                                    )
          Defendants.                               )
_____)


OPINION

          Plaintiffs, former flight service ("FS") specialists with the Federal Aviation

Administration ("FAA"), brought this suit against the FAA and the Department of

Transportation (collectively "defendants" or the FAA) alleging discrimination on the basis of

age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C.

§ 621, et seq. Defendants terminated plaintiffs' employment pursuant to a reduction in force

("RIF") that involved outsourcing the FS function to Lockheed Martin, a private company.

Plaintiffs allege (1) a disparate treatment claim — that the FAA decided to outsource the FS

function because of the age of the FS specialists, and (2) a disparate impact claim — that the

FAA's decision had a disproportionate impact on workers over the age of 40.

---

[1]          The First Amended Complaint [Dkt. 3] names Norman Y. Mineta, former
Secretary of Transportation, as one of the party defendants. The Court substitutes his most
recent successor, Elaine L. Chao, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Defendants have moved for summary judgment on both theories. As to the disparate treatment claim, they contend that (1) the RIF applied to every FS specialist, regardless of age; (2) the agency had legitimate, nondiscriminatory reasons for outsourcing the FS function; and (3) comments made by FAA managers about age and the aging workforce were not made by decision makers in the A-76 process or the 2005 RIF decision and, in any event, were legitimate in the context in which they were made. As for the disparate impact claim, defendants argue that there can be no disparate impact claim based on the RIF or, alternatively, on the 2002 decision to designate the FS function as "non-core," because neither was a facially neutral employment policy or practice. Upon careful consideration of the parties' briefs, the relevant legal authorities, and the entire record in this case, the Court will deny defendants' summary judgment motion on plaintiffs' disparate treatment claim but grant their motion on plaintiffs' disparate impact claim.[2]

---

[2] The documents considered in connection with the pending motion include: the Amended Complaint ("Am. Compl.") [Dkt. 3]; Defendants' Motion for Summary Judgment ("Def. MSJ") [Dkt. 256]; Defendants' Statement of Undisputed Material Facts as to Which There are No Genuine Issues ("Def. Facts") [Dkt. 256]; Plaintiffs' Memorandum in Support of Their Cross Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment ("Pl. MSJ") [Dkt. 262]; Plaintiffs' Statement of Undisputed Material Facts ("Pl. Opp. Facts") [Dkt. 262-1]; Plaintiffs' Corrected Statement of Undisputed Material Facts ("Pl. Facts") [Dkt. 265-3]; Defendants' Reply and Opposition to Cross-Motion ("Def. Reply") [Dkt. 268]; Defendants' Response to Plaintiffs' Corrected Statement of Undisputed Material Facts ("Def. Opp. Facts") [Dkt. 268-1]; Plaintiffs' Reply ("Pl. Reply") [Dkt. 271]; Plaintiffs' Supplemental Brief ("Pl. Supp. Br.") [Dkt. 309]; Defendants' Supplemental Brief ("Def. Supp. Br.") [Dkt. 310]; Plaintiffs' Response to Defendants' Supplemental Brief ("Pl. Supp. Rep.") [Dkt. 325]; and Defendants' Response to Plaintiffs' Supplemental Brief ("Def. Supp. Rep.") [Dkt. 326].

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Role of Flight Service Specialists*

FS specialists provide preflight, inflight, and airport advisory information to aircraft operators. Def. Facts ¶ 3. Before a flight, FS specialists communicate with pilots directly, providing meteorological and aeronautical information to help them plan safe flights. Pl. Opp. Facts at 1-2. FS specialists also communicate with pilots during flight by radio, helping them to avoid hazards, aiding them during emergencies, helping lost pilots find their bearings, and initiating search and rescue operations if they cannot confirm that a flight has ended safely. Id.; Def. MSJ at 4; Def. MSJ, Ex. 61 at 33-34 [Dkt. 256-62]; Def. MSJ, Ex. 80 at 37 [Dkt. 256-81]. FS specialists can also disseminate information through the National Air System via Notices to Airmen. Pl. Opp. Facts at 1-2. FS specialists are not involved in separating or controlling aircraft while in the air; that is the job of so-called "Aircraft Separating Controllers." Def. Facts at ¶ 5; see also 5 U.S.C. § 2109(1)(A)(i). FS specialists also cannot prohibit a pilot from flying, but can recommend that pilots do not fly if doing so would be hazardous. Def. MSJ at 3; 5 U.S.C. § 2109(1)(A)(ii).

FS specialists comprised one of several air traffic control functions that the FAA administered prior to the October 2005 RIF. Def. Facts ¶ 1. At that time, commercial airlines relied on their own or on a contractors' employees to provide the information that FS specialists also provided. Id. ¶ 9; Def. MSJ, Ex. 61 at 95 [Dkt. 256-62]; Def. MSJ, Ex. 86 at 52 [Dkt. 256-87]; Def. MSJ, Ex. 51 at 44 [Dkt. 256-52]. Some private pilots also used private companies to plan for flights. Def. Facts ¶ 10; Def. MSJ, Ex. 50 at 52 [Dkt. 256-51]. Despite these alternatives, plaintiffs contend that the FAA's FS function provided the most comprehensive source of flight information. Pl. Opp. Facts at 4-5 ("Flight Service is virtually

the only source of in-flight air/ground services for general aviation.") (emphasis omitted); Pl. Facts at ¶ 14 ("[N]o non-governmental workforce . . . was trained and certified to perform all of the functions of flight service for general aviation.").

The FAA's "Aerospace Forecast" for 2005-2016 noted several ominous trends affecting the FS function, such as the fact that "[t]he introduction of new technology for flight service has significantly changed the operating environment for the flight service system." Def. MSJ, Ex. 3 at VII-16 [Dkt. 256-4]. The FAA predicted that the "increased use of automation and new system capabilities" would "dampen the growth in traditional FS[] workload measures," such as contact with pilots. Id. at VII-16-18. In the years leading up to 2005, the FAA collected data showing that private pilots increasingly accessed weather reporting, flight planning, and navigational assistance — the traditional FS functions — online. Def. MSJ, Ex. 42 ¶ 6 [Dkt. 256-43]; Def. MSJ, Ex. 80 at 33-34 [Dkt. 256-81]; Def. MSJ, Ex. 84 at 50 [Dkt. 256-85]. The FAA also approved systems for transmitting weather information directly into pilots' cockpits during flight without the need for a FS specialist. See Def. MSJ, Ex. 1 at 1 [Dkt. 256-2]. And comprehensive automated weather systems replaced the FS specialists' task of going outside at airports to observe weather conditions. Def. MSJ, Ex. 53 at 59 [Dkt. 256-54]; Def. MSJ, Ex. 61 at 26 [Dkt. 256-62]; Def. MSJ, Ex. 62 at 73-74 [Dkt. 256-63].

As a result of these changes, the work of FS specialists declined; there were fewer contacts with pilots, fewer briefings, and fewer flight plan filings every year. Def. MSJ, Ex. 2 at VII-8 [Dkt. 256-3]; Def. MSJ, Ex. 3 at VII-16, VII-18 [Dkt. 256-4]. As FS specialists retired or left their jobs, the FAA decided not to rehire new FS specialists to replace them. Pl. MSJ, Ex. 33 at 142 [Dkt. 263-35]. The number of FS specialists the FAA employed gradually declined and the remaining FS specialists were gradually "aging" in the years leading up to 2005. Def.

Facts ¶¶ 18-19; Def. MSJ at 15-16.  FS facilities also were starting to deteriorate insofar as buildings required repair or replacement and the computer system used by FS specialists required major investment and attention.  Def. MSJ at 17.

These changes caused the FAA to seek methods to consolidate air traffic control functions in order to save money. See, e.g., Def. Facts ¶¶ 16-17.  A number of internal and external studies found that the FAA could save significant amounts of money by restructuring and consolidating its FS function.  Id. ¶¶ 21-23; Pl. Facts ¶ 10.  A 1996 report by the FAA's Office of the Inspector General recommended that the FAA "consider having the private sector provide the full range of flight services."  Def. Facts ¶ 24; Pl. Opp. Facts at 7.  Other reports recommended consolidation but also recommended that the FS function remain within the government.  Pl. Opp. Facts at 9-11.

## B.  The FAIR Act

Between the late 1990s and the early 2000s, the government pushed federal agencies to restructure and outsource any functions that the private sector could provide better and more efficiently.  Def. MSJ at 17-18.  Congress's 1998 Federal Activities Inventory Reform Act ("FAIR Act") mandated that agencies annually classify all activities performed by government personnel as either commercial or inherently governmental, and submit a list of those that were "not inherently governmental functions."  Federal Activities Inventory Reform Act of 1998, Pub. L. No. 105-270 § 2(a)-(b), 112 Stat. 2382 (codified as amended in scattered sections of the United States Code); ses also Def. Facts ¶ 31; Def. MSJ at 18.  Agency heads were then to review the list and consider contracting with a private source for the listed activities. 112 Stat. 2382 at § 2(d).  If the agency head decided that certain activities could be outsourced, he or she was to use a competitive process to select the private contractor.  Id.  The rules for such

a competition are outlined in Office of Management and Budget ("OMB") Circular A-76, and competitions under these rules are called "A-76" studies or competitions. OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, CIRCULAR NO. A-76 (REVISED) (2003); Def. MSJ at 19.

   To further expand A-76 competitions, President George W. Bush put the "Competitive Sourcing Initiative" on his President's Management Agenda ("PMA") in 2001. Def. Facts ¶ 32. The Initiative required federal agencies to either subject 15% of their commercial work functions to an A-76 process or directly convert 15% of their commercial activity inventory by the end of fiscal year 2003. Id. ¶ 34. These cost comparisons and conversions were to continue after 2003 until eventually 50% of every agency's commercial activity inventory had been covered. Pl. Opp. Facts at 12. The OMB discarded these numeric benchmarks in July 2003. Def. Opp. Facts at 8; Def. MSJ, Ex. 9 at 7-8 [Dkt. 256-10]. As a result, the FAA in 2002 was under pressure to save money and consider functions for possible competitive sourcing. Def. Facts ¶¶ 38-39.

### C. Before the A-76 Study

   During negotiations in 2002 for the FAA's budget request for fiscal year 2003, the FAA sought budgetary authority to modernize the computer software used by FS specialists. Def. Facts ¶ 35; Pl. Opp. Facts at 14. The OMB suggested that the FAA look at consolidating instead of updating its computer systems. Pl. Opp. Facts at 14; Def. MSJ, Ex. 47 at 21-24 [Dkt. 256-48] (Deposition of Chief Financial Officer Christopher Bertram ("Bertram Dep.")). Instead of consolidation, the FAA decided to conduct an A-76 study to see if the FAA could provide flight services more efficiently. Pl. Opp. Facts at 15; Bertram Dep. at 28. Defendants

claim that it was the FAA's Chief Financial Officer, Christopher Bertram, and his deputy CFO, John Hennigan, who made this decision. See Def. MSJ at 20.[3]

In June 2002, Bertram sent a memorandum to the FAA's Administrator, Jane Garvey, about the decision of the FAA's Office of Financial Services to subject the FS function to an A-76 competition as a means of meeting the OMB's requirements. Def. Facts ¶ 40. Bertram's memorandum stated that, according to the OMB instructions and the Competitive Sourcing Initiative's 15% requirement, the FAA would need to outsource 1,100 positions by the end of calendar year 2003, and that outsourcing the FS function could meet this goal. Id. ¶ 41. Bertram also informed Administrator Garvey that the FAA had engaged an outside contractor to perform a feasibility study to clarify the scope of the review and determine whether private companies would bid on the work. Id. ¶ 42; Def. MSJ at 22. The FAA then formed a working group to develop an action plan for considering the FS function for an A-76 process. Def. Opp. Facts at 7. The members of this group included Deputy CFO John Hennigan, Ronald Page from the FAA's Office of Finance, and former FS division managers Marilyn Jackson-Brame and Jack Nimmo. Pl. Facts ¶ 5; Pl. MSJ, Ex. 9 at 64, 199-200 [Dkt. 265-7]; Pl. MSJ, Ex. 54 at 39 [Dkt. 265-42].

The FAA contracted with the accounting firm Grant Thornton LLP to perform the feasibility study; Grant Thornton ultimately found that that the FS function was a strong candidate for competitive sourcing. Def. Facts ¶ 43; Pl. MSJ, Ex. 22 at D00253 [Dkt. 265-14]. It based this finding on the participation of three private sector companies that performed work similar to FS specialists, none of which eventually bid on the FS function contract when it was

_____

[3]        Bertram's deposition obscures who exactly suggested the A-76 process. See Bertram Dep. at 32.

offered. Pl. Opp. Facts at 17. According to plaintiffs, Grant Thornton's study also found, however, that one part of the FS function was inherently governmental and should not be contracted out. Pl. Opp. Facts at 17. Defendants dispute this because Grant Thornton's report identified a private vendor who had performed such services outside of the United States. Def. Opp. Facts at 12; see Pl. MSJ, Ex. 22 at D00248 [Dkt. 265-14]. After reviewing the Grant Thornton report, the FAA retained Grant Thornton for an additional four years and paid the company nearly $14 million for its work. Pl. Opp. Facts at 17 n.5.

CFO Bertram accepted the results of Grant Thornton's feasibility study and, in August 2002, he notified then Acting FAA Administrator Monte Belger that he had decided to proceed with an A-76 study for the FS function. Def. Facts ¶ 44; Def. MSJ, Ex. 11 [Dkt. 256-12].[4] Belger stated that proceeding with an A-76 study was part of an effort to meet the requirements of the President's Management Agenda. Def. Facts ¶ 45. In his deposition, Bertram claimed that he did not learn or consider the average age of the FS workforce in the course of making the decision to subject the FS function to an A-76 study, but instead based that decision on budgetary and financial concerns. Id. ¶¶ 48-50; see Bertram Dep. [Ex. 47] at 106, 111. Bertram also testified that he did not know if the staff members who advised him were aware of the age of the FS workforce. Bertram Dep. at 112.

As noted, John Hennigan was Bertram's deputy CFO during this time. Def. Facts ¶ 51. Hennigan's office was in charge of compiling the 2002 FAIR Act list of activities that were not inherently governmental. Id. ¶¶ 53-54. Hennigan stated in his deposition that he did

---

[4] Acting Administrator Belger decided to exclude Alaska from the study due to its unique weather conditions and terrain, causing distinct flying conditions and thus different requirements for aviation from the rest of the country. Def. Facts at ¶¶ 46-47. From here on, any references to the FS function excludes employees in Alaska.

not consider age in determining what to classify an activity as commercial on the inventory list. Id. ¶ 55. The National Association of Air Traffic Specialists ("NAATS"), the union that includes FS specialists, challenged the decision to include FS specialists on the FAIR Inventory in March 2003. Id. ¶ 56. The FAA denied the challenge and NAATS appealed to the Department of Transportation, which upheld the FAA's denial in May 2003. Id. ¶¶ 57-58. Only six groups on the 2002 FAIR Inventory had more than 1,101 full-time equivalent positions, including the FS specialists. Id. ¶ 59. FS specialists were the only workforce out of these six seriously considered for an A-76 study. Pl. Opp. Facts at 21.

### D. The A-76 Study Leading to the RIF

After realizing that their budget office was not equipped to undertake a major A-76 study, Bertram and Hennigan placed the responsibility for conducting it in the newly created Office of Competitive Sourcing. Def. MSJ at 24. Early in 2003, Joann Kansier became the Director of that office, and Marilyn Jackson-Brame her deputy director. Def. Facts ¶¶ 68-69. Kansier was not personally involved in CFO Bertram's earlier decision to subject the FS function to the A-76 process. Id. ¶ 70. Jackson-Brame was involved in the debate, but she was against the decision Bertram made. Id. ¶¶ 71-72; Pl. MSJ, Ex. 9 at 94-97, 112 [Dkt. 265-7].

Both Kansier and Marion Blakey, the FAA Administrator, made references to an "aging workforce" on numerous occasions. In a June 25, 2003 briefing made to OMB and NAATS about the A-76 process, Kansier listed "aging workforce" as one of five items under the "State of AFSS" that together created an opportunity for an A-76 process for the FS function. Def. MSJ, Ex. 14 at P01179 [Dkt. 256-15]. Kansier used a similar reference in two slide presentations she gave on January 12, 2003, and August 1, 2003. Pl. MSJ, Ex. 20 at P01155, D007686 [Dkt. 263-24]. Kansier subsequently changed this "aging workforce" language to

"retirement eligible workforce" on other slide presentations and on the FAA website.  Id. at D007193, P04428, P00003.  Administrator Blakey also referred to the FS workforce as "eligible to retire" in two speeches, although not as a reason for the A-76 process.  Pl. MSJ, Ex. 55 at P01166, P00633 [Dkt. 265-43].  And plaintiff Kathleen Breen testified at her deposition that the Administrator specifically referred to the age of certain persons in explaining why they should not be promoted.  Breen Dep. at 101.

        One of the first steps in the A-76 process was for the FAA to create a statement listing the requirements for bidders and what work all bidders must perform.  Def. Facts at ¶ 73; Def. MSJ, Ex. 38 ¶ 5 [Dkt. 256-39] (Declaration of Joann Kansier ("Kansier Decl.")).  The Office of Competitive Sourcing formed a team to develop the statement consisting of FAA management from the FS division, NAATS union members, and contract support from Grant Thornton.  Def. Facts ¶¶ 74-75; Def. MSJ, Ex. 15 at 1 [Dkt. 256-16].  In December 2013, after requests for input from interested parties, the FAA announced that it would subject the FS function to the A-76 process and solicit bids.  Def. Facts ¶¶ 77-79; Kansier Decl. ¶ 7.  Several FS specialists — who are plaintiffs in this action — allege that the FAA's statement soliciting bids significantly understated the tasks performed by FS specialists.  Pl. Opp. Facts at 26.

        In May 2004, the FAA released a formal request for bids to five private sector companies who were selected to take part in the competition, including Lockheed, and to the government's in-house bidder — known as Most Efficient Organization ("MEO").  Def. Facts ¶ 80; Kansier Decl. ¶¶ 2, 8, 9.  According to plaintiffs, the FAA guaranteed a workforce to the winning bidder in the sense that it promised that "the majority of the Flight Service workforce would be made available to the winning bidder."  Pl. Facts at 9.  At the very least, the FAA told the winning bidder that many FS specialists would be available to recruit.  See Pl. MSJ, Ex. 16

at 17-19 [Dkt. 263-20]. Defendants, however, point to the official solicitation for bids to show that the FAA did not guarantee a workforce, but instead required that the winning bidder offer a right of first refusal for employment opening[s] to FAA employees who were qualified for those openings and "who ha[d] been or will be adversely affected or separated as a result of award of this contract." Pl. MSJ, Ex. 15 at § I.4 [Dkt. 263-19]. Further, one of the items the FAA assessed when evaluating bids was "the degree to which the staffing approach provides for recruitment and retention to ensure delivery of effective services to support safe and efficient flight." Def. MSJ, Ex. 18 at 10 [Dkt. 256-19] (Judge Neill Opinion, Public Version ("Neill Opinion")).[5] The bidders then presented both their technical and cost proposals, and technical and cost evaluation teams at FAA reviewed the bids. Def. Facts ¶¶ 81-82; Kansier Decl. ¶¶ 11-12. The technical team rated Lockheed's proposal as "excellent" on each of four factors, and the MEO's proposal as "good" on one factor and "satisfactory" on the other three. Def. Facts ¶¶ 86-87; Neill Opinion at 54-55. The cost team concluded that Lockheed's bid was 5% less costly than the MEO's. Def. Facts ¶ 87; Neill Opinion at 52.

The FAA then submitted the technical and cost team evaluations to the Source Selection Evaluation Board, which the FAA tasked with issuing a recommendation to the ultimate selection official. Def. Facts ¶¶ 88, 90; Kansier Decl. ¶ 16; Def. MSJ at 27. Kansier and contracting officer Donald King chaired the board, which also consisted of both technical and cost experts. Def. Facts ¶¶ 88, 90; Kansier Decl. ¶ 16. The Board rejected two findings of weaknesses and one of costliness associated with the MEO proposal, but ultimately concluded that Lockheed had the best technical solution and "clearly provided the greatest benefit to the

---

[5]     Judge Edwin B. Neill of the General Services Administration Board of Contract Appeals was appointed to serve as Special Master for the A-76 bid protest. See generally Def. MSJ, Ex. 18

Government." Def. Facts ¶¶ 91-92; Neill Opinion at 100. One Board official, Dennis DeGaetano, concurred with the Board's recommendation because Lockheed had the best bid, even though it cost slightly more than one other proposal. Def. Facts ¶ 94. Kansier later stated that the Board did not consider age in making its decision. Kansier Decl. ¶ 26. DeGaetano also said that he did not consider age in making the decision. Def. MSJ, Ex. 58 at 98 [Dkt. 256-59]; Def. MSJ, Ex. 36 ¶ 8 [Dkt. 256-37]. The FAA estimated that the Lockheed contract would save taxpayers about $2.1 billion over the ten-year life of the contract. Def. MSJ at 28. The FAA ultimately announced the decision to award the contract to Lockheed on February 1, 2005. Id. at 29.

The FAA issued RIF notices to all FS employees covered by the Lockheed contract in July 2005. Def. Opp. Facts at 18; Pl. MSJ, Ex. 19 [Dkt. 263-23]. The RIF occurred on October 3, 2005, thereby terminating plaintiffs' employment with the FAA. Def. Facts ¶¶ 111, 114. Not every FS specialist hired by the FAA lost his or her government position because the FAA permitted some individuals to continue in positions other than as FS specialists. See Def. MSJ at 41.

### E. Administrative Challenges to the RIF

After the FAA announced that Lockheed had won the award, the MEO and Kathleen Breen — as the agent for the FS specialists — each filed contests with the Office of Dispute Resolution for Acquisition to challenge the decision. Def. Facts ¶¶ 101-03; Neill Opinion at 3. Judge Edwin B. Neill of the General Services Administration Board of Contract Appeals served as the Special Master overseeing the contests. Def. Facts ¶ 105. Judge Neill ultimately rejected both contests in their entirety, applying standards of review that ask whether the agency decision had a rational basis, whether it was arbitrary, capricious or an abuse of

discretion, and whether it was supported by substantial evidence.  Neill Opinion at 61; Def. Facts

¶ 106.  FAA Administrator Blakey adopted Judge Neill's findings of fact and recommendations

in full.  Id. ¶ 107.  Breen did not further appeal this determination.  Def. MSJ at 31.

        In 2005, nine plaintiffs filed this lawsuit on their own behalf and as

representatives of 834 others, alleging disparate treatment and disparate impact claims under the

ADEA.  See First Amended Class Action Complaint [Dkt. 3].  Judge Richard W. Roberts of this

Court denied plaintiffs' motion for a preliminary injunction against the RIF on September 30,

2005, see Breen v. Mineta, No. 05-0654, 2005 WL 3276163, at *10 (D.D.C. Sept. 30, 2005), and

denied defendants' motion to dismiss for lack of jurisdiction or, in the alternative, for summary

judgment on January 8, 2007.  See Breen v. Peters, 474 F. Supp. 2d 1, 9 (D.D.C. 2007).

Defendants thereafter filed this motion for summary judgment.  Plaintiffs filed a cross motion for

summary judgment on the disparate impact claim, but later withdrew the motion.  See Plaintiffs'

Unopposed Motion to Withdraw Their Cross Motion for Summary Judgment [Dkt. 306].

## II.  LEGAL FRAMEWORK

        Summary judgment is appropriate only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Baumann v. District of

Columbia, 795 F.3d 209, 215 (D.C. Cir. 2015); FED. R. CIV. P. 56(a), (c).  In making that

determination, the Court must view the evidence in the light most favorable to the nonmoving

party and draw all reasonable inferences in its favor.  Baumann v. District of Columbia, 795 F.3d

at 215; see Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam); Anderson v. Liberty

Lobby, Inc., 477 U.S. at 255; Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).  A disputed

fact is "material" if it "might affect the outcome of the suit under the governing law." Talavera v. Shah, 638 F.3d at 308 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). A dispute over a material fact is "genuine" if it could lead a reasonable jury to return a verdict in favor of the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Grimes v. District of Columbia, 794 F.3d 83, 94-95 (D.C. Cir. 2015); Paige v. DEA, 665 F.3d 1355, 1358 (D.C. Cir. 2012). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment. Thus, [the court] do[es] not determine the truth of the matter, but instead decide[s] only whether there is a genuine issue for trial." Barnett v. PA Consulting Grp., Inc., 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting Pardo-Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)); see also Tolan v. Cotton, 134 S. Ct. at 1866; Baumann v. District of Columbia, 795 F.3d at 215; Allen v. Johnson, 795 F.3d 34, 38 (D.C. Cir. 2015).

The ADEA prohibits discrimination by an employer against employees based on age. See 29 U.S.C. § 623(a)(1) (making it unlawful "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age"). Section 633a of the statute extends ADEA protections to most federal employees, providing that all personnel actions affecting federal employees "shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). There are two types of ADEA claims at issue here: (1) disparate treatment, by which "plaintiffs seek to prove an employer intentionally treated some people less favorably than others because of their age," Aliotta v. Bair, 614 F.3d 556, 561 (D.C. Cir. 2010); and (2) disparate impact, by which plaintiffs "must show that a facially neutral employment policy or practice has a significant disparate impact on a protected class of which he is a member."

Jianqing Wu v. Special Counsel, Inc., 54 F. Supp. 3d 48, 54 (D.D.C. 2014), aff'd sub nom. No. 14-7159, 2015 WL 10761295 (D.C. Cir. Dec. 22, 2015).

The Court now proceeds to a discussion of the legal framework for analyzing each of the plaintiffs' separate claims — disparate treatment and disparate impact — and an examination of whether the plaintiffs have proffered sufficient evidence to create a genuine issue of material fact entitling them to a trial.

## III.  DISPARATE TREATMENT CLAIM

"Under both Title VII and the ADEA, a plaintiff can prove her case with either direct or circumstantial evidence."  Burford v. Yellen, --- F. Supp. 3d ----, 2017 WL 1214398, at *7 (D.D.C. Mar. 31, 2017) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009)).  "A plaintiff may prove . . . her claim with direct evidence, for example through a statement that itself shows . . . bias in the employment decision.  Alternatively, a plaintiff may base her claim on circumstantial evidence under the familiar McDonnell Douglas burden-shifting framework."  Nurriddin v. Bolden, 818 F.3d 751, 758 (D.C. Cir. 2016) (citations omitted).  That burden-shifting framework, first developed under Title VII, "also applies to claims for age discrimination under the ADEA."  Hunter v. Rice, 531 F. Supp. 2d 185, 191 (D.D.C. 2008); see also Duncan v. Johnson, 213 F. Supp. 3d 161, 182 (D.D.C. 2016) (same).[6]

The McDonnell Douglas burden-shifting framework contains three steps, the first of which is that a plaintiff must establish a prima facie case of age discrimination under the ADEA.  See Walker v. Johnson, 798 F.3d 1085, 1091 (D.C. Cir. 2015).  "In Title VII and ADEA

_____

[6]        Plaintiffs contend that they have direct rather than circumstantial evidence of discrimination on the basis of age.  Pl. Supp. Rep. at 8.  For the reasons explained infra at 23 n.9, the Court finds that none of plaintiffs' evidence is direct evidence of discrimination on the basis of age.

cases alleging disparate treatment, a plaintiff establishes a prima facie case of discrimination by pleading facts from which it can reasonably be inferred that '(1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that his employer took the action because of his membership in the protected class).'" Bartlette v. Hyatt Regency, 208 F. Supp. 3d 311, 321-22 (D.D.C. 2016) (quoting Brown v. Sessoms, 774 F.3d 1016, 1022 (D.C. Cir. 2014)).

Second, if the employee makes out a prima facie case, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the challenged action. Morris v. McCarthy, 825 F.3d 658, 668 (D.C. Cir. 2016). Third, if the employer does so, the McDonnell Douglas burden-shifting analysis "falls away," id., and "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [age], race, color, religion, sex, or national origin?" Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008); see also Gaujacq v. EDF, Inc., 601 F.3d 565, 576 (D.C. Cir. 2010). "The employee can survive summary judgment by providing enough evidence for a reasonable jury to find that the employer's proffered explanation" for an adverse employment action "was a pretext for retaliation or discrimination." Morris v. McCarthy, 825 F.3d at 668; see Nurriddin v. Bolden, 818 F.3d at 758-59.

The Court turns to an analysis of plaintiffs' disparate treatment claim by first addressing two preliminary legal issues: (1) what is the adverse employment action in this case, and (2) what is plaintiffs' burden on the issue of causation or the inference of discrimination. The Court will then evaluate defendants' asserted legitimate, nondiscriminatory reasons for the

adverse employment action.  Finally, the Court will assess plaintiffs' evidence that defendants'

asserted legitimate, nondiscriminatory reasons were actually pretext for discrimination on the

basis of age.  In that respect, the Court will begin with plaintiffs' strongest evidence of pretext —

defendants' widespread comments during the A-76 process related to age — and conclude with a

discussion of various alleged procedural irregularities in the A-76 process.

### A.  *Preliminary Legal Issues*

First, defendants argue that plaintiffs may challenge only the RIF itself and not

the decisions leading up to the RIF because the RIF was the only adverse employment action in

this case.  <u>See</u> Def. MSJ 49-54; Def. Supp. Rep. at 2-5.  As just noted, to maintain an ADEA

disparate treatment claim, "plaintiffs must show they suffered an adverse employment action."

<u>Aliotta v. Bair</u>, 614 F.3d at 566.  Such adverse employment actions include "'ultimate

employment decisions'" like "'hiring, granting leave, promoting, and compensating.'"  <u>Easy v.

Newport</u>, --- F. Supp. 3d ----, 2017 WL 2062851, at *5 (D.D.C. May 12, 2017) (quoting <u>Taylor

v. FDIC</u>, 132 F.3d 753, 764 (D.C. Cir. 1997)).  Defendants contend that the FAA's decisions

leading up to the RIF — including, <u>inter alia</u>, the decisions to (1) undertake an A-76 process,

(2) classify FS specialists as commercial rather than governmental or core as opposed to non-

core, and (3) solicit and evaluate different bids — are not "adverse employment action[s]."  Def.

MSJ at 49.  On defendants' theory, those "antecedent decisions" instead were "about who the

employer even is or will be" and "what lines of business an employer decides to undertake," and

they therefore cannot be the basis for an age discrimination claim.  <u>Id</u>.  A disparate treatment

discrimination claim, they maintain, cannot be based on "the employer's decision not to have any

such jobs to offer," or to engage in some lines of business but no longer in others.  <u>Id</u>. at 49,

50-51, 53.

The Court agrees with the defendants that the RIF is the only adverse employment action about which plaintiffs may complain.  But the process by which the defendants arrived at the RIF decision is relevant to defendants' motives in taking that action, the defendants' argument that it had legitimate, nondiscriminatory reasons for its action, and plaintiffs' claim of pretext.  The Court therefore finds that certain decisions leading up to RIF of the entire FS workforce are relevant for the factfinder to consider.

Second, defendants argued in earlier briefs that plaintiffs must show "but for" causation to satisfy their evidentiary burden and cited Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009), in support of that proposition.  Def. Reply at 18-20.  The Supreme Court established in Gross that, in an ADEA disparate treatment case where there are alleged mixed motives (legitimate and non-legitimate) for the adverse employment action, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action."  557 U.S. at 180.  Its analysis was based on the statutory provision governing private employers, 29 U.S.C. § 623(a)(1).  Id. at 177.  Since Gross, however, the D.C. Circuit in Ford v. Mabus, 629 F.3d 198 (D.C. Cir. 2010), held that a different burden applies when the federal government is the defendant and the claim is brought under 29 U.S.C. § 633a; it based its analysis on the difference in the language of Sections 623 and 633a.  629 F.3d at 205-06.  Under Section 633a, courts must look for "the existence of [any discriminatory] influence" that may "taint[] a personnel action."  Id. at 206.  Therefore, plaintiffs can use either "the McDonnell Douglas evidentiary framework to establish that age was the but-for cause of the

challenged personnel action," or they may establish liability "by showing that age was <u>a factor</u> in the challenged personnel action." <u>Id</u>. at 207 (emphasis added).[7]

### B. Legitimate, Nondiscriminatory Reasons

An employer's burden to demonstrate a legitimate, nondiscriminatory reason at step two of <u>McDonnell Douglas</u> is "one of production, not persuasion." <u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1151 (D.C. Cir. 2004). "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff[.]" <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). "[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — <u>and should not</u> — decide whether the plaintiff actually made out a <u>prima facie</u> case under <u>McDonnell Douglas</u>." <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d at 494.

Here, there is no serious dispute that plaintiffs satisfy the first two prongs of a <u>prima facie</u> ADEA claim: protected class and adverse employment action. Plaintiffs are all over 40 years old and the RIF resulted in the termination of their federal employment. Pl. MSJ at 53. Defendants dispute the third prong, that the record permits an inference of discrimination on the basis of age, because they maintain that they had three legitimate, nondiscriminatory reasons for undertaking the A-76 process for the FS function that resulted in the RIF: (1) the general decline

---

[7]    The D.C. Circuit in <u>Ford v. Mabus</u> also established that for a plaintiff in such a disparate treatment claim to be entitled to merit reinstatement and back pay, the plaintiff must show but-for causation. 629 F.3d at 207. If the plaintiff proves only that age is "a factor" in the decision, then that plaintiff can obtain declaratory and possibly injunctive relief. <u>Id</u>. The D.C. Circuit did not speak to what level of causation is necessary for a plaintiff to obtain compensatory money damages.

in demand for the work done by FS specialists because of a decline in licensed pilots and flights

and an increase in modern technologies that could perform FS work, Def. Reply at 37;

(2) the PMA mandate to outsource commercial work, id. at 39; and (3) decades of pressure on

the FAA to save money.  Id. at 43; see also supra at 3-5 (cataloguing the record support for

defendants' claims).[8]

        As to defendants' first justification, the D.C. Circuit has acknowledged that

implementing a RIF "to respond to decreased workload" may be a legitimate, nondiscriminatory

reason for an employer to take adverse employment actions against certain employees.  See

Aliotta v. Bair, 614 F.3d at 564.  Plaintiffs argue, however, that the decline in demand for FS

specialists was "questionable" at the time of the RIF and is now a "post hoc rationalization" for

the RIF.  See, e.g., Pl. MSJ at 30-31.  Plaintiffs support these assertions by alleging that there is a

lack of record evidence showing that defendants identified the decline in the need for FS

specialists as a basis for the A-76 process and the RIF.  Id.  The Court finds, however, that there

is some support in the record for defendants' position that the FS function was growing

increasingly obsolete due to technological changes in the years before the RIF, and that

defendants considered this record evidence at the time of the A-76 process and the RIF.  See Def.

MSJ, Ex. 3 at VII-16-18; Def. MSJ, Ex. 42 ¶ 6 [Dkt. 256-43]; Def. MSJ, Ex. 53 at 59

---

[8]     Plaintiffs also lodge several critiques concerning how the FAA ran its A-76 process that are beside the point.  See, e.g., Pl. Supp. Br. at 8-9.  First, plaintiffs contend that it was not true that the PMA required a single workforce to be outsourced — it was the practice of all other agencies in 2003 to outsource multiple workgroups — and it is not true that FS was the only workforce large enough to satisfy the PMA minimum requirement.  Id. at 8.  Plaintiffs also suggest that the FAA's choice to outsource FS function was "at odds" with the usual types of jobs the PMA designates as suitable for outsourcing such as payroll, data collection, and other commercial activities that are readily available in the private market.  Id. at 8-9.  The Court does not view plaintiffs' arguments here as rebutting the FAA's legitimate, nondiscriminatory reasons for the RIF.

[Dkt. 256-54]; Def. MSJ, Ex. 61 at 26 [Dkt. 256-62]; Def. MSJ, Ex. 62 at 73-74 [Dkt. 256-63]; Def. MSJ, Ex. 80 at 33-34 [Dkt. 256-81]; Def. MSJ, Ex. 84 at 50 [Dkt. 256-85]; see also supra at 3-5. At trial, the parties will be able to present evidence with respect to the decline in the need for FS specialists, and the factfinder can then determine whether, and to what extent, this was a legitimate reason for the FAA's adverse employment action. It will be up to the factfinder to decide whether decreased workload was a real reason for the adverse personnel decision or whether it was a pretext for age discrimination.

The Court will simultaneously address defendants' asserted second and third legitimate, nondiscriminatory reasons for the A-76 process and the RIF — the PMA's mandate to outsource commercial work and cost savings generally — because both go to the issue of cost reduction. Plaintiffs challenge these assertions that cost savings supported contracting out the FS function to a private entity, arguing that defendants "significantly overstate the amount of money to be saved from contracting out the Flight Service." Pl. MSJ at 67; see also Pl. Supp. Br. at 10. The Court finds that there are genuine issues of material fact concerning cost savings as a possible legitimate, nondiscriminatory reason for the RIF. The original estimate for how much the FAA would save by outsourcing FS was $12 billion over 10 years. Def. MSJ, Ex. 29 at P00582 [Dkt. 256-30]. But after choosing Lockheed as the winning bidder, the FAA then estimated that it would save only $2.1 billion over the ten-year life of the contract. Def. MSJ at 28. And John Hennigan — the deputy CFO — said in his deposition that the FAA did not actually know the costs of running the FS function. Pl. MSJ, Ex. 12A at 56-58 [Dkt. 265-9]. Resolving such conflicting inferences from the evidence in the record is "precisely the type of function we leave to the [factfinder], not to a judge ruling on a summary judgment motion." Morris v. McCarthy, 825 F.3d at 672.

In sum, drawing all reasonable inference in plaintiffs' favor, the Court finds ample evidence in the record to create genuine issues of material fact concerning whether decreased demand for the work of FS specialists and cost savings motivated the FAA's decision to subject the plaintiff FS specialists to a RIF. Furthermore, based primarily on defendants' widespread comments related to age — a matter to which the Court next turns — a reasonable factfinder could find that defendants intentionally discriminated against the plaintiffs on the basis of their age. Defendants therefore are not entitled to summary judgment on plaintiffs' disparate treatment claim.

### C. Widespread Comments Related to Age

Plaintiffs' best evidence demonstrating disparate treatment consists of defendants' widespread comments related to age, specifically the terms "aging workforce" and "retirement eligible workforce." Pl. Supp. Rep. at 8. Defendants admit that FAA managers used these terms, but argue that (1) the speakers were not decision makers in the A-76 process or with respect to the RIF itself, and (2) the speakers' comments related to age were legitimate in the context and under the circumstances in which they were made. Def. Reply at 23-27.

Marion Blakey — the FAA Administrator during the time after Christopher Bertram decided to undertake the A-76 process — made a number of age-based remarks. First, in September 2004 when discussing the reasons to subject the FS function to outsourcing at a FS Managers Conference, Administrator Blakey expressed concern about the FS's "aging workforce." Pl. Supp. Br., Ex. 4 at 98-99 [Dkt. 309-4]. Second, in a meeting with NAATS Union President Kathleen Breen and other union members, Administrator Blakey responded to a question about rehiring the FS specialists by saying "it wouldn't be in the best interest of the taxpayers to give these jobs to them with their current age and that they're ready for retirement."

Pl. MSJ, Ex. 33 at 101 [Dkt. 265-24]; see also Pl. MSJ, Ex. 34 at 130-32 [Dkt. 265-25]; Breen

Dep. at 101. Third, Administrator Blakey allegedly told former FS specialist Homer McCready

that he could not be rehired because he was too old. Pl. Supp. Br., Ex. 6 ¶ 7 [Dkt. 309-6].

Fourth, the prepared text for Administrator Blakey's speech promoting the A-76 process listed

the "retirement eligible workforce" as a basis for it. Pl. MSJ, Ex. 55 at P01166 [Dkt. 265-43].

Finally, Administrator Blakey gave a presentation describing the alleged retirement eligibility of

40% of the workforce as a "dilemma." Id. at P00633. Administrator Blakey justified the use of

the terms "aging workforce" and "retirement eligible" by saying that an older workforce makes it

difficult to recruit and retrain new workers when the older workers started to retire. Pl. Supp.

Br., Ex. 4 at 89-90 [Dkt. 309-4].

   Joann Kansier — the Director of the Office of Competitive Sourcing at FAA —

also referred to the age of FS specialists on several occasions. In her slide presentation to OMB

and the Air Traffic Controllers Association promoting the A-76 process, a slide describing the

reasons for selecting FS for the A-76 competition listed "aging workforce" as a primary reason.

Pl. MSJ, Ex. 20 at P001128, P001155, D007311, D007314, D007682, D007686 [Dkt. 265-12].

It appears that Kansier gave this presentation numerous times. Kansier changed the "aging

workforce" language in later presentations to "retirement eligible." Id. at P00003, D007189,

D007193, P004428. Kansier also called FS specialists "disgruntled" during her deposition as

another reason for the action. Pl. Supp. Br., Ex. 8 at 167 [Dkt. 309-8]. Finally, Jack Nimmo —

a former manager at an Arkansas FS station — said in his deposition that in 2001, FAA

employees developing the feasibility study for the A-76 competition frequently used the

terminology "aging workforce" and that the term came into use before he was drawn into the group. Pl. MSJ, Ex. 54 at 120 [Dkt. 265-42].[9]

Defendants argue that these statements do not raise genuine issues of material fact requiring a trial. First, they maintain that the individuals who made these statements were not the decision makers and that only statements made by decision makers matter in a disparate treatment case. Def. Reply at 23-27. Because CFO Christopher Bertram and his deputy, John Hennigan, made the strategic decision to undertake an A-76 process — not Administrator Blakey, Kansier, or Nimmo — defendants maintain that these statements are of no moment. Def. MSJ at 75-78. It is established, however, that statements evidencing discrimination on the basis of age by persons other than the ultimate decision maker are relevant if the speaker had "had the ability to influence [the ultimate decision maker's] decision." See Hall v. Giant Food, Inc., 175 F.3d 1074, 1079-80 (D.C. Cir. 1999); see also Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 355 (6th Cir. 1998) (asking whether the speaker "was in a position to influence the alleged decision). For example, under "the so-called 'cat's-paw' theory of liability[,] . . . the discriminatory animus of a subordinate who recommends an adverse employment decision is imputed to the selecting officer who relies on the subordinate's recommendation" and "an employer may be held liable for discriminatory acts by a direct

---

[9]     As discussed supra at note 6, plaintiffs contend that these widespread comments related to age constitute direct evidence of discrimination. The Court concludes that they are, at best, indirect evidence of age discrimination. "[D]irect evidence" is, "for example, . . . a statement that itself shows racial bias in the employment decision." Nunnally v. District of Columbia, --- F. Supp. 3d ----, 2017 WL 1080900, at *5 (D.D.C. Mar. 22, 2017) (quoting Nurriddin v. Bolden, 818 F.3d at 758). Defendants' comments related to age do not manifest defendants' discriminatory intent on their face because, unlike a racial or ageist slur, they are subject to multiple interpretations, as the Court will discuss. See infra at 26-28.

supervisor — even where that supervisor is not the final decision maker . . . ."  Brandli v. Micrus Endovascular Corp., 209 F. Supp. 3d 356, 361 (D.D.C. 2016) (internal quotation marks omitted).

Here, plaintiffs do not dispute that Bertram and Hennigan were the ultimate decision makers, nor do they allege a "cat's paw" theory.  Nonetheless, taking the facts alleged in the light most favorable to plaintiffs, a reasonable factfinder could find that the Administrator of the FAA — the person in charge of the entire agency — and the Director of the important Office of Competitive Sourcing had the ability to influence Bertram and Hennigan.  After all, Administrator Blakey and Director Kansier listed "aging workforce" or "retirement eligible workforce" as primary reasons for the A-76 during presentations to other FAA employees, and they were high-level officials speaking for the agency.  See Pl. MSJ, Ex. 20 at P001128, P001155, D007311, D007314, D007682, D007686 [Dkt. 265-12].  Furthermore, as plaintiffs suggest, it is possible that Administrator Blakey and Kansier did not prepare those presentations on their own, but instead had input from the agency's ultimate decision makers, see Pl. Supp. Br. at 6 n.4, a matter that can be considered by the factfinder at trial.  In addition, Nimmo — who defendants admit was a member of the FAA's working group to develop an action plan for considering the FS function for an A-76 process, see Def. Opp. Facts at 7 — stated that the use of the term "aging workforce" was prevalent at the FAA before he arrived in 2001.  Pl. MSJ, Ex. 54 at 120 [Dkt. 265-42].  These were not isolated or stray remarks, and they therefore are appropriate for consideration by the factfinder at trial on the issue of pretext.  See Wilson v. Cox, 753 F.3d 244, 247-48 (D.C. Cir. 2014); see also Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d at 355.

Second, defendants argue that the speakers' statements related to age were legitimate comments in the context in which the speakers made them.  They contend that it was

legitimate for the FAA to be concerned about how to ensure that the next generation of workers

would be "fully and timely trained" for such a highly skilled position. Def. MSJ at 77. For

example, FAA Administrator Blakey made the following statement during her deposition:

> I think the emphasis on retirement eligible means that . . . you are going to have a
> significant change in the population of people who will be leaving federal service
> and . . . you are going to have significant recruitment, significant training. In this
> case [retirement eligible] also indicates . . . that you have got a lot of people who
> will be able to take advantage of federal retirement benefits on a full basis.

Pl. Supp. Br., Ex. 4 at 90 [Dkt. 309-4]. Defendants' position is that these and similar "aging

workforce" or "retirement eligible" comments reflect legitimate, nondiscriminatory business

concerns — primarily the need to transition from an older generation of FS specialists to a

younger generation. Def. MSJ at 76-78; Def. Reply at 26.

     The problem with defendants' argument is plain. The statements of Administrator

Blakey and others emphasizing the need to recruit and train new FS specialists are in direct

conflict with defendants' own asserted justification for the A-76 process and the RIF — namely,

that the FAA was not hiring any new FS specialists as older ones retired because the FS function

was growing increasingly obsolete due to technological changes in the years before the RIF.

Def. MSJ at 15-16. See supra at 3-4. If defendants' business justification for outsourcing the FS

function is true, a reasonable factfinder would understandably view with some skepticism

defendants' stated concern about recruiting and training a new generation of FS specialists.

"Pretext may be shown with evidence that the employer's reason for the termination has changed

substantially over time," Loeb v. Best Buy Co., Inc., 537 F.3d 867, 873 (8th Cir. 2008), and

doubt may be cast on the employer's proffered reasons by, "among other things, pointing to

changes and inconsistencies in the stated reasons for the adverse action." Evans v. Sebelius, 716

F.3d 617, 620 (D.C. Cir. 2013) (internal quotations marks omitted). A reasonable factfinder in

this case could easily conclude that defendants' asserted business justification was not the real reason for the RIF of the FS function. The Court concludes that defendants' widespread comments related to age — in particular, uses of the terms "aging workforce" and "retirement eligible" — create a genuine issue of material fact concerning pretext that only a factfinder can resolve.[10]

Defendants' contradictory explanations for their actions also make it inappropriate for the Court to defer to defendants' business judgment at the summary judgment stage, as defendants request. See Def. MSJ at 55-57. As the D.C. Circuit has said: "[C]ourts should not evaluate the reasonableness of the employer's business decisions, such as whether it made financial sense to terminate an employee who generated substantial revenue; [courts] are not 'a super-personnel department that reexamines an entity's business decisions.'" DeJesus v. WP Co. LLC, 841 F.3d 527, 534 (D.C. Cir. 2016) (quoting Adeyemi v. District of Columbia,

---

[10]     Defendants cite a number of cases where courts have found comments related to age to be nondiscriminatory in the context in which they were made. See, e.g., Apsley v. Boeing Co., 691 F.3d 1184, 1202-03 (10th Cir. 2012) (general manager's belief that "an older workforce was indicative of an unhealthy business" and his concern "about the aging workforce" were not indicative of age discrimination because "an aging workforce indicates that a business is not growing because it suggests the business is not hiring new employees"); Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 548-49 (6th Cir. 2004) (statements made by various members of Lockheed's management about general need to lower the average age of workforce were not discriminatory because the speakers were concerned that the industry was in danger of having a high percentage of its most important, highly skilled workers retire soon; "the concern was that most of the workers with critical skills were eligible or nearly eligible for retirement, and that when those people retired the nuclear industry could potentially suffer dearly"); Mereish v. Walker, 359 F.3d 330, 336-37 (4th Cir. 2004) (comments about protecting "the young, bright, junior scientists" and the "'problem' of the 'average age going higher'" were legitimate because the speaker was concerned that "a significant portion of the agencies' scientists might retire at the same time and thus result in a sudden loss of a "critical mass of expertise and knowledge in certain areas"). In none of those cases, however, did the employer offer contradictory explanations for its actions requiring a factfinder to address the contradiction. Here, the contradiction presents a question central to this case: Did defendants need to recruit and train a new generation of FS specialists, or was there never an intent to replace FS specialists because their function was increasingly obsolete because of technological changes?

525 F.3d 1222, 1227 (D.C. Cir. 2008)).  But here, a reasonable factfinder could find that

defendants' primary proffered legitimate, nondiscriminatory reason for the RIF — the increasing

obsolescence of the FS function — was so inconsistent with the deposition testimony of

management officials about the need to recruit and train a new generation of FS specialists that

the FAA's stated justification could not be viewed as reasonable by a factfinder and might well

"provoke[] suspicion of mendacity."  See id.  "In other words, the [factfinder] might hear

[defendants'] explanation" for the RIF "and think:  '[they don't] really believe that.'"  See id.

    In sum, the contradiction inherent in defendants' explanation for the RIF and

management's widespread comments related to age create a genuine issue of material fact as to

whether defendants' proffered reasons for the RIF were pretext for discrimination on the basis of

age.  Here, there is more than sufficient evidence for a reasonable factfinder to conclude that the

reason proffered was not the real reason and that the FAA intentionally discriminated against the

employees on the basis of age.  See Wilson v. Cox, 753 F.3d at 247-48.  The Court therefore will

deny defendants' motion for summary judgment on plaintiffs' disparate treatment claim.

### D.  Procedural Irregularities

    Plaintiffs also argue that their disparate treatment claim should survive summary

judgment in part because a number of "procedural irregularities" leading up to or during the

A-76 process and the RIF suggest discrimination on the basis of age — specifically, that the

FAA "departed from its own procedures" and those set forth in the Presidential Management

Agenda, the PMA.  Pl. Supp. Br. at 7-14.  These alleged irregularities include:  (1) designating

the FS function as a non-core function that was "[n]either [r]equired by the PMA nor [c]onsistent

with the FAA's [o]wn [p]rocedures," see id. at 7-11; (2) entering into a contract with Grant

Thornton to assess the feasibility of outsourcing the FS function that would pay the contractor

millions, see id. at 11; and (3) ensuring the failure of the Most Efficient Organization, the MEO (which would have allowed FS specialists to stay employed by the federal government) during the bidding process.  See id. at 11-13.

1. FAA's Designation of the FS Function as "Non-Core"

Designating a workforce as "non-core" is an essential prerequisite to outsourcing that workforce under the PMA.  Pl. Supp. Br. at 7.  Plaintiffs state that the designation of the FS function as non-core was "at odds with prior FAA practice, the practice of other agencies, and guidance from the OMB and the PMA."  Id. at 7.  They contend that doing so "ignored the longstanding treatment of this Service as an important governmental function" by Congress and the President, both of which allegedly considered FS specialists alongside Aircraft Separating Controllers as inherently governmental functions.  Id. at 7-8.  Finally, plaintiffs question the timing of the designation because the FS function was only designated as "non-core" after the FAA had decided to subject it to competition.  Id.; see also Pl. MSJ, Ex. 13 at 21-23, 74-75 [Dkt. 265-10].

"[M]inor procedural irregularities in personnel practices . . . do not [themselves] give rise to an inference of discrimination."  Moore v. Pritzker, 204 F. Supp. 3d 82, 94 (D.D.C. 2016) (internal quotation marks and alternations omitted).  Likewise, whether defendants' conduct broke from "longstanding treatment" of FS specialists as an important governmental function will not support a claim of disparate treatment.  But whether the FAA deviated from its own prior practices or those of other agencies may be relevant evidence with respect to the issue of pretext.  As the D.C. Circuit has said:  "Employees may cast doubt on the employer's proffered reason by, among other things, pointing to 'changes and inconsistencies in the stated reasons for the adverse action; [or] the employer's failure to follow established procedures or

criteria . . . .'"  Evans v. Sebelius, 716 F.3d at 620 (quoting Brady v. Office of Sergeant at Arms,

520 F.3d at 495 n.3).  After all, the central question at the heart of the Court's inquiry under

McDonnell Douglas is:  Was defendants' adverse employment action motivated by legitimate,

nondiscriminatory business reasons or by discrimination on the basis of age?  And might

plaintiffs' evidence of procedural irregularities in the core versus non-core designation tip the

balance on the issue of pretext?[11]  The Court finds that there is sufficient evidence in the record

to permit a reasonable factfinder to consider these issues.

## 2.  The Grant Thornton Contract

Next, plaintiffs argue that Grant Thornton — the accounting firm with which the

FAA contracted in 2002 to study whether it was feasible to outsource the FS function — was not

independent because it had conflicts of interest.  Pl. Supp. Br. at 11.  Plaintiffs contend that the

contract provided Grant Thornton business worth $1.5 million for 5 years, but only if the

contractor found that outsourcing the FS function was feasible.  Id.  The Court finds that the

plain language of Grant Thornton's contract with the FAA contains no such provision.  See Pl.

MSJ, Ex. 60 [Dkt. 265-47].  The contract mentions neither FS specialists nor any other FAA

---

[11]     Defendants argue that 49 U.S.C. § 46110(a) vests the D.C. Circuit with exclusive
jurisdiction to adjudicate plaintiffs' challenge to the FAA's core versus non-core designation.
Def. Supp. Rep. at 7.  Judge Roberts rejected a similar argument that defendants made in their
motion to dismiss, holding that "[n]either the FAA nor the [Office of Dispute Resolution for
Acquisition] has authority to hear a complaint of age discrimination," and so any appeal to those
bodies "could not have encompassed plaintiffs' age discrimination claims."  Breen v. Peters, 474
F. Supp. 2d at 6.  As such, "plaintiffs' ADEA claim [wa]s not inescapably intertwined with the
July 2005 Order, and district court jurisdiction [wa]s not precluded."  Id.  Defendants now
attempt to resurrect this jurisdictional argument.  Def. Supp. Rep. at 7-8 (citing Ligon v.
LaHood, 614 F.3d 150 (5th Cir. 2010); Jones v. United States, 625 F.3d 827 (5th Cir. 2010);
Griggs v. LaHood, 770 F. Supp. 2d 548 (E.D.N.Y. 2011)).  The Court understands plaintiffs'
argument to be that the FAA's "procedural irregularities" — and not the FAA's order itself —
are evidence of discrimination on the basis of age.  There is no basis to revisit Judge Roberts'
earlier reasons for rejecting defendants' jurisdictional challenge.

workforce, and instead Grant Thornton was to provide general assistance to the FAA to help it achieve the mandate of the PMA.  See Pl. MSJ, Ex. 60 [Dkt. 265-47].  There is no evidence in the record to permit a reasonable factfinder to consider this supposed procedural irregularity.

### 3.  Handicapping the MEO

Plaintiffs next claim that defendants handicapped the MEO — an alternative proposal to outsourcing that would have allowed the FS workforce to remain employed by the FAA — in a variety of ways that ensured its failure vis-à-vis the proposal from Lockheed:

(1) the FAA assigned a human resources consultant to help the MEO team create a transition package, but the team actually "had very little assistance," see, e.g., Pl. Opp. Facts at 26; Pl. MSJ at 59; Pl. MSJ, Ex. 35 at 49-50 [Dkt. 263-37], and the human resources consultant allegedly worked with the FAA's Office of Competitive Sourcing at the same time — a conflict of interest that plaintiffs allege the A-76 Circular expressly prohibits, see Pl. Supp. Br. at 12;

(2) the FAA deemed the NAATS union a risk in the MEO's evaluation because, during the period the MEO was being developed, the FAA delayed bargaining with NAATS on RIF procedures and refused to agree on rehiring procedures, see Pl. Opp. Facts at 27; Pl. MSJ at 59;

(3) the FAA prohibited NAATS members of the MEO from speaking at the oral presentations for the bids, see Pl. MSJ at 60-61; Pl. MSJ, Ex. 35 at 43-48 [Dkt. 263-37];

(4) the FAA also refused to allow the MEO to waive the required age of 56 for retirement, even though it had authority to do so and waived it for the private bidders, see Pl. Supp. Br. at 12; Pl. Supp. Br., Ex. 10 [Dkt. 309-10];

(5) the FAA allowed Lockheed to use parts of the MEO's proposal once Lockheed's proposal failed in practice, see Pl. MSJ at 60; Pl. MSJ, Ex. 35 at 89-90 [Dkt. 263-37]; Pl. MSJ, Ex. 36 at 137, 139 [Dkt. 263-38]; and

(6) FS division manager Jackson-Brame told plaintiff Angela Bowman in December 2004 that the MEO was "not going to win the bid" and that the Office of Competitive Sourcing was "instructed to make the outsourcing happen"; it was "going to happen no matter what."  See Pl. Supp. Rep., Ex. 3 ¶ 7 [Dkt. 309-3].

Plaintiffs argue that this evidence "strongly implies an intention on the part of FAA management not to permit the older workforce to remain employed by the Agency," Pl. MSJ at 61, and shows that the FAA was predisposed to outsourcing the FS function. Pl. Supp. Br. at 13. In sum, they say, "[w]hile it is impossible to be certain that the MEO would have won the competition had the procedures been fair, it is possible to state that, given the handicaps placed on the MEO, there was no possibility that it would win the competition as it was run." Pl. Reply at 9 n.7.

Defendants respond that issue preclusion bars all arguments about the MEO. Def. Reply at 28-30. Recall that Judge Neill presided over some of the administrative challenges to the FAA's decision to outsource the FS function to Lockheed. See generally Neill Opinion [Dkt. 256-19]. The doctrine of issue preclusion or collateral estoppel commands that "'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" United States v. All Assets Held at Bank Julius, --- F. Supp. 3d ----, 2017 WL 90658, at *7 (D.D.C. Jan. 10, 2017) (quoting Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992)). "Issue preclusion applies if three conditions are met: 'First, the issue must have been actually litigated, that is, contested by the parties and submitted for determination by the court. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in the first . . . [case]. Third, preclusion in the second . . . [case] must not work an unfairness.'" Id. (quoting Otherson v. Dep't of Justice, 711 F.2d 267, 273 (D.C. Cir. 1983)).[12]

---

[12] It is immaterial to the Court's issue preclusion analysis that not all of the individual plaintiffs in this case participated in the administrative challenges before Judge Neill because the named plaintiff in this case, Kathleen Breen, litigated the administrative challenge

The Court concludes that the only issue on plaintiffs' list of six ways the FAA handicapped the MEO that the parties actually litigated before Judge Neill was the FAA's decision to downgrade the MEO due to risks related to the NAATS union. In that respect, Judge Neill affirmed the agency's determination that the MEO's unique relationship to the NAATS union was a "weakness" in the MEO's proposal, stating that "mere disagreement with the agency analysis does not render the evaluation unreasonable." See Neill Opinion at 77. Issue preclusion bars plaintiffs from litigating that matter here. Issue preclusion does not bar plaintiffs from raising any of the other five ways that plaintiffs now allege the FAA handicapped the MEO's bid, however, because Judge Neill did not address those arguments.

On the basis of this record evidence, viewed in a light most favorable to the plaintiffs, the Court finds that there are genuine issues of material fact with respect to the issue of handicapping the MEO.[13]

---

"as agent for a majority of directly affected federal aviation administration employees." Neill Opinion at 1.

[13] Plaintiffs also argue that certain events that occurred after the RIF demonstrate that the FAA systematically attempted to remove older workers and is further evidence of pretext. See, e.g., Pl. MSJ at 61-66; Pl. Reply at 6 n.5; Pl. Supp. Br. at 14. Plaintiffs maintain that defendants put obstacles in the path of older workers who attempted to stay with the FAA through the "bump and retreat" process, which gives FAA employees priority for reassignment to another position within the agency. Pl. MSJ at 61-62. Plaintiffs state that "the FAA has instead given preference to new hires 'off the street,'" and present statistical evidence that most of the FS specialists rehired by the FAA were under age 40. Pl. MSJ at 62-63; see also Pl. MSJ, Ex. 2 at 7 [Dkt. 263-3]. Defendants respond that FAA Order 3350.2c (Oct. 17, 1994), available at https://www.faa.gov/documentLibrary/media/ Order/3350.2C.pdf (last visited May 4, 2017), governs plaintiffs' "bump-and-retreat" rights, not the regulations on which plaintiffs rely, 5 C.F.R. §§ 351.701-.705. Def. Supp. Rep. at 15 n.15.

The Court need not resolve this issue because this post-RIF conduct cannot create a genuine issue of material fact on the issue of pretext. The Court has serious doubts about the relevance of the post-RIF hiring plaintiffs have identified because, in order for a federal agency's post-RIF hiring decisions to substantiate an ADEA claim that the agency used the RIF as pretext, the rehiring must be for "similarly situated" positions. See Aliotta v. Bair, 614 F.3d at 570 (internal quotation marks omitted). Here, the FAA rehired former FS specialists for positions in

IV. DISPARATE IMPACT

Disparate impact claims involve employment practices that are "facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Aliotta v. Blair, 614 F. 3d at 561 (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993)).[14] It does not require proof of discriminatory intent or animus. Id. at 561, 565. To establish a prima facie case of disparate impact, a plaintiff must show "that a facially neutral employment policy or practice has a significant disparate impact on a protected class of which he is a member." Jianqing Wu v. Special Counsel, Inc., 54 F. Supp. 3d at 54. Proof of the disparate impact on a protected class may be shown through statistical evidence "of a kind and degree sufficient to show the employment decision disproportionately impacts older employees." Aliotta v. Bair, 614 F.3d at 565.

"[T]he employee is 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.'" Smith v. City of Jackson, 544 U.S. 228, 241 (2005) (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656 (1989)) (emphasis in original). "[A] plaintiff 'cannot attack an overall

---

human resources, air traffic security, flight data communications, and a variety of other fields not "similarly situated" to the FS function. Def. MSJ at 43 n.39 (citing deposition testimony). The Court therefore concludes that defendants' post-RIF conduct does not create a genuine issue of material fact on the issue of pretext.

[14] Defendants suggest in their supplemental briefs that "it is doubtful" that an ADEA disparate impact claim is cognizable against federal government employers. Def. Supp. Br. at 2. As the D.C. Circuit explained in Aliotta v. Bair, "[a]lthough neither this court nor the Supreme Court has addressed the question whether the ADEA authorizes disparate impact claims against federal employers, we need not resolve the issue in this case . . . ." 614 F.3d at 570. Judges of this Court have reached contrary conclusions on this issue. See Anderson v. Duncan, 20 F. Supp. 3d 42, 58 (D.D.C. 2013) (collecting cases). But even if the Court were inclined to decide this issue for itself, the law of the case precludes ruling in defendants' favor. In his 2007 opinion denying defendants' motion to dismiss, Judge Roberts found that the ADEA does authorize disparate impact claims against the federal government. Breen v. Peters, 474 F. Supp. 2d at 6-7. This Court has no reason to disturb this ruling.

decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact.'" Davis v. District of Columbia, --- F. Supp. 3d ----, 2017 WL 1208388, at *19 (D.D.C. Mar. 31, 2017) (quoting Stout v. Potter, 276 F.3d 1118, 1124 (9th Cir. 2002)); see also City of Joliet, Illinois v. New West, L.P., 825 F.3d 827, 830 (7th Cir. 2016) ("Disparate-impact analysis looks at the effects of policies, not one-off decisions, which are analyzed for disparate treatment."). Thus, in the housing context, for example, the Supreme Court has explained that "a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all." Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507, 2523 (2015) ("Texas Housing").[15] A plaintiff's "oblig[ation] . . . to isolate and identify the specific employment practices that are allegedly responsible for any observed statistical disparities . . . has bite." Meacham v. Knolls Atomic Power Lab., 554 U.S. 84, 100 (2008).

Here, plaintiffs identify the employment policy or practice as "the overall A-76 process" leading to the RIF, as well as "the subsidiary practices of selection of core and non-core

---

[15]     At least one court has applied the "one-time decision" language from Texas Housing to disparate impact claims under the ADEA. In Sneed v. Strayer Univ., No. 15-cv-0004, 2016 WL 1023311 (E.D. Va. Mar. 8, 2016), the court granted summary judgment to the defendant on the plaintiffs' disparate impact claim under the ADEA because the plaintiff "allege[d] a policy of discrimination based on a single action to close down an entire branch" and "present[ed] no evidence that this practice is common or that Defendants ha[d] committed such action before." Id. at *10. This analysis mirrors how district courts have read the "one-time decision" language in housing cases. For example, in Barrow v. Barrow, No. 16-cv-11493, 2016 WL 6996996 (D. Mass. Nov. 29, 2016), the court held that allegations "that defendants, in various ways, acted to deprive plaintiff of the full value of her inheritance" were not an "allegation of an unlawful practice or policy. A single decision relevant to a single piece of property, without more, is not evidence of a policy contributing to a disparate impact." Id. at *5.

functions and the selection of [FS] from among the available non-core group functions."  Pl. MSJ at 18; see also Pl. Supp. Br. at 15-16.  The Court finds that "the overall A-76 process" leading to the RIF is not a specific employment policy or practice under Texas Housing because the RIF is a "one-time decision" that defendants did not repeat over and over with respect to different employees.  Defendants conducted the RIF all at once on October 3, 2005, see Def. Facts ¶¶ 111, 114, and did not repeat the RIF with respect to any employees other than FS specialists.  While it is possible that a different RIF may constitute a specific employment policy or practice sufficient to support a disparate impact claim, plaintiffs here fail to show that this RIF was anything more than a "one-time decision" that is not "a policy at all."  See Texas Housing, 135 S. Ct. at 2523; accord Davis v. District of Columbia, 2017 WL 1208388, at *19 ("[n]umerous courts . . .  have decided that simply pointing to a RIF generally is not sufficient" to support a disparate impact claim).

   The Court also finds that the "subsidiary practices" plaintiffs identify are not specific employment policies or practices under Texas Housing.  While defendants likely have designated functions other than FS as core or non-core, plaintiffs did not include any evidence of other such designations in the record.  There therefore is no record basis for the Court to conclude that the 2002 decision to designate the FS function as "non-core" while designating other aircraft separating controllers as "core" was part of a policy or practice.  Pl. Supp. Br. at 15-16.  The one-time nature of defendants' conduct is even more apparent with respect to plaintiffs' other alleged "subsidiary practice," the selection of FS for the A-76 process from among the available non-core group functions.  This decision is not even capable of repetition because, by design, defendants undertook the A-76 process to RIF a single workforce.  The Court therefore finds that plaintiffs cannot establish a prima facie case of disparate impact on

older workers based on "the overall A-76 process" leading to the RIF or either of the "subsidiary practices" plaintiffs identify.

The Court concludes that the Amended Complaint does not identify a facially neutral policy or practice that led to or caused a disparate impact on a protected class. Plaintiffs thus have failed to establish a _prima_ _facie_ case of disparate impact based on any of defendants' specific employment practices. The Court therefore will grant summary judgment to defendants on plaintiffs' disparate impact claim.

## V. CONCLUSION

For the reasons set forth in this Opinion, the Court will grant defendants' motion with respect to plaintiffs' disparate impact claim and deny defendants' motion with respect to plaintiffs' disparate treatment claim. An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: May 26, 2017